# **Exhibit C**

```
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   FTX TRADING LTD., et al.,   .  Case No. 22-11068 (JTD)
                                 .
 5                               .
                                 .  Courtroom No. 5
 6                               .  824 Market Street
                    Debtors.     .  Wilmington, Delaware 19801
 7                               .
                                 .  Monday, February 6, 2023
 8   . . . . . . . . . . . . . . .  9:30 a.m.

 9                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:           Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
13                             919 Market Street, Suite 1800
                               Wilmington, Delaware 19801
14
                               James L. Bromley, Esquire
15                             Christopher Dunne, Esquire
                               SULLIVAN & CROMWELL LLP
16                             125 Broad Street
                               New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Jermaine Cooper

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
1   APPEARANCES (CONTINUED):

2   For the U.S. Trustee:      Juliet Sarkessian, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
3                              844 King Street, Suite 2207
                               Lockbox 35
4                              Wilmington, Delaware 19801

5   For the Committee:         Kenneth Pasquale, Esquire
                               PAUL HASTINGS LLP
6                              MetLife Building
                               200 Park Avenue
7                              New York, New York 10166

8   For JPLS Bahamas:          Christopher Shore, Esquire
                               WHITE & CASE LLP
9                              1221 6th Avenue
                               New York, New York 10020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2   MOTION:                                                 PAGE

3   Agenda

4   Item 1: Motion of the United States Trustee for          28
            Entry of an Order Directing the Appointment
5           Of an [D.I. 176; Filed 12/1/22]

6           Court's Ruling:                                  135

7

8   WITNESSES CALLED
    BY THE DEBTOR:                                          PAGE

9
        KEVIN COFSKY
10      Direct examination by Mr. Bromley                    32
        Cross-examination by Ms. Sarkessian                 67
11

12  EXHIBITS:                                               PAGE

13  Joint Exhibits 2, 3, and 8                               28

14  Joint Exhibits 1, 4 through 7, and 9 through 23          30

15  Debtor's Exhibit 1                                       31

16

17

18

19

20

21

22

23

24

25

```
 1        (Proceedings commence at 9:33 a.m.)

 2      (Call to order of the Court)

 3           THE COURT:  Now you can hear me.  Okay.

 4           One small change on the pretrial order is you

 5   identified me as the Chief Bankruptcy Judge at one point, and

 6   I had to correct that, so ...

 7           MR. LANDIS:  Your Honor, no battlefield promotion.

 8      (Laughter)

 9           THE COURT:  I don't want it, either.

10      (Laughter)

11           MR. LANDIS:  I'm sure your time will come.

12           So, with that, Your Honor, I would cede the podium

13   to Ms. Sarkessian, the movant, and we'll proceed following

14   her lead.

15           THE COURT:  Okay.  And just a reminder for those on

16   Zoom, this is a formal court proceeding.  You are

17   participating in a formal manner, so you need to keep your

18   video off unless I call on you to speak, and your audio

19   should remain off at all times.  Disruptions will not be

20   tolerated and you will be removed if you interrupt the

21   proceedings.

