## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | Jointly Administered |
| | |
| ANDREW R. VARA, UNITED STATES TRUSTEE, | |
| Appellant, | U.S. District Court |
| v. | Case No. 1:23-cv-00241 (CFC) |
| FTX TRADING LTD., *et al.*, | |
| Appellees. | |

### OPPOSITION OF APPELLEE, OFFICIAL COMMITTEE OF UNSECURED CREDITORS, TO MOTION OF APPELLANT ANDREW R. VARA, UNITED STATES TRUSTEE, TO CERTIFY DIRECT APPEAL TO THE COURT OF APPEALS UNDER 28 U.S.C. § 158(d)(2)

Appellee, the Official Committee of Unsecured Creditors (the "Committee")

appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned

debtors and debtors-in-possession (the "Debtors"), by and through its undersigned

counsel, hereby submits this Opposition (this "Opposition") to the *Motion of*

*Appellant Andrew R. Vara, United States Trustee, to Certify Direct Appeal to the*

*Court of Appeals Under 28 U.S.C. § 158(d)(2)* [Docket No. 14][1] (the "Motion"), and in support thereof, respectfully states as follows:

### PRELIMINARY STATEMENT[2]

The Appeal presents a singular issue: "Did the bankruptcy court err in denying the United States Trustee's motion to appoint an examiner under 11 U.S.C. § 1104(c)?" Statement of Issues at 2. That issue – whether appointment of an examiner is appropriate under the particular facts and circumstances of these Chapter 11 Cases – does not meet the applicable legal standard for certification to the Court of Appeals. The Motion should be denied.

The U.S. Trustee avers that its appeal "satisfies at least two of the statutory tests for direct certification" pursuant to 28 U.S.C. § 158(d)(2)(A). Mot. at 12. To the contrary, in both instances, the U.S. Trustee's Motion misapprehends or misapplies applicable law.

First, the Appeal does not present a pure question of law for which there is no controlling decision by the Third Circuit or the United States Supreme Court. Rather, the U.S. Trustee appeals a *mixed* question of law and fact – whether appointment of an

---

[1]   References to "Bankr. Docket No." refer to docket entries in the Chapter 11 Cases; references to Docket No. refer to docket entries in the Appeal.

[2]   Capitalized terms used in this Preliminary Statement that are not defined shall have the meanings ascribed to them later in the Opposition or in the Motion, as applicable.

examiner was appropriate under the facts and circumstances of these Chapter 11 Cases – and thus the Appeal falls outside of the statute's ambit.

Second, the Appeal does not involve a matter of public importance. In that regard, the Motion suffers from the same flaw as the underlying Examiner Motion – namely, it focuses on the importance of an investigation being conducted for the benefit of the general public, rather than an examiner specifically conducting that investigation for the stakeholders in these Chapter 11 Cases. As the Bankruptcy Court recognized, appointment of an examiner is unnecessary and, indeed, inappropriate, because such appointment would be a duplicative, additive expense borne by the estates' creditors, where, as here, an investigation is being performed by the Debtors and Committee (and has now been proceeding for the past four months).

Finally, direct review of the Appeal will not resolve any conflicts within the Third Circuit (and the U.S. Trustee has not cited any), and thus the U.S. Trustee has failed to satisfy the third prong of the analysis. The U.S. Trustee's newly-minted argument that a decision from the Third Circuit may "provide important guidance to bankruptcy courts" is simply not relevant to the analysis under the direct appeal statute and should be disregarded.

Accordingly, for the reasons set forth herein, the Motion should be denied.

## BACKGROUND

On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").

On December 1, 2022, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Bankr. Docket No. 176] (the "Examiner Motion"), seeking an order appointing an examiner to conduct an independent investigation into the "allegations of fraud, dishonesty, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and causes of action exist to remedy losses." Examiner Motion at 2.

On December 15, 2022, the U.S. Trustee appointed nine members to the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code, having received a "tremendous response" from people "located all over the world" who wanted to serve on the Committee. *See Notice of Appointment of Committee of Unsecured Creditors* [Bankr. Docket No. 231]; *In re FTX Trading, Ltd.*, Dec. 14 Hr'g. Tr. at 13:4-10, annexed hereto as Ex. A. The Committee is empowered by statute to act as a fiduciary for all of the estates' unsecured creditors. *See, e.g.*, 11 U.S.C. §§ 1102, 1003.

4

On January 25, 2023, the Committee, the Joint Provisional Liquidators of FTX Digital Markets Ltd. and the Debtors each filed an objection to the Examiner Motion [Bankr. Docket Nos. 571, 572 and 573], respectively (each, an "Examiner Objection"). On February 1, 2023, the U.S. Trustee filed an omnibus reply to the Examiner Objections [Bankr. Docket No. 601].

On February 15, 2023, after hearing testimony from the Debtors' Chief Executive Officer, John J. Ray III, and the parties' arguments, the Bankruptcy Court issued a bench ruling denying the Examiner Motion, holding, among other things, that, "under the facts and circumstances of these cases, appointment of an examiner is not needed." Feb. 15 Hr'g. Tr. (the "Bench Ruling") at 15:21-23, annexed hereto as Ex. B. In reaching such conclusion, the Bankruptcy Court relied on the extensive evidentiary record before it and found that:

- the Debtors are now being managed by "highly qualified professionals," who have ensured that "all prior senior management of the debtors were removed" (Bench Ruling at 7:16-8:13);

- if appointed, an examiner would "have the same attributes as Mr. Ray and the independent directors," who are already deeply involved in the investigations (Bench Ruling at 9:8-16);

- permitting additional parties, such as an examiner, to access the Debtors' "extremely vulnerable electronic information containing crypto-assets that have already suffered hacking incidents," "would create an increased risk of further loss through inadvertent disclosures or hacking" (Bench Ruling at 8:18-24; 15:9-20);

- the cost of an examiner would be extremely high, "in the tens of millions of dollars and would likely exceed $100 million," which would be "borne by the creditors" (Bench Ruling at 9:17-10:21);

- there are already "multiple investigations underway" and "[r]equiring the creditors to bear the burden of yet another investigation does not comport with the requirements of Section 1104(c)(1) or the general scheme of the bankruptcy code; that is to maximize recovery to creditors." (Bench Ruling at 10:6-14);

- that the appointment of an examiner is not mandatory pursuant to 11 U.S.C. § 1104(c)(2) because, among other reasons, "[e]ven the Trustee concedes . . . that a Bankruptcy Court has some discretion in determining whether or not an examiner must be appointed under 1104(c)(2), for example, for a motion to appoint an examiner is being used by a creditor to obtain an advantage in plan negotiations. In other words, the Trustee agrees there are times when the appointment of an examiner would not be appropriate under 1104(c)(2)" (Bench Ruling at 11:2-9);

- that "every bankruptcy judge in this district to consider the issue has concluded that there is discretion" to appoint an examiner under 11 U.S.C. § 1104(c)(2) inasmuch an examiner may only be appointed when the circumstances are "appropriate" (Bench Ruling at 12:2-15 (collecting authority)); and

- that "under the facts and circumstances of these cases, appointment of an examiner is not needed pursuant to 1104(c)(2) and appointing one would impose an unnecessary burden on the debtors and ultimately the creditors for whose benefit these cases are being pursued. Contrary to the Trustees position this is not inconsistent with the language of the statute or the legislative history." (Bench Ruling at 15:21-16:3).

The Bankruptcy Court entered the *Order Denying Motion for the Appointment of an Examiner* [Bankr. Docket No. 746] (the "Examiner Order") on February 21, 2023, denying the Examiner Motion for the reasons stated in the Bench Ruling. On March 6, 2023, the U.S. Trustee filed its notice of appeal [Bankr. Docket No. 805;

Docket No. 1] (the "Notice of Appeal"), commencing the appeal (the "Appeal") from the Examiner Order.

On March 20, 2023, the U.S. Trustee filed its *Statement of Issues to be Presented on Appeal* [Bankr. Docket No. 1123; Docket No. 6] (the "Statement of Issues"), stating the following single issue: "Did the bankruptcy court err in denying the United States Trustee's motion to appoint an examiner under 11 U.S.C. § 1104(c)?" On March 20, 2023, the U.S. Trustee filed a motion with the Bankruptcy Court, seeking certification of the Appeal directly to the United States Court of Appeals for the Third Circuit (the "Third Circuit"). When the Bankruptcy Court became divested of jurisdiction over the Appeal pursuant to Fed. R. Bankr. P. 8006(b), (d), the U.S. Trustee then filed the instant Motion in this Court, seeking the same relief.

## **OBJECTION**

By its Motion, the U.S. Trustee asks this Court to certify its Appeal from the Examiner Order for direct review by the Third Circuit pursuant to 28 U.S.C. § 158(d)(2)(A). That statute provides that the court before which the appeal is pending shall certify a direct appeal to the applicable court of appeals when:

>    i.    the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

>    ii.   the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

iii.   an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A).

Courts have generally analyzed section 158(d)(2)(A) as containing four disjunctive factors, breaking out the first prong of the statute into two subparts: "no controlling decision" and "matter of public importance." *See In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 708 (Bankr. D. Del. 2016) (finding 28 U.S.C. § 158(d)(2)(A) actually provides "four disjunctive criteria as subpart (i) sets forth two separate benchmarks for certification," namely no controlling decision, matter of public importance, resolution of conflicting decisions, and material advancement of the case). "The twin purposes of th[is] provision [are] to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy." *In re Pacific Lumber Co.*, 584 F.3d 229, 241-42 (5th Cir. 2009) (citing H.R. REP. NO. 109–31 pt. I, at 148 (2005)).