22           So, with that, Ms. Sarkessian, go ahead.

23           MS. SARKESSIAN:  Thank you, Your Honor.  Good

24   morning.  For the record, Juliet Sarkessian on behalf of the

25   U.S. Trustee.
```

1          THE COURT:  Are there microphones on there, too?

2   Okay.  You might need to pull it a little closer to you.

3          MS. SARKESSIAN:  Okay.  Hopefully, this is working.

4          THE COURT:  I can hear you now, yeah.

5          MS. SARKESSIAN:  So, Your Honor, the -- counsel for

6   the parties-in-interest had discussed and we wanted to

7   present to you a proposal that we would each start with not

8   more than a ten-minute opening, if it pleases the Court,

9   followed by evidence and then closing statements.  Is that

10  acceptable to Your Honor?

11         THE COURT:  Yes, absolutely.  Yeah.

12         MS. SARKESSIAN:  Thank you, Your Honor.

13         Also, Your Honor, in the joint pretrial order, the

14  U.S. Trustee included two motion in limine.  Would Your Honor

15  -- when would Your Honor like to hear those?

16         THE COURT:  Well, before we start the evidence.  So

17  let's do the openings and then we'll do the motions in limine

18  and then we'll go from there.

19         MS. SARKESSIAN:  Thank you, Your Honor.

20         The U.S. Trustee has moved to appoint an examiner

21  in these cases under both 1104(c)(1) and 1104(c)(2).  As the

22  U.S. Trustee has argued in its motion and reply, Section

23  1104(c)(2) of the Bankruptcy Code mandates the appointment of

24  an examiner in a debtor's case if:

25         There is no trustee appointed;

1          No Chapter 11 plan has been confirmed;

2          A party-in-interest or the U.S. Trustee has

3   requested the appointment of an examiner;

4          And the debtor has fixed, liquidated, unsecured

5   debts other than for debt -- debts for which services or

6   taxes or owing to an insider that exceed $5 million.

7          All of these elements have been made in this case.

8   I think everybody can agree there's no trustee and there's no

9   Chapter 11 plan and the U.S. Trustee has requested an

10  examiner.

11         The -- all of the objectors -- the debtors, the

12  committee, and the joint provisional liquidators -- have all

13  stipulated that the five-million-dollar threshold has been

14  met under 1104(c)(2) for three debtors:  West Realm Shires

15  Inc., FTX Trading Ltd., and Alameda Research, LLC.

16         As to the other debtors, the objecting debtors do

17  not stipulate that the five-million-dollar threshold has been

18  met because they are not currently in a position to make that

19  determination; however, the objecting parties stipulate they

20  are not contesting the examiner motion on the basis that the

21  five-million-dollar threshold has not been met for those

22  other debtors.

23         So, based on the stipulated facts alone, the U.S.

24  Trustee believes that the Code does mandate the appointment

25  of an examiner in these cases under 1104(c)(2).

1          The objectors argue that, in addition to the

2     elements that I've just set forth, the Code has an additional

3     requirement, which is that the Court find the appointment of

4     an examiner is appropriate in these cases.  While the U.S.

5     Trustee believes that the evidence will establish that an

6     examiner is appropriate in these cases, the U.S. Trustee does

7     not believe that the Code requires a finding of

8     appropriateness for either (c)(2) or (c)(1) for the reasons

9     set forth in the U.S. Trustee's reply brief, which I will

10    touch on.

11         The objectors' reading of the statutes would mean

12    that the only time that (c)(2) would be applicable is if the

13    five-million-dollar threshold was met and it was not in the

14    best interests of the creditors to have an examiner because,

15    if it was, then it would go under (c)(1).  But the -- so

16    that, even though it was not in the best interests of the

17    creditors, it was nevertheless appropriate to appoint an

18    examiner.

19         So that -- if appropriateness is a requirement,

20    that would be the only time that (c)(2) would apply.  It's

21    not in the best -- the threshold has been met.  It's not in

22    the best interests of the creditors, but it's somehow still

23    appropriate.  That is -- it's rather difficult to imagine

24    what that situation would be.

25         In addition, the wording of 1104(c) is that:

1          "-- the court shall order the appointment of an
2          examiner to conduct such an investigation of the
3          debtors as is appropriate" --
4          I will note that it does not say if it is
5     appropriate, which is different, and that's how the objectors
6     are interpreting it.  The U.S. Trustee, along with the
7     majority of the published opinions have -- that have
8     addressed that issue do not interpret "as is appropriate" to
9     mean if it is appropriate, but rather "as is appropriate" to
10    modify the term directly before it, which is "an
11    investigation."  So, in other words, "as is appropriate"
12    relates to the scope of the investigation, an appropriate
13    scope of the investigation, not whether an examiner shall be
14    appointed if the requirements of 1104(c)(1) or (c)(2) are
15    met.
16          And I think it's also important to note that
17    1104(c)(2) does not provide for the examiner -- for an
18    examiner in every case in which a debtor has debts that
19    exceed 5 million; it's much more narrow than that.  To be
20    counted to the 5 million, it has to be unsecured, fixed,
21    liquidated, and for debts other than goods, services, or
22    taxes, and not be owing to an insider.  Not being for goods
23    or services is a pretty significant factor.  So it's much
24    more stringent than just having over $5 million in debt.
25          That's my way, Your Honor, of saying that

1    1104(c)(2) does not mandate that an examiner be appointed in

2    every case in which the debtor has more than $5 million in

3    debt and anybody requests it.  That would be virtually every

4    case that's before this Court, I would imagine.  But it's

5    much more narrow than that.  And here, again, they've

6    stipulated there's no question that that five-million-dollar

7    threshold, with all of the qualifying terms, have been met,

8    at least for the three, and they're not contesting for the

9    others.

10           So, Your Honor, I would ask, if the Court is now

11   prepared to make a ruling on whether 1104(c)(2) mandates the

12   appointment of an examiner in these cases because, if the

13   Court so rules, then there would be no need for an

14   evidentiary hearing.

15           THE COURT:  Well, I'm not going to make that ruling

16   now, but I will give you the opportunity to argue that in

17   closing.

18           MS. SARKESSIAN:  Thank you, Your Honor.

19           Your Honor, the U.S. Trustee also believes that the

20   requirements for 1104(c)(1) have been met because the

21   appointment of an examiner is in the best interests of

22   creditors and other parties-in-interest, as has been

23   demonstrated by the testimony of Mr. Ray, Mr. Mosley by way

24   of declarations which we will be admitting, as well as Mr.

25   Ray's testimony before the House Financial Services

1   Committee.

2         And the U.S. Trustee will reserve the remainder of

3   the argument for closing, unless Your Honor has any questions

4   at this time.

5         THE COURT:  Okay.  No, I'll save my questions for

6   closing.  Thank you.

7         MS. SARKESSIAN:  Thank you, Your Honor.

8         MR. BROMLEY:  Good morning, Your Honor.  Jim

9   Bromley of Sullivan & Cromwell on behalf of the FTX debtors,

10  and may it please the Court.

11        Your Honor, the question that the United States

12  Trustee has posited, whether or not we are in a world of

13  mandatory rulings here, is one that, unfortunately, the U.S.

14  Trustee mischaracterizes, in terms of both the statute and

15  the statutory language and the precedent that exists.

16        If you focus first on the statute, Your Honor,

17  before you get to (c)(1) or (c)(2), the word "appropriate,"

18  it's in the statute; "as is appropriate" is the phrase.  And

19  that phrase, "as is appropriate," has not been determined by

20  the Revco decision in the Sixth Circuit, the only circuit

21  decision that the U.S. Trustee hangs so many hats on.

22        In fact, if you go to the Revco decision, it's

23  about 3 pages long.  The 20 minutes that the Sixth Circuit

24  spent on writing the Revco decision should not be controlling

25  the decision as to whether or not this Court or any other

1  court should be appointing an examiner as a mandatory manner

2  so long as the five-million-dollar threshold is met.

3          Notwithstanding the U.S. Trustee's most recent

4  comments, the five-million-dollar is but a peppercorn when

5  you're dealing with super-mega cases like we have here.

6          God bless you.

7          So, when we're talking about cases of this size and

8  scope and magnitude, it's virtually certain that a five-

9  million-dollar threshold is going to be met; and, therefore,

10  under the rule that is proposed by the U.S. Trustee, it's

11  virtually certain that an examiner is going to be appointed

12  in every case.

13          And remember, Your Honor, we may be sitting here

14  today with the U.S. Trustee, but the statute is written in

15  terms of any party-in-interest or the U.S. Trustee.  The vast

16  majority of examiners are requested by parties-in-interest

17  who have a particular point to advocate, a particular ax to

18  grind.  If we simply adopted the United States Trustee's

19  point that, if you meet the five-million-dollar threshold,

20  that an appointment of an examiner is mandatory, then we're

21  going to have an examiner in virtually every case.

22          And indeed, the precedent here in the District of

23  Delaware is very instructive and virtually ignored by the

24  U.S. Trustee.  Court after court in matter after matter,

25  including Your Honor, have ruled that 1104 does not require

1   the appointment of an examiner if the five-million-dollar has

2   been met; Judge Sontchi, Judge Walrath, Judge Gross, Judge

3   Carey, yourself, Judge Silverstein.  This is not

4   happenstance; this is a rule in the District.

5           The U.S. Trustee makes a great deal of hay about

6   the fact that there's not a written decision, a published

7   decision.  That, with all due respect, ignores the practice

8   that we all engage in, which is that we have here, in case

9   after case, situations where we ask bankruptcy judges to make

10  rulings, and many of those rulings come from the bench.  And

11  we consistently look at those rulings as binding precedent.

12  And it's not as if one decision came out or one comment came

13  out.  But we have a consistency here over a fifteen-year

14  period and longer, even back to Judge Walsh.  That is what

15  the law is here in the District of Delaware.

16          And we shouldn't lose sight of what's happening

17  here today.  This isn't about FTX.  This is about the United

18  States Trustee's Office out of Washington looking to make a

19  matter of national policy and using --

20          MS. SARKESSIAN:  Your Honor --

21          MR. BROMLEY:  -- this case --

22          MS. SARKESSIAN:  -- I'm sorry.  I'm going to object

23  to that.

24          THE COURT:  It's opening.  He can -- we'll see if

25  he can sustain it with evidence, but I'll -- he can make

1   whatever comments he likes in opening.

2         MR. BROMLEY:  So, Your Honor, what we are looking

3   at here is not about FTX.  As a matter of fact, since we've

4   been in your -- in front of Your Honor since November 11th, I

5   would say 80 or 90 percent of the time we have spent in court

6   has been dealing with issues that have been raised by the

7   United States Trustee, whether it has to do with the creditor

8   matrix, whether it has to do with 2004 requests that we

9   filed.  We had an objection filed over the weekend to a 2004

10  request to take discovery from Sam Bankman-Fried.  What the

11  U.S. Trustee is doing here in this case is seeking, not

12  simply to be a watchdog, but to be a participant in a manner

13  that effectively replacements the Official Committee of

14  Unsecured Creditors, that they themselves have appointed.

15        There is nothing in the statute that talks about a

16  true neutral.  There's nothing in the statute that talks

17  about there needing to be an independent party that is

18  standing outside of the four corners of the debtors when the

19  facts will show that the four corners of these debtors is

20  controlled by an independent chief executive officer, an

21  independent board of directors, both of whom were appointed

22  after the petition date -- or on the petition date and after.

23        The facts are going to show, Your Honor, that it is

24  not appropriate in this case, it is not appropriate in this

25  case to appoint an examiner, it's not appropriate in this

1   case to conduct any investigation at this moment in time.

2           Mr. Ray will testify that there are enormous

3   efforts that have been made since the beginning of the case

4   to investigate the facts and circumstances that gave rise to

5   these filings.  Mr. Ray is going to testify that the

6   cybersecurity environment that characterizes these debtors is

7   unique; that to allow anyone else into that cybersecurity

8   environment will jeopardize the security of everything that

9   has gone forward and everything that will go forward.

10          With all due respect, the U.S. Trustee's Office

11  views this as if we have a warehouse full of sacks of

12  potatoes.  We do not.  We have a virtual environment that is

13  filled with code.  And even looking at that code puts at risk

14  everything about the cybersecurity environment.  The

15  investigation is not simply a legal investigation, it's not

16  simply an accounting investigation.  It is a technology

17  investigation.

18          The facts and circumstances here make it very

19  clear, Your Honor, that, if there is a case where an examiner

20  is not appropriate, it's this case.  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Anyone else wish to make an opening?

23          MR. PASQUALE:  Good morning, Your Honor.  Ken

24  Pasquale from Paul Hastings for the Official Committee of

25  Unsecured Creditors.

1           Let me just start by saying -- and I'll save some

2    time -- I agree with Mr. Bromley's comments with respect to

3    the discretionary nature of the statute.  I'll perhaps talk

4    some more about that in closing.  But I only wanted to make a

5    couple of very brief points in opening.

6           We all recognize that this is a unique case, and

7    it's unique in two particular ways, I believe, with respect

8    to the U.S. Trustee's motion for an examiner:

9           First, as Mr. Bromley just alluded to and we will

10   hear testimony regarding, the debtors are controlled by

11   entirely new management and boards of directors that were

12   installed literally on the eve of the bankruptcy cases.  None

13   of the alleged bad actors remain with the company.  The new

14   management group's task is, not only to investigate what

15   happened pre-petition, as would an examiner, but also, unlike

16   an examiner, to act upon that investigation and, with the

17   committee, evaluate and prosecute claims to maximize

18   recoveries for all of the stakeholders of these estates.

19          Secondly, unlike many other cases involving fraud

20   in which an examiner was found to be appropriate, here,

21   there's only one class of creditors:  The unsecured

22   creditors.  These debtors do not have any secured debt.  It's

23   the committee's statutory and fiduciary obligation to

24   investigate what occurred pre-petition for the benefit of

25   those unsecured creditors, customers and other creditors

1   alike.

2          And given the capital structure here, the committee

3   has no incentive or reason to use an investigation for a

4   strategic advantage in plan negotiations or otherwise, as the

5   U.S. Trustee asserts in her motion -- in its motion.  Excuse

6   me.  The committee is perfectly positioned to investigate in

7   these cases with the debtors and, as necessary, individually.

8          Accordingly, Your Honor, and as you'll hear in

9   closings and after the proof, we do not believe it is

10  appropriate in the circumstances of this case to appoint an

11  examiner.  And unless the Court has questions now, I'll

12  reserve further comments for closing.

13          THE COURT:  Okay.  Thank you.  No questions.

14          MR. PASQUALE:  Thank you, Your Honor.

15          MR. SHORE:  Good morning, Your Honor.  Chris Shore

16  from White & Case on behalf of the joint provisional

17  liquidators in the Bahamian proceedings of FTX Digital

18  Markets.

19          We don't intend to put on any evidence today and

20  will reserve argument for closing.

21          THE COURT:  Okay.  Thank you.

22          Anyone else?

23      (No verbal response)

24          THE COURT:  All right.  Ms. Sarkessian.

25          MS. SARKESSIAN:  Thank you, Your Honor.  May I

1    address the motions in limine at this time?

2             THE COURT:  Yes.

3             MS. SARKESSIAN:  Your Honor, the U.S. Trustee has

4    two motions in limine:

5             The first one relates to the scope of the testimony

6    of Mr. Ray.  Based on information that the debtors' counsel

7    has provided to the U.S. Trustee concerning the scope, it

8    appears that he will be testifying as a fact witness about

9    his opinion on the usefulness of examiners in bankruptcy

10   cases in general or perhaps just in the bankruptcy cases in

11   which he's been involved.  Now such testimony should not be

12   admissible for the following reasons:

13            First of all, this is really in the nature of

14   expert testimony.  And Mr. Ray is not qual -- he has not been

15   put forward as an expert witness and I do not believe he is

16   qualified as an expert witness on whether examiners are

17   helpful in bankruptcy cases.

18            In addition, such testimony is also not relevant

19   under Federal Rule of Evidence 401 as to whether an examiner

20   should be appointed in these cases.  Under 1104, the standard

21   for appointment of an examiner is not whether it's been

22   helpful in other cases.  It is a legal issue as to whether

23   the requirements of 1104(c) have been met.

24            The utility of examiners in general is a policy

25   issue for Congress; it is not for the trier-of-fact or the

1    trier-of-law.  It is not relevant to consider usefulness of

2    examiners in other bankruptcies because it does not inform

3    the Court regarding the factors to be considered here.

4         So -- and balancing under 403 the probative value

5    of any of Mr. Ray's testimony on this issue is outweighed by

6    the danger of confusing the issues, undue delay, and wasting

7    time.  He does not have an examiner report in this case.  He

8    is giving us subjective opinion of examiner reports in other

9    cases.  That's my understanding of what his testimony is to

10   be.  And it is not relevant to whether an examiner should be

11   appointed here.

12        And then our other motion in limine relates to

13   exhibits, it's a related motion, essentially, because I

14   understand Mr. Ray is going to be testifying about the

15   exhibits to which we object.

16        So, Your Honor, should I allow other parties to

17   address this first motion in limine?

18        THE COURT:  Let's do the first one and then we'll

19   go to the second one.  Thank you.

20        MR. BROMLEY:  Your Honor, Jim Bromley from Sullivan

21   & Cromwell.

22        I don't know that I would characterize Ms.

23   Sarkessian's comments as a motion in limine.  It's more of an

24   objection to particular testimony that's not yet occurred.

25        I can assure the Court we are not going to offer

1  Mr. Ray as an expert, so I agree that we have not submitted

2  an expert report or we're seeking to elicit some sort of

3  expert opinion from Mr. Ray.  I should -- I can assure the

4  Court we're not going to do either of those things.

5          With respect to Mr. Ray's prior experience, we

6  believe it's absolutely relevant, critical, not confusing for

7  Mr. Ray to talk about the two circumstances where he has run

8  into examiner.  Mr. Ray is the chief -- former Chief

9  Executive Officer of Enron and the former Chief Executive of

10 Residential Capital.

11          Both of those matters involved preparation and

12 filing of substantial expert reports at costs totaling nearly

13 $200 million.  Mr. Ray was responsible for prosecuting

14 claims.  As you will hear in his testimony, he reviewed the

15 reports and has views as to -- and these aren't opinions,

16 these are his personal experiences -- as to whether or not

17 the reports were helpful or relevant to him in his -- the

18 exercise of his duties.

19          So this is -- this goes directly to his own

20 experience.  We're not talking about him looking at reports

21 that he has not had experience with.  These are two matters,

22 two very important matters, which, frankly, qualified Mr. Ray

23 himself as a person with a great deal of experience in

24 dealing with Chapter 11 and one of the reasons he's here,

25 right?  One of the reasons he's in the role that he is.

1      If there's any particular questions about that

2  experience that Ms. Sarkessian finds objectionable, then I

3  think she has the right to make objections at the time on

4  whatever evidentiary basis may exist at the time.  But to,

5  right now, simply prohibit him from testifying because they

6  are, neither relevant, nor -- or could potentially lead this

7  Court to confusion, we believe simply is not justified.

8      THE COURT:  Okay.  Thank you.

9      All right.  On this motion, it's difficult for me

10 to make a determination in a vacuum as to what the testimony

11 is going to be that might be objectionable.

12     I would note that, if Mr. Ray is going to be

13 testifying about his experience in other cases and how it

14 might -- his perception at least of what the efficacy or

15 usefulness of examiners are in these types of cases, I think

16 would fall under Rule 701, which is opinion testimony by a

17 lay witness based on his personal perception; and so,

18 therefore, I would allow that testimony to go forward.

19     But Ms. Sarkessian, you're free to object during

20 the course of the testimony to any questions you think are

21 inappropriate.

22     MS. SARKESSIAN:  May I move on to my second motion

23 in limine --

24     THE COURT:  Yes --

25     MS. SARKESSIAN:  -- Your Honor?

1          THE COURT:  -- of course.

2          MS. SARKESSIAN:  And Your Honor, just to -- again,

3   Juliet Sarkessian for the U.S. Trustee.  Just to make sure to

4   preserve all objections, we will be having a continuing

5   objection to Mr. Ray testifying about his experience in other

6   cases or what his opinions are about the usefulness of

7   examiner reports in other cases.  I just want to put that on

8   the record.

9          THE COURT:  It's noted, so you don't have to raise

10  it every time he answers a question.

11         MS. SARKESSIAN:  I may --

12         THE COURT:  You can -- I'll give you a continuing

13  objection on that.

14         MS. SARKESSIAN:  Okay.  I may still object a few

15  times, Your Honor.

16         THE COURT:  That's fine.  That's fine.

17         MS. SARKESSIAN:  Okay.  So the second issue has to

18  do with exhibits.  So, Your Honor, we were able to stipulate

19  to -- is it 23 joint exhibits, I believe?  And I certainly

20  appreciate all the parties' efforts in that regard.

21         On Friday, the debtors filed a declaration of Mr.

22  Glueckstein, an attorney with Sullivan & Cromwell, in further

23  support of the debtors' objection to the motion of the U.S.

24  Trustee to appoint an examiner.  It attached 3,855 pages,

25  it's the three binders, large binders, and what's attached.

1          The first exhibit we do not object to.  The first

2     exhibit is just a -- something that Mr. Sam Bankman-Fried

3     signed, a corporate authorization that's actually part of all

4     of the petitions.  I don't think it needs to be separately

5     admitted.  It's admitted in Exhibit 1A, B, and C.  But apart

6     from that, what Mr. Glueckstein attaches are the examiner

7     reports in Enron and Residential Capital.

8          So, first of all, this filing was untimely.  The

9     objections to the examiner report and all responding papers

10    were due on January the 25th, and this was filed February the

11    3rd, one business day before the hearing.  And I can assure

12    Your Honor that I did not have an opportunity to review three

13    hundred -- 3,833 pages of documents.

14         These also were not identified in response to the

15    debtors' -- I'm sorry -- in the debtors' response to the U.S.

16    Trustee's discovery.  So one of the interrogatories the U.S.

17    Trustee had -- there were very few -- but one of them was

18    please set forward all the exhibits that you will use at

19    trial.  There was nothing about -- they listed some things,

20    but there was nothing about anything from Enron or ResCap or

21    anything of that nature.

22         In addition, these documents are hearsay.  They

23    don't fall under any hearsay exception.  We don't have the

24    author of the document to lay a foundation for the documents

25    -- or the authors -- excuse me -- which would be the

1  examiners.  And they're also completely irrelevant to the

2  issue that is before this Court, which is appointment of an

3  examiner in these cases.

4        Of course, as Your Honor knows, we don't think any

5  of this would be relevant under (c)(2).  But even under

6  (c)(1), the best interests of the creditors, it's not

7  relevant what an examiner in another case put in his or her

8  report.

9        And I'd like to respond to, in the joint pretrial

10  order, the debtors set forth their statement about why they

11  believe these examiner reports should -- could come in.

12        So the first thing they indicated was that the

13  Judge can take -- Your Honor can take judicial notice of

14  these reports.  The U.S. Trustee agrees that Your Honor can

15  take judicial notice of the fact that examiners were

16  appointed in these other cases and that they issued reports

17  that were filed with the Court.  We have no problem with

18  that.  But that does not make them -- that does not make the

19  content of the reports admissible.

20        They also argue that these are admissible as

21  business records of the relevant debtors -- I assume they

22  mean Enron and Residential Capital -- under Federal Rule of

23  Evidence 803(6).

24        Now 803(6) is a document that is kept in the

25  ordinary course of regularly conducted activity of a

1   business, organization, occupation, or calling, and that

2   making the record was a regular practice of that activity,

3   and that all these conditions are shown by the testimony of a

4   custodian or other qualified witness or by certification that

5   complies with Federal Rule of Evidence 902(11) or (12).  None

6   of these elements are present.

7           An example of a business record -- and I'm sure

8   Your Honor is, you know, very familiar -- an invoice would be

9   an example of a business record, not a report created by a