In its Motion, the U.S. Trustee argues that "at least two" (if not three) of the four factors are present and thus that direct certification should be granted. Mot. at 12. However, as set forth below, the Motion does not satisfy *any* of the requisite factors.[3]

---

[3]   In addition to conceding that it has failed to satisfy the third factor (*see* Mot. at 17), the U.S. Trustee does not even attempt to argue that the fourth factor (i.e., advancement of the case) is satisfied here. That is because an immediate appeal to the Third Circuit would *not* materially advance these Chapter 11 Cases. Indeed, the ongoing investigations being performed by the Debtors and Committee and progress

## I.   The Appeal Does Not Involve a Question of Law as to Which There is No Controlling Decision

First, the Appeal does not involve a pure question of law and, accordingly, the U.S. Trustee cannot satisfy the criterion for a direct appeal in circumstances where an issue of law exists for which there is no controlling decision, as provided in 28 U.S.C. § 158(d)(2)(A)(i). In denying the U.S. Trustee's Examiner Motion, the Bankruptcy Court expressly found that "*under the facts and circumstances* of these cases, appointment of an examiner is not needed." Bench Ruling at 15:21-23 (emphasis added). Indeed, as the Bankruptcy Court noted in its Bench Ruling, the "Trustee concedes . . . that a Bankruptcy Court has some discretion in determining whether or not an examiner must be appointed under 1104(c)(2), for example, for a motion to appoint an examiner is being used by a creditor to obtain an advantage in plan negotiations. In other words, the Trustee agrees there are times when the appointment of an examiner would not be appropriate under 1104(c)(2)." Bench Ruling at 11:2-9; *see also* Examiner Motion at ¶ 34 (U.S. Trustee acknowledging that the Court has authority to limit the scope of an examination). With this backdrop, the U.S. Trustee's description in its Motion of the issue on Appeal – "whether the bankruptcy court erred in denying the motion to appoint an examiner under 11 U.S.C. § 1104(c)(2) although

---

towards a plan of reorganization in these Chapter 11 Cases will not be impacted by this Appeal proceeding through traditional appellate channels.

it is uncontested that the statutory requirements for appointment are satisfied[]" (*see* Mot. at 10) – has embedded in it a question of fact: did the Bankruptcy Court correctly determine, based on the facts and circumstances of the case, that appointment of an examiner to conduct an investigation is not appropriate?

In these circumstances, courts in this district have routinely held that where an appeal involves mixed questions of law and fact, certification for direct review under section 158(d)(2)(A)(i) is inappropriate. *See, e.g.*, *In re Am. Home Mortg. Inv. Corp.*, 408 B.R. 42, 44 (D. Del. 2009) ("[I]ssues that are specifically linked to the Bankruptcy Court's decision are, in the Court's view at this juncture, mixed questions that implicate the particular circumstances of this case, and as such, they are not pure legal questions warranting direct certification."); *In re Tribune Co.*, 477 B.R. 465, 472 (Bankr. D. Del. 2012) ("The issue . . . is not a pure legal issue; it is not appropriate for direct appeal."); *see also Weber v. United States*, 484 F.3d 154, 158 (2d Cir. 2007) (noting that legislative history confirms that Congress intended the statute to allow courts of appeals to "facilitate [their] provision of guidance on *pure questions of law*") (emphasis added).

Moreover, the Bankruptcy Court's well-reasoned Bench Ruling was consistent with every other ruling by a bankruptcy court in this district to consider the issue. *See* Bench Ruling at 12:16-13:5 (collecting authority). Thus the "twin purposes" of the direct certification statute – (i) expediting appeals in significant cases (which, as

discussed above, the U.S. Trustee does not even attempt to argue is necessary) and (ii) creating binding precedent where case law is "plagued by indeterminacy" – are simply not present here, where the decisions among bankruptcy courts in this district have been uniform. *In re Pacific Lumber Co.*, 584 F.3d at 241-42.

## II.     The Appeal Does Not Involve a Matter of Public Importance

Second, direct appeal is not warranted because the Appeal does not involve a matter of public importance. The U.S. Trustee argues that its Appeal qualifies as a matter of public importance because "[t]he collapse of FTX raises concerns . . . about the cryptocurrency industry generally." Mot. at 16. However, the U.S. Trustee misapplies the standard to establish "public importance." It is not sufficient that members of the public may be interested in the underlying bankruptcy cases or even in the outcome of this litigation[4] – rather, the issue on appeal must "transcend[] the litigants and *involve[] a legal question* the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *In re Am. Home Mortg. Inv.*

---

[4]     Although the Committee agrees that the general public's interest in these cases has been immense, that interest does not give rise to a "public importance" for purposes of the direct appeal statute. *Cf. In re Nortel Networks Inc.*, Nos. 15-196-LPS, 15-197-LPS, 2016 WL 2899225, at *5 (D. Del. May 17, 2016) (finding that "public scrutiny" may amount to public importance where, unlike here, the public had an interest in the outcome of the *legal question* of how the debtors' assets would be distributed and whether such allocation methodology comported with U.S. law). Here, the Appeal involves an issue that is, in part, necessarily factual (and thus will not "advance the cause of jurisprudence") and will not impact interested members of the public who are not party to this litigation (i.e., individual creditors of FTX).

*Corp.*, 408 B.R. at 44 (emphasis added); *In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 141-42 (Bankr. S.D.N.Y. 2016) (declining to find issue of public importance based on argument that dispute received substantial news coverage or because industry members were watching closely).

Initially, as previously discussed, this Appeal raises a mixed question of law and fact and thus cannot be considered a "question of law . . . involv[ing] a matter of public importance." 28 U.S.C. § 158(d)(2)(A)(i); *see also In re Aerogroup Int'l, Inc.*, No. BR 17-11962 (CSS), 2020 WL 757892, at *5 (D. Del. Feb. 14, 2020) (declining to find issue of public importance because "an issue involving a mixed question of law and fact generally does not constitute a matter of public importance").

Moreover, while some courts have found an alternative basis for satisfying the "public importance" prong when there are "important practical ramifications" to an appeal (even where there is no threshold determination of a question of law), this Appeal does not involve such ramifications. *See In re Aerogroup Int'l, Inc.*, 2020 WL 757892, at *5 (citing *Jaffe v. Samsung Electronics Co. (In re Qimonda AG)*, 470 B.R. 374, 386-89 (E.D. Va. 2012) (finding that a matter may be of public importance where it could impact a large number of jobs)). Other than conclusory statements about the importance of the Chapter 11 Cases to the cryptocurrency industry on the whole (*see* Mot. at 16), the U.S. Trustee provides no support for its argument that mandatory appointment of an examiner in circumstances that the Bankruptcy Court found are not

appropriate has important practical ramifications. The U.S. Trustee's arguments effectively conflate the general need for an investigation of the Debtors' prepetition activities – which the Committee very much agrees is of great importance – with the need for such investigation to specifically be conducted by an examiner (and, by extension, the U.S. Trustee avers that the public will suffer if such an investigation is not conducted by an examiner). Thus, the only "practical ramification" of this Appeal, should the U.S. Trustee prevail, is to burden the creditors in these Chapter 11 Cases with the significant costs of an examiner. The Bankruptcy Court determined that an investigation by an examiner would be duplicative of the "multiple investigations [already] underway by incredibly competent and independent parties," and thus would *not* benefit the public or be in the best interests of the Debtors' estates. *See* Bench Ruling at 10:6-10; 14:7-12; 15:21-16:1. Thus, the "cryptocurrency industry generally" (Mot. at 16) is already being served by an able and competent investigation, and there is no practical ramification in having an examiner do the same.

## III.  Direct Review of the Appeal Will Not Help Resolve Conflicting Decisions Within This Circuit

Third, certification for direct review of this Appeal by the Third Circuit is not warranted because it will not resolve conflicting decisions within this circuit.

In support of its Motion, the U.S. Trustee primarily points to three out-of-circuit decisions that conflict with the consistent body of Delaware bankruptcy and district court decisions on the issue raised by the Appeal. Mot. at 18. However, a conflict

between a Delaware bankruptcy court decision and out-of-circuit decisions does not satisfy the direct appeal standard because the conflict is not *within* this circuit. *See In re Millennium Lab Holdings II, LLC*, 543 B.R. at 715 (concluding that inter-circuit splits do not satisfy section 158(d)(2)(A)(ii)); *see also* 1 Collier on Bankruptcy P 5.06 (16th 2023) (the requisite conflict for section 158(d)(2)(A)(ii) can "exist among bankruptcy judges in the same district or different districts, among district courts in the same district or different district, or among appellate panels *in the same circuit*") (emphasis added).

The U.S. Trustee freely admits in the Motion that there is no conflict within this circuit, and correctly notes that an inter-circuit conflict does not trigger section 158(d)(2)(A)(ii). Mot. at 17. This makes perfect sense in light of the plain meaning of the statute that allows the Court to directly certify an appeal when "the judgment, order, or decree involves a question of law requiring *resolution* of conflicting decisions." 28 U.S.C. § 158(d)(2)(A)(ii) (emphasis added). The Third Circuit cannot *resolve* a conflict between itself and the Sixth Circuit – the only court with that power is the United States Supreme Court. *See In re Goody's Fam. Clothing, Inc.*, No. CIV.A. 09-409RMB, 2009 WL 2355705, at *2 (D. Del. July 30, 2009) ("In any event, the Third Circuit is not empowered to 'resol[ve] ... conflicting decisions' between circuits.") (citation omitted); *In re IMMC Corp.*, No. AP 10-53063 (BLS), 2016 WL 356026, at *7 (D. Del. Jan. 28, 2016) (finding no conflicting decisions within Third Circuit, and,

14

with respect to cases outside Third Circuit, "the Third Circuit is not empowered to resolve conflicting decisions between circuits").

To make up for this deficiency in its argument, the U.S. Trustee attempts to invent a completely new basis for certification. *See* Mot. at 17 (claiming that direct review may "provide important guidance to bankruptcy courts"). Of course, this language cannot be found in 28 U.S.C. § 158(d)(2)(A). Regardless, the decisions of bankruptcy courts in this district have been uniform and these courts are simply not in need of expedited Third Circuit guidance on this issue. Thus, no conflict exists for purposes of section 158(d)(2)(A)(ii) and direct certification is not warranted for this additional reason.

## **CONCLUSION**

WHEREFORE the Committee respectfully requests that this Court deny the Motion and grant such other and further relief as the Court finds just and appropriate.

Dated: April 20, 2023       YOUNG CONAWAY STARGATT &
Wilmington, Delaware      TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mlunn@ycst.com
      rpoppiti@ycst.com

-and-

PAUL HASTINGS LLP
Kristopher M. Hansen*
Luc A. Despins*
Kenneth Pasquale*
Isaac S. Sasson*
John F. Iaffaldano*
200 Park Avenue
New York, NY 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
      lucdespins@paulhastings.com
      kenpasquale@paulhastings.com
      isaacsasson@paulhastings.com
      jackiaffaldano@paulhastings.com

*Admitted pro hac vice*

*Counsel to the Official Committee of Unsecured
Creditors*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this Opposition complies with the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A), as well as the type, font and word limitations set forth in this Court's Standing Order Regarding Briefing in All Cases. Exclusive of the exempted portions specified in Fed. R. Bankr. P. 8015(g), this Opposition contains 3,347 words. This Opposition has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

April 20, 2023                                    /s/ *Robert F. Poppiti, Jr.*
                                                  Robert F. Poppiti, Jr.