10  court-appointed examiner.  That is not a business record.

11  And you also don't have any person to lay the foundation --

12  well, again, I assume it would be the examiner -- to lay the

13  foundation that this is somehow a business record.

14          The last thing that the debtors set forth is 807,

15  which is the residual exception.  The U.S. Trustee does not

16  believe that the requirements for this exception have been

17  met.  And in order to meet this exception, you would also

18  still need to lay a foundation.  You would need to have the

19  examiners in Enron and Residential Capital who wrote these

20  reports testify to establish the foundation to meet 807.

21          Also, 807(b) requires that the proponents give an

22  adverse party reasonable notice of the intent to offer the

23  statement.  And Your Honor, the U.S. Trustee did not receive

24  reasonable notice here.

25          So, Your Honor, that -- those are the reasons why

1   we believe that the exhibits to Mr. Glueckstein's declaration

2   that was filed at Docket 611 should not be admitted, other

3   than the first exhibit, which, again, does not need to be

4   separately admitted because it's already part of Exhibit 1A,

5   B, or C.

6           THE COURT:  Okay.  Thank you.

7           MR. BROMLEY:  Your Honor, I am happy that the U.S.

8   Trustee is willing to stipulate that Your Honor can take

9   judicial notice that examiner reports were prepared in the

10  Enron and Residential Capital matters.  And in fact, if we

11  had had that conversation Friday, maybe we could have avoided

12  some of this.

13          But the fact is, Your Honor, these are business

14  records of Enron and Residential Capital.  Ms. Sarkessian is

15  absolutely incorrect that either 803 or 807 requires that the

16  author of a document be present and able to testify.  The

17  basic construct of records of regularly conducted activity

18  are that the testimony that would be necessary to admit such

19  a document is an exception to hearsay would be sufficient if

20  it was provided by a custodian of such document.

21          Now it is naive to think that, in a case such as

22  Residential Capital or Enron or, indeed, FTX, that the

23  epitome of a business record is an invoice.  The business of

24  those entities and the business of this entity is winding

25  down its business.  The records of regularly conducted

1    activity of Chapter 11 debtors include, by definition, those

2    matters that are prepared and filed on court dockets.

3              When it comes to the custodian of that document --

4    or these documents, Mr. Ray is present in court and was the

5    chief executive of both of those entities and is qualified to

6    testify that these documents, indeed, were maintained by each

7    of Enron of Residential Capital in the ordinary course of

8    their business, which, at the time, was liquidating and

9    winding down.

10             Now, that being said, Your Honor, the purpose of

11   the use of these examiner reports is not to point to Page 532

12   and say that, on such and such a date, such and such a thing

13   happened.  The reason these reports are present in court and

14   are sitting here in front of you is so that Mr. Ray can

15   testify that, yes, these reports were something that he

16   considered during the course of his work in each of those

17   entities, and that among the obligations that he had was to

18   maximize recovery on assets and the use to which he put those

19   reports.

20             He is not going to be testifying about any

21   particular fact or assertion in any of the Enron or

22   Residential Capital reports.  It's merely the fact that they

23   existed and that he considered them.  So he is not going to

24   be testifying in a manner that would require us to introduce

25   either of the reports for the truth of the matter asserted in

1   those reports, merely for the fact that Mr. Ray consulted

2   with, read, and considered those reports during the course of

3   his obligations of the Chief Executive of each of Enron and

4   Residential Capital.

5           THE COURT:  All right.  All right.  On this one,

6   I'm not going to allow the -- other than Exhibit 1, I'm not

7   going to allow the two reports to be admitted into evidence

8   for a number of reasons:

9           One, I don't believe there was fair notice to the

10  U.S. Trustee that these exhibits were going to be introduced.

11          Two, I don't see how they're relevant to the issues

12  before me today.

13          Three, they are hearsay.  They certainly don't fit

14  within a business record exception, which requires, under

15  Rule 803, that they be a record of regularly conducted

16  activities.  And certainly, an examiner report is not a

17  regularly conducted activity of an entity.

18          So, for those reasons, I will not allow them into

19  evidence.  But Mr. Ray can testifying, obviously.  I've

20  already ruled he can testify about his work as a -- in other

21  cases where there were examiner reports introduced, and he

22  can testify about his experience in that regard without

23  reference to the reports, the specific information contained

24  in those reports.  Okay?

25          All right.  Ms. Sarkessian, is that -- are we done

 1  with motion practice at this point and we're moving on to the

 2  evidence?

 3           MS. SARKESSIAN:  Yes, Your Honor, at least from the

 4  U.S. Trustee's standpoint.

 5           THE COURT:  Okay.

 6      (Pause in proceedings)

 7           MS. SARKESSIAN:  Your Honor, our -- the testimony

 8  of witnesses will be coming in by way of declarations that

 9  have been marked as exhibits:

10           So that's Mr. Ray's declaration, that's at Docket

11  24, and another one at Docket 92, which are Joint Exhibits 2

12  and 3, as well as his testimony before Congress, which is

13  Joint Exhibit 8 and is on the docket at 371.

14           In addition, Mr. Mosely of Alvarez & Marsal, Mr.

15  Edgar Mosely, by way of his deposition [sic] in support of

16  first-day pleadings, which is Joint Exhibit 4 and Docket 93.

17           THE COURT:  Any objection?

18           UNIDENTIFIED:  No objection, Your Honor.

19           THE COURT:  They're admitted without objection.

20      (Joint Exhibit 2 received in evidence)

21      (Joint Exhibit 3 received in evidence)

22      (Joint Exhibit 8 received in evidence)

23           MS. SARKESSIAN:  And Your Honor, we did list Mr.

24  Ray as a witness for us, so we are not going to be asking him

25  any questions initially.  But to the extent that I understand

1    the debtors will be putting him on, we reserve the right to

2    cross-examine and then to go beyond -- if Your Honor permits,

3    to go beyond the scope of their direct and use him as our

4    witness, which, again, we did put in a -- we did file the

5    notice that he would be a witness and we did reserve that

6    right in our notice.

7              THE COURT:  Is there any objection?

8              UNIDENTIFIED:  No, Your Honor.

9              THE COURT:  Okay.

10             UNIDENTIFIED:  No objection.

11             THE COURT:  All right.

12             MS. SARKESSIAN:  Thank you.

13             THE COURT:  Thank you.

14        (Participants confer)

15             MS. SARKESSIAN:  I'm sorry.  I'm sorry, Your Honor.

16   My colleague reminded me I need to move for the admission of

17   all of the exhibits, 1 through 23.  And I'm not sure with

18   respect to Mr. Glueckstein's declaration, how they want to

19   handle that, because it's only a piece of it that's coming

20   in.  But we would move for the admission of Exhibits 1 to 23.

21             THE COURT:  Okay.

22             MS. SARKESSIAN:  Thank you, Your Honor.

23             THE COURT:  Any objection?

24             UNIDENTIFIED:  Your Honor, we have no objection to

25   admission of Exhibits 1 to 23.

1          THE COURT:  Okay.

2          UNIDENTIFIED:  With mister -- in terms of the

3    exhibits to Mr. Glueckstein's declaration that Your Honor is

4    willing to accept, we would submit that it should be

5    submitted separately and not simply with the petitions as

6    filed.

7          THE COURT:  All right.

8          MR. SHORE:  And on behalf of the JPLs, there was a

9    stipulation which was included in the pretrial order that

10   what was coming in today was for the purposes of this hearing

11   only and was not going to be coming in for al lpurposes in

12   the cases.

13         THE COURT:  All right.  That's fine.

14      (Joint Exhibit 1 received in evidence)

15      (Joint Exhibits 4 through 7 received in evidence)

16      (Joint Exhibits 9 through 23 received in evidence)

17         THE COURT:  So, with the exhibit, do you want to

18   mark that as a debtors' exhibit then separately, Debtors'

19   Exhibit Number 1, as opposed to a --

20         UNIDENTIFIED:  We will --

21         THE COURT:  -- joint exhibit?

22         UNIDENTIFIED:  -- Your Honor.

23         THE COURT:  Any objection?

24         MS. SARKESSIAN:  No, Your Honor.  I would just --

25   right now, it's attached to Mr. Glueckstein's declaration

1  with the 3,800 pages, so ...

2         THE COURT:  Okay.

3         MS. SARKESSIAN:  Can we just have -- I don't know -

4  - I don't know how to do that technically, but I don't want

5  that entire thing being -- coming in as an exhibit.

6         THE COURT:  No, understood.  We'll just submit

7  Exhibit 1 to Mr. Glueckstein's declaration as a separate

8  exhibit as Debtors' Exhibit Number 1.

9         MS. SARKESSIAN:  Thank you, Your Honor.

10       (Debtors' Exhibit 1 received in evidence)

11       (Participants confer)

12       THE COURT:  Any other evidence, Ms. Sarkessian?

13       MS. SARKESSIAN:  I'm sorry, Your Honor?

14       THE COURT:  Any other evidence?

15       MS. SARKESSIAN:  No.

16       THE COURT:  Okay.

17       MS. SARKESSIAN:  No, Your Honor.

18       THE COURT:  Thank you.

19       Mr. Bromley.

20       MR. BROMLEY:  Your Honor, the debtors would like to

21  call John J. Ray, III to the stand.

22       THE COURT:  Okay.  Mr. Ray, please come forward,

23  take the stand and remain standing, please.

24       THE ECRO:  Please raise your right hand.  Please

25  state your full name and spell your last name for the court

1  record, please?

2          THE WITNESS:  John J. Ray, III.  Last name R-a-y.

3  JOHN J. RAY, III, WITNESS FOR THE DEBTORS, AFFIRMED

4          THE ECRO:  You may be seated.

5          Your Honor.

6          THE COURT:  Thank you.

7          Mr. Bromley, you may proceed.

8          MR. BROMLEY:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10  BY MR. BROMLEY:

11  Q    Mr. Ray, what's your current occupation?

12  A    I'm owner of an advisory firm called Owl Hill Partners,

13  and I'm also Chief Executive Officer of FTX.

14  Q    And could you please give a brief summary of your

15  educational background?

16  A    Yes.  I graduated in 1980 from the University of

17  Massachusetts.  In 1982, I graduated from Drake University

18  Law School, initially admitted in Iowa, Nebraska, and still

19  admitted in good standing in the State of Illinois.

20  Q    And could you please give the Court a short summary of,

21  say, the first ten years of your professional career?

22  A    The first ten years, I began at Touche Ross, an

23  accounting firm, doing tax work as a lawyer.

24          Thereafter, I moved on to become an associate at Mayer,

25  Brown & Platt, now known as Mayer Brown, in Chicago Illinois,

1  practicing in -- initially, in the employee benefits and

2  securities area.  The practice included M&A work, primarily.

3      Thereafter, I departed private practice and became

4  employed by a private company.

5  Q    And what private company were you employed by?

6  A    Initially, it was Waste Management, now known as WMX.  I

7  began there in 1988, and worked there, either for Waste

8  Management, Inc. or one of its operating subsidiaries, as

9  general counsel of the various operating units, including

10  certain of their public subsidiaries, again, for

11  approximately ten years.  The practice included their

12  corporate governance, securities law matters.  And then, at

13  the operational level, a variety of -- you know, managing

14  complex litigations and other investigatory matters relative

15  to the company's operations.

16  Q    And after Waste Management, what did you do?

17  A    After Waste Management, the company was sold.  I then

18  became general counsel of a company called Fruit of the Loom,

19  also based in Chicago, Illinois.  I was general counsel and

20  chief administrative officer of that company.

21  Q    And when did you first come in contact with Chapter 11?

22  A    The company, unfortunately, shortly after I got to the

23  company, the company went into bankruptcy.  The company had a

24  number of operational issues that led to the Chapter 11, and

25  very quickly became embroiled in issues relative to the chief

1  executive officer of the company who, at the time, had loans

2  that were guaranteed by the company prior to my joining the

3  company, and they became quickly issues in the Chapter 11.

4  Q    And did you have any role in investigating anything

5  with respect to the CEO?

6  A    I did.  I mean, ultimately, you know, within days,

7  really, of the filing, the chief executive officer was

8  dismissed by the board.  I then became the most senior

9  officer of the company and ran the Chapter 11 for

10  approximately 26 months after the case was confirmed.

11       The creditors asked me to stay on to prosecute a

12  variety of claims, including the claims related to the chief

13  executive officer, which I did.  We litigated those at cases

14  in a couple different jurisdictions including the Federal

15  District Court in New York to recover the monies that were

16  loaned to the chief executive officer.

17  Q    And what was the result of those efforts?

18  A    We got our money back.

19  Q    And after Fruit of the Loom what did you do?

20  A    After Fruit of the Loom I took a liking to Chapter 11.

21  It sort of fit, essentially, you know, my business

22  experience, my legal experience, and I took on a variety of

23  Chapter 11 cases either as a chief restructuring officer or,

24  in many cases, such as a liquidating trustee of post-

25

1  confirmation trusts primarily to prosecute claims related to

2  the bankruptcy.

3       A number of those cases involved prosecuting claims

4  against accountants, and directors, and officers.  And I

5  certainly can take you through those cases.

6  Q    Can you do that for us?

7  A    Yes, please.

8       First case that -- of course of, you know, no notoriety

9  and you've heard many comments in the last few months over,

10  of course, was Enron.  I became a chairman of the board of

11  Enron and chief executive officer.  That began in 2004.

12      From 2004 through 2008 it was primarily the time period

13  in which those cases were prosecuted.  The company still was

14  very, very complex in Chapter 11.  I wouldn't say that much

15  was accomplished in the Chapter 11, but much was left over in

16  the Chapter 11.  We still owned a public utility in Oregon,

17  the Portland Utility Company.  We still owned International

18  Energy business.  We still had several thousand employees,

19  and we still were plaintiff in over a thousand cases.

20      Those cases were a wide variety.  Virtually, every

21  single bank in America, some outside North America were

22  defendants in cases that were brought that were either fraud

23  cases or avoidance actions.  And then, there was cases

24  against law firms, accounting firms, including Anderson.

25  Vinson & Elkins is a law firm that was a suit in those cases,

1  but it's a massive list of cases where the company was

2  appointive recovering for various misfeasance, malfeasance,

3  fraud, negligence, and really the waterfront of events that

4  occurred during the Chapter 11 that were ultimately

5  prosecuted.

6        We recovered in litigation proceeds about --

7            MS. SARKESSIAN:  Your Honor, I'm going -- I was

8  waiting for the next question, but I'm going to object to

9  this testimony based on relevance.

10            THE COURT:  I think he's giving his background.

11  I'll overrule.

12            THE WITNESS:  We recovered, you know, over $5

13  billion in litigation recoveries against just the banks

14  alone, and the overall recoveries in the case were, you know,

15  approximately $26 billion, which is double the plan of

16  recovery that was estimated in the disclosure statement.

17            From there, I took on a number of other cases.  I

18  was the litigation trustee at a company called Hayes Lemmerz.

19  Hayes Lemmerz was in bankruptcy a couple of times.  I was

20  involved with Hayes Lemmerz I.  My sole role in that capacity

21  was to sue the officers and directors for breach of their

22  fiduciary duty, ultimately settling with the directors

23  related to that action.  We also sued the accounting firm

24  related to Hayes Lemmerz.

25

1          Other cases that I have been involved in; I was,

2    essentially, the chief executive officer of Nortel which is a

3    cross border case where we had conflicts between the United

4    States operations for Nortel, the Canadian operations, and

5    the operations outside of the United States in Canada that

6    involved 19 separate subsidiaries.  A very complex case

7    involving a myriad of intercompany transactions that was, you

8    know, somewhat complex that went on for an extended period of

9    time due to the issues between the various silos within that

10   Nortel estate.

11         I also was in Overseas Shipping Group [ph] CEO,

12   CRO, about the same time from 2012 to 2015.  That case,

13   another Chapter 11 case.  The principal problem in that case

14   was the company had understated its tax liability by

15   somewhere between $300 million and $500 million.  They had

16   achieved that status by obtaining a legal opinion from a very

17   prominent firm in New York, and that legal opinion, to which

18   they relied on, was the vehicle under which they avoided

19   those taxes.

20         So, ultimately, you know, our mission in Overseas

21   Shipping Group, you know, beyond the Chapter 11 was to take

22   on the issues surrounding, you know, the tax opinions that

23   were in the view of the company and, ultimately, the

24   creditors that involved malpractice by that law firm.

25

1          The case was somewhat unique in the sense that it

2   has one sort of similarity with FTX.  Almost immediately upon

3   filing the case and discovering, of course, the legal opinion

4   and the faulty nature of that legal opinion, we went into the

5   Internal Revenue Service.  I went in with council at the time

6   and walked over to the offices over at the IRS on around

7   about 8th and 56th Street in New York and we walked and we

8   self-reported that liability, which was somewhat startling,

9   you know, to the service, but it was my obligation, you know,

10  as an officer of the company to go in and report that.  Of

11  course, the reactions from the Internal Revenue Service were

12  unique.  There was no particular form for that.  Very

13  startling for the IRS to see someone come in and self-report

14  a liability that was half a billion dollars.

15          MS. SARKESSIAN:  Your Honor, I don't think this is

16  relevant, but I would object to Mr. Ray testifying about what

17  was in the head of IRS agents, whether they were surprised.

18          THE COURT:  I'll sustain that.

19          MS. SARKESSIAN:  Thank you.

20          THE WITNESS:  Ultimately, after Overseas Shipping,

21  I moved on to, you know, Residential Capital.  Residential

22  Capital was, essentially, a mortgage case.  It was a

23  subsidiary of General Motors.  I was appointed as the

24  litigation trustee for that case and prosecuted over a

25  hundred separate legal actions related to indemnification and

1  breech of contract related to the sale of mortgages to

2  Residential Capital in the tens of billion of dollars that

3  ultimately were faulty and, in some cases, fraudulent, and we

4  litigated those for several years and I presided over that

5  litigation.

6  BY MR. BROMLEY:

7  Q    So, Mr. Ray, to take it back a bit, in Enron, when you

8  the CEO, were you aware that examiner reports had been

9  prepared in connection with that case?

10  A    Yes.  I was made very aware of those reports.  The

11  reports, when I became affiliated with Enron, almost

12  immediately on my joinder, we were in the middle of somewhat

13  of a skirmish related to those reports because various

14  parties were attempting to use those reports to get access to

15  those reports.

16       There was, you know, essentially, fights over whether

17  or not they should be redacted.  There were, in effect, on

18  the criminal trials that were yet to have occur as well as

19  the use of those reports that the parties had substantial

20  disputes over.

21            MS. SARKESSIAN:  Your Honor, I'm continuing

22  objection to the relevance of this testimony.

23            THE COURT:  Overruled.

24  BY MR. BROMLEY:

25

1 Q     And Mr. Ray, do you have a sense of the cost of the

2 Enron estate reports?

3            MS. SARKESSIAN:  Your Honor, again, I object as

4 irrelevant.

5            THE COURT:  Overruled.

6            THE WITNESS:  The Enron report was $90 million.

7 BY MR. BROMLEY:

8 Q     Now, moving on to Residential Capital, was there an

9 examiner report in Residential Capital?

10 A     There was.

11 Q     And are you familiar with that report?

12 A     Yes, I am.

13 Q     And do you know what the cost of that report was?

14 A     The cost of that report was approximately $100 million.

15 Q     And do you use that report at all in your collection

16 efforts?

17            MS. SARKESSIAN:  Your Honor, again, I object for

18 relevance.

19            THE COURT:  Overruled.

20            THE WITNESS:  Neither in Enron, nor in Residential

21 funding and Residential Capital did I make use of that report

22 for distinctively different reasons, but neither case did I

23 use those reports.

24 Q     And what was the reason you didn't use it in Enron.

25            MS. SARKESSIAN:  I'm sorry, Your Honor, I have to

1   object again based on relevance.

2           THE COURT:  Overruled.

3           THE WITNESS:  Multiple reasons in _Enron_.  You

4   know, first, when you review the _Enron_ report, which I

5   believe is, in my experience, characteristics of many of the

6   reports, they're very topical, they're very general.  They're

7   almost, sort of, a curated, you know, gathering of statements

8   that failed to take real positions relative to what occurred.

9           MS. SARKESSIAN:  Your Honor, I have a different

10  objection here.  I believe that the witness is testifying now

11  not just about an _Enron_ report, but more generally, in

12  addition, he is testifying about the contents of the _Enron_

13  report, and Your Honor has ruled that those reports are not

14  to be admitted and, therefore, he cannot testify about the

15  contents.

16          THE COURT:  Mr. Bromley.

17          MR. BROMLEY:  I would ask the witness to limit

18  your comments with respect to the _Enron_ report, not other

19  reports.  With respect to the contents, Mr. Ray is testifying

20  as to not what the contents were, but how he used those

21  reports in the exercise of his duties.

22          THE COURT:  You can testify about how you use the

23  reports, but don't talk about the contents of the reports.

24          THE WITNESS:  Yes, Your Honor.

25          I did not use the reports because they were, you

1   know, very shallow.  I mean, sort of a mile wide inch deep

2   and, and ultimately --

3           MS. SARKESSIAN:  Again, Your Honor, I think that

4   relates to the contents of the report.

5           THE COURT:  Well, he can characterize -- he can't

6   really talk about how he used them, he can't characterize how

7   he perceived those reports.  So, I'll overrule that.

8           MS. SARKESSIAN:  Thank you, Your Honor.

9           THE WITNESS:  You know, ultimately, the

10  information that was in the report was, you know, it didn't

11  go far enough relative to about what I needed to do to

12  prosecute the actions.  The reports are somewhat ambivalent

13  in the conclusory sense, and ultimately the evidence --

14          MS. SARKESSIAN:  Objection, Your Honor, he's

15  testifying about the contents again; what the conclusions

16  were.

17          THE COURT:  He's not telling me what the

18  conclusions were, he's saying that he did not find the

19  conclusions helpful to him.  I think that's appropriate, and

20  I'll overrule the objection.

21          THE WITNESS:  But ultimately, I had to spend, you

22  know, all of the time to investigate and, ultimately,

23  prosecute those actions, and the reports themselves did not

24  aid in that investigation.

25              Relative to Residential Capital, somewhat of a

1    different story there.  Residential Capital largely was

2    focused on their company transactions involving the parent

3    company GMC who still owned the equity in the company.  So, a

4    shareholder was still present during the Chapter 11 and there

5    was an investigation related to that existence.

6            The ResCap is notable for, frankly, for what it

7    didn't cover.  When you read that report, very, very

8    extensive report, you can take an eye full over there.  It's

9    a very deep report.  But, ultimately, the tens of billions of

10   dollars' worth of mortgage fraud in terms of the mortgages

11   that were sold to the company that I prosecuted, it yielded

12   over a billion three in recoveries which included, you know,

13   over a hundred cases in two trials; a jury trial and a bench

14   trial.  There's not a single word in that report related to

15   those actions, so --

16           MS. SARKESSIAN:  Your Honor, I'm going to object.

17   He's talking about the content of the documents again.

18           THE COURT:  Now you're getting into the content of

19   the document.  I'll sustain the objection.

20           MS. SARKESSIAN:  Thank you.

21   BY MR. BROMLEY:

22   Q    Mr. Ray, I'd like to just touch on, based on a couple

23   of the other matters that you mentioned just briefly.  In

24   connection with the Nortel case, did you have a cooperative

25   relationship with the creditors committee in that?

1          MS. SARKESSIAN:  I'm going to object on relevance,

2    Your Honor.  I'm sorry to keep making the same objection, but

3    I feel it's necessary.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.  A very cooperative

6    relationship.  We worked hand and glove.

7    BY MR. BROMLEY:

8    Q    And was that including in investigating the prosecuting

9    claims?

10   A    Yes.  We did that really on a joint basis.  You know,

11   at the end of the day, you know, we're debtors there for, you

12   know, the benefit of creditors.  So, we worked very

13   cooperatively.

14   Q    What was the ultimate recovery to the Nortel creditors.

15         MS. SARKESSIAN:  I'm sorry, Your Honor.  I'm going

16   to object for the record on relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  It was capped at 100 percent.  It

19   certainly could have been higher.

20   BY MR. BROMLEY:

21   Q    Mr. Ray, I'd like to turn your attention now to FTX.

22   A    Yes.

23   Q    Prior to your appointment to your current position, did

24   you have any connections to FTX?

25   A    No.  I did not.