**Exhibit A**

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .
 5                               .  Courtroom No. 5
                                 .  824 Market Street
 6               Debtors.        .  Wilmington, Delaware 19801
                                 .
 7                               .  Wednesday, December 14, 2022
     . . . . . . . . . . . . . . .  11:00 a.m.
 8
                          TRANSCRIPT OF HEARING
 9             BEFORE THE HONORABLE JOHN T. DORSEY
                CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:            Adam Landis, Esquire
12                              Kimberly Brown, Esquire
                                Matthew Pierce, Esquire
13                              LANDIS RATH & COBB LLP
                                919 Market Street, Suite 1800
14                              Wilmington, Delaware 19801

15                              Andrew G. Dietderich, Esquire
                                James L. Bromley, Esquire
16                              Brian D. Glueckstein, Esquire
                                Alexa J. Kranzley, Esquire
17                              SULLIVAN & CROMWELL LLP
                                125 Broad Street
18                              New York, NY 10004

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Danielle Gadson

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1  APPEARANCES (CONTINUED):

 2  For the U.S. Trustee:     Juliet Sarkessian, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
 3                            844 King Street, Suite 2207
                              Lockbox 35
 4                            Wilmington, Delaware 19801

 5  For the Bohemian
    Securities Exchange
 6  Commission:              Kenneth Aulet, Esquire
                             BROWN RUDNICK LLP
 7                           7 Times Square
                             New York, New York 10036
 8
                             Blair Rinne, Esquire
 9                           BROWN RUDNICK LLP
                             One Financial Center
10                           Boston, Massachusetts 02111

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                    INDEX

2      MOTIONS:                                                        PAGE

3      Agenda

4      Item 1: Motion of the Joint Provisional Liquidators of      4
               FTX Digital Markets Ltd. for Entry of an Order
5              Shortening the Notice and Objection Periods with
               Respect to the Emergency Motion of the Joint
6              Provisional Liquidators of FTX Digital Markets
               Ltd. (I) for Relief from Automatic Stay and (II)
7              to Compel Turnover of Electronic Records Under
               Sections 542, 1519(A)(3), 1521(A)(7) and 1522 of
8              the Bankruptcy Code
               [D.I. 199, filed on December 9, 2022]
9