```
 1  Q      Did you have any connections to Sam Bankman-Fried?

 2  A      No.  I did not.

 3  Q      Or Gary Wang.

 4  A      No.

 5  Q      Or Caroline Ellison.

 6  A      No.

 7  Q      Nishad Singh.

 8  A      No.

 9  Q      Ryan Salame.

10  A      No.

11  Q      Did you have connection with any of the executives at

12  FTX?

13  A      No.

14  Q      Did you have any connection with Mr. Bankman-Fried's

15  parents?

16  A      No.

17  Q      Can you tell me how you chose the members of the boards

18  of directors?

19  A      Each of the members of the board of directors was

20  somewhat curated.  Each of them has their independent.  First

21  of all, they had no involvement with FTX, similar to my

22  position.  We needed an independent board in place

23  immediately.

24         So, really, within hours of my appointment, I saw the

25  need to have an independent board, so I contacted several
```

1    individuals who I knew that had diverse experiences who

2    collectively as a group would form the ideal board to govern

3    the situation.

4    Q    Mr. Ray, in your first day declaration you described

5    generally the state of FTX when you arrived, but can you just

6    summarize that for the Court today?

7    A    The company, you know, was really unlike any other I've

8    ever seen.  Not a single list of anything.  You know,

9    normally, you come in and there's a bank account list -- but

10   there's personnel who you speak to about these things.

11   There's lists of assets.  There's balance sheets.  There's

12   income statements.  There's professionals.  There's

13   insurance.  There's just nobody to turn to really in the

14   company, just a complete void, massive scramble for

15   information.

16        And fortunately, you know, we had the services of, you

17   know, firms at my disposal who ultimately could become what

18   I've described as an army of soldiers of women and men who

19   have been dedicated to putting this together.

20            MR. BROMLEY:  Your Honor, I'd like to put up on

21   the screen a demonstrative.

22            THE COURT:  Okay.

23   BY MR. BROMLEY:

24   Q    Do you have that in front of you, Mr. Ray?

25   A    Yes.  I do.

1  Q     Now, Mr. Ray, could you just help walk us through this

2  starting first with the debtor's advisors --

3         MS. SARKESSIAN:  Your Honor, I'm just, again,

4  going to put on the record my objection to this testimony as

5  not being relevant.

6         THE COURT:  I'm not even sure what the testimony

7  is yet.  Let me hear the testimony first.

8         MS. SARKESSIAN:  Okay, Your Honor.

9  BY MR. BROMLEY:

10  Q     Mr. Ray, with respect to the group that's debtor's

11  advisors, are they participating at your direction in an

12  investigation and series of investigations with respect to

13  FTX?

14  A     Yes.  I mean, the first thing, obviously, to observe

15  here is the center of this wheel and I am one with the

16  directors are empowered to deal with this, you know, sort of

17  circle of different advisors and different fiduciaries as

18  well as, you know, other parties here.  But to your bottom

19  left to answer your question are the debtor's advisors and

20  it's really a multiple set of advisors because of the

21  technical, highly technical, nature of this case.

22      It's also driven by the lack of professionals that were

23  ongoing and that I could rely on, the existed on a pre-

24  petition basis.  So, either there was an absence of

25  consultants, or professionals, or those professionals were

1   not reliable such that we had to replace those.

2        So, obviously, starting at the top of the hour, you

3   know, Sullivan & Cromwell is our main bankruptcy lawyers.

4   Immediately, at the time of the filing with haste, we

5   employed Quinn Emanuel, and we did that for purposes of not

6   only the bankruptcy expertise, but they had one of the more

7   renowned lawyers in the country and investigatory work, Mr.

8   Bill Burke.  He's in this courtroom.

9        Yes.  We brought on Ernst & Young because the company,

10  on a worldwide basis, did not have reliable accounting

11  professionals.  In some cases, we didn't have income

12  statements and balance sheets at all.  All of this had to be

13  recreated.  And as you'll see in a moment to the far right of

14  me, you know, since the IRS, who's investigating various tax

15  positions taken by the company, and Ernst & Young was brought

16  in to do that, so we really needed the sort of books and

17  records.

18       Down below, of course, is the Landis firm whose counsel

19  here in Delaware and all, also available for other purposes

20  relative to the debtor's cases, down below is Perella

21  Weinberg Partners, the investment bankers to sell the

22  portfolio.  This is the portfolio of roughly $5 billion of

23  approximately four hundred investments that were made over a

24  myriad of, you know, industries and in a relatively sort time

25  period from October of 2021 primarily to the petition date.

1    Then below that, is Alvarez & Marsal restructuring

2    professionals that are really sort of the backbone along with

3    Sullivan & Cromwell relative to almost everything that has to

4    be achieved in these cases.

5    We also brought on AlixPartners.  AlixPartners, you

6    know, another well renowned firm that had a particular

7    expertise related to investigations, and tracing, and certain

8    skill sets that were essential given what had happened in the

9    company, and their particular expertise was essential

10   relative to the underlying investigations that have led to

11   not only our future prosecution of the avoidance actions, but

12   they've aided immensely the investigation in replying to the

13   regulatory stories that I'll get into in a moment.

14   And then last, but not least, is Sygnia.  Sygnia is a

15   highly technical cybersecurity firm.  This case, you know, is

16   about cybersecurity or the failure of cybersecurity.  This

17   firm was needed to protect what was a crumbling shell of

18   securities around assets that are highly vulnerable, and

19   their services were critical, as we saw, in the waking hours

20   of the morning of the 11th as these petitions were being

21   filed, you know, hacking was occurring.  So, this firm, you

22   know, is not only instrumental in stopping that but also

23   rebuilding an environment that's highly sensitive to this day

24   because of the nature of crypto assets and the vulnerability

25   of crypto assets.

1    You know, over the last year there's been something

2  worldwide reported about $4 billion worth of crypto that's

3  been hacked and so these folks are essential for us to have

4  some integrity in our systems to allow us to preserve assets

5  and to repair what was a dangerous, dangerous environment

6  relative to the storage of hot wallets and other wallets

7  related to the companies crypto.

8  Q    Now, Mr. Ray, what steps have been taken to replace

9  prior management?

10           MS. SARKESSIAN:  I'm sorry.  Now that his

11  testimony is over, I would like to renew my objection.

12  Obviously, under 1104(c)(2), the U.S. Trustee does not

13  believe any of Mr. Ray's testimony is relevant, but even

14  under (c)(1) as to whether this is in the best interest of

15  the creditors.  The fact that the debtors have a lot of

16  retained professionals and they're working together is not

17  relevant to the issue as to whether an examiner should be

18  appointed even under (c)(1).

19           THE COURT:  Overruled.

20           THE WITNESS:  I'm sorry.  Could you repeat the

21  question?

22  BY MR. BROMLEY:

23  Q    Sure.  What steps have been taken to replace prior

24  management?

25  A    Prior management has been terminated.  There's no one

1  that was in a control position that today is in a control

2  position whatsoever.  That was eliminated, you know,

3  immediately on my taking control.

4  Q    Now, when you took control, the omnibus corporate

5  authority, which is Debtors Exhibit 1, referenced a request

6  for Mr. Bankman-Fried to consult with his counsel at Paul

7  Weiss regarding director appointments.  Did you ever consult

8  with Paul Weiss.

9  A    No, I did not.

10 Q    And why not?

11 A    I didn't think it was in the best interest of the

12 estate to consult with lawyers for someone we now know has

13 been charged with crimes.

14 Q    Now, Mr. Ray, I'd like to throw your attention on the

15 demonstrative to the lower right-hand corner, federal,

16 criminal, and regulatory authorities.  Do you see that?

17 A    Yes.  I do.

18 Q    Are you familiar with criminal and regulatory

19 investigations that are ongoing?

20 A    Yes.  I am.

21 Q    And what have you directed the company and your

22 advisors to do with respect to those investigations?

23 A    I made it very, very clear from the beginning of my

24 taking control, on virtually the day of the control, that we

25 would do whatever the Government request relative to

 1   cooperation.

 2        We believe that, ultimately, not only is that, you

 3   know, required but we believe that, you know, it's in the

 4   best interest of creditors to allow these regulatory

 5   authorities to get full access to the information on a real

 6   time basis as we're learning about what happened in the

 7   company.  They're virtually getting information, again, real

 8   time, and we believe that was sort of fundamental to our, you

 9   know, mission here which is to maximize value for the

10   creditors.

11   Q    And do you receive regular reports on the materials

12   that have -- and cooperation that's been given to the

13   investigative authorities?

14   A    Virtually, daily.

15   Q    I'd like to -- I'll come back to the slide in a moment,

16   but I'd like to turn to the next one.  You familiar with this

17   slide?

18   A    Very much so.

19            MS. SARKESSIAN:  Your Honor, I'm going to, again,

20   object on relevance.

21            THE COURT:  Overruled.

22   BY MR. BROMLEY:

23   Q    And Mr. Ray, what does this slide --

24   A    The first part of it, it talks really about -- speaks

25   to the volume, the massive amount of data that we have

1   produced.  As you can see, we've collected ten terabytes of

2   data, over twenty-seven million documents.  We've provided an

3   analysis of several hundred thousand documents.  We've

4   interviewed and received pro offers of 24 current and former

5   employees.  And then, we've also provided an analysis

6   relative to the transactions inside the companies databases.

7        The companies databases include a couple of different

8   databases of primarily primary databases, the AWS System

9   which Amazon Web Services, where we housed some of the

10  wallets, the hot wallets.  And the database itself is in the

11  millions of terabytes of date so it's a vast resource of

12  information, unfortunately, in a somewhat unconstructed

13  environment which requires, you know, the assistance of, you

14  know, people like Alvarez and people like AlixPartners to

15  sift through these terabytes to ultimately provide useful

16  data to the regulatory authorities.

17  Q    Are you familiar with the cooperation that's been given

18  to the U.S. Attorney's Office for the Southern District of

19  New York and the Department of Justice's National Crypto-

20  Currency Enforcement Team?

21  A    Yes.  Our teams have been involved with, you know,

22  virtually daily requests.  As you can see, we've had over 150

23  requests from the Southern District, produced substantial

24  amounts of information, and provided substantial cooperation

25  relative to instances where they wanted specific information

1   related to certain actions, prehistoric actions, for the

2   company.

3        So, it's virtually an ongoing exercise, but the last,

4   you know, roughly 90 days have been an extremely intense

5   effort to provide the information that the Government has

6   requested which, obviously, you know, yielded substantial

7   results in record time.

8   Q    Now, Mr. Ray, are you familiar with how these requests

9   come in from the Department of Justice?

10  A    Yes, I am.  I am familiar with how they contact the

11  company.  They do that through Sullivan & Cromwell primarily.

12  Q    And have you ever -- are you aware of any instances

13  where full cooperation was not given immediately?

14  A    That wouldn't be tolerated.

15  Q    I'd like you to turn your attention to the next slide.

16  Now in addition to the Southern District of New York, the

17  U.S. Attorneys Office, you are familiar with other U.S.

18  Attorneys Offices that have submitted information requests?

19  A    We have had full participation.  You know, we have had

20  numerous requests, as shown by this chart, from other

21  prosecutors around the country.  The Securities & Exchange

22  Commission has had a number of requests; again, all

23  cooperative presentations that have been provided.  The CFTC

24  has been extremely active here in connection with their

25  investigation and have submitted over 150 requests.

1    On a state basis, not shown on this chart, but we have

2  entered into dozens of cease and desist orders with respect

3  to licenses around the world, the money transaction sector,

4  licenses that were maintained by the company.  So, this chart

5  really doesn't show the full gambit of the things that we

6  have done to cooperate on a state, you know, and local basis,

7  as well as these particular federal agencies.

8  Q    If I could draw your attention to the next slide.

9  A    Yes.  This is really what I am referring to.  We self-

10 reported to 26 state regulators.  We produced a mountain of

11 documents there as well. We have been in regular contact with

12 these agencies; not leaving it to the agencies to come to us.

13 You know, we have taken a pro-active effort to work with

14 them.  We have hosted update calls with these agencies.  They

15 are almost treating these agencies, in effect, like they're

16 own committee, if you will, in giving them real time

17 information.

18         MS. SARKESSIAN:  Objection, Your Honor.

19         THE COURT:  Overruled.

20 BY MR. BROMLEY:

21 Q    Now in addition to the various states and state

22 authorities have you -- are you aware of additional requests

23 that have come from Congress and non-US authorities?

24 A    Yes.  I have been very active and personally involved in

25 these requests.  As everyone has reported, I testified in

1  front of Congress, but leading up to that congressional

2  testimony we have had 100 requests from the Financial

3  Services Committee.  We have requests from the Senate as well

4  and follow-up testimony that has been provided to the House

5  Financial Services Committee and then we've also been

6  involved in regulatory requests from outside the United

7  States.

8      They are listed here and pretty extensive requests that

9  stem from our international operations.  We have exchanges

10  that, for example, are in Japan and Singapore, Cyprus, we

11  have European operations where we host a European exchange.

12  So, all of these agencies relate to the operations outside

13  the United States, and they've been very active in terms of

14  requests as well as us responding to those requests.

15  Q    And since the -- you're aware of the appointment of the

16  creditors committee in these cases?

17  A    Yes, I am.

18  Q    And so what has been the level of cooperation with the

19  creditors committee since its appointment?

20  A    Well, I'd like to think it's a model of how a company

21  should work with the creditors committee.  My approach really

22  is a, sort of, partnership approach with the creditors

23  committee.  We have numerous requests from the committee.

24  They have been in place, I think, for less then probably a

25  full 45 days; something to that effect.

1    So, had a head start, if you will, which is helpful.

2    That head start allowed us then to really put the committee

3    in a position right away where they could, you know, be a

4    true partner with us in this whole process, this journey

5    we're on to figure out where we are going with the assets and

6    the recoveries here.

7    So, we have lots of calls, almost hourly contact between

8    the professionals and the committee, and the debtors. I

9    personally had a call with members of the creditor committee.

10   I have also given my contact information, on a personal

11   level, to the co-chairs of the committee with a full invite

12   for them to call me at any time related to any requests that

13   they might have or any views that they might have that they

14   would like to share with me on a personal basis. So, we

15   really have a, I think, hopefully what should be a model for

16   cooperation in this important mission.

17   Q    Now let's go back for a moment to the directors that

18   were appointed. Did you appoint the directors with any,

19   keeping in mind the potential for any conflicts between

20   silos?

21   A    Yes. Its no coincidence that the way we establish the

22   director positions. It is not one board. They often

23   function to get information at the same time just for

24   efficiencies and clarity as to the information, but each

25   director is the director of a separate silo. So, they have

1  duties as a director, for example, of the Alameda silo.  The

2  other directors do not.

3      There is a director, for example, for West Realm Shires.

4  So, each of the directors there is, you know, one silo or

5  there is two directors on a silo, but each of these

6  directors, essentially, have their own silo and their own

7  responsibilities related to -- their silo in a subsidiary is

8  beneath it.  There is also a subsidiary director for those

9  silos who is separate as well.

10 Q    Do you have separate board meetings for the directors in

11 the separate silos?

12 A    We have joint meetings which are informational for all

13 the directors and then we have separate meetings for the

14 directors related to their unique silo.  So, we actually put

15 presentations together that only deal with that director and

16 that director's unique silo information.  And we do that for

17 a few reasons.

18     One is that we want to really give in depth information

19 related to that silo to that particular director, but we also

20 want to create an environment under which that director can

21 raise any issue whatsoever with respect to their silo versus

22 any other silo or any other issue that exists in the FTX

23 environment.

24     So, we want to create an efficient process which allows

25 all the directors to share ideas, and share their

1   experiences, and share access to the host, you know, of

2   professionals we have, but we also have a very sterile

3   environment where each director gets to spend, you know,

4   quality time relative to the specific information that

5   relates to that particular silo.

6       For example, if there are assets that are in that silo,

7   not in another silo, or if there are intercompany claims, for

8   example, that directors want to discuss in their silo, vis-à-

9   vis other silos, they have got the environment and the forum

10  to do that outside of the presence of the other directors.

11  So that is really the model we created.

12  Q    Now, Mr. Ray, I would like to go back to the

13  cybersecurity environment that you mentioned a few minutes

14  ago.  Now, when -- is there a physical location right now

15  where FTX is located, the company?

16  A    No, there is not.  The company was described, and I

17  think we referred to it in the first day petitions, as

18  located in the metaverse, but we have no physical location

19  whatsoever.

20  Q    So, the investigations work that has been taking place

21  so far how does that take place in the metaverse?  How does

22  that investigation take place?

23  A    Carefully because all of our data is stored in the

24  cloud.  Its stored electronically.  This isn't a case where,

25  for example, like Enron where we owned 100,000 square foot

1    facility, and we owned a forklift, and we hired a forklift

2    operator to go get the documents when someone required them.

3    This requires someone to go into our data environment to do

4    their day job.

5    Q    Now on the first day of the case we received relief that

6    provided indemnities for certain individuals who were

7    accessing that environment.  Do you recall that?

8    A    Yes, I do.

9    Q    Why was that indemnity required?

10   A    The reason for that, and its very extensive and I will

11   try to keep it focused and brief, is you're allowing and

12   requiring, more importantly, you know, professionals to enter

13   into a highly fragile computerized database where things can

14   happen and go wrong pretty quickly.  If you open up that

15   database, you're subjecting yourself to third-party hacks.

16   You are subjecting yourself to inadvertent errors.

17        You know, I guess the word sometimes that might come to

18   mind is, sort of, thick fingers or whatever.  You literally

19   could hit the wrong key in this environment and destroy

20   hundreds of millions of dollars' worth of value because you

21   mis-Q'd letters to a code, a key if you will, a password that

22   allow you to open up a wallet.

23        This is an environment that has to be very cleansed,

24   very clinical.  This is not something for people to bounce

25   around in without creating tremendous amounts of risk;

1   external risks, internal risks.  So, it's a laboratory that

2   you have to work in very, very carefully.

3   Q    So, I would like to show you another demonstrative.

4   This -- you are familiar with this slide?

5   A    Yes, unfortunately.

6   Q    And so could you please describe what this is depicting?

7   A    Well this depicts, you know, a couple few different

8   things.  As you can see, the bricks around this wall shows,

9   you know, the state of what our AWS environment was at the

10  time of the petition; a very loose environment, one that is

11  probably a case study for how not to have a controlled

12  environment for crypto.  Its very vulnerable.  We had a hot

13  wallets in a system where multiple people had access to

14  passwords, wallets, you know, sitting in a system that are

15  accessible virtually by anyone who could access that data

16  system.

17       So, there is multiple access points into an environment

18  that literally held billions of dollars' worth of the

19  company's assets.  And as you can see to the right there is a

20  few different, you know, words set out in red print there,

21  you know, prepetition.  This environment allowed insiders to

22  freely transfer assets of the company with  no accountability

23  and no tracing. Literally, one of the founders could come

24  into this environment, download half a billion dollars' worth

25  of wallets onto a thumb drive, and walk off with them and

1  there would be no accounting for that whatsoever.  Virtually

2  unthinkable, really, in a controlled environment.

3      What you will see down below is that, you know, while we

4  were securing this environment that the petition date, we

5  signed the power that gave me the right to advise on the

6  filing of this. It was done at 4:24 a.m. in the morning on

7  the 11th.  By 7 o'clock in the morning I was reviewing

8  petitions.  By 10 o'clock we were filing the first petitions.

9  By early afternoon we had, I think, achieved most of the

10  filings of the petitions.  Then throughout that day those

11  early hours, within six, seven hours, you know, we were doing

12  the normal first day petition filing.

13      One of our team -- one of our advisors, not someone

14  inside the company, one of our advisors that we had hired,

15  detected movement of crypto off of our wallets.  So,

16  immediately, effectively, on the filing we had, you know, an

17  issue with the crypto being stolen from the company.  At the

18  same time, you know, there were efforts.  At the time we

19  didn't fully realize what was transpiring, but there was

20  efforts by the provisional liquidators to also secure assets

21  for the protection of customers.  This was all happening

22  simultaneously.

23      So, your normal first day petition, as chaotic as

24  sometimes can be, this was something that I have never

25  experienced.  It all stems from the failure of this system

1   and a lack of integrity related to this system.  We were

2   fortunate enough, because of the professionals we had, to

3   stop the crypto being stolen.

4        We were fortunate, of course, that the provisional

5   liquidators were also able to capture some of this value held

6   in custody in the Bahamas that, presumably, could have also

7   been stolen in this time period.  Those hacks went on

8   virtually all night long.  I think they somehow ceased around

9   4 to 5 a.m. the following day.  We had over 100 people on the

10  phone trying to stop these hacks because at that point you

11  have no passwords. You don't know where the wallets are in

12  this environment.

13       Someone described the wallet, sort of, in this AWS

14  system as, sort of, needles in a haystack of needles.  We

15  don't have the wallets.  We don't have the passwords.

16  Obviously, some people did have passwords that were accessing

17  these.  So, it was really 48 hours of what I can only

18  describe as pure hell.

19            THE COURT:  Mr. Bromley, before you continue, how

20  much longer do you think you have?

21            MR. BROMLEY:  I would say another 15 minutes.

22            THE COURT:  We will go ahead and finish-up and

23  then we will take a recess before we do cross.