10             Court's Ruling:                                     21

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 11:01 a.m.)
 2              THE COURT:  Good morning.  This is Judge Dorsey.
 3    We're on the record in FTX Trading Limited, Case Number 22-
 4    11068.
 5              Before we begin let me just remind everyone that
 6    even though this hearing is remote it is a formal Court
 7    hearing.  So if you are not speaking or not presenting,
 8    please, keep your camera off and your lines muted.
 9    Interruptions will not be tolerated and you will be removed
10    if you interrupt the proceeding and not be allowed back in.
11              So with that -- I requested this hearing on the
12    motion to shorten that was filed by the joint liquidators in
13    the Bohemian proceeding.  Ordinarily I wouldn't hold a
14    hearing on a motion to shorten, but I wanted to take the
15    opportunity to talk to the parties about where we are in this
16    case and what's going on.
17              It seems to me -- I understand that there is a lot
18    of heated debate between the parties here over what is
19    happening, but I do believe that there must be some path
20    forward here to resolve the concerns of everybody involved.
21    I think everyone would agree -- Mr. Bromley, I will give you
22    the chance to tell me I'm wrong, if I'm wrong, but I think
23    everyone agrees that the joint liquidators are entitled to
24    the data and information that relates to their debtor entity
25    that is in liquidation in the Bahamas.
```

1          Is there any dispute about that issue, Mr. Bromley?

2          MR. BROMLEY:  Yes, there is, Your Honor.

3          THE COURT:  I'm sorry, there is a dispute or, no,

4     there isn't?

5          MR. BROMLEY:  Yes, there is a dispute.

6          THE COURT:  Okay.  Over whether they're entitled to

7     their own information?

8          MR. BROMLEY:  Well, the requests are not just for

9     information, Your Honor.  The requests are for dynamic access

10    to live systems.  We believe that that is inappropriate.  So

11    in terms of static information we are certainly happy to sit

12    down and talk about that.  Dynamic access we believe should

13    not be permitted.

14         THE COURT:  Well how are they going to run their

15    case in the Bahamas if they don't have access, dynamic

16    access, to, at least, their own information?

17         I can separate this out.  Is there a distinction --

18    are you telling me there is an issue with regard to -- that

19    the only way to provide this information is to provide them

20    access to the entire system and there is some concern about

21    that or is there a way to provide just dynamic access to

22    their own information?

23         MR. BROMLEY:  I think there's a way, Your Honor, at

24    this point, right, to provide static information and we are

25    happy to sit down, and have a meet and confer about how that

1   static information might be able to be provided.

2          The concern we have with respect to dynamic access

3   to live systems is that we believe that any dynamic access

4   will be provided immediately to the Government of the Bahamas

5   and, in particular, the Securities Commission.  And to date

6   any access that the Securities Commission has had to our

7   systems has led to the relief from the debtors of digital

8   assets.  And we do not believe that that should be permitted.

9          We do not believe that that should be permitted.

10  We do not believe that there is a separation between the

11  JPL's and the Securities Commission at this point in time,

12  certainly no separation that provides the debtors with

13  comfort that whatever is provided to the JPL's will not be

14  provided immediately to the Securities Commission.

15          THE COURT:  Well, Mr. Shore, what is the

16  relationship between the JPL's and the Securities Commission

17  in the Bahamas?

18      (No verbal response)

19          THE COURT:  You're muted, Mr. Shore.

20          MR. SHORE:  I'd like to, at some point, speak to

21  the larger issues Your Honor is referencing and certainly

22  respond to what Mr. Bromley is saying.

23          In response to your question the JPL's are the

24  analog would be a Chapter 11 Trustee.  The commission's

25  analog is the SEC.  So no more than Mr. Bromley can be blamed

1   for or be accused of being an arm of the SEC, the JPL's are a

2   Court created trustee liquidating FTX Digital.

3           THE COURT:  Well is there --

4           MR. BROMLEY:  Your Honor --

5           THE COURT:  -- any -- let me just get to my point;

6   is there any use in my ordering the parties to mediate this

7   issue or, at least, sit down and talk to each other about

8   this issue, or is -- are we to the point where I'm going to

9   have to have a full evidentiary hearing on these issues and

10  make a decision?

11          MR. SHORE:  I'd like to think that the parties can

12  work it out.  The one situation we can't be held into or put

13  into is having that meet and confer, having the debtors raise

14  these, sort of, issues and, essentially, set the bar as being

15  the JPL's must prove that there was no collusion between the

16  commission and SBF before they can get dynamic access to the

17  information and then have everybody disappear for the

18  holidays so, essentially, we get timed out.

19          So if what is going to happen here, which is what I

20  was going to propose, is that the Court set this hearing for

21  Friday, Monday, I know Your Honor has travel plans, but at

22  least some control date so that if we don't get to resolution

23  we can, at least, come back to Your Honor with discreet

24  issues to be resolved.

25          So, for example, we have made very clear to the

1   Sullivan & Cromwell team how about just getting us a clone of

2   the system.  We don't need dynamic information right now.  We

3   can get back their access right now.  Can't you just get us a

4   clone?  And Mr. Bromley is saying what I want to do is sit

5   down with Mr. Shore, have our respective teams sit down, and

6   they can discuss the shape of a clone.

7           That is not going to work.  He can't appear in

8   Court today and say we have no problem giving a clone, but

9   they just need to sit down and talk to us about what that

10  clone is going to look like.  It's got to be resolved in the

11  next couple of days, not weeks, certainly not months.

12          MR. BROMLEY:  Your Honor, that is a conclusion, not

13  an argument.  Mr. Shore has given no indication as to why

14  there is anything that needs to be done in the next couple of

15  days, first of all.

16          Second, Mr. Shore and his colleagues have not

17  simply said we are willing to take a clone of static

18  information.  Their motion asks for live dynamic access.  The

19  information that we have provided to the Court, and we

20  provided yesterday to Congress from Mr. Ray's testimony,

21  indicates that the Securities Commission of the Bahamas has

22  already collaborated with the JPL's to obtain access to

23  digital assets and to mint tokens.  The JPL's have been

24  involved in that.  The JPL's went to Court after the fact to

25  get approval to approve violations of the automatic stay that

1   occurred.

2        Mr. Shore can shake his head all he wants, that is

3   what the evidence shows.

4        So we are happy to sit down.  We're happy to have a

5   mediation.  We're happy to talk about providing static

6   information, but I will tell Your Honor with respect to

7   dynamic information we can have a hearing on Friday, we will

8   go immediately -- if the ruling is against us we will go

9   immediately on appeal and seek a stay pending appeal.

10       This is dangerous information.  We do not trust the

11  Bohemian Government and because of the evidence we have in

12  terms of the actions to date of the JPL's we simply don't

13  trust that the JPL's will be able to hold this information

14  and not provide it to the Bohemian Government.

15       MR. SHORE:  Your Honor, while I appreciate your

16  desire to shortcut this can we just maybe get into the

17  hearing because what was just said is exactly what a Chapter

18  15 is not supposed to be.

19       MR. BROMLEY:  And we don't have a Chapter 15

20  approval yet either.

21       MR. SHORE:  Okay.  All right.

22       THE COURT:  Hold on.  I am not going forward with

23  the hearing today.  It's not going to be Friday either.  It's

24  probably not going to be before next year because this is

25  going to be a full evidentiary hearing and for an evidentiary

1  hearing it's live, and I expect witnesses in the Courtroom,

2  and presented live before me so I can judge credibility.

3  That is not something that can happen Friday, or Monday, or

4  even before the Christmas holiday.

5       So if we are going to have to go forward with a

6  hearing it's going to be in January.  I can give the parties

7  January 6th beginning at 9:30 a.m.  As I said, it will be a

8  live hearing.

9       These are serious allegations and, obviously, this

10 is a gating issue that I am going to have to resolve before

11 we can move forward with how to proceed with the dynamic

12 between the Bohemian proceeding and this proceeding. I am

13 hoping there is still some way to resolve this before we get

14 to January 6th.  I would highly encourage the parties to talk

15 to each other and if you think it would be productive to find

16 a mediator to help mediate that issue as well.

17      I don't know if there is a way to fashion an order,

18 Mr. Bromley, that would limit the ability of the JPL's

19 similar to what you might have in a 502 motion order that

20 limits the ability of the JPL's to share that information.

21 They can share it with their advisors, obviously, and

22 themselves, and that's it.  Maybe that is a possibility of a

23 way to move forward, but I will leave that to the parties to

24 see if you can work something out.  If not I will hear

25 everybody on the 6th.

1          MR. SHORE:  Your Honor, if I may be heard for a

2    little bit on this because I think there is another

3    perspective to this and I think Mr. Bromley is wrong when he

4    says this is not a Chapter 15.  We filed.  We have come and

5    asked for provisional relief and ultimately what I am going

6    to ask Your Honor, which you were mentioning, is I would like

7    you to keep a controlled date on Friday to see if Your Honor

8    can't resolve not issues about whether the Bohemian

9    Government was in cahoots with SBF which, I agree, would be

10   an evidentiary hearing, but rather whether or not we can

11   fashion an order that provides protection for the legitimate

12   concerns that Mr. Bromley has raised.

13          THE COURT:  Well --

14          MR. SHORE:  I've got to say, in the last 30 years I

15   have seen a lot of cases go off the rails where accusations

16   like this fly and every hearing turns into a charge

17   referendum on the case, and it becomes overly expensive,

18   burdensome on the Court, and value destructive.

19          So when the CRO of the debtor appears and testifies

20   in front of Congress with respect to what the debtor is

21   doing, the investigations that are going on, and that a

22   foreign Government has colluded with somebody who is jailed

23   right now we're, at least, tilting on the rails.

24          I just -- on behalf of my client it may come to

25   that, but its way too early in our case for this case to

1    devolve.  I agree with Your Honor, there has got to be a way

2    the professionals can work this out without getting into the

3    kind of accusations that are flying.

4            THE COURT:  All right.

5            MR. SHORE:  To be clear, we filed the pleading this

6    morning, Your Honor.  It attaches a declaration that Mr. Ray

7    could not have seen, nor counsel could have seen, which

8    belies this notion that what the commission was doing was

9    working with SBF.  In fact, the email they attach where SBF

10   says --

11           THE COURT:  Well, I'm not going to get into the

12   merits of it at this point, Mr. Shore.  We will talk about

13   that on the 6th if we get to it.

14           MR. SHORE:  Okay.  But recognize --

15           THE COURT:  Hold on, Mr. Shore.  I want to move on.

16           MR. SHORE:  Sure.

17           THE COURT:  Let's talk about the 16th.  We have the

18   motion objecting to the seal by the U.S. Trustee.  Is the

19   U.S. Trustee on the line, someone from the U.S. Trustee?

20           MS. SARKESSIAN:  Yes, Your Honor.  Juliet

21   Sarkessian for the U.S. Trustee.

22           THE COURT:  Ms. Sarkessian, I have some concerns

23   about that hearing going forward on Friday from a number of

24   perspectives.

25           Number one, the motion implicates individual

1   creditors and there is no creditor's committee yet.  I think

2   the creditor's committee would want to weigh-in on that

3   motion.  Do we know yet when the committee will be formed?

4           MS. SARKESSIAN:  Your Honor, first, I -- maybe

5   apology is not the right word, but we had hopes to have a

6   committee formed by this time.  We had a tremendous response

7   and people are located all over the world.  Unfortunately it

8   becomes a little bit difficult when people are in very

9   different time zones, and there is a lot of complicated

10  information, as I'm sure Your Honor can imagine.

11          So we are moving as expeditiously as possible.  You

12  know, and we hope to be filing a notice of appointment very

13  soon. I can't say anything more than that other than very

14  soon.

15          I do have concerns.  You know, they, obviously,

16  have to choose counsel.  So, you know, I think there

17  certainly is a reasonable possibility that they might not

18  have counsel by Friday or maybe they have it by Thursday, but

19  there is not, you know, as much time as one would like for

20  them to have.

21          So I mean Your Honor certainly brings up a valid