24            MR. BROMLEY:  Thank you, Your Honor.

25  BY MR. BROMLEY:

1   Q    Mr. Ray, can you take a look at the next slide.  So, Mr.

2   Ray, could you describe the computing environment at FTX

3   today?

4   A    We have created, you know, the environment, you know, as

5   it should be.  I mean we have hired experts in computer

6   science and cryptography.  I mentioned the Sygnia group as

7   well as the Alvarez & Marsal group that have been essential

8   to rebuilding the brick walls around these wallets to give

9   them some security.

10       We have gotten access to the code, the controls and the

11  data to prevent any further loss by way of hacking.  We have

12  moved hot wallets into what is called cold storage to secure

13  those.  We have also gone off to exchanges where wallets are

14  contained and moved those wallets over to a controlled

15  environment.

16       So, this first exercise, with the assistance of computer

17  experts, is to provide integrity to the environment, increase

18  the security, move those wallets into cold storage and secure

19  the assets for the benefit of customers and creditors.  That,

20  of course, involves, you know, the analytics that these

21  experts use to find wallets and also what is key here is to –

22  – we're doing a tracing analysis in to look at unauthorized

23  transfers of crypto that either were in wallets or in the

24  environment itself; all with the goal -- this isn't, sort of,

25  a study for study sake.  There is a purpose here to what this

1   is beyond just the integrity of the system and maintaining

2   it, and securing the assets.

3       This is, effectively, to also, you know, recoup those

4   assets to investigate who moved assets and for what purpose,

5   the source of the funds for those assets, whether that is

6   external or on an inter-company basis.  When we are

7   investigating who did that, the potential misconduct, the

8   wrongdoers, the claw back opportunities, really, to that.

9   And, of course, in the process of that all of the evidentiary

10  work that we are doing to cooperate with the Government is

11  not an exercise for exercise sake.

12      There is no, sort of, billing code that just says

13  cooperate with the Government.  We look at all of our

14  cooperation really on an end-use basis.  What do we do with

15  that information, what is the buy product of that

16  investigation.  The by-product is always with an asset in

17  mind or recovery in mind.  Its not sharing for sharing sake.

18  Its how do we use that information that we provided to

19  ourselves and to regulatory authorities to then synthesize it

20  in a way that provides us with the tools that we need to

21  recover on avoidance actions, to inevitably file actions

22  related to, you know, misfeasance or malfeasance against

23  insiders, for example.

24      Then, obviously, you know, there is the compliance with

25  our Chapter 11 obligations and disclosure.  You know, that is

1  an ongoing obligation that we have and that is fulfilled

2  through this very exercise.  Then lastly, as I mentioned, our

3  by-product of that leads to sharing evidence and cooperating

4  with the authorities.

5      This is an ongoing, you know, circular effort, right,

6  you know, answers, we get questions, we provide information,

7  that information gets synthesized, that turns into new

8  inquiries, new questions, and we're continuing to evolve in

9  the process.  We have been at it 90 days. Its night and day.

10 When you see this environment today it's a very simple chart,

11 but to get from where we were 90 days ago, which I would

12 describe as pure hell, to where we are today is pretty

13 satisfying.

14 Q   Mr. Ray, do you think there would be a danger of

15 introducing a new party into the environment?

16         MS. SARKESSIAN:  Objection.  His opinion on this

17 issue is not relevant to the Court's determination regarding

18 appointing an examiner.

19         THE COURT:  Overruled.

20         THE WITNESS:  There is a danger.  You know, beyond

21 the -- we have a lot of seats at the table.  We are happy to

22 feed all those people at the table, but what is unique about

23 this, you know, is this controlled environment.  This isn't

24 some, you know, lawyer exercise, you know, where we bring in

25 a well-healed professional who observes some misconduct by

1   people.

2            Literally you have to operate in this laboratory

3   to investigate, to secure these assets, and to develop a

4   process of translating this data into recoverable assets for

5   customers.  This is just too fragile of an environment for me

6   to accept, you know, yet another seat at the table of someone

7   who just bounces into this environment and puts ourselves at

8   risk.  We have come too far to allow that to happen in my

9   mind.

10            MR. BROMLEY:  That's all I have for this witness

11   at the moment, Your Honor, reserving time for redirect.

12            THE COURT:  All right.  Thank you.

13            Let's go ahead and take a 15-minute recess.  We

14   will reconvene at 11:25.

15        (Recess taken at 11:11 a.m.)

16        (Proceedings resumed at 11:27 a.m.)

17            THE COURTROOM DEPUTY:  All rise.

18            THE COURT:  Thank you, everybody.  You may be

19   seated.  We are back on the record.

20            Whenever you're ready.

21            MS. SARKESSIAN:  Thank you, Your Honor.  And for

22   the record Juliet Sarkessian on behalf of the U.S. Trustee.

23                      CROSS-EXAMINATION

24   BY MS. SARKESSIAN:

25   Q    Good morning, Mr. Ray.

1   A      Good morning.

2   Q      So, Mr. Ray, what -- in Enron when was it that you were

3   appointed?

4   A      In 2004.  I believe July of 2004.

5   Q      And was that after the plan had been confirmed?

6   A      It was prior to the confirmation date.

7   Q      Was it after the examiner's report had been filed?

8   A      Yes.

9   Q      And prior -- so, prior to that time, July 2004, you had

10  no involvement with the Enron case?

11  A      That's correct.

12  Q      You did not lead an investigation of the Enron debtors,

13  did you?

14  A      I lead the prosecution of those cases, yes.

15  Q      What type of actions were you prosecuting?

16  A      Virtually all types.  There was accounting malpractice,

17  legal malpractice, breach of fiduciary duty, crime.  There

18  were actions against insurance carriers for failure to pay.

19  There was avoidance actions.  I mean virtually, you know, any

20  type of affirmative recovery that one could think of.

21  Q      Now you testified something to the effect that you did

22  not feel that the examiner reports in Enron, or ResCap were

23  particularly useful to you in your roles?

24  A      That's correct.

25  Q      So, do you know whether the Courts in those cases viewed

1  the examiner reports as being helpful?

2  A    No, I don't.

3  Q    You don't know either way?

4  A    I don't know either way.

5          MS. SARKESSIAN:  Your Honor, since -- ordinarily I

6  wouldn't do this, but since Mr. Ray testified about his

7  opinion as to whether these examiner reports in these other

8  cases were helpful, I would like to bring to the Court's

9  attention what the Courts stated in the confirmation order in

10 Enron as well as a transcript in the ResCap case.  I can –

11         MR. BROMLEY:  Objection.  That is not evidence.

12         MS. SARKESSIAN:  It's not evidence, Your Honor,

13 but he testified about his opinion and these orders and

14 transcripts are part of the Court record.  And the Court can

15 take judicial notice of them.

16         THE COURT:  Well, I think you argued earlier I

17 could take judicial notice that they were filed and not the

18 content of those documents, right?

19         MS. SARKESSIAN:  That is true, but at least with

20 respect to an order, an order says what it says.

21         THE COURT:  Well, if it's an order I will take

22 judicial notice of the order. If its in a transcript I will

23 not take judicial notice of the transcript.

24         MS. SARKESSIAN:  So, the order that we have is in

25 -- that one is Enron.  It's the findings of fact and

1   conclusions of law.

2          MR. BROMLEY:  I don't have --

3          MS. SARKESSIAN:  I'm sorry.

4          THE COURT:  Do you want to produce a copy?

5          MR. BROMLEY:  And can I also ask are you done with

6   the witness?

7          MS. SARKESSIAN:  No.

8          MR. BROMLEY:  Well, what does this have to do with

9   --

10          MS. SARKESSIAN:  Oh, I'm sorry.  I apologize

11   because I was actually going to ask the witness about it, but

12   he's right, since the witness didn't know I can do this

13   later.

14          THE COURT:  You can do this later, yes.

15   BY MS. SARKESSIAN:

16   Q    Now, Mr. Ray, you talked about appointing directors,

17   correct?

18   A    Yes, I did.

19   Q    And your power to appoint directors came from the

20   omnibus corporate authority that was signed by Mr. Sam

21   Bankman-Fried, is that correct?

22   A    In part.

23   Q    What is the other part?

24   A    At that point I was the only officer of the company.

25   And pursuant to that power I was able to -- I had the power

1  to nominate directors and elect them.

2  Q    So, when you say the power, you mean the omnibus

3  corporate authority?

4  A    Yes.

5  Q    And that is Debtor's Exhibit 1.  I can -- do you have

6  Exhibit 1? Do you have a binder up there?

7  A    I do.

8  Q    If you could turn to Exhibit 1A, please.  That is the

9  petition of West Realm Shires Inc.

10       (Audio interference)

11             MS. SARKESSIAN:  I'm sorry?

12             THE COURT:  Whoever that was kick them out,

13  please.

14  BY MS. SARKESSIAN:

15  Q    If you look at the top of the page it has the ECF page

16  numbers. So, if you could turn to page 11 of 20, please.

17  Does that say omnibus corporate authority at the top?

18  A    Yes, it does.

19  Q    Is that the omnibus corporate authority that gave you

20  the authority to appoint directors for the debtors?

21  A    Yes.

22  Q    If an examiner is appointed, if the Court appoints an

23  examiner in this case, would you cooperate with that

24  examiner?

25  A    I will follow whatever orders are issued by this Court.

1  Q    Assuming that you were directed to cooperate with the

2  examiner would you do so?

3  A    Can you explain what you mean by "cooperation?"

4  Q    If the examiner needs documents, for example, that the

5  debtors have would you provide those documents to the

6  examiner?

7  A    I think there might be some caveats to that but, yes.

8  Q    Are there other things that you would not provide to the

9  examiner if he or she asked?

10         MR. BROMLEY:  Objection, Your Honor; speculation.

11  There needs to be a question.

12         MS. SARKESSIAN:  That's a fair objection.

13         THE COURT:  Okay.

14  BY MS. SARKESSIAN:

15  Q    You had testified that -- I believe you had testified

16  that all -- I don't want to misstate your words.  Did you

17  testify that all former management has been terminated?

18  A    I said that any former management that was in a control

19  position has been terminated.

20  Q    Okay.  But there still are some officers currently at

21  the debtors that were present prior to the petition date,

22  correct?

23  A    There are employees that are employed who were also

24  employed prepetition.  They're not officers of the company.

25  Q    We do have a stipulation -- I would point to we have a

1  stipulated fact that there are certain officers that still

2  remain.  Are you saying that is inaccurate?

3  A    I am saying that you may be confusing titles with, you

4  know, officer positions which are different in a corporate

5  context and sometimes get confused.  For example, the general

6  counsel of the company is a title.  I have not stripped that

7  person of their title, but they don't function as general

8  counsel or officer of the company. I certainly haven't

9  appointed him as officer post-petition.

10 Q    So, you are saying that there are some individuals who

11 hold officer titles at the debtor that were there

12 prepetition.

13 A    That are not in control positions of the company.

14 Q    What do you mean by "control position?"

15 A    Positions of control.

16 Q    Could you elaborate a little further?

17 A    Controlling the actions of the company, making decisions

18 related to the company's business or operations.

19      Is that sufficient?

20 Q    Yes.  Thank you.

21      Are you aware that -- you had given some testimony

22 regarding cooperating with various State Attorney General

23 Offices and the like.  Is that correct?

24 A    Yes.

25 Q    And are you aware that certain State Attorney General

1   Offices or other State agencies have, in fact, joined in the

2   U.S. Trustee's motion to appoint an examiner?

3   A    I believe there was two joinders; I think Wisconsin and

4   one other state, yes.

5   Q    You don't recall there was a third one more recently?

6   A    If you say so.

7   Q    Okay.  It attached a bunch of letters from other State

8   agencies. You didn't see that?

9              MR. BROMLEY:  Objection, Your Honor.

10             MS. SARKESSIAN:  I was asking did you see that,

11  the attached letters from other State agencies supporting the

12  joinder?

13             THE WITNESS:  Yeah.  I don't know which ones you

14  are referring to.  I did review two of them. If there is a

15  third, I will take your word for it.  I did read the two that

16  were filed.  There is a third, I may not have read it.

17  BY MS. SARKESSIAN:

18  Q    Joinder of the Texas State Securities Board.  You didn't

19  see that?

20             MR. BROMLEY:  Your Honor, can I just ask the

21  relevance of this?  I mean we're happy to stipulate that the

22  Texas joinder was filed.

23             MS. SARKESSIAN:  Your Honor, he testified --

24             THE COURT:  I've seen it too and I've seen the

25  letter.

1        MS. SARKESSIAN:  He testified about how, you know,

2   he's assisting them, and I think its relevant that they are

3   joining in the motion.

4        THE COURT:  I get that point, but I don't know

5   what else he can elaborate on.  He said he didn't see the

6   third one. I have seen it, so I know it's out there.

7        MS. SARKESSIAN:  Thank you, Your Honor. I just

8   wanted to make sure if I said Texas he might have said, oh,

9   yes, now I remember.

10        THE COURT:  Okay.

11   BY MS. SARKESSIAN:

12   Q    Are you aware of any State agencies that have objected

13   to the motion to appoint an examiner?

14   A    I think -- didn't you just say that two states, three

15   states had objected to --

16   Q    No, joined.

17   A    Oh, joined.

18   Q    I'm asking are you aware of any that objected?

19   A    No, I am not.

20   Q    Now your firm is called Owl Hill Advisory, correct?

21   A    That's correct.

22   Q    And are you the only employee of Owl Hill?

23   A    Yes.

24   Q    Okay.  So, you are -- among your services some of the

25   services you're doing relate to ongoing investigations of

1   various prepetition actions?

2   A    I'm sorry, in what case are you referring to?

3   Q    I'm sorry, FTX.  In FTX is one of the services you are

4   currently performing is investigating certain actions that

5   took place prepetition?  Is that something you are doing?

6   A    Well, in my capacity as CEO of the company I am

7   overseeing, you know, every aspect of the company's business

8   operations including investigations related to prepetition

9   conduct.

10  Q    Okay.  But you are not personally conducting any of that

11  yourself?

12  A    It depends on the topical matters, but in some cases I

13  am.

14  Q    Are there other employees at the debtor that are

15  performing those functions?

16  A    Yes.

17  Q    And are you overseeing them?

18  A    Yes.

19  Q    And you are billing on an hourly rate in this case, is

20  that correct?

21  A    That's correct.

22  Q    Do you know approximately the amount of fees that your

23  firm has incurred to date in connection with the services you

24  performed for the debtors?

25  A    Through what date?

1  Q    Through any date, today or the end of last year, or

2  whatever date you might have information on.

3  A    The most recent date I would have information on is the

4  period from November 11th, which was the start of the

5  engagement, through December 31st.  That approximate amount,

6  excluding the expenses, is $690,000 which is simply the

7  number of hours spent times the hourly rate.

8  Q    Have you looked at the examiner's report in Celsius

9  Network?

10 A    Yes, I have.

11 Q    Are you aware of how many times that report references

12 FTX?

13 A    I did not do a word count.

14 Q    But you did notice that there were references?

15 A    I'm sure there was the word "FTX."  Again, I didn't do a

16 word count.

17 Q    Did you look at the examiner's report in the Cred case?

18 A    No, I did not.

19 Q    Have you ever been an examiner?

20 A    No, I have not.

21 Q    Have you ever represented an examiner as counsel?

22 A    No, I have not.

23        MS. SARKESSIAN:  I'm sorry, Your Honor, could I

24 have a moment, please?

25            THE COURT:  Sure.

 1                MS. SARKESSIAN:  Your Honor, my cross is

 2  completed.  I can wait until after to deal with the order in

 3  the Enron case.

 4                THE COURT:  Let's see if there is any redirect.

 5                MR. BROMLEY:  No redirect, Your Honor.

 6                THE COURT:  Thank you.

 7                Mr. Ray, thank you.  You may step down.

 8         (Witness excused)

 9                MS. SARKESSIAN:  Your Honor, I'm going to hand

10  these out.

11                THE COURT:  Okay.

12                MS. SARKESSIAN:  Your Honor, may I approach?

13                THE COURT:  Yes.

14                MS. SARKESSIAN:  Should I give a copy as well?

15                THE COURT:  Yes.

16                MS. SARKESSIAN:  I should mark this U.S. -- well,

17  it's not an exhibit.

18                THE COURT:  This is for impeachment purposes only.

19                MS. SARKESSIAN:  Yes.  Effectively, yes.

20         (Pause)

21                MS. SARKESSIAN:  So, this is the findings of fact

22  and conclusions of law confirming the supplemental modified

23  fifth amended joint plan of affiliated debtors pursuant to

24  Chapter 11 of the United States Bankruptcy Code and related

25  relief in Enron, Southern District of New York Case No. 01-

1  16034.  The date is -- I don't have the docket number on

2  this, I apologize.

3           THE COURT:  I noticed at the top it says not for

4  publication.

5           MS. SARKESSIAN:  Yes.

6           THE COURT:  What is the effect of that on my

7  ability to take judicial notice of this document?

8           MS. SARKESSIAN:  I understand, Your Honor.  Like I

9  said, I -- my colleague tells me it is available on the

10 Bankruptcy Court's website.  Why does it say not for

11 publication? It is available on the Bankruptcy Courts

12 website.

13          THE COURT:  But not on the docket?

14          MS. SARKESSIAN:  It pre-dates -- the problem is

15 the date apparently.  Its from 2004.  I think that is what

16 the issue was, Your Honor.

17          THE COURT:  Okay.

18          MS. SARKESSIAN:  I mean it's, obviously, not a

19 written decision, but, again, Mr. Ray was allowed to testify

20 as to his opinion as to whether the examiner report was

21 useful.  And it would seem to me that the Judge's opinion on

22 that matter is, at least, equally relevant.

23          MR. BROMLEY:  Your Honor, we're not -- I don't

24 know that this is the Judge's opinion.  It says not for

25 publication.  I don't even know what part of it -- its 130

1   pages or 63 pages.

2           MS. SARKESSIAN:  Yes.  I will point that out.

3           MR. BROMLEY:  Okay.

4           MS. SARKESSIAN:  So I would first point out on

5   page 101, in the first full paragraph, fifth line down, the

6   Court states, "The ENA examiner has provided valuable

7   services to the estates of ENA and its subsidiaries in

8   satisfaction of his duties imposed by the Court."

9           MR. BROMLEY:  First of all, Your Honor, there were

10  four examiner reports, this references one examiner.  It

11  doesn't say the report was helpful, it just says the

12  examiners provided services.  We don't know who wrote this.

13  Proposed findings of fact and conclusions of law are

14  generally drafted by counsel and we haven't had a chance to

15  look at it.

16          We object to use of this -- and we're not even

17  sure what the use of it is for.  It doesn't impeach Mr. Ray

18  because he said he hadn't seen it.  So --

19          MS. SARKESSIAN:  Well, Your Honor, I mean, the

20  U.S. Trustee's position is that all of Mr. Ray's testimony is

21  completely irrelevant and we objected, obviously, repeatedly

22  to him giving his opinion about whether he thought the

23  examiner reports were useful in the two cases he was involved

24  in.  In Enron, it was after the fact; he came in after the

25  reports were filed.

1          So, again, if he's allowed to provide that

2    testimony, I think the Court can take judicial notice of an

3    order of the Court, findings of fact and conclusions of law

4    that was signed by the Judge with these findings.  And there

5    is some other provisions I would read about some of the other

6    examiners, but --

7          MR. BROMLEY:  Your Honor --

8          MS. SARKESSIAN:  -- I started with that one.

9          MR. BROMLEY:  -- Mr. Ray's testimony was opinion

10   testimony:  it's his own experience as to whether or not

11   these reports were helpful to him in a job that he conducted

12   and an effort that he was supervising.  I am sure that there

13   are people who think that the examiner report was helpful.  I

14   think Mr. Batson, who earned $9 million writing it, probably

15   thought it was helpful, but none of that is relevant to this

16   case.

17         MS. SARKESSIAN:  I agree that none of this is

18   relevant --

19         MR. BROMLEY:  No, this is --

20         MS. SARKESSIAN:  -- to this case --

21         MR. BROMLEY:  -- Mr. Ray is the chief executive

22   officer of FTX.

23         THE COURT:  All right, hold on.  Well, the problem

24   I have is, one, it says not for publication.  I have no idea

25   where this came from, I have no testimony where it came from;

1  so it's not authenticated.  It has an electronic signature,

2  but that doesn't tell me much unless I have something.

3  Usually, there's a web address that is identified on it or it

4  comes from the docket and there's a docket entry identified

5  on the document.

6          And, frankly, I mean, what you just read to me is

7  not -- I'll take it for what it is, what you just read to me,

8  but I don't think I can take judicial notice of this given

9  the way it's being presented to me.  I need to have some

10 authentication of the document, I don't have any.

11         MS. SARKESSIAN:  Your Honor, could I just speak to

12 my colleague for one minute?

13         THE COURT:  Sure.

14     (Pause)

15         MS. SARKESSIAN:  Your Honor, we do have the web

16 address where it came from.  Would it be helpful if we

17 forwarded this to you?

18         THE COURT:  I think, unfortunately, the only way

19 to do this is to have your colleague take the stand.

20         MS. SARKESSIAN:  Unfortunately, this colleague did

21 not personally download the document, another colleague did

22 that's not present in the courtroom and is in another state.

23         THE COURT:  That's a problem.

24         MS. SARKESSIAN:  Yeah.  Okay, Your Honor.  So

25 we'll -- there's nothing further to be done by this.  I

1    understand Your Honor's ruling and, again, normally I would

2    never do anything with these types of documents because I

3    think it is completely irrelevant to the issues before the

4    Court, but, again, because of Mr. Ray's testimony -- and I

5    agree, you know, I think it's a little bit different to say,

6    well, other people might have thought that the report was

7    helpful, but the Court's opinion is more important than other

8    people's opinions, I would think --

9              THE COURT:  I understand your point.

10             MS. SARKESSIAN:  Thank you, Your Honor.  Are we

11   moving on to --

12             THE COURT:  Yes.

13             MS. SARKESSIAN:  -- final arguments?

14             THE COURT:  Do you have any other evidence?

15             Well, I guess we're on -- you weren't done with

16   your evidence.  Do you have any other evidence, Mr. Bromley?

17             MR. BROMLEY:  No, Your Honor.

18             THE COURT:  Okay.  Any --

19             MR. SHORE:  Just one clarification before the

20   evidence is closed.  Again, Chris Shore for the Joint

21   Provisional Liquidators.

22             It's unclear whether and to what extent the

23   presentation that was given is coming into evidence or not,

24   and normally I wouldn't care since it would just be coming in

25   for this proceeding, but there was on that global -- or the

 1   -- I guess it was the first page of the chart which showed

 2   all the corporate logos and the admin burn that's going on,

 3   there was a line that went out that said other fiduciaries

 4   and listed the JPLs.  And I want the record to be very clear,

 5   I don't think the implication was being made, but the chart

 6   shows it that the JPLs are fiduciaries for the debtors;

 7   they're a fiduciary for the Chapter 15 debtor, that's all.

 8              THE COURT:  Well, those were demonstratives; they

 9   weren't admitted into evidence, so they're not part of the

10   record.