22  concern.  We had hoped it would be different.  We had hoped

23  that we would have a committee formed by this time, but the

24  reality is due to circumstances outside of our control it has

25  not yet happened.

1          THE COURT:  Okay.  I also noticed the Trustee also
2     objected to a consolidated creditor matrix on similar grounds
3     on the redaction of the creditor information, I believe.
4          MS. SARKESSIAN:  Your Honor, that was the motion I
5     was talking about.
6          THE COURT:  Oh, okay.
7          MS. SARKESSIAN:  So there was two motions, seal
8     motions; one of them relates to the
9     indemnification/exculpation motion and I will allow the
10    debtor to address that, but understanding, based on
11    discussions as well as the agenda, is that they are agreeing
12    for that to be unsealed.
13         THE COURT:  Okay.
14         MS. SARKESSIAN:  With respect to the other motion
15    relates to the creditor matrix, schedules and statements, top
16    50 list, and pretty much any document in the case that would
17    have names or addresses of creditors or customer/creditors.
18         THE COURT:  Okay.
19         MS. SARKESSIAN:  So that is the motion I was
20    discussing that we did file an objection to.
21         THE COURT:  Okay.
22         MS. SARKESSIAN:  We have not technically filed an
23    objection to the other motion because they said, effectively,
24    they're -- I don't know if withdrawal is the right word, but
25    they're not going to pursue that relief on a final basis.

1           THE COURT:  Okay.  I also have the motion to

2    intervene filed by members of the media.  I don't know if

3    anyone plans on objecting to the motion to intervene, but I

4    certainly want to give the media the opportunity to

5    participate in that hearing as well.

6           So, Ms. Sarkessian, should we -- should I set

7    another date now in January or do you want to wait to see

8    when the committee is formed, and retains counsel, and has an

9    opportunity to talk to you about how to go forward?

10          MS. SARKESSIAN:  So, Your Honor, I just want to be

11   clear; Your Honor is asking that the hearing on Friday on the

12   motion to seal the creditor matrix be put off until after the

13   committee is formed?

14          THE COURT:  Yes.

15          MS. SARKESSIAN:  I think, Your Honor -- okay.  So

16   you want a date in January.  I guess my feeling is it would

17   probably be best if we could schedule that now and -- I mean,

18   I think a committee is going to be formed in very short

19   order.  We are not going to be in a situation, I pray, that

20   we're in January and we don't have a committee.  So I think

21   that scheduling it now would actually be very helpful.

22          THE COURT:  Okay.  My first week of January is

23   booked because I have a two day evidentiary in another

24   Chapter 15 on recognition for the 4th and the 5th.  I just

25   scheduled the 6th for a hearing on the relief from stay from

1   the liquidators. So it would have to be pushed into the week

2   of January 9th.

3           MR. BROMLEY:  We do have a hearing, Your Honor,

4   already scheduled for the 11th, our second day hearing.  We

5   could put it on that day.

6           THE COURT:  I do see that, yes.  All right.

7           Does that work, Ms. Sarkessian, to add it to the

8   agenda for the second day hearing?

9           MS. SARKESSIAN:  I believe so, Your Honor.  I don't

10  see any problem with respect to that.  I don't know what the

11  debtors intend, if they intend to put, you know, any

12  witnesses on, but I don't expect.  My hope would be that it

13  would not be -- if there is testimony that it would not be

14  extensive.  So hopefully that would fit into -- if I could

15  just ask Your Honor how much time you have on the 11th.

16          THE COURT:  Well I have --

17          MS. SARKESSIAN:  If it's only an hour that might be

18  a problem.

19          THE COURT:  -- it scheduled beginning at 10 for the

20  second day hearing.  I have three other hearings in the

21  afternoon.  I probably can't -- they're not going to come

22  off, at least two of them are not going to come off because

23  they're contested hearings. So we would probably have -- I

24  can move it -- we could start at 9 a.m. and you would have

25  until 12:30.  I don't know what other objections might be

1  raised at that time to any of the motions that were presented

2  at the first day hearing.

3         I assume, Mr. Bromley, you are going to be calling

4  witnesses for the seal motion.

5         MR. BROMLEY:  We will have a declarant, Your Honor.

6  And that is assuming that we are not able to resolve the

7  issues with the creditors committee once they're appointed.

8         THE COURT:  Well if there is going to be cross the

9  witness have to be here even if it's a declarant.

10        MR. BROMLEY:  Correct.

11        THE COURT:  All right.  So let's move -- we're

12  going to move that hearing then, Ms. Sarkessian, and Mr.

13  Bromley, to the second day hearing on January 11th.

14        Mr. Bromley, circling back on what Ms. Sarkessian

15  said about the indemnification motion are we in agreement on

16  that one that is going to be unsealed?

17        MR. BROMLEY:  Yes, we are, Your Honor.

18        THE COURT:  Okay.

19        MS. SARKESSIAN:  Your Honor, if I could just ask a

20  favor for the start time for the hearing.  I am thinking, and

21  Mr. Bromley can indicate otherwise, I'm thinking that three

22  hours should be enough.  Just based on my schedule it would

23  be much easier if we started at 9:30 if that did not

24  inconvenience the Court.

25        THE COURT:  Go ahead, Mr. Bromley.

1          MR. BROMLEY:  We do have other things -- I'm sorry,

2    Your Honor, it is our second day hearing so we do have a fair

3    amount on the calendar for that day.  We are, obviously,

4    going to work to resolve all of those issues.  I do respect

5    that Ms. Sarkessian's time concerns, but --

6          MS. SARKESSIAN:  That's okay.  That's okay.  If

7    there is any issue we will start at 9.  I will make the

8    arrangements.

9          MR. BROMLEY:  Okay.  We will continue to work to

10   resolve the issues just like we resolved the issues for the

11   sealing on Friday.

12         THE COURT:  All right. The other possibility is we

13   can always -- I can try to rearrange and move my other

14   hearings in the afternoon to the 12th, the next day.  I will

15   ask my Chambers to do that so that that would free up the

16   entire day for this case because I do have time.  The other

17   option is if we can't move any of those off from the 11th I

18   have time on the 12th in the afternoon that we can always

19   continue the second day hearing on the 12th in the afternoon.

20         MS. SARKESSIAN:  I mean, Your Honor, from my

21   perspective I -- again, even with the other motions that are

22   on for that date I don't really expect this would take more

23   than three hours or three and a half hours.  I would not want

24   to inconvenience the Court with trying to move the afternoon

25   hearings, but I also don't know what other motions or

1  applications the debtors might be filing that, you know,

2  retention applications and what not that could be scheduled.

3       If the debtors feel that it is helpful for the

4  Court to try to move those afternoon hearings I don't object.

5  I don't want to inconvenience other people if it's not

6  necessary.

7       THE COURT:  All right.  Well that brings me to the

8  next issue which is the liquidator's motion to dismiss that

9  was filed on Monday and set for a hearing on the 11th which,

10 Mr. Shore, in the future if you -- that was not an omnibus

11 date, that is a second day hearing.  So it was not an open

12 invitation to schedule something.  You need to contact

13 Chambers to request a date for -- particularly a motion like

14 a motion to dismiss. I mean that is going to be an

15 evidentiary.

16      MR. SHORE:  Understood, Your Honor.  We will do

17 that in the future.  I will discuss it with Cleary or

18 Sullivan about when that can go forward.

19      THE COURT:  Yeah, let's find another date to handle

20 that one.

21      All right.  That brings me to, I wanted to ask

22 about the motion for recognition.  Where are we are on that,

23 Mr. Shore?  Are we going forward?  What is happening?

24      MR. SHORE:  We are still trying to see if we

25 couldn't resolve that. I think that is going to be part of a

1  package of discussions that have to occur kind of now to see

2  how we are proceeding.

3          THE COURT:  All right.  Well let's try to get that

4  resolved as well here.

5          So let me circle back then to the request by Mr.

6  Shore to have the 16th as -- I guess it would be kind of a

7  status conference on where the parties are on the issue of

8  the relief from stay.

9          Mr. Bromley, do you have a position on that?

10 Everyone was going to be available anyway.  So I assume

11 everybody is available.

12         MR. BROMLEY:  We are available, Your Honor.  We

13 would like to have the opportunity to meet with the folks

14 from White & Case.  We would also like to include in that

15 conversation the Securities Commission of the Bahamas who we

16 think is an essential party to these conversations.

17         Our view is that we would be amenable to mediation.

18 We believe that before you go to mediation you should, at

19 least, sit down and try to talk about it.  We know that the

20 commission has US counsel because they have contacted us on

21 other matters.  We believe that hopefully now with Mr.

22 Bankman-Fried in custody in the Bahamas there might be a way

23 forward that we can move along with a cooperative

24 relationship.  If this is going to be an attempt to seize

25 control of these debtors' cases and move them to the Bahamas

1    we will fight them with all our strength.

2           THE COURT:  Let me ask: Is there anyone on the call

3    from the Bohemian Securities Commission just by chance?

4           MS. RINNE:  Yes, Your Honor.  This is Blair Rinne

5    from Brown Rudnick.

6           MR. AULET:  This is Kenneth Aulet also from Brown

7    Rudnick, Your Honor.

8           THE COURT:  You can turn your cameras on so I can

9    see you, please.

10          MR. AULET:  Just to be clear, Your Honor, while we

11   are attending the hearing to observe we are not entering an

12   appearance. The Bohemian Securities Commission is not

13   consenting to personal jurisdiction in this Court.

14          THE COURT:  Well I was only going to ask if you

15   were willing to sit down with the joint liquidators and the

16   debtors here to talk about a path forward.

17          MR. AULET:  Your Honor, we will take it back to our

18   client.  We are always happy to (indiscernible).

19          THE COURT:  I think it would be helpful.  It might

20   help resolve some of the concerns that the debtors here have

21   if they can talk to the commission.  So I would highly

22   recommend doing that and encourage the commission to

23   participate in that discussion.

24          So I will leave the 16th on then as a status

25   conference to see where we are on this issue on the motion

1  for relief from the automatic stay and the turnover of the

2  records.  We will go from there.

3           Did I set a date for that one?  I didn't set a

4  date.  We will talk about that on Friday, I guess.  That is

5  what I set for the 6th, right, January 6th.  So that is set

6  for the 6th.  We will discuss it on Friday, see where we are,

7  and see if it's necessary to go forward on the 6th.  So if

8  there is something else I can do to help accommodate the

9  party's attempts at mediation.

10          MR. SHORE:  What time on Friday, Your Honor?

11          THE COURT:  It is currently scheduled at 10 a.m.,

12  and we will just leave it at 10.

13          MR. SHORE:  Okay.  We will be busy between now and

14  then.

15          THE COURT:  Mr. Landis, you turned your camera on.

16  Do you have anything else?

17          MR. LANDIS:  Yes, I did, Your Honor.  I just wanted

18  to note for the record -- Adam Landis of Landis Rath & Cobb,

19  co-counsel to the debtors.

20          We will file an amended agenda reflecting Your

21  Honor's rulings in moving the various hearings.  We will get

22  that on file as soon as possible.

23          THE COURT:  Okay.  Great.  Thank you.  I appreciate

24  that.

25          Anything else then before we adjourn?

1      (No verbal response)

2           THE COURT:  Thank you.  I appreciate everyone

3   getting on the call on shortened notice and hopefully we can

4   continue to talk and move these things forward.  Until then I

5   will see everyone on Friday morning.

6           MR. BROMLEY:  Thank you very much, Your Honor.

7           THE COURT:  We're adjourned.

8       (Proceedings concluded at 11:29 a.m.)

9

10

11

12

13                            CERTIFICATION

14       I certify that the foregoing is a correct

15   transcript from the electronic sound recording of the

16   proceedings in the above-entitled matter to the best of my

17   knowledge and ability.

18

19   /s/ Mary Zajaczkowski                    December 14, 2022

20   Mary Zajaczkowski, CET-531

21   Certified Court Transcriptionist

22   For Reliable

23

24

25

**Exhibit B**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   FTX TRADING LTD., et al.,   .  Case No. 22-11068 (JTD)
                                 .
 5                               .  (Jointly Administered)
                                 .
 6                               .  Courtroom No. 5
                                 .  824 Market Street
 7            Debtors.           .  Wilmington, Delaware 19801
                                 .
 8                               .  Wednesday, February 15, 2023
     . . . . . . . . . . . . . . .  10:00 a.m.
 9
                        TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE JOHN T. DORSEY
                 UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtor:          Adam Landis, Esquire