11              MR. PASQUALE:  Ken Pasquale for the committee,

12   Your Honor.  We have no additional evidence.  Thank you.

13              THE COURT:  Thank you.

14              Any rebuttal?  Ms. Sarkessian?

15              MS. SARKESSIAN:  Oh, I'm sorry.  I'm sorry, Your

16   Honor, I didn't hear you.

17              THE COURT:  Any rebuttal evidence?

18              MS. SARKESSIAN:  No --

19              THE COURT:  Okay.

20              MS. SARKESSIAN:  -- no rebuttal evidence.

21              THE COURT:  All right.  So we can go to closings.

22              MS. SARKESSIAN:  Thank you, Your Honor.  Again,

23   for the record, Juliet Sarkessian on behalf of the U.S.

24   Trustee.

25              And, Your Honor, I am going to make sure I'm not

1    repeating my opening argument, but I think that -- we've had

2    some evidence today and I'll speak about that in a minute,

3    but of course the U.S. Trustee's position, as I did indicate

4    -- I am repeating my opening -- under 11 -- the requirements

5    for 1104(c)(2) have been met and in fact the only facts that

6    could have been disputed were stipulated by the debtors and

7    the other objectors.  And, therefore, the U.S. Trustee

8    believes that an examiner is mandated.  Of course, the scope

9    of such examination will be decided -- if Your Honor was to

10   appoint an examiner, the scope would be dealt with after

11   that, but --

12              THE COURT:  Don't I need to do that beforehand?  I

13   mean, how do I determine as is appropriate if I don't know

14   what the proposed scope of the examination is?

15              MS. SARKESSIAN:  Well, of course, Your Honor, the

16   U.S. Trustee does not believe that the as is appropriate

17   relates actually to the scope of the examination and not to

18   whether an examiner should be appointed.  And the number of

19   cases --

20              THE COURT:  Well, it has to point to one -- it has

21   to apply to one or the other, doesn't it?  I mean --

22              MS. SARKESSIAN:  Yes, it's a scope -- yes, it

23   applies to the scope of the investigation.

24              THE COURT:  So that's my question, I don't know

25   what scope you're asking me to grant.  How would I know how

1  to do that?  I can't just say I'm going to appoint an

2  examiner and do what?

3        MS. SARKESSIAN:  Well, Your Honor, I understand

4  that in other cases, I believe that included Residential

5  Capital, you know, the Court said that will be -- appointing

6  the examiner -- and that -- Residential Capital did actually

7  think that the as is appropriate was a requirement that had

8  to be found and they found it was appropriate, but the Court

9  nevertheless said, okay, the scope will be dealt with, you

10 know, now the parties get together, the U.S. Trustee appoints

11 -- you know, nominates and appoints an examiner, and then the

12 examiner meets with the parties and they talk about the scope

13 and then they come back to the Court.

14       But, Your Honor, I am happy to give you -- I

15 circulated last night to all the other parties -- because

16 we've had a number of questions about scope, so last night we

17 said, all right, here are some examples -- we can't say that

18 this is every -- here's some examples of the types of things

19 that would -- you know, excuse me, an examiner could

20 investigate.

21       So, number one, the facts and circumstances

22 surrounding the misuse of customer funds prepetition;

23 identifying the individuals and entities that were involved

24 in that or who knew about it or should have known about it;

25 and determining whether any of those individuals remain

1    employed at the debtors or otherwise have some continuing

2    involvement in the debtors' affairs.

3            Also investigating any actions taken by the

4    debtors, their officers, directors, employees, or others to

5    conceal the misuse of customer funds, including by way of

6    software.  That was something that Mr. Ray in his first day

7    declaration talked about the use of software to hide, to

8    conceal the misuse of customer funds.  And then, again,

9    whether such individuals remain employed at the debtors.

10           Also investigating who was responsible for the

11   debtors' corporate controls and governance; the gathering and

12   maintaining of financial information; systems integrity; the

13   control of the debtors' cash; maintaining the security of the

14   debtors' digital assets, maintaining the security of customer

15   cash and customer digital assets, and what actions were taken

16   or not taken by the debtors, their directors, officers,

17   employees, or others in that regard; and determining whether

18   any individuals or entities who were responsible for such

19   failures remain employed by the debtor or have continuing

20   involvement in the debtors' affairs.

21           And, again, this is picking up on Mr. Ray's first

22   day declaration where he talked about just a complete -- I

23   believe complete lack of these various controls and financial

24   information, and all of these issues that he said was the

25   worst thing he had ever seen, even worse than Enron.

1            So that would be who was responsible for that.

2     Who turned a blind eye?  So that would be another area.

3            Also, just I think more generally, investigating

4     all allegations of fraud, dishonesty, incompetence,

5     misconduct, mismanagement of the debtors by their officers,

6     directors, employees, or others; determining whether any

7     individuals or entities who committed fraud, dishonesty,

8     incompetence, misconduct, et cetera, remain at the debtors or

9     have continuing involvement with the debtors' affairs; and

10    then also investigating the facts and circumstances revolving

11    around all of the hacks of the debtors' exchanges that

12    occurred both before the petition date and after the petition

13    date, determining what individuals or entities were

14    responsible for those hacks and, separate issue, what

15    individuals or entities on behalf of the debtors were

16    responsible for preventing such hacks, whether those persons

17    -- whether they were negligent in the performance of their

18    duties and whether those individuals remain employed by the

19    debtors; and then, finally, shedding transparency into the

20    relationship between the FTX entities and the Celsius

21    entities.

22            Again, this is not meant to be a comprehensive

23    list, but I'm providing it, as I did provide to the other

24    parties yesterday evening, these are the types of things that

25    we could see an examiner looking into in these particular

1   cases.

2          THE COURT:  So pretty much anything and everything

3   that happened prepetition is what you're asking for?

4          MS. SARKESSIAN:  We're not -- Your Honor is the

5   final determiner of the scope of the examiner, not the U.S.

6   Trustee.  These are just things that we think would make

7   sense, but scope could be different.

8          And I will also point out, Your Honor, that, you

9   know, there was testimony by Mr. Ray about securing -- having

10  secured wallets and that, you know, having an examiner could,

11  I guess, create some type of a security risk, I think was

12  what he was saying.

13         Number one, I mean, I certainly hope there

14  wouldn't be any security risk with any examiner.  I mean,

15  obviously, we would appoint an appropriate person.  But a lot

16  of these issues I don't think would even involve having to

17  look into -- I really don't understand a whole lot about the

18  system, Your Honor, I'll have to admit, but, you know,

19  looking into cold wallets, hot wallets, any of the --

20         THE COURT:  Well, you wanted him to investigate

21  what happened with the customer funds, which would require

22  investigating what happened with the cold wallets, the hot

23  wallets, and all the -- and the entire computerized system of

24  the debtors, wouldn't it?

25         MS. SARKESSIAN:  I'm not a technology expert, Your

1   Honor.  I think that some of it could be -- I also don't know
2   what type of documentation there is of that.  I think some of
3   that could be done without actually getting into wallets.
4   It's certainly -- I mean, because there will be transfers --
5   once the money is taken from the wallets, it was then
6   transferred to Alameda, is my understanding -- I don't mean
7   to be testifying, but that's my understanding.  And it may be
8   that there's things that could be traced as to how it got to
9   Alameda that would not require actually going into the
10  wallets themselves, but I am very -- I am not the type of
11  person that could really clarify that, I'm sorry, Your Honor,
12  I don't understand how that works well enough.  Obviously,
13  any examiner appointed would have to be somebody that was
14  very knowledgeable about that area, about cryptocurrency, and
15  we think certainly that would be appropriate to have somebody
16  who's very knowledgeable about cryptocurrency.

17          But to the degree that that type of investigation
18  is needed, I feel very confident that the debtors, along with
19  their professionals, will take very step to make sure that
20  all -- that there's no compromise of any system, that all
21  security that's needed is there and protected, and that they
22  would, hopefully, cooperate with the examiner as much as
23  possible.  The examiner can't get access to this unless the
24  debtors give the examiner access, there's no other way for
25  the examiner to do it.  So it would be -- the debtors would

1  be supervising this.  There should not be any type of a

2  security risk under the circumstances.

3            THE COURT:  Well, let's talk about your view on

4  the mandatory nature of 1104.  So 1104 says that, if I don't

5  appoint a trustee, that an examiner, under (c), can be

6  appointed and the appointment -- and I should take into

7  account an investigation of the debtor, as is appropriate.

8  So what does that mean, as is appropriate?

9            I know you say that doesn't mean if appropriate,

10  but doesn't as is appropriate also mean as is necessary,

11  isn't that the same --

12            MS. SARKESSIAN:  Well, that would relate --

13            THE COURT:  -- aren't those the same thing?

14            MS. SARKESSIAN:  -- well, that would relate to the

15  scope.  Well, I guess, Your Honor, I think what Your Honor is

16  getting to -- and please correct me if I'm wrong -- is that

17  there are other parties here that are conducting

18  investigations and we're well aware of that.  The debtor is

19  conducting an investigation with its professionals,

20  presumably -- I understand that the committee is doing the

21  same.

22            And I think, in that regard, what's relevant is

23  that the Code talks about, you know, if these elements are

24  met, an examiner shall be appointed.  It doesn't say an

25  examiner shall be appointed unless the debtor is

1   investigating itself or, you know, unless there's new

2   management at the debtor or unless there's a committee that

3   can undertake that process.  I mean, even -- my understanding

4   is, Your Honor, in Cred, there was a committee and there was

5   new management and Your Honor still appointed an examiner.

6   And there are other cases that we cited in our reply papers

7   and probably our moving papers as well where -- I mean,

8   there's creditors committees in most cases.

9          Clearly, the Congress was aware that the creditors

10  committee has the ability under the Code to conduct

11  investigations, but they nevertheless approved 1104(c)(1) and

12  (2) and said, you know, under this circumstance, it's an

13  examiner that has to do it, it's not good enough to have a

14  committee do it, it's not good enough to have a debtor, even

15  if it has new management to do it.

16         THE COURT:  Well, in Cred, I indicated first that

17  I didn't think it was a mandatory obligation under 1104.

18  And, two, there was still -- the two main founders of that

19  company were still in charge; they had appointed an

20  independent director, but they were still there and running

21  things, which informed my decision on whether or not I should

22  appoint an examiner in that case.

23         So let me ask you a hypothetical here.  Say a

24  debtor meets the debt threshold under 1104(c)(2) and, a week

25  before the confirmation hearing, a creditor comes in and says

1   we want you, Judge, to appoint an examiner because we think

2   there was -- something happened at the firm, we don't know

3   exactly what it was, but we think there's something wrong and

4   we want an examiner.  Am I obligated to appoint an examiner

5   in that circumstance and put off confirmation of the plan for

6   however long it takes the examiner to do a report?

7            MS. SARKESSIAN:  Well, Your Honor, I think, first

8   of all, I don't think the Code provision requires that

9   confirmation not go forward, it doesn't say that if an

10  examiner is -- I understand why it would make sense to do

11  that, but I don't think that that's a requirement.

12           THE COURT:  How could I confirm a plan if I've

13  appointed an examiner to let me know whether there was

14  insiders who did something wrong?

15           MS. SARKESSIAN:  Well, so I think -- so UAL Corp.,

16  which is a bankruptcy, Northern District of Illinois, back

17  from 2004 actually, I think, addressed that issue.  They said

18  that if you have a situation in which the case where the debt

19  exceeds the threshold and, you know, parties sought an

20  appointment of an examiner to investigate a private dispute

21  -- that's how the Court put it, a private dispute with the

22  debtor that does not raise issues as to the quality of the

23  debtor's management, the Court could limit the scope of the

24  investigation to, quote, "whether there is good cause to

25  engage in the inquiry suggested by the movant," close quote.

1   So -- and that's 307 --

2          THE COURT:  Well, that would be an inquiry into

3   whether I should appoint an examiner.

4          MS. SARKESSIAN:  No.  I think -- I thought what

5   the Court was saying is you do appoint an examiner, an

6   examiner looks to see -- if somebody comes in and makes

7   allegations that seem to be, you know, motivated by, you

8   know, a litigation tactic or something that doesn't seem to

9   be in good faith, then the Code provision does state that an

10  examiner still has to be appointed if that threshold is met,

11  but the examiner can look into are there any grounds for

12  these allegations, I mean, is there anything.  And of course,

13  if it's found that there are, then, presumably, the scope

14  would be -- the Court would expand the scope to look into

15  those allegations that the examiner found there, you know,

16  might be something there.

17         THE COURT:  Well, what if the creditor comes in

18  and says we think there was a $10,000 fraudulent transfer to

19  an insider of the company, we want an examiner to investigate

20  that, but the debtor is on the verge of administrative

21  insolvency and, if I appoint an examiner, it's going to push

22  them over the edge, do I still have to appoint an examiner

23  then too?

24         MS. SARKESSIAN:  I mean, Your Honor, under the

25  Code provision that would appear to be the case.  We don't

1   have that situation here, obviously.

2          THE COURT:  Well, what I'm trying to get at is,

3   are there exceptions, which means that there are -- there is

4   some discretion that has to be applied and determining when

5   and how to apply that discretion should be on the Court,

6   should it not, not on an examiner appointed who then tells me

7   whether or not he thinks I should appoint an examiner further

8   to investigate?

9          MS. SARKESSIAN:  Well, the Court does have

10  discretion if it falls under (c)(1) of 1104.  I mean, if the

11  threshold -- and, again, remember, Your Honor, the threshold

12  is not $5 million in debt, it's $5 million in a very

13  particular kind of debt, which is not every case, but if that

14  occurs --

15         THE COURT:  It would be quite a few of them in

16  this court.

17         MS. SARKESSIAN:  If that occurs, if that threshold

18  is met and the other things -- you know, there's not a

19  confirmed plan, there's not a trustee, there is no discretion

20  in the statute, that is the U.S. Trustee's view, that is the

21  view of the only Circuit Court that ruled on this, and the

22  few District Courts that have ruled have reversed the

23  Bankruptcy Court under these saying there is no discretion,

24  they must be appointed.

25         Now, I understand -- I certainly understand the

1   Court's concern that someone might be, again, acting in an

2   abusive manner, you know, acting for -- under -- for a

3   wrongful purpose.  Again, that's certainly not this

4   situation.  I think that's one of the things that -- well,

5   wrongful purpose or that the -- they're not really asking for

6   an examiner, I mean, they're not -- there's nothing to

7   examine.  Like some of these cases in this district where it

8   was part of the plan confirmation and a party was trying to

9   get an examiner appointed to basically look at legal issues

10  or like in Mallinckrodt where there were allegations that

11  counsel representing certain tort claimants had done things

12  that were improper -- of course, that was not the debtor, it

13  has to be actions by the debtor.

14          And so that we do have some -- it has to actually

15  fit.  Somebody actually has to be asking for an examiner to

16  actually investigate the debtors, the action of the debtors,

17  not something else, not a legal issue.  But if it does fall,

18  if they meet all of the requirements of 1104(c)(2), the U.S.

19  Trustee believes that there is no discretion by the Court,

20  that that's what Congress intended.  And we cite and we go

21  through the legislative history in our reply brief, that was

22  what -- this was a compromise where there were certain

23  parties that wanted to have trustees appointed automatically

24  in all large cases, that didn't happen, this was the

25  compromise that an examiner would have to be appointed under

1  these circumstances.

2          THE COURT:  Let's talk about kind of the overall

3  scheme of 1104 because 1104 says you don't even get to

4  1104(c) unless the Court decides not to appoint a trustee.

5  So why would the appointment of a trustee obviate the need

6  for an examiner?

7          MS. SARKESSIAN:  Well, the trustee has the ability

8  to conduct all sorts of investigations, I mean, that's part

9  of what a trustee does.

10          THE COURT:  And a trustee is someone who is

11  appointed who is independent --

12          MS. SARKESSIAN:  Independent.

13          THE COURT:  -- no connection with the company

14  before they filed for bankruptcy, all of the attributes that

15  we have with Mr. Ray and the independent directors who've

16  been appointed in this case.

17          MS. SARKESSIAN:  But, Your Honor, there is a

18  difference between a trustee and new management.  I mean,

19  again, the Code doesn't -- so 1104(c) doesn't say unless

20  there's new management or unless there's a committee that can

21  conduct the investigation.

22          And I think that it's very important that a -- the

23  difference is an examiner or a trustee and certainly it would

24  stick with an examiner.  An examiner has to prepare a report

25  and that is a public-facing report.  It is independent and

1  does not represent any constituency.  Yes, Mr. Ray did not

2  have a prior connection with the debtors; he was appointed by

3  Mr. Sam Bankman-Fried and he is the CEO of the debtors, he

4  does represent a constituency that is the debtors, he is not

5  independent, not like an examiner.

6        And even though a committee -- I mean, a committee

7  also represents a constituency, but, again, Congress was

8  aware, it gave committees the ability to do investigations,

9  they don't file reports with the Court.  It's very different

10 than an examiner.  They can settle, so can the debtor.  The

11 debtor can investigate things; it can investigate claims and

12 settle without that investigation ever becoming public.

13        THE COURT:  Well, they'd have to file a 9019

14 motion.

15        MS. SARKESSIAN:  They do have to file a 9019

16 motion, but it is not the same -- and I've seen many a 9019

17 motion -- that is not the same thing as an examiner's report.

18 This is -- again, this is what Congress decided needed to be

19 done under these circumstances.

20        And even, Your Honor, honestly, even if you say,

21 all right, you're reading as is appropriate to mean if

22 appropriate, this is a case where -- it's hard to imagine

23 that it's not appropriate.  I mean, I will use, for example,

24 Judge Sontchi in -- I'm sorry --

25        UNIDENTIFIED SPEAKER:  In Visteon.

1          MS. SARKESSIAN:  In Visteon, thank you.  Judge

2    Sontchi, there he did not believe that (c)(2) was mandatory

3    and there he said that -- he also -- he didn't -- it seemed

4    unclear as to, you know, what actually was being asked of the

5    examiner to do and I believe this was also -- if it wasn't at

6    confirmation, it was close to it -- but Judge Sontchi said,

7    quote, "At some point, there has to be a level of smoke, if

8    you will; not a lot, but more than none, more than just a

9    whiff of smoke."

10         And let's compare that to what Mr. Ray said in his

11   declaration that's being admitted as Exhibit 20, paragraph 9,

12   saying that FTX's situation is a dumpster fire.

13         So we don't have a situation where there doesn't

14   really seem to have been any wrongdoing that somebody is

15   coming in and asking for an examiner for an improper purpose

16   -- again, this is assuming, I am for a moment assuming, which

17   of course the United States Trustee does not agree to, but if

18   as is appropriate means it has to be appropriate, we think

19   it's very appropriate here and of course we think for the

20   same reasons that it's in the best interest of the creditors.

21         We understand that Mr. Ray was not prior

22   management, but, again, 1104(c) nowhere, whether it's under

23   (c)(1) or (c)(2), it doesn't say unless you have new

24   management, unless there's a committee, unless you have

25   federal and state agencies doing their own investigation.

1  None of that is in there, none of that -- those elements are

2  relevant to whether or not an examiner should be appointed.

3  And, again, because an examiner, it is public-facing, it does

4  do -- he or she does do a report.

5          I'd like to talk a little bit about -- hold on

6  just one moment, Your Honor.  I don't want to go out of order

7  and confuse things.

8       (Pause)

9          MS. SARKESSIAN:  Right.  So, again, Residential

10  Capital, which again is one of the cases that the objectors

11  do rely on, it's one of the written opinions that says it's

12  not mandatory, but even there the Court said when it did

13  appoint an examiner, it said it must be appointed, quote,

14  "notwithstanding the ability of any other party to

15  effectively and expeditiously investigate the debtor," close

16  quote.

17          So we're not the -- you know, the fact that there

18  is a committee or are other people that can do it is not

19  relevant once the elements have been -- the elements of

20  1104(c) have been met.

21          And, again, an examiner is required to publish a

22  report, a committee -- the committee has discretionary

23  ability to investigate, it's not required, and they are

24  certainly not required to file any report, and conducting an

25  investigation is specifically removed from the list of the

1  debtor-in-possession duties under 1107(a).  So, again, the

2  fact that there's new management, none of that is relevant.

3       And it's not novel to appoint an examiner in

4  situations in which you have governmental, you know, law

5  enforcement or regulatory agencies conducting their own

6  investigation; that happens all the time.  Those agencies

7  will not be filing a report with this Court as to the results

8  of their investigation; it's a completely separate function

9  that they are performing.

10       The debtors also talk about -- again, talk about

11  the law of this district.  He cited a Third Circuit opinion

12  saying there is no such thing as law of the district; that

13  just doesn't exist.  He also said the bench rulings are

14  binding precedent, they're not binding precedent.  In fact, I

15  mean, Judge Walrath won't even let you quote back her own

16  bench rulings to her.  I'm not saying that that -- you know,

17  I'm not saying that all the Judges are like that, but it's

18  not -- it's not binding precedent certainly.

19       I want to talk a little bit about the cost issue.

20  Cost is not mentioned anywhere in 1104.  This is not a case

21  like Dewey & LeBoeuf in which -- I mean, Your Honor asked

22  about converting to a Chapter 7 -- that was a case in which

23  the Court indicated that the cost of an examiner would result

24  in the case -- the debtor's cases being converted to a

25  Chapter 7 and most likely becoming administratively

1   insolvent.  That is absolutely not this case.  In fact,

2   Exhibit 15, which is the debtors' interim financial update as

3   of December 31st of last year, which was -- I want to -- they

4   haven't filed any monthly operating reports, it was their way

5   of filing something along those lines, although it doesn't

6   comply with a monthly operating report, but on page 11 it