13                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
14                            Wilmington, Delaware 19801

15                            James L. Bromley, Esquire
                              SULLIVAN & CROMWELL LLP
16                            125 Broad Street
                              New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Danielle R. Gadson

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the Debtors:           Matthew Lunn, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
3                              Rodney Square
                               1000 North King Street
4                              Wilmington, Delaware 19801

5   For JPLS Bahamas:          Christopher Shore, Esquire
                               WHITE & CASE LLP
6                              1221 6th Avenue
                               New York, New York 10020

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

| | | |
|---|---|---|
| MOTION: | | PAGE |
| | | |
| Agenda | | |
| Item 6: | Motion of the United States Trustee for | 4 |
| | Entry of an Order Directing the Appointment | |
| | of an Examiner | |
| | [D.I. 176; Filed 12/1/22] | |
| | | |
| | Court's Ruling: | 5 |
| | | |
| Agenda | | |
| Item 5: | Motion for an Order Granting the Committee | 17 |
| | Leave and Permission to File the Reply of | |
| | the Official Committee of Unsecured Creditors | |
| | to Objection of the United States Trustee to | |
| | the Application for an Order Authorizing the | |
| | Retention and Employment of FTI Consulting, | |
| | Inc., as Financial Advisor to the Official | |
| | Committee of Unsecured Creditors | |
| | [D.I. 697, filed on February 13, 2023] | |
| | | |
| | Court's Ruling: | 21 |
| | | |
| | | |
| EXHIBITS: | | PAGE |
| | | |
| Brian Simms Declarations | | 20 |
| | | |
| Sophia Rolle-Kapousouzoglou Declaration | | 20 |
| | | |
| JPL Exhibit 5 Order from Supreme Court of the Bahamas | | 20 |

1          (Proceedings commence at 10:07 a.m.)

2          (Call to order of the Court)

3              THE COURT: Good morning, everyone.  Thank you.

4      Please be seated.

5              Mr. Landis.

6              MR. LANDIS:  Good morning, Your Honor.  May I

7      please the Court, Adam Landis, for the record, from Landis

8      Rath & Cobb, on behalf of FTX Trading Ltd., and its

9      affiliated debtors.

10             Your Honor, we are here today with two agendas.  I

11     don't know if the Latin for that is agendum, but we are here

12     with two agendas; one in the FTX Trading Ltd., case and one

13     in the FTX Digital Markets case.  Nothing is contested, Your

14     Honor, on either agenda.

15             With respect to the FTX Trading agenda, and we have

16     spoken with counsel to the joint provisional liquidators, we

17     thought we would go forward with the FTX Trading Chapter 11

18     agenda first. We filed a second amended agenda last night

19     noting that the committee had filed certificates of counsel

20     with respect to the professional retentions that had been

21     contested by the U.S. Trustee.

22             I note that, I think, as we were standing here this

23     morning Your Honor signed the orders for FTI and Jefferies.

24             THE COURT:  Yes.

25             MR. LANDIS:  So, unless Your Honor has question

1    with respect to anything on the agenda, we believe we can

2    move right to item number six which is the Court's ruling

3    with respect to the United States Trustees motion to appoint

4    an examiner.

5         THE COURT:  Okay.  I don't have any questions.  So,

6    we can go ahead.

7         So, this is the ruling on the motion to appoint an

8    examiner. The United States Trustee moved for the appointment

9    of an examiner in these cases pursuant to Section 1104(c)(1)

10   and (c)(2) of the Bankruptcy Code.  Section 1104 provides

11   that if a Chapter 11 Trustee is not appointed in a case then

12   at any time prior to confirmation of a plan:

13        "On request of a party in interest or the United

14   States Trustee, and after notice and a hearing, the Court

15   shall appoint an examiner to conduct such an investigation of

16   the debtor, as is appropriate, including an investigation of

17   allegations of fraud, dishonesty, incompetence, misconduct,

18   mismanagement, or irregularity in the management of the

19   debtor if (I) such appointment is in the interest of the

20   creditors, and any equity security holders, and other

21   interests of the estate, or (II) the debtors fixed liquidated

22   unsecured debts other then debts for goods, services, or

23   taxes, or owing to an insider exceed $5 million."

24        The Trustee, joined by several state regulatory

25   authorities, argues that because there are allegations of

1   massive fraud alleged against the debtors prepetition

2   management the appointment of an examiner is in the best

3   interest of the debtor's creditors and other interest holders

4   under 1104(c)(1).

5          The Trustee also argues that even if I conclude the

6   requirements of 1104(c)(1) have not been met, I am required

7   to appoint an examiner under 1104(c)(2) because three of the

8   debtors meet the debt threshold or the debtors do not, for

9   the purposes of this motion, contest the debt limit with

10  regard to the remaining debtors.

11         The debtors, the committee, general unsecured

12  creditors, and the joint provisional liquidators or FTX

13  Digital Markets Ltd., appointed in the provisional

14  liquidation proceeding pending in the Bahamas, object to the

15  appointment of an examiner arguing that given the

16  investigations being conducted by the debtors and the

17  committee, as well as various federal law enforcement and

18  regulatory agencies, there is no need to appoint an examiner

19  to conduct yet another costly investigation that would slow

20  the progress of these cases.  Moreover, the objectors argue

21  that, contrary to the Trustees position, appointment of an

22  examiner is not mandatory under 1104(c)(2) even if the debt

23  threshold is met.

24         For the reasons I will explain, I agree with the

25  objectors and will deny the motion to appoint an examiner.

 1              These cases have been described as unique, unusual,

 2    highly complex, and unprecedented to name just a few of the

 3    adjectives applied to them, and they have certainly lived up

 4    to that billing.  A multi-billion dollar company built over

 5    the course of just a few years.  A spectacular crash with

 6    billions worth of assets missing, allegations of gross

 7    mismanagement and massive fraud leading to criminal

 8    indictments and investigations by numerous federal agencies.

 9              Behind that backdrop sit the creditors and the

10    customers of the debtors; individuals and entities that

11    trusted the management of the company with a relatively new

12    type of asset, cryptocurrency, as well as those who did

13    business with the debtors on a day to day basis.  This case

14    is about making sure that those parties get back as much

15    value as possible from the debtor's estates.

16              That process began immediately prior to the filing

17    of cases with the appointment of Mr. Ray as the new CEO of

18    the debtors.  Although appointed by the previous CEO, Mr.

19    Bankman-Fried, who is currently under federal indictment,

20    there is no question that Mr. Ray is completely independent

21    of prior management and the company seems appointed to lead.

22              Mr. Ray is the consummate professional, highly

23    qualified with decades of experience in taking control of

24    companies in dire financial condition.  Mr. Ray, in turn,

25    appointed four independent directors to three silos of debtor

1  entities to assist him in determining what happened, how to

2  sort out the financial condition of the debtors, and return

3  as much value as possible to creditors and customers.

4        Each of the four directors are also highly

5  qualified professionals with no prior connection with the

6  debtors or the debtor's prior management.  Mr. Ray also

7  insured that all prior senior management of the debtors were

8  removed; two of whom have been indicted and plead guilty to

9  various crimes involving the management of the debtors.

10 Although some prior officers of the debtors remain in place,

11 there is no indication they were involved in any wrongdoing,

12 and according to Mr. Ray all have been stripped of any

13 decision making authority.

14       Mr. Ray has also retained a group of highly

15 qualified experts to assist in sorting through the debtor's

16 poorly maintained records.  In many instances records don't

17 exist at all because the recordkeeping was neglected by prior

18 management.  Mr. Ray testified that those experts, among

19 other things, are accessing the debtor's extremely vulnerable

20 electronic information containing crypto-assets that have

21 already suffered hacking incidents both pre and post-petition

22 before controls could be restored.  Those hacks resulted in

23 the possible loss of hundreds of millions, if not billions of

24 dollars' worth, of crypto-assets.

25       He further testified that he has been informed by

1  those experts that given additional persons access to the

2  data creates the risk of further inadvertent disclosure or

3  hacking of information that could lead to additional losses.

4  Indeed, even committee counsel indicated that while they are

5  working closely with the debtors in conducting investigations

6  into what happened, the committee is not requesting direct

7  access to the debtor's data due to those risks.

8          There is no question that an examiner or a Chapter

9  11 Trustee, for that matter, appointed pursuant to Section

10  1104 would have the same attributes as Mr. Ray and the

11  independent directors.  That person would be independent with

12  no connection to the debtors or the debtors prior management.

13  That person would need to be qualified -- would need to be as

14  qualified and as experienced as Mr. Ray and that person would

15  retain qualified and experienced professionals to assist with

16  the investigation.

17          There is no question that if an examiner was

18  appointed here the cost of the examination, given the scope

19  suggested by the Trustee at the hearing, would be in the tens

20  of millions of dollars and would likely exceed $100 million.

21  Contrary to the suggestion of the Trustee, the debtors and

22  the committee could not merely sit idly by while a months

23  long investigation unfolded leading to exponential costs to

24  the estate which would have to be borne by the creditors.

25          While the debtors may ultimately have billions of

1  dollars' worth of assets to distribute, creditors will likely

2  not come close to recovering the full amount of their losses

3  and it may take some time to recover anything as the debtors

4  and the committee work to claw back as much as the assets as

5  possible.

6          Given the facts and circumstances of this highly

7  unique case I have no doubt that the appointment of an

8  examiner would not be in the best interests of the creditors.

9  There are already multiple investigations underway by

10 incredibly competent and independent parties.  Requiring

11 creditors to bear the burden of yet another investigation

12 does not comport with the requirements of Section 1104(c)(1)

13 or the general scheme of the bankruptcy code; that is to

14 maximize to recovery to creditors.

15          It is important to keep in mind that while we talk

16 about the cost of an investigation being born by the debtors

17 we are actually talking about the cost being born by the

18 creditors.  Every dollar spent in these cases on

19 administrative expenses is a dollar less to the creditors;

20 therefore, I will deny the request to appoint an examiner

21 under 1104(c)(1).

22          The Trustee argues, however, that even if I

23 conclude that the appointment of an examiner is not in the

24 best interests of the creditors, I am still obligated to

25 appoint one as mandated by Section 1104(c)(2) because the

1   debtors met the debt threshold or, at least, do not contest

2   that they do for purposes of this motion.  Even the Trustee

3   concedes, however, that a Bankruptcy Court has some

4   discretion in determining whether or not an examiner must be

5   appointed under 1104(c)(2), for example, for a motion to

6   appoint an examiner is being used by a creditor to obtain an

7   advantage in plan negotiations.  In other words, the Trustee

8   agrees there are times when the appointment of an examiner

9   would not be appropriate under 1104(c)(2).

10        To be sure there is a split of authority over

11   whether 1104(c)(2)leaves any discretion on the appointment of

12   an examiner, Courts that hold there is no discretion

13   concentrate on the language in 1104 that states:

14        "The Court shall appoint an examiner if the debtor

15   meets the debt requirements of (c)(2)."

16        Those Courts either ignore the additional language

17   of 1104 that states: "To conduct such an investigation of the

18   debtors as is appropriate" or conclude that the language only

19   means the Court can direct the scope and nature of an

20   examination after an examiner is appointed.  For example, see

21   In Re Revco, 898 F.2d 498 at 501, Sixth Circuit (1990).  The

22   Court held appointment is mandatory, but: "The Bankruptcy

23   Court retains broad discretion to direct the examiner's

24   investigation including its nature, extent, and duration."

25        The Sixth Circuit is the only Circuit Court of

1   Appeals to consider the issue.  Other courts have concluded

2   that the as appropriate language in 1104(c) permits a

3   Bankruptcy Court to deny the appointment of an examiner in

4   limited circumstances even if the debtor meets the debt

5   requirements of (c)(2).

6           Examples are In Re Residential Capital LLC, 474