7   shows the debtors having unrestricted cash of over 1.2

8   billion.  That does not -- that's apart from custodial cash,

9   that's apart from restricted cash.

10          So this is not a situation in which these debtors'

11  cases are going to be converted or they're going to become

12  administratively insolvent because there's an examiner.  That

13  doesn't mean that there's no budget for the examiner, of

14  course there's going to be a budget for the examiner.  But

15  there's no reason to believe that the cost of the examiner

16  doing an investigation is going to be more than the debtors'

17  professionals conducting an investigation.

18          And I point to Exhibit 10, which is a supplemental

19  declaration of Mr. Dietderich of Sullivan & Cromwell.  It

20  attaches the list of professionals that worked on and billed

21  time -- they haven't filed their fee application yet, but

22  billed time on the matter.  There were over 150 individuals,

23  of which 30 have billing rates of over $2,000 an hour.

24          So to the extent an examiner is doing certain

25  investigations, to prevent duplication that should mean that

1   the debtors' professionals can cut back on what they're doing

2   in that regard.

3           I will also say that the debtors' arguments

4   regarding the cost of an examiner should not be given weight

5   because the U.S. Trustee, in one of its discovery requests,

6   asked for documents reflecting any budget or estimate of the

7   cost of an investigation to be performed by the debtors'

8   professionals of any of the events leading up to the debtors'

9   Chapter 11 filing; fraud, bad acts, et cetera.  The response

10  to that was an objection to say -- they did not provide the

11  information and it said, quote, on the grounds that it is

12  irrelevant to the examiner motion.  Well, we agree, but the

13  debtors can't have it both ways.  They can't say, oh, it's

14  going to be so costly to have an examiner based on examiners

15  in other cases, but at the same time not be willing to

16  produce their budget or estimate for what it's going to cost

17  for the debtors' professionals to do the same kind of

18  investigation.

19          THE COURT:  Well, I can take my own experience and

20  say -- given the scope of what you laid out earlier, the

21  proposed examiner investigation, I can give you a ballpark of

22  what it's going to cost and it's going to be in the tens of

23  millions, if not hundreds of millions of dollars to do that

24  investigation because they're going to have to hire all the

25  same types of experts, financial advisers, cybersecurity

1  advisers, crypto advisers, who are all going to have to do

2  the same thing that the debtors already started to do and the

3  committee has already started to do and the Government has

4  already started to do.

5       It's going to be -- if it's the scope that you're

6  asking me for, it's going to be expensive.  Or, the

7  alternative is, I have complete discretion, right?  I mean, I

8  could say, okay, I'll appoint an examiner; your budget is

9  $10,000.  Are you going to find somebody to take the job?

10       MS. SARKESSIAN:  No, Your Honor, but I think

11  that's effectively the same thing as not appointing an

12  examiner.

13       THE COURT:  Doesn't that show why 1104(c) really

14  doesn't make any sense to be a mandatory obligation by the

15  Court that it's not subject to discretion?  Because it's kind

16  of the same as Rule 65 injunctions -- or is it -- I think

17  it's 65(d) says, if the Court imposes an injunction -- it's

18  different for -- a little different for a debtor in a Chapter

19  11, but if the Court imposes an injunction under Rule 65, if

20  you read the language of Rule 65, I think it's (d), it says

21  you have to impose a bond, but courts have almost universally

22  said I can set the bond at whatever.

23       If I can set the bond at a dollar, then certainly

24  I can say you don't need to set a bond at all, especially if

25  you have a case where you have an individual suing a major

1    corporation and the individual is successful in getting an

2    injunction, then you're going to impose a billion dollar bond

3    on that party who can't do it and then they lose their case?

4    No, we can't do that.

5          So courts have universally said that's not a

6    mandatory obligation, even though the language, if you read

7    it the way you propose reading here, would make it mandatory.

8          So there's always discretion by the Court, right?

9          MS. SARKESSIAN:  Your Honor, we would not agree.

10   And, again, other cases in the District Courts, the few --

11   there have not been a lot, but the few District Courts and

12   the one Circuit Court that have ruled on this disagree, and

13   the District Courts were reversing -- and the Circuit Court

14   as well, I believe -- were reversing the determinations by

15   the Bankruptcy Court that there was discretion under

16   1104(c)(2) and said, no, there's not.  It says what it says,

17   shall means shall; this is what Congress wanted.

18         Now --

19         THE COURT:  But I can set the budget at whatever I

20   want.

21         MS. SARKESSIAN:  Well, if it's set to the point as

22   the equivalent of not having an examiner, then the statute

23   really hasn't been complied with.  I mean --

24         THE COURT:  All it says is I have to appoint an

25   examiner, it doesn't say I have to give them a $100 million

1   budget.

2          MS. SARKESSIAN:  Well, we would hope that Your

3   Honor would not provide no budget for the examiner, if Your

4   Honor was to appoint an examiner, because that's, again,

5   effectively not appointing an examiner.  But I understand the

6   point Your Honor is making.  Just a few other things I'd like

7   to mention.

8          Again, if Your Honor was looking under -- if we

9   look under (c)(1), the best interests of the creditors or,

10  another way to say it, whether -- again, if one was to use

11  the as is appropriate as meaning if appropriate, we do

12  believe that there is plenty here.  And I think part of this

13  shows the joinders that were filed to the U.S. Trustee's

14  motion to appoint an examiner, there were joinders filed.

15  There was one by Texas State Securities Board and Department

16  of Banking, that's at 600 on the docket, and they attached

17  letters from state agencies or attorney general's office from

18  15 states and D.C. supporting the joinder, it was a total --

19  when you add the other joinders that were filed before, 18

20  states and the District of Columbia.

21          And what the Texas joinder said was that Texas is

22  currently undertaking an investigation of the debtors for

23  violations in connection with transactions of business in

24  Texas and with Texas accountholders.  And then they say, this

25  will require constant access to information and documentation

1   in connection with its investigation and it would benefit

2   from working with and gaining this information from a neutral

3   third party investigator who focuses on investigating the

4   debtors as opposed to running the debtors' business.

5          And, you know, Mr. Ray has a lot of jobs here and,

6   you know, we have a situation where the debtors' schedules

7   and statements have yet to be filed and they were -- it's

8   been -- you know, they filed the cases on November 11th, we

9   have no schedules and statements; we have no monthly

10  operating reports, we have this, I want to call it a faux

11  monthly operating report that they filed; we have no 2015.3

12  rule statements, they have not been filed.

13         So we're missing a lot of very basic documents in

14  this case and my hope would be that Mr. Ray could focus on

15  doing that and have the examiner focus on doing an

16  investigation as to what happened prepetition.  They also --

17  the examiner also has to look at the acts that happened post-

18  petition as well when Mr. -- shortly after Mr. Ray came on

19  board.  But that, I think, is what these joinders are saying,

20  let him focus on that, which I think is a great idea, let the

21  examiner focus on doing an examination and investigation.

22         Another thing that -- I'm sorry, I think I already

23  mentioned that in -- and I do want to clarify, the list that

24  I gave Your Honor about possible things for the examiner to

25  investigate was simply that, it was simply examples.  We are

1   not -- we have not taken a position and we don't feel that

2   this is the right time, we haven't taken the position, oh,

3   yes, it has to do all of these things, but because we were

4   asked repeatedly by other counsel what is the scope, what do

5   you have in mind, these were some examples.  And, you know,

6   Your Honor is the ultimate -- you will, will ultimately

7   determine that.  I do not want to say that we're insisting

8   that each one of these things be investigated or that these

9   are the only things, you know, this was what we came up with

10  to give Your Honor and to give other folks an idea about what

11  could be appropriate for an examiner to look into.

12          Your Honor, I believe that is my argument, unless

13  Your Honor has any further questions.

14          THE COURT:  No other questions.  Thank you very

15  much.

16          MS. SARKESSIAN:  Thank you, Your Honor.

17          MR. BROMLEY:  Good afternoon, Your Honor, Jim

18  Bromley of Sullivan & Cromwell.

19          Your Honor, the U.S. Trustee makes a very clear,

20  policy-driven argument that the Court has zero discretion

21  under Section 1104(c)(2).  If the $5 million threshold is

22  met, which is going to be met in virtually every large case,

23  certainly in every mega case and certainly in every super-

24  mega case, the import of the U.S. Trustee's argument is that

25  this Court and no other court has discretion to determine

1  whether or not an examiner should be appointed.  That is

2  simply not a realistic or accurate reading of the statute or

3  the precedent.

4        And it is, frankly, Your Honor, disconcerting

5  because there are two places where discretion, we believe,

6  matters, one is with Your Honor and that 1104 and the

7  language which phrase -- and particularly the phrase as is

8  appropriate provides you with discretion, but, frankly, Your

9  Honor, in the discretion to have brought this motion to begin

10 with and that resides with the Office of the U.S. Trustee.

11       There is zero evidence that's been put on before

12 Your Honor today about whether or not (c)(1) has been

13 satisfied by the movant, who bears the burden.  Nothing but

14 conclusory statements that because Mr. Ray had put in a

15 declaration that said that there's some sort of fraud that

16 has occurred here, period, full stop, it is in the best

17 interests of creditors under (c)(1) for an examiner to be

18 appointed.  And keep in mind, the U.S. Trustee moves under

19 both (c)(1) and (c)(2).  We believe there's zero evidence

20 under (c)(1).

21       Mr. Ray testified for over an hour, an hour and a

22 half, and the gravamen of his testimony is that it is not in

23 the best interest of creditors, stakeholders, or the estate

24 for an examiner to be appointed.

25       Mr. Ray testified that he is independent, that his

1   directors are independent, that he has, at his direction,

2   commanded a group of highly sophisticated professionals to

3   take care of a highly technical and dangerous environment.

4   That environment was so dangerous that on the day that these

5   cases were commenced, that over $400 million were stolen,

6   because of the condition that the prior management left the

7   company in, in that security environment.

8          If it was not for the immediate action of Mr. Ray

9   and those advisors under his direction, this company would

10  simply have faded away, been stolen, bled dry and yet, the

11  U.S. Trustee stands here and says, I don't really understand

12  these technical things.  It's going to be okay.  I'm sure

13  they'll work on it.  I'm sure it'll be fine.

14         And then the U.S. Trustee stands up today and

15  says, Well, I haven't said anything about scope.  Now I'm

16  going to read to you what the scope is, and it's everything,

17  everywhere, all at once.

18         We have in front of you, Your Honor, two sets of

19  examiner reports from two other mega, super-mega-cases.

20  Those binders represent $200 million.  That's it.

21  $200 million.

22         And the U.S. Trustee says, We'll, you have $1.2

23  billion of unrestricted cash on your balance sheet.  You

24  should spend some -- a lot of that and completely replace

25  everything that's being done with a new set of professionals

1   who are going to do the exact same thing, with no evidence

2   that any of those professionals or this examiner to be

3   appointed would be any more independent, any more qualified,

4   any more able to secure these assets.  It's simply going to

5   be the duplication of effort and an enormous amount of

6   expense.

7           The fact that we may have $1.2 billion of

8   unrestricted cash is not the point.  We need $8 billion of

9   unrestricted cash.  We do not have enough money to pay back

10  all of our creditors.  And the U.S. Trustee, for pure

11  purposes of public policies, because bleach and sunshine is a

12  public policy that we need here, says that we should spend

13  tens, or even hundreds of millions of dollars to provide some

14  guidance to states that have written one paragraph that said,

15  We agree with what they said before.

16          And the evidence that Mr. Ray has put on, and is

17  uncontradicted, is that we have done nothing over the past 90

18  days, other than cooperate and provide massive amounts of

19  information to warrant regulators all around the world.

20          THE COURT:  Well, let me ask you a question.  You

21  mentioned bleach and sunshine, so let me ask you about one

22  issue that the U.S. Trustee raises, which is that under 1106,

23  if I appointed an examiner, there'd be a public report filed.

24          MR. BROMLEY:  Uh-huh.

25          THE COURT:  And what is the view of the debtors in

1   this case of the need to provide the creditors in this case

2   with something that shows them what's been done:  what

3   investigations have been undertaken, how they were

4   undertaken, and what the results of those investigations are,

5   because under 1107, a debtor-in-possession doesn't have that

6   obligation.

7          MR. BROMLEY:  Well, there are two things, Your

8   Honor, right.  One is what we've already done and we continue

9   to do and then there's what the Bankruptcy Code provided in

10  other sections.  So, what we have already done is one of the

11  exhibits, which we agreed to jointly, is a very extensive

12  presentation that the debtors made to the Creditors'

13  Committee.  It is not normal course in a case of this size or

14  substance that when you meet with the Creditors' Committee,

15  that you publish the same day for the public, the complete

16  contents of the presentation that we made.  We did that.  We

17  will continue to do things like that.

18          It is the view of Mr. Ray and the management of

19  the directors that there is -- this is a different case.  We

20  need to approach that in a different way.  Do we have a

21  specific schedule of things that we're going to say and at

22  what point?  No.  But are we going to continue to follow in

23  those footsteps that we've already set forth?  Yes, we will.

24          In addition, Your Honor, we have an obligation to

25  put together a disclosure statement.  That disclosure

1   statement in a case like this is going to be a recitation of

2   everything that has taken place.  And it'll be up to you,

3   Your Honor, to determine whether the information set forth in

4   that disclosure statement is adequate, under the

5   circumstances.

6           We believe that in order for us to confirm a plan,

7   we're going to have to put together a disclosure statement

8   that brings that bleach and sunshine to this situation.  So,

9   we believe that -- well, and I will note, 1106 and 1107 and

10  1104 do not require in every circumstance that there be a

11  public report.  When we talk about the debtors furthering

12  public policy, we have spent, literally, tens of millions of

13  dollars, complying with public policy by reporting to the

14  Congress, to the House, to the Senate, to the U.S. Attorney's

15  Office in the Southern District of New York and three other

16  Districts.  It has led to the indictment of three individuals

17  who led the company in record time.  There have been lawsuits

18  already filed by the SEC and the CFTC.

19          When you talk about the debtors dedicating assets

20  to transparency to the public process, I don't think you can

21  find a case where debtors have done anything matching what

22  these debtors have done in the first 90 days of the case.

23  And will we continue to do that?  Yes, we will.

24          What Mr. Ray testified to is that on a daily

25  basis, we receive emails that, in substance, say, We would

1    like you to look at these transactions, these individuals,

2    and get us this information in 24 hours.  And what that

3    requires, Your Honor, is us to actually go in -- and when I

4    say, "us," it's the entirety of the investigations team -- to

5    go into this virtual environment and track down the

6    information that's being requested by the authorities.  It's

7    not simply going into a warehouse and picking things off of a

8    shelf.  It's interpreting code.  It's making sure that when

9    the code is discovered and accessed, it doesn't trigger

10   things that Mr. Ray was talking about that might damage the

11   assets.

12          We don't have -- there are no wallets.  There are

13   no keys.  There are no buildings.  Everything we have is a

14   series of zeros and ones and any time that environment is

15   accessed, it creates risk that damage will occur.  And so

16   every time we're going into that environment, the

17   investigation exercise is also securing assets.  It's also

18   figuring out whether there are claims as to whether or not

19   the issues that we're finding in the environment have some

20   explanation that's other than a mistake or incompetence or

21   inexperience.  Maybe it's fraud.  You don't know that.

22          When we talk about fraud in court, we also talk

23   about badges of fraud.  You don't have badges of fraud in the

24   same way when you're sitting there and having digital experts

25   in Israel and in the United States trying to figure out why

1   the code was changed from X to Y, by whom, who had the right

2   to change it, who had access to it; all of that is a

3   consolidated exercise that takes place every single day.  So,

4   quite honestly, the idea that we are able to simply hand over

5   that environment to an examiner is naive.

6            Mr. Ray said he will comply with any order of this

7   Court and I know he will and I know we all will.  But the

8   idea that there's going to be some ability to find somebody

9   else out there and put together a team and have that team

10  operate as independently and as effectively as the team

11  that's in place and then write a report, simply means that

12  we're going to add on top of this, months, if not years of

13  additional time and tens of millions, if not hundreds of

14  millions of additional cost.

15           And who bears that cost?  The creditors,

16  Mr. Pasquale's clients.

17           We should not be sitting here duplicating the same

18  thing that is happening every single day because the U.S.

19  Trustee believes that there's a policy point of view that

20  1104 says that it's mandatory no matter what.  And the

21  slippery slope of that mandatory argument is not in this

22  courtroom.  It's not because the U.S. Trustee is going to be

23  an advocate or pushing a particular agenda.  I don't believe

24  that.

25           But 1104 doesn't stop at the U.S. Trustee.  It

1   says, "party in interest or the U.S. Trustee."  Any case law

2   that is established in this case that says, "mandatory" means

3   mandatory, means that every single Chapter 11 case with more

4   than $5 million worth of debt is going to be at risk of being

5   held hostage at confirmation, at the first disclosure

6   statement hearing, at any point in time.  It will just become

7   a weapon in the arsenal of every party in interest, because

8   if you take the discretion away from the Courts, the weapon

9   is only in the hands of those who are in the courtroom.

10          And the idea that we will then be reduced to

11   saying the only choice that the Courts have to say is, you

12   know, No, I'm not going to give the examiner a budget.  Well,

13   I think that's a -- and as the Courts have continually ruled,

14   here in Delaware, that's a silly decision to make.  Because

15   the point is, it's not as if 1104 doesn't provide the

16   language.  It does.  And the history of 1104, the legislative

17   history that was cited, I think incorrectly by the U.S.

18   Trustee, illustrates that point.

19          There's not a Court that's really gone into this

20   in any level of detail.  The Revco case, with all due

21   respect, 1990, the drugstore case, there's two and a half

22   pages.  Not much analysis, they don't mention the words "as

23   is appropriate" and they don't go into the legislative

24   history.  That's not much of a Circuit decision in my mind.

25          What happens in that situation, if you read 1104,

1   1104(c) says, "if a trustee hasn't been appointed."  1104(e)

2   says that the U.S. Trustee shall move for a trustee in

3   certain circumstances.  They haven't done that.  They have to

4   move under 1104(a).  No one's moved for a trustee under

5   1104(a).  Why is 1104 even there?  Why is it bounced back and

6   forth between trustee and examiner?

7          Because the pre-Code rule was trustees were

8   appointed and the United States decided, to our credit, that

9   debtors-in-possession were a better way of reorganizing

10  companies than putting them in the hands of Securities and

11  Exchange Commission and trustees.

12         1104 is a backstop in case things don't work out.

13         THE COURT:  I just think 1104 might be a leftover

14  from the days when we used to have a Chapter 10 and a

15  Chapter 11.

16         MR. BROMLEY:  I think that's right, Your Honor.

17         The point being is, notwithstanding the fact that

18  I think that's the legacy, the introductory language, "as is

19  appropriate" is not irrelevant.  The U.S. Trustee reads,

20  "shall" and ignores "as is appropriate."  Whether "as is

21  appropriate" modifies investigation, appoint, or examiner,

22  this Court has the discretion to determine whether it's

23  appropriate.

24         In our view, an examiner is not appropriate.  In

25  our view, a report is not appropriate.  Thank you, Your

1  Honor.

2         THE COURT:  Mr. Pasquale?

3         MR. PASQUALE:  Thank you, Your Honor.  Ken

4  Pasquale, again, for the Committee.

5         Mr. Bromley really hit on all of the key points

6  and we couldn't agree more with all of his arguments, but do

7  I think there are a few particularly important points that

8  I'd like to reemphasize if I may, and I'll be as brief as I

9  can.  The U.S. Trustee, first of all, concedes.  We heard

10  Ms. Sarkessian in her closing say that she recognizes the

11  Committee's statutory authority to do an investigation under

12  1103(c)(2) of the Bankruptcy Code.  And as you heard Mr. Ray

13  testify, the Committee has been doing that.

14         The Committee was appointed on December 15th.

15  It's not even been two months yet.  And in that time, as

16  Mr. Ray testified to some extent, the Committee has been

17  working lockstep with the debtors to understand what happened

18  pre-petition and more importantly, perhaps, and it all ties

19  together, and it's one of the points I really want to make to

20  the Court is, the investigation doesn't stand alone.  It fits

21  in with the rest of what this case will need to be and,

22  ultimately, what do distributions look like to the creditors

23  of these estates?

24         And so, the investigation informs the next steps

25  in this case, including whether there'll be what we've been

1   calling a "2.0 some type of reorganization" or whether it

2   will just be monetizing the assets of this company.  That's

3   all to be determined and the investigation, again, informs

4   all that.

5            So, what have we done as a committee in the less

6   than two months since the U.S. Trustee appointed the group?

7   As you heard Mr. Ray say, we served extensive discovery

8   requests on the debtor.  We did it informally.  We still

9   don't see a need to have to come to the Court for that.

10  We've been working cooperatively.  And we have been

11  prioritizing our requests with the debtors and receiving

12  prompt responses to what we ask.

13           Over 70,000 pages or 70,000 documents, excuse me,

14  have been produced, as you heard Mr. Ray testify, that have

15  previously been produced for the regulators.  We are

16  efficiently reviewing those documents, doing targeted

17  searches on any number of issues that we become aware of or

18  know from Mr. Ray's prior testimony before Congress and first

19  day here.

20           We are evaluating what the debtors, their pre-

21  petition relationships with their professionals.  And by

22  that, I mean their attorneys, their accountants, their

23  auditors that were in the process of coordinating with

24  debtors' counsel on the next steps there, which will be