7   B.R. 112, 117, Bankruptcy SDNY (2012); In Re Dewey & LeBoeuf,

8   478 B.R. 627, 629, Bankruptcy SNDY (2012); In Re Shelter

9   Resources, 35 B.R. 304, 305, Bankruptcy Northern District of

10  Ohio (1983); In Re Gilman Services, 46 B.R. 322, 327,

11  Bankruptcy District of Massachusetts (1985); In Re Erickson

12  Retirement Communities LLC, 425 B.R. 309 at 312, Bankruptcy

13  Northern District of Texas (2010); In Re GHR Companies, Inc.,

14  43 B.R. 165, 170, Bankruptcy District of Massachusetts

15  (1984).

16          Indeed, every bankruptcy judge in this district to

17  consider the issue has concluded that there is discretion;

18  see In Re SA Telecom Inc., Case No. 97-2395-2401, Judge

19  Walsh, March 27th, 1998, Hearing Transcript at 82; In Re

20  Spansion, 426 B.R. 114, 128, Bankruptcy Court District of

21  Delaware (2010), a Judge Shannon decision; In Re Visteon

22  Corporation, No. 09-11786, a Judge Sontchi decision from May

23  12th, 2010, Hearing Transcript at 170; In Re Washington

24  Mutual, Inc., Case No. 08-12229, a Judge Walrath decision,

25  Bankruptcy District of Delaware, May 5th, 2010, Hearing

1   Transcript at 97; and two of my own prior cases In Re Cred

2   Inc., Case No. 20-12836, Bankruptcy District of Delaware,

3   December 12th, 2020, Hearing Transcript at 95, and In Re

4   Mallinckrodt PLC, Case No. 20-12522, November 22nd, 2021,

5   Hearing Transcript 28 through 46.

6           As Judge Glenn posited the question in Residential

7   Capital:

8           "If the as is appropriate language provides such

9   discretion with respect to the nature, extent, and duration

10  of the investigation, then why doesn't the same language

11  provide discretion to just say no to an examiner

12  investigation where it may not be justified on the particular

13  facts and circumstances of the case."

14          That is 474 B.R. at 118.

15          As the Trustee pointed out during argument,

16  ultimately Judge Glenn did appoint an examiner in Residential

17  Capital because (I) no plan had been confirmed; (II) no

18  Trustee had been appointed; (III) the debtor had fixed debts

19  exceeding $5 million; and (IV) investigation was appropriate,

20  and an investigation by the committee had just begun.

21          The first three elements of this analysis are

22  certainly present here, but while one could argue the fourth

23  is also met because the debtors and the committee are in the

24  early stages of their investigations the facts present here

25  are fundamentally different then Residential Capital.

1        First, Judge Glenn recognized in <u>Residential</u>

2  <u>Capital</u> that:

3        "Other than the committee, there is currently no

4  independent party with the ability and authority to fully

5  investigate and analyze the transactions at issue."

6        Judge Glenn emphasized the no independent party in

7  that state.  By contrast, in this case, all the senior

8  managers of the company accused of wrongdoing have been

9  removed and replaced by extremely competent independent

10 professionals led by Mr. Ray with the ability and authority

11 to investigate all claims that might ultimately benefit the

12 creditors in these cases.

13       Moreover, as indicated before, all remaining

14 employees and officers of the debtors that have not been

15 accused of wrongdoing do not possess any decision-making

16 authority.  Mr. Ray has also retained professionals that are

17 fully capable of conducting a thorough investigation.

18       Second, as Judge Glenn recognized, an examiner

19 investigation might not be appropriate when, among other

20 things, the debtors senior management has been indicted; 474

21 B.R. at 118, Footnote 6.  Here, of course, senior management

22 has been indicted; two have plead guilty and a third is

23 scheduled for trial in October.

24       Finally, the issues to be investigated in

25 <u>Residential Capital</u> involved a "Complex constellation of pre

1   and post-bankruptcy transactions involving billions of

2   dollars in transfers and financing among interested parties."

3   That is at 115, Note 3, emphasis on "interested parties."

4           In Residential Capital the allegations were that

5   transfers between the debtors and certain secured creditors

6   benefited the secured creditors to the detriment of unsecured

7   creditors.  Here, there are no secured creditors.  There are

8   only unsecured creditors.

9           Finally, the issues to be investigated in

10  Residential Capital -- excuse me, moreover, while the

11  transfers at issue in Residential Capital were clearly

12  complex commercial transactions, there was no indication that

13  accessing the debtor's financial information would create a

14  risk of further harm to the debtors or their creditors.  By

15  contrast, the uncontroverted testimony during the hearing in

16  this matter established that given the debtor's business and

17  the vulnerability of the debtor's financial data, permitting

18  additional parties access to the financial information would

19  create an increased risk of further loss through inadvertent

20  disclosures or hacking.

21          Therefore, I conclude that under the facts and

22  circumstances of these cases, appointment of an examiner is

23  not needed pursuant to 1104(c)(2) and appointing one would

24  impose an unnecessary burden on the debtors and ultimately

25  the creditors for whose benefit these cases are being

1    pursued.  Contrary to the Trustees position this is not

2    inconsistent with the language of the statute or the

3    legislative history.

4          Congress did not explain the language of the

5    statute itself what it meant by the "as is appropriate"

6    limitation.  As I previously mentioned, many courts have

7    concluded that it means a Bankruptcy Court must always

8    appoint an examiner if the debt limit has been met, but can

9    limit the nature, extent and duration of any examination.

10   Others have concluded that if the Bankruptcy Court can limit

11   the scope and duration it must also mean that the Court can

12   conclude that no examination is needed at all under specific

13   facts and circumstances.

14         Clearly, there is more than one logical conclusion

15   as to the meaning of Section 1104(c).  The legislative

16   history of 1104(c), which at the time of its enactment was

17   1104(b), concluded that:

18         "The standards for the appointment of an examiner

19   are the same as those for the appointment of a Trustee. The

20   protection must be needed and the cost and expense must not

21   be disproportionately high."

22         HR Rep No. 95-595, Ninety-Fifth Congress First

23   Section 402 (1977).

24         Thus, the legislative history supports the

25   conclusion that an examiner shall be appointed "as

1   appropriate under the particular circumstances of the case,"

2   but "the protection must be needed."  That legislative intent

3   is met in cases where even though the debt limit of

4   1104(c)(2) is met the evidence establishes and examiner is

5   not needed under the facts and circumstances of a particular

6   case.

7          Therefore, I will sustain the objections and deny

8   the motion to appoint an examiner.  The parties should meet

9   and confer and submit a form of order under certification of

10  counsel.

11          Any questions?

12    (No verbal response)

13          THE COURT:  Next up.

14          MR. LANDIS:  Thank you, Your Honor.

15          I just wanted to go back very briefly to the

16  second amended agenda.  There's an Item 5 that was the

17  committee's motion for permission to file a response to the

18  United States Trustees objection.  I believe that matter is

19  mooted out and the committee is not pressing it, but I

20  didn't, for house keeping purposes, want to just let that

21  hang out on the agenda.  So, you'll probably hear from the

22  committee on that.

23          THE COURT:  It does seem moot.

24          MR. LUNN:  Your Honor, Matthew Lunn from Young

25  Conaway.

1          I believe it's just the motion for relief to file

2     the reply Your Honor.  Simply procedure.  I don't believe the

3     U.S. Trustee had an objection to it.  Housekeeping we can

4     upload a form of order if it's acceptable.

5          THE COURT:  Al right.  We'll go ahead and just

6     enter the order.

7          MR. LANDIS:  Thank you.  I just wanted to make

8     sure that that loose end was tied.  And with that, we can

9     pass the podium over to counsel to the joint provisional

10    liquidators.

11         THE COURT:  All right.

12         MR. SHORE:  Good morning, Your Honor.  Chris Shore

13    from white & Case on behalf of the joint provisional

14    liquidators in the Chapter 15 case now.

15         We're here today seeking recognition of the

16    pending Bahamian liquidation as a foreign proceeding and

17    grating related relief.  Tending in the courtroom today are

18    Brian Simms and Peter Greaves; two of the JPL's.  The third,

19    Kevin Cambridge, unfortunately was unavailable to come today

20    because he has COVID.

21         As for today's agenda, we're happy to report that

22    there's no pending objections to our request for recognition.

23    So, if it's okay with the Court, I'd like to proceed as

24    follows:

25

1          First, I'd like to move in the evidence into the

2    record and request that the Court enter the proposed form of

3    order which we filed on Monday at Docket 125.  Then I'd like

4    to give the Court a fifteen minute status update, not in the

5    way of evidence, but just to give Your Honor a sense of what

6    the JPL's have been doing and give you kind of a six month

7    look forward so you know what's going to be happening in the

8    case.

9          And good news is I don't perceive that we're going

10   to be doing a lot in the fifteen over that time but maybe at

11   the end we can set a further status conference just to let

12   you know what's happening in that proceeding.  And, of

13   course, at any time if Your Honor has questions, I'm happy to

14   answer them or have others assist in the answer.

15         As for the evidence, the verified petition is

16   filed at Docket No. 1 of the Chapter 15.  We have three

17   declarations that we'd like to submit into evidence in

18   support of the application.  Those are the two declarations

19   of Mr. Simms and the declaration of Sophia Rolle-Kap in

20   support of the petition at Dockets 2, 5, and 8.

21         Mr. Simms is here should you have any questions

22   for him.  Ms. Rolle-Kap had to be in the Bahamas yesterday at

23   the recognition of the debtors Chapter 11 cases in the

24   Bahamian proceedings, but she is available via zoom should

25   the court have any questions about the intricacies of

1   Bahamian liquidation law, but I'd like to offer their

2   declarations into evidence as Exhibits 1 to 4 on the exhibit

3   list.  We distributed it to the parties in interest and the

4   C.  And also move into evidence Exhibit 5 which is an order

5   from the Supreme Court of the Bahamas regarding the JPL's

6   ability to commence the Chapter 15 action.

7              THE COURT:  Okay.  Anyone have an objection to

8   introduction of the evidence?

9              MR. BROMLEY:  Your Honor, Jim Bromley from

10  Sullivan & Cromwell on behalf of the Chapter 11 debtors.

11             We do not have an objection to the admission of

12  the evidence with respect to the recognition proceeding, but

13  there are certain aspects of the declarations which we

14  believe go beyond the four corners of the Chapter 15

15  recognition.  So, as long as it's limited just to Chapter 15

16  recognition, just to this hearing, and just to this relief,

17  we have no objection.

18             THE COURT:  All right.  They're admitted without

19  objection subject to the limitation that Mr. Bromley

20  requested.

21         (Evidence received into evidence)

22             MR. SHORE:  As for the motion itself as part of

23  the cooperation agreement that we entered into with the

24  debtors, we agreed to support their application for

25  recognition of the Bahamas.  They agreed to support our

1    application here and we took their comments on the order.  We

2    then reached agreement on language with the DOJ, the U.S.

3    Trustee, and the committee.  So, as I said, the form of

4    order, which has been agreed to by the parties, is at Docket

5    125.

6              I do want to note that there have been a number of

7    informal letters submitted by Mr. Leslie Stewart, a Bahamian

8    citizen.  Specifically, he sent a letter that was docketed in

9    the Chapter 11 cases at Docket 357 and some others.  We don't

10   believe any of them constitute an objection to recognition

11   but wanted to raise this to Your Honor's attention.

12             THE COURT:  I did see those letters and I directed

13   they be put on the docket just because I wanted everyone to

14   be able to see what kind of things that I'm receiving from

15   folks.

16             MR. SHORE:  Yes, Your Honor.  So, unless the Court

17   has any questions, we'd respectfully request that the court

18   enter the amended proposed order and we move to the status

19   update.

20             THE COURT:  Okay.  Anybody wish to be heard on the

21   recognition?

22         (No verbal response)

23             THE COURT:  All right.  Satisfied the relief is

24   appropriate, I will enter the order.

25

1      MR. SHORE:  So, just to -- I wanted to give Your

2  Honor a sense of where the JPL's have been and, as I said,

3  give a kind of six month look forward so you know what's

4  going on and I'll focus on, if you think of the debtors

5  presentation in the silos, FTX Digital is a subsidiary within

6  the FTX international platform, that international silo.

7      Now, the first day presentation may have left the

8  court with the impression that the FTX Digital estate played

9  an undersized role in the saga and I do want to address that

10  because it is actually, from our perspective, a big piece of