25  pursuing discovery, ultimately evaluating potential claims.

1          We have filed a joint 2004 motion for authority to

2    serve subpoenas on insiders and related parties.  I think

3    that's on for Wednesday this week to be heard.  That's an

4    obvious avenue necessary for investigation.  And these are

5    just some of the things, of course, Your Honor, but I think

6    the last, and I think this is really important, and Mr. Ray

7    testified, is with respect to the cybersecurity environment.

8          The Committee does not have access to the AWS and

9    the system for the very reasons Mr. Ray testified; however,

10   we've had excellent coordination and cooperation from the

11   debtors' cybersecurity experts.  And our committee members,

12   of course, are very knowledgeable in this area, as customers

13   of the debtors, and this is their business so to speak, and

14   are consistently bringing issues to us that we bring to the

15   debtors and we're very quickly getting answers to those

16   inquiries.  So, the system is working.

17         The investigation process is working and there's,

18   in our view, and as you've heard argument, would not be

19   appropriate in these circumstances to appoint an examiner

20   when things are proceeding the way the Code has designed them

21   to proceed with the Committee exercising its statutory

22   authority.

23         Now, I do want to touch, Your Honor, on the costs.

24   The United States Trustee said there's no evidence that the

25   costs will be more if an examiner is appointed, but I think

1   it's obvious that it would.  So, the debtors and the

2   Committee would not just sit idly by if an examiner were to

3   perform its own examination.  At a minimum, we'd have to work

4   with that examiner.  We have to provide information to the

5   examiner.  We have to coordinate with the examiner.  And

6   there's obviously incremental costs that would be incurred in

7   that process.  There's no other way that they could proceed.

8            And I think I did mention this in opening, Your

9   Honor, but I do want to mention it again, given the capital

10  structure here where there is no other creditor group that

11  our unsecured creditors would be competing with, there's no

12  incentive for our Committee to do anything but what I will

13  call, you know, an "unbiased investigation."  The

14  investigation is not going to be used for any adversarial

15  purpose, which again, was argued by the U.S. Trustee in the

16  motion.

17           Continuing with the issue of the costs, Your

18  Honor, we do think it's entirely inappropriate for an

19  examiner to be appointed in order to, for the purpose of

20  issuing a report that satisfies some public interest outside

21  of these cases for the very simple reason, as Mr. Bromley

22  mentioned:  the cost of an examiner will come out of the

23  unsecured creditors' recoveries.  There's no denying that the

24  work that we're doing is, you know, that there's a

25  significant cost to that work, but it's necessary work and

1    the examiner -- excuse me -- an examiner's investigation

2    would just be over and above what is already being done and

3    those costs that are being incurred.

4         I think Judge Walrath in the Washington Mutual

5    case said it well on that particular point, not only

6    acknowledging that the Committee was well-positioned to do

7    the investigation, but quote -- excuse me, not quote yet --

8    that it would not be, and here's the quote:

9         "It would not be fair to the creditors in this

10   case to be saddled with the cost of an investigation into

11   systematic problems that would only benefit future parties,

12   but not benefit the parties in this case."

13        And that's Exhibit D to our objection.  It's the

14   transcript, page 98, starting at line 12.

15        I think that's exactly the situation here.  Given

16   the investigation's already going on by the congressional

17   committees, CFTC, SEC, the prosecutors, the public interest

18   is being well-served in all of those ways.  Our purpose here

19   is to investigate for the benefit of the stakeholders in

20   these estates.

21        I think the only other thing I really wanted to

22   mention, Your Honor, if I may, is just with respect to Your

23   Honor's question about the report.  Mr. Bromley mentioned,

24   entirely correctly, there will a disclosure statement in that

25   case.  That disclosure statement will detail the results of

1  the investigation.

2          We, as the Creditors' Committee, have an

3  obligation in that context to make a recommendation to

4  creditors as to the provisions of the plan that that

5  disclosure statement will describe and we, of course, take

6  that obligation seriously.  That document will explain the

7  results of the investigation.

8          I'll mention, also, of course, as is the

9  Committee's obligation, to the extent that we're able,

10  subject to confidentiality and other privileges and the like,

11  the Committee will be providing information on its website,

12  which is now up and running, and to the extent practicable,

13  on social media, as well.  So, we will take all necessary

14  steps to inform creditors of what's transpiring, again, with

15  the obvious limitations around confidentiality and keeping in

16  mind work product and the fact that this investigation will

17  be used to evaluate claims going forward to maximize

18  recoveries to creditors.

19          I think that's all I have, Your Honor, for now,

20  unless you have any questions?"

21          THE COURT:  No questions, thank you.

22          MR. PASQUALE:  Thank you.

23          THE COURT:  Mr. Shore?

24          MR. SHORE:  Thank you, Your Honor.  Chris Shore

25  from White & Case for the JPLs.  I'll try not to be

1   duplicative here.

2            At the end of the day, what's before the Court are

3   questions of law and questions of fact, but it's kind of hard

4   to ignore that, based upon the U.S. Trustee's brief and the

5   first half of Mr. Ray's testimony, that the policy

6   implications of this are coming to the fore and what we do

7   about examiners in big cases.

8            I'm going to start with a simple proposition.

9   There is, in fact, zero policy reason to support the U.S.

10  Trustee's interpretation of the statute.  According to the

11  U.S. Trustee, we're out -- we're at -- when you get outside

12  of (c)(1), the Court has already determined that it is not in

13  the best interests of the estate to have an examiner, and we

14  move into (c)(2) land.  In every case with $5 million of

15  funded debt, a party in interest, including the U.S. Trustee

16  who would have no economic stake in the outcome of the case,

17  needs to file a motion and everybody in the case must have an

18  evidentiary hearing like this -- this is not free -- and

19  there must be an examiner appointed, then we'll all figure it

20  out later.

21           In fact, none of the case law supports that.  All

22  the cases dispose of that issue the way Your Honor was asking

23  questions in one of two ways.  They use the word "as is

24  appropriate" to modify "must appoint" or they say, "as is

25  appropriate" modifies "investigation."

1          On the mandatory point, I'm not going to repeat

2     what counsel have already said on that, except to say in

3     their reply brief, the U.S. Trustee charges that the JPLs

4     wrongly quote the legislative history in H.R. 95-595.  That's

5     not accurate.  We, in fact, write down -- wrote down exactly

6     what it said there.  I think their point is that it's not

7     binding legislative history, which again, is wrong if you

8     look at 92 (indiscernible) 2688, which lists the legislative

9     history, H.R. 595 is listed there.

10         I think what the U.S. Trustee is arguing is that

11    because of the debates on the floor after the initial bill,

12    somehow that's the binding legislative history here.  But

13    I'll be -- make very clear, no legislative history at all

14    that addresses the point that they're trying to make, that

15    whether you call it weaponizing or empowering parties in

16    interest, or someone with no economic stake in a case to

17    bring the case to a halt, nobody, none of these senators or

18    representatives were saying that on the floor.  So, there is

19    no support for this kind of policy idea that "shall" means

20    "shall."  It's going to have to come down to the text of the

21    statute.

22         And I'll focus on the -- an examination, as is

23    appropriate.  The U.S. Trustee bears the burden of showing

24    what an examination is -- an investigation is appropriately.

25    Give you the contours of what's going to go on and we can

1   have a debate about whether or not that is appropriate.  And,

2   in fact, the motion, as we point out in our papers, just

3   says, I want it to the fullest extent of the statute, as

4   written.

5              Now, courts have not accepted that.  Courts

6   generally look to what I list as five things when we're

7   trying to figure out what an appropriate examination is.

8   They ask, first:  Is there really a need for an examination

9   here?  And I'll get to the smoke point in a bit.  What is the

10  scope of what the examiner is going to be doing?  What is the

11  cost of the examination on the estate?  What is the

12  appropriate duration of it?  And then, ultimately, we get to

13  a report:  How are we going to be using it in the case and

14  how we'd deal with issues like privilege and whether it's

15  hearsay or not; all those kinds of issues get resolved.

16  Again, the U.S. Trustee is silent on that and, of course,

17  I've got some problems.

18             First of all, it seems easy to say in that case,

19  We need an examiner report.  There's a dumpster fire.

20             No, we're all standing around right now in a

21  burning that is -- that a building that is burnt to the

22  ground and two of the three principals of the company have

23  pleaded guilty to arson.  So, do we really need to spend a

24  hundred million dollars for an examiner to come in and say,

25  The building burned down?  We know it burned down.  We know

1  there were no corporate controls.  We know, based upon the

2  pleas of two of the three principals, that frauds occurred

3  here.

4  So, the U.S. Trustee has done nothing, other than

5  posit that there is smoke, without really answering the

6  question:  So, who cares?

7  Obviously, there needs to be an investigation to

8  determine who's responsible for that, and I trust that the

9  U.S. Trustee and the debtors are working on that, and if

10  monies need to be clawed back, they'll be clawed back.  But

11  we don't really need to know the "why" here.

12  Second, appropriate scope.  I agree with Your

13  Honor, how can you appoint an examiner, especially on the

14  topics we're talking about, unless we know what the scope is

15  or how can the U.S. Trustee do it?  Should there be an

16  accountant?  Should it be a cryptocurrency guru?  Should it

17  be a cybercrimes investigator?  Should it -- right -- should

18  it be a corporate controls expert?

19  How do you get to the issue of an appointment

20  without knowing what the scope's going to be?  I don't think

21  I've ever seen blank-check case is which was basically being

22  posited here, where the Court directed the U.S. Trustee:

23  Just appoint somebody who's examinery [sic] and then we'll

24  figure out what he or she is going to be doing.

25  There has to be real context around this,

 1  particularly when we're talking about the next point, which

 2  is cost and duration.  There are cases, I was in ResCap where

 3  Judge Glenn kicked the can down the road and there were

 4  reasons for that.

 5          There are three reasons why you can't kick the can

 6  down the road here without giving the examiner, which you

 7  said, if it's going to be a $10,000 investigation, an

 8  examiner needs to know that when picking up the charge.

 9  First, with respect to the $1.2 billion in cash, I think

10  that's a little misleading.  As the U.S. Trustee points out

11  in the reply, or actually in the moving papers, there is an

12  issue as to what if this is customer funds and where the

13  customers are and everything else.  So, it's not fair to say

14  that the debtors have, in fact, free access to use all the

15  cash they're listing as "unrestricted."

16          Second on this, assume it is $1.2 billion of cash

17  that can pay admin claims, that first chart was breathtaking.

18  The number of individuals who are already involved, that

19  didn't list the Committee advisors, right.  This case is

20  burning superhot.  We'll find out just how superhot when the

21  fee apps start coming in.  But the comfort that there's going

22  to with $1.2 billion in available cash doesn't answer the

23  question of how much distributable value is there going to be

24  in this case and how is a hundred-million-dollar examination

25  going to relate to that.

1          Third, and I agree with Mr. Pasquale, the concept

2   of deduping, we'll just point an examiner and everybody else

3   is going to sit -- that never happens.  The Committees

4   continue to work.  The debtors continue to work.  And,

5   actually, he focused on Mr. Ray's testimony about that

6   second, or the second and third demonstrative, where he lists

7   all the work they're doing to coordinate with the requests.

8          That's what's going to happen with an examiner,

9   too.  The request is going to come in to Mr. Bromley:  I need

10  70,000 documents.  They're going to go through and say, Well,

11  what do we do with privilege?  What do we do with these

12  documents?  How do we control the data so that it's secure?

13  And it's just all going to continue to build; in other words,

14  the hundred million dollars is additive, not subtractive from

15  other work that goes on.

16         And, finally, appropriate form and use.  There is,

17  in my experience, no evidentiary value to an examiner's

18  report.  It just kind of comes out.  And whether Your Honor

19  would feel that that was important or not, I don't know how

20  important it is when we're not dealing with a case with

21  insiders *in situ* and, rather, we have a whole new group

22  coming in.  And sometimes it helps courts with doing things

23  like, has the plan been proposed in good faith and things

24  like that.  I just haven't heard anything articulated by the

25  United States Trustee that would go to that issue.

1   It's not going to, as the U.S. Trustee seems to

2 posit, lead to an indictment.  The Court can't indict anybody

3 here, nor can an examiner indict anybody here, so the

4 government authorities who are doing their investigations

5 aren't going to get any help out of the report.

6   And then, finally, on this point of important

7 public interest in looking at this, this is not a case in

8 which governments are sitting behind; in other words, there's

9 not somebody out there protecting the public.  As seen, the

10 Congress is looking at it, the CFTC, the SEC, the IRS, all

11 the State Governments.  They don't need to outsource their

12 work to the creditors of the debtor, because the irony of the

13 position here is that the creditors, who are just going to

14 want to get their fiat currency and crypto back, are going to

15 be forced to bear the cost of an examination that's only

16 going to tell them the who, what, when, where, and why they

17 lost money, but not actually give the money back.  You can't

18 tax them to answer questions that no creditor is coming

19 forward and saying, We want answers to.  We're willing to

20 pay, as customers, for an investigation into this work.

21   If the U.S. Trustee or other government agencies

22 want work, it looks like -- or want answers, it looks like

23 they're getting the participation they need from the debtors

24 and I'm sure that will continue.

25   So, from the perspective of the JPLs, whether

1   you're looking at a mandatory or an inappropriate

2   investigation, I don't think the U.S. Trustee has met their

3   burden here to really explain why we should all be paying for

4   that.

5           THE COURT:  Thank you.

6           Ms. Sarkessian, rebuttal?

7           MS. SARKESSIAN:  Is this your phone?

8           UNIDENTIFIED SPEAKER:  No.

9           UNIDENTIFIED SPEAKER:  I think that one is

10  actually mine.  Don't hold me to it.

11          MS. SARKESSIAN:  Thank you, Your Honor.  Again,

12  for the record, Juliet Sarkessian on behalf of the U.S.

13  Trustee.  I have just a few points to reply to.  I think

14  they're all mostly comments that debtors' counsel made, so

15  we're winding back the clock a few minutes.

16          So, one thing that debtors' counsel indicated was

17  that the U.S. Trustee had put in no evidence to show that

18  we've complied 1104(c)(1).  So, our evidence is the

19  declarations of Mr. Ray.  Now, we didn't put him on the stand

20  and have him, you know, make those statements, but those are

21  in evidence.  And paragraph 5 of his first day declaration

22  says, quote:

23          "Never in my career have I seen such a complete

24  failure of corporate controls and such a complete absence of

25  trustworthy financial information, as occurred here.  From

1  compromised systems integrity, faulty regulatory oversight

2  abroad, to the concentration of control in the hands of a

3  very small group of inexperienced, unsophisticated, and

4  potentially compromised individuals, this situation is

5  unprecedented," close quote.

6          And that's just, you know, one piece of what he

7  says in this one declaration and then, also, of course, his

8  testimony before Congress.  So, that is all in evidence, even

9  if we didn't put on a live witness today and that goes to the

10 best interests of the creditors.

11         And, again, if one is looking at the "as is

12 appropriate," the way that certain cases have looked at it,

13 and Your Honor has looked at it in the past, it also

14 establishes that it is appropriate to have an examiner.  This

15 is not a case where, you know, there's not a whiff of smoke

16 about wrongdoing.  There's, as Mr. Ray said, a dumpster fire.

17         Debtors' counsel also mentioned this report that

18 they gave to the creditors that was then filed on the court

19 docket, which is our Joint Exhibit 9, and, you know, yes,

20 they are correct, that they did file it on the docket.  It's

21 20 pages.  It's a PowerPoint.  There's a lot of charts and

22 pictures.  I'm not saying there's no information in it, but

23 it doesn't compare to something like an examiner's report.

24         So, the debtor -- both, the debtor and I believe

25 some other counsels, were referring to, you know, $5 million

1  worth of debt.  Any case -- is, you know, the U.S. Trustee

2  going to be required to file a motion for an examiner in any

3  case with $5 million worth of debt?

4          It's not just $5 million worth of debt.  There's a

5  lot of restrictions and that is not every case with

6  $5 million worth of debt.

7          But in addition, I just want to be clear, the U.S.

8  Trustee is not required to file a motion for an examiner.  It

9  is under 1104(e), there are certain situations in which the

10  U.S. Trustee would be required to file a motion for a

11  trustee, but there is nothing requiring it.  The Code says we

12  can -- we can file a motion, but we're not required to.

13          And I think that, you know, one can see throughout

14  the years, the U.S. Trustee is not filing examiner motions in

15  every case in which the debt is over $5 million, again, of

16  any debt or specific debt.  It is discretionary.  The U.S.

17  Trustee does, when it feels it's the right thing to do.

18          One counsel cited to the Washington Mutual

19  transcript at page 98.  In that case, Judge Walrath said that

20  the debtors had been, quote, "investigated to death," close

21  quote, and that she could not imagine any examiner finding

22  one unturned stone.  At that's page 9 -- excuse me,

23  transcript 98, lines 12 to 17.

24          That is not where we are in this case.  The

25  debtors just, you know, filed a few months ago.  The U.S.

134

1    Trustee filed a motion to appoint an examiner 11 days after

2    the first day hearing, 20 days after the petition date.  The

3    debtors, even at this point, are nowhere near being

4    investigated to death.

5             Also, debtors' counsel and some other counsel

6    brought up that there will be a -- the disclosure statement

7    filed at some point, possibly, depending on what happens.  A

8    disclosure statement is not a report of an independent

9    examiner.  I mean, there's no comparison to those two things.

10   Clearly, Congress knew that in Chapter 11 cases, debtors file

11   disclosure statements.  Again, 1104(c) doesn't say, Unless

12   the debtor has or may file a disclosure statement.  What it

13   says is, After the plan is confirmed, you can't make the

14   motion, I mean, well, it's -- it wouldn't meet the

15   requirements.  But there isn't a disclosure statement here

16   and it's irrelevant to 1104(c).

17            And, Your Honor, there's two other things I want

18   to point out.  At the end of Mr. Bromley's argument, he said

19   the debtors' view is a report is not appropriate.  We just

20   want that to be very clear that the debtors have no intention

21   of filing any report as to whatever investigation they may be

22   doing; whereas, of course, an examiner is required to do

23   that.

24            And, finally, Your Honor, it is -- the U.S.

25   Trustee agrees that Your Honor has the discretion to set the

1    scope and a budget for any examiner, if you were to appoint

2    an examiner.  But the Court should not abuse discretion in

3    such a way that it completely eviscerates 1104(c)(2), as it's

4    been approved by Congress.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              All right.  I'm going to take a recess here and

8    I'd like to see counsel for the four parties in chambers in

9    my -- in the conference room over here and then I'll come

10   back on the record after that.

11        (Recess taken at 1:09 p.m.)

12        (Proceedings resumed at 1:20 p.m.)

13             THE COURT:  We're back on the record, Jermaine?

14        (No verbal response)

15             THE COURT:  Okay.  We're back on the record.

16             So, I requested to see the parties in chambers

17   just to have a brief discussion about whether there was a way

18   to find a path towards a consensual resolution of this motion

19   and parties have indicated they want to discuss that and come

20   back to me later.  So, I'm encouraging them to do that.

21             In the meantime, I'm going to take the matter

22   under advisement and we'll wait to hear from the parties.

23             I think we have another hearing scheduled on

24   Wednesday and maybe by then the parties can give me a status

25   report on where this issue is.  And I told them to ensure

1    that there's no concern about my being upset about somebody

2    who holds up the process.  I told them that if anybody

3    objects to resolving it, I will rule on it.

4           They should contact chambers, let my judicial

5    assistant or my courtroom deputy know that there has been an

6    objection -- debtors' counsel can do that -- don't tell me

7    who's objected.  Just tell me there's been an objection and

8    then I will go forward with a ruling on the underlying

9    motion.

10          So, with that, do we have -- I think we have some

11   other housekeeping issues before we adjourn.  Just to make

12   sure.  There was some stuff -- some retention apps that need

13   to be moved -- potentially, moved?

14          MR. LANDIS:  Your Honor, we will -- Adam Landis

15   for the record, from Landis Rath & Cobb -- we will file an

16   amended agenda for the hearing on Wednesday, but we believe

17   it's only one matter that will need to go forward.

18          THE COURT:  Okay.  That's the objection to the

19   2004 again?

20          MR. LANDIS:  That's correct, Your Honor.

21          THE COURT:  And that's -- I assume there's no

22   witnesses for that?

23          MR. LANDIS:  There are none.  And we would ask the

24   Court's indulgence to do that virtually.

25          THE COURT:  Yes, that can be done virtually.  If

1    there's no witnesses, it can be done virtually.

2              Okay.  Anything else, then, before we adjourn?

3         (No verbal response)

4              THE COURT:  All right.  Well, thank you all very

5    much.  I appreciate the arguments.  It was an interesting,

6    interesting argument.  Thank you.

7              COUNSEL:  Thank you, Your Honor.

8         (Proceedings concluded at 1:23 p.m.)

```
 1                      CERTIFICATION
 2            We certify that the foregoing is a correct
 3    transcript from the electronic sound recording of the
 4    proceedings in the above-entitled matter to the best of our
 5    knowledge and ability.
 6
 7    /s/ William J. Garling              February 6 2023
 8    William J. Garling, CET-543
 9    Certified Court Transcriptionist
10    For Reliable
11
12    /s/ Tracey J. Williams             February 6, 2023
13    Tracey J. Williams, CET-914
14    Certified Court Transcriptionist
15    For Reliable
16
17    /s/ Mary Zajaczkowski              February 6, 2023
18    Mary Zajaczkowski, CET-531
19    Certified Court Transcriptionist
20    For Reliable
21
22    /s/ Coleen Rand                    February 6, 2023
23    Coleen Rand, CET-341
24    Certified Court Transcriptionist
25    For Reliable
```