11  the puzzle that's going to need to get resolved.

12      At the time of the collapse, Digital employed

13  eighty-four persons including thirty-eight who were

14  transferred over from other FTX debtor entities including a

15  board in key management personnel.  That company was the

16  headquarters in Nassau, Bahamas.  It's one of fifty-two

17  properties that the JPL's have identified in the Bahamas all

18  held in the name of a Chapter 11 debtor in this case, FTX

19  Property Holdings.  Amongst those properties was a deluxe

20  office suite, residential complexes, and accommodations for

21  the employees, and a six acre FTX campus in New Providence,

22  Bahamas.  All of these properties, we seem to think, are

23  worth north of $250 million.  They were financed by FTX

24  Digital and are on FTX's Digital's balance sheet as

25  intercompany receivables.

1          As part of the cooperation agreement, we've agreed

2   with the debtors that the JPL's will take the lead on

3   liquidating that real estate in the Bahamas.  So, there is a

4   big real estate piece in FTX Digital.

5          THE COURT:  There was a motion to dismiss that

6   entity, wasn't there?

7          MR. SHORE:  I thought it was the Turkish

8   proceeding that did get dismembered.

9          THE COURT:  I thought I remembered seeing another

10  one for one of the Bahamian entities.

11         MR. BROMLEY:  Yes, Your Honor.  The properties in

12  the Bahamas are actually owned in fee by a U.S. debtor, and

13  the joint provisional liquidators did file a motion to

14  dismiss that individual proceeding.  That's been resolved --

15         THE COURT:  Okay.

16         MR. SHORE:  Sorry. Yes.  That one has been

17  resolved as part of the corporation agreement.  We're going

18  to go ahead and mark it and sell those assets, and then we're

19  going to have a discussion about where those assets go at a

20  later date, but --

21         THE COURT:  So, I need to put something on the

22  docket to close that out, close that motion out.

23         MR. SHORE:  Okay.  We can address that.

24         So, of the eighty-four employees who were living

25  in the Bahamas at the time, there are sixteen employees who

1   remain working on a variety of forensics matters and

2   assisting with ongoing investigations.  But moving back in

3   time, as Mr. Bromley said at that first day hearing, the FTX

4   international platform was primarily a digital assets trading

5   in exchange platform for not U.S. citizens.

6            To that end, FTX was created -- FTX Digital was

7   created in July 2021 for maintaining -- for the purpose of

8   migrating the business.  And you might remember Mr. Bromley

9   said that the entity was moving around the country and then

10  offshore.  It was all going to be moving to the Bahamas where

11  this giant real estate conglomeration was and then

12  headquarters.  And that was going to allow FTX Group to take

13  advantage of the Bahamas favorable regulatory environment in

14  the newly created DARE Act which you've kind of heard about.

15           The question that's going to come up in this case

16  is what was the status of that movement between the time that

17  Digital was created and FTX and Digital filed their

18  respective proceedings.  And I'm going to come back to that

19  migration concept in a bit, but I did want to give Your Honor

20  a sense before I get there of how the Bahamian proceeding is

21  going to go along.  The Bahamian proceedings are either

22  voluntary or court supervised.  Ours is court supervised.  To

23  that end, Mr. Simms, Mr. Greaves, and Mr. Cambridge were

24  appointed as joint provisional liquidators.

25

1          They -- the Supreme Court of the Bahamas has

2    exclusive jurisdiction.  Right?  Your Honor has exclusive

3    jurisdiction over assets worldwide of the debtors.  The

4    Supreme Court of the Bahamas is the one that has exclusive

5    jurisdiction over insolvency proceedings and has broad

6    authority to make winding up orders for all types of

7    companies.

8          When a company is being wound up compulsively by

9    the Court, the Court issues an order which describes the

10   steps that the liquidators must take to liquidate the company

11   and the liquidator then -- as the JPL's here have been filing

12   periodic status updates with the Bahamian Court as to have,

13   they're doing on the order laying out their duties.

14         Once appointed, liquidators generally gather

15   assets, distribute the companies' assets to the creditors on

16   a pari passu basis.  They have broad authority to bring and

17   defend lawsuits, file claims, engage in business on behalf of

18   the debtors, so it's best really to think about the JPL's as

19   Chapter 11 debtors.  There are some distinctions, but

20   normally the process runs that way.

21         So, to that end, over the past few months, let's

22   talk about what they've been doing and then I'll come to what

23   needs to get done.  Beginning right from appointment, the

24   JPL's took steps to identify and gain custody of cash.

25   They've identified approximately $143 million of cash held by

1   Silvergate and Moonstone which Your Honor may have heard

2   about.  We filed requests for provisional relief with respect

3   to those funds and then, as the Court knows, the U.S.

4   Department of Justice seized the funds, but the JPL's are an

5   active discussion with the DOJ with respect to the release of

6   the funds and hope to have a consensual resolution on that.

7            The JPL's also established cash management

8   controls to ensure proper stewardship and security over the

9   estate funds, much like the debtors have been doing, and the

10  controls include rolling cash flow forecasts, payment

11  approval controls, anti-money laundering, treasury controls;

12  all the things that you would expect a U.S. Chapter 11

13  Trustee to do.

14           There have been significant efforts, and it's part

15  of their requirements, to communicate with customers and

16  creditors.  The JPL's launched a general informational

17  website and creditor portal website.  They've also sent

18  letters out to approximately 2.4 million of potential

19  customers inviting them to register their contact information

20  in order to receive updates of what's going on.

21           They've also been, much like the U.S. debtors,

22  been in active communication with regulators in the Bahamas

23  and in the U.S., and participating in investigations as well.

24  We have been active in the Chapter 11 case.  I'll get to it.

25  We believe we're a very large creditor in these cases, but,

1  you know, the main goal, which we reached early on in the

2  case, was the cooperation agreement which this Court has

3  approved, and the Bahamian Court has approved.  And it just

4  gives us a framework from which we're going to try and figure

5  out how the two proceedings are going to be done.

6          This is where we are, just to get a sense of the

7  current financial picture, not evidence, but just give Your

8  Honor a sense of the size of what we're talking about.  As I

9  said, there's about $220 million in cash, $143 subject to the

10  DOJ seizure order.  There's the $276 million receivable

11  relating to the property, but so far, the JPL's have traced

12  two major sources of out flows from their accounts in the

13  lead up to the case.  $5.6 billion was transferred from FTX

14  Digital custodial accounts to a U.S. debtor, FTX trading, and

15  $2.1 billion was transferred from FTX Digital custodial

16  accounts to Alameda, another Chapter 11 debtor.

17          So, to get the proper sense of the size here,

18  we're talking about $7.7 billion of cash out flows from the

19  Bahamian estate to the U.S. debtors.  And then we have other

20  tangible assets of about $3 million mostly relating to office

21  furniture, equipment, and the fleet of cars that the

22  employees had in the Bahamas.

23          So, that's where we stand right now.  Over the

24  next six months -- we got a deal with the customer migration

25  issue.  Obviously, determining whether customers were

1   customers of U.S. debtors or Digital is going to be critical

2   to any distribution scheme.  We've got to address the issue

3   of customer trust claims as has happened in many other crypto

4   cases.  There are unresolved legal and factual issues as to

5   the nature of the customers deposits whether they're held in

6   trust, whether they're general unsecured claims, and we're

7   going to need to work through that.

8          We've got open trade contracts that we're going to

9   need to address and see if there can't be a way to

10  restructure the platform, and then as the debtors are doing

11  here, there's a ton of work being done into antecedent

12  transactions.  Not just intercompany, but also with respect

13  to third parties to determines whether those third parties or

14  any of the persons associated with the transactions need to

15  bring money back into the estate.

16         So, as I said, there's a lot of work that needs to

17  be done.  I'm not sure how much of it is going to need the

18  involvement of the Court, but we may be back seeking

19  additional relief from the Court to be able to get all that

20  stuff done.  And unless Your Honor has any questions, I just

21  think we -- it's probably best to set a status conference

22  sometime in the May, June timeframe and come back and kind of

23  tell you where we are on those issues and then give you a

24  look forward again just so you're not wondering what's

25  happening with your Chapter 15 case.

1          THE COURT:  Okay.  I appreciate the update, Mr.

2   Shore.  Why don't we set a status conference for May 17th at

3   10:00 a.m.

4          MR. SHORE:  All right.  Thank you very much, Your

5   Honor.

6          THE COURT:  Thank you.  I appreciate it.

7          Mr. Bromley.

8          MR. BROMLEY:  Your Honor, I just would like to

9   mention a couple things from our perspective.  One, is we did

10  have a hearing yesterday in the Bahamas and the Supreme Court

11  of the Bahamas has agreed to enter an order that would be

12  consistent with the order that Your Honor will enter here to

13  allow the two proceedings -- sets of proceedings to be

14  recognized.  The U.S. proceedings being recognized in the

15  Bahamas, the Bahamian proceedings being recognized here in

16  the United States.

17         THE COURT:  Okay.  I don't know if you're just not

18  speaking into the microphones or if we're --

19         MR. BROMLEY:  No.  I'm sorry.  I'm a little rough

20  today.

21         THE COURT:  Yes.  I know the feeling.

22         MR. BROMLEY:  I wish I could say it was because I

23  was out drinking last night, but I wasn't.

24         THE COURT:  I wasn't either.

25

1        MR. BROMLEY:  Your Honor, just wanted to point out
2   there was a hearing yesterday in the Bahamas.  The Supreme
3   Court of the Bahamas has agreed to enter an order to
4   recognize the Chapter 11 proceedings in the Bahamas so that
5   there will be a coincident recognition in both jurisdictions,
6   right.  So, we'll have a recognition here.  A recognition in
7   the Bahamas.  And the corporation agreement had required that
8   both the orders be entered so they're mutually dependent on
9   each other.
10        The other thing I'd like to say, Your Honor, I
11   hadn't been aware that Mr. Shore was going to make any
12   comments about issues, and one of the things that are coming
13   up.  And I do think that it's important that the Chapter 11
14   debtors also make a statement here.  Many of the points that
15   Mr. Shore mentioned is in terms of things like assets that
16   were in Digital market accounts, or the migration of
17   customers, and things of that sort.  Those are all open
18   issues.
19        The cooperation agreement is a starting point, but
20   the issues as to whether assets belong in the Bahamian estate
21   or in the U.S. estate are open issues.  And so, the statement
22   that Mr. Shore has made in that regard are statements that
23   the U.S. debtors reserve all their rights on and, frankly,
24   disagree with many of them.
25        THE COURT:  Understood.

1          MR. BROMLEY:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Anything else?

4      (No verbal response)

5          THE COURT:  Where do we stand on the examiner?

6  You knew what I was going to ask, Mr. Landis.

7          MR. LANDIS:  Thank you, Your Honor.  For the

8  record, Adam Landis from Landis Rath & Cobb on behalf of the

9  Chapter 11 debtors.

10         Yes.  I saw that question coming and I can

11 represent to the Court that the parties have been discussing

12 this periodically.  Sometimes more frequently than others.

13 But there are discussions going back and forth.  We've

14 identified a couple of potential fee examiners and we're

15 trying to come to ground to have an agreement on this rather

16 than submit it to the Court for the Courts determination.

17         So, we're still working on that.  We hope to have

18 it done soon and we do appreciate that the Court is not going

19 to approve any fee applications unless and until a fee

20 examiner is appointed and has an opportunity to review those

21 applications.

22         THE COURT:  Okay.  Thank you.

23         All right anything else?

24     (No verbal response)

25         THE COURT:  Well, it turned out to be a lot

1   shorter hearing than I had anticipated.  I appreciate

2   everyone's cooperation.  I appreciate the updates.

3               We are adjourned.  Thank you.

4         (Proceedings concluded at 10:46 a.m.)

5

6

7

8

9

10

11                        CERTIFICATION

12               I certify that the foregoing is a correct

13   transcript from the electronic sound recording of the

14   proceedings in the above-entitled matter to the best of my

15   knowledge and ability.

16

17   /s/ Mary Zajaczkowski                    February 15, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25