No. 23-cv-00241

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

In re FTX TRADING LTD., *et al*., Debtors.

---

ANDREW R. VARA, UNITED STATES TRUSTEE, Appellant,

v.

FTX TRADING LTD. *et al*., Appellees.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

**APPENDIX OF APPELLEE-DEBTORS
FTX TRADING LTD., ET AL.**

---

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
    brown@lrclaw.com
    pierce@lrclaw.com

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (*pro hac vice*)
James L. Bromley (*pro hac vice*)
Brian D. Glueckstein (*pro hac vice*)
Alexa J. Kranzley (*pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
    bromleyj@sullcrom.com
    gluecksteinb@sullcrom.com
    kranzleya@sullcrom.com

**INDEX**

| Document | Page |
|---|---|
| Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner, Doc. 176 | A220-A248 |
| Objection of the Debtors' to the Motion of the United States Trustee to Appoint an Examiner, Doc. 573 | A249-A272 |
| Objection of the Official Committee of Unsecured Creditors to Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner, Doc. 571 | A273-A403 |
| Limited Objection and Response of the Joint Provisional Liquidators of FTX Digital Markets Ltd. to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner, Doc. 572 | A404-A412 |
| Transcript of Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge, dated February 6, 2023 | A413-A550 |
| Statement of Issues to be Presented on Appeal, Doc.1123 | A551-A553 |
| Excerpt of Hearing Transcript, *In re Neiman Marcus Group Ltd.*, No. 20-32519 (Bankr. S.D. Tex. May 29, 2020), ECF No. 827 | A554-566 |

| | |
|---|---|
| Order, *In re Parmalat USA Corp.*, No. 04-11139 (Bankr. S.D.N.Y. May 17, 2004), ECF No. 383 | A567-A569 |
| Excerpt of Hearing Transcript, *In re Mallinckrodt PLC*, No. 20-12522 (Bankr. D. Del. Nov. 22, 2021) (Dorsey, J.), ECF No. 5516 | A570-A579 |
| Excerpt of Hearing Transcript, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 16, 2018) (Sontchi, J.), ECF No. 252 | A580-A584 |
| Excerpt of Hearing Transcript, *In re Paddock Ents., LLC*, No. 20-10028 (Bankr. D. Del. June 17, 2020) (Silverstein, J.), ECF No. 376 | A585-A587 |
| Excerpt of Hearing Transcript, *In re Washington Mutual, Inc.*, No. 08-12229 (Bankr. D. Del. May 5, 2010) (Walrath, J.), ECF No. 3699 | A588-A596 |
| Excerpt of Hearing Transcript, *In re Visteon Corporation*, No. 09-11786 (Bankr. D. Del. May 12, 2010) (Sontchi, J.), ECF No. 3145 | A597-A602 |
| Excerpt of Hearing Transcript, *In re HSH Delaware GP LLC*, No. 10-10187 (Bankr. D. Del. Apr. 23, 2010) (Walrath, J.), ECF No. 246 | A603-A606 |

| | |
|---|---|
| Excerpt of Hearing Transcript, *In re Magna Entm't Corp.,* No. 09-10720 (Bankr. D. Del. Apr. 20, 2010) (Walrath, J.), ECF No. 2442 | A607-A612 |
| Excerpt of Hearing Transcript, *In re IdleAire Techs. Corp.,* No. 08-10960 (Bankr. D. Del. June 13, 2008) (Gross, J.), ECF No. 622 | A613-A619 |
| Excerpt of Hearing Transcript, *In re Am. Home Mortgage Holdings, Inc.,* No. 07-11047 (Bankr. D. Del. Oct. 31, 2007) (Sontchi, J.), ECF No. 1997 | A620-A626 |
| Excerpt of Hearing Transcript, *In re SA Telecomms., Inc.,* Nos. 97-2395 to 97-2401 (Bankr. D. Del. Mar. 27, 1998) (Walsh, J.), ECF No. 268 | A627-A629 |
| Excerpt of Hearing Transcript, *In re Webcraft Techs., Inc.,* No. 93-1210 (Bankr. D. Del. Nov. 4, 1993) (Balick, J.), ECF No. 103 | A630-A633 |
| Excerpt of Hearing Transcript, *In re ACandS, Inc.,* No. 02-12687, (Bankr. D. Del. Nov. 18, 2002) (Newsome, J.), ECF No. 202 | A634-A641 |
| Excerpt of Hearing Transcript, *In re CRED Inc., et al.,* No. 20-12836, (Bankr. D. Del. December 18, 2020) (Dorsey, J.), ECF No. 277 | A642-A648 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re*<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

**MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN
ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER**

Andrew R. Vara, United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In support thereof, the U.S. Trustee respectfully represents:

## I.     PRELIMINARY STATEMENT

Over the course of eight days in November, beginning with reports of significant problems with one debtor's (Alameda Research) balance sheet, the Debtors suffered a virtually unprecedented decline in value—from a market high of $32 billion just earlier this year—and a severe liquidity crisis after a proverbial "run on the bank" amid revelations of multiple corporate failures and misuse of customer funds facilitated by "software to conceal" it. *Declaration of John J. Ray in Support of Chapter 11 Petitions and First Day Pleadings* ("Ray") [D.I. 24] ¶ 65. The

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

result is what is likely the fastest big corporate failure in American history, resulting in these "free fall" bankruptcy cases. Debtors' approximately one million worldwide creditors,[2] outside investors, and regulators are demanding answers to what happened and how. The CEO provided an initial answer in his "first day" testimony: there was a "complete failure of corporate controls and [] a complete absence of trustworthy financial information . . . . From compromised systems integrity . . . to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented." Ray ¶ 4. Like the bankruptcy cases of Lehman, Washington Mutual Bank, and New Century Financial before them, these cases are exactly the kind of cases that require the appointment of an independent fiduciary to investigate and to report on the Debtors' extraordinary collapse.

The appointment of an independent examiner would be in the interests of the Debtors' creditors and other parties in interest in the Debtors' estates, consistent with Code section 1104(c)(1). An examiner could—and should—investigate the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and causes of action exist to remedy losses. The appointment of an examiner is mandatory under 11 U.S.C. § 1104(c)(2) because the Debtors' fixed, liquidated, unsecured debts to its customers alone far exceed section 1104(c)(2)'s $5 million threshold.

---

[2] The Debtors' customers constitute most of their creditors. *Mot. of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing the Debtors to Serve Certain Parties by E-Mail; and (III) Granting Related Relief* [D.I. 9] ¶¶ 19, 22.

2

An examination is preferable to an internal investigation under the facts of these cases because the findings and conclusions of the examination will be public and transparent, which is especially important because of the wider implications that FTX's collapse may have for the crypto industry. Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues. But the questions at stake here are simply too large and too important to be left to an internal investigation. Although the U.S. Trustee does not question the qualifications, competence, or good faith of Mr. Ray, his role in these cases is that of a fiduciary for the Debtors' estates with objectives that may not necessarily be aligned with those of all other interested parties. By contrast, because an examiner would be able to act as a true neutral as to all affected parties, an examiner's findings likely would enjoy broader acceptance and credibility than an examination conducted by any stakeholder in these cases. An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the debtors' businesses while allowing the examiner to investigate the Debtors' collapse and prior management. The Motion should be granted.

## II.   JURISDICTION, VENUE AND STANDING

1.   This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.   Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

3

*Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

### III.      FACTUAL BACKGROUND

#### A.  *The Debtors' Businesses*

4.      The Debtors' businesses have been divided into four "silos" by its new management: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor-subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions. Ray ¶ 9.

4

5.      Each of the four Silos was controlled by Samuel Bankman-Fried ("Bankman-Fried").  Minority equity interests in the Silos were held by Zixiao "Gary" Wang (Chief Technology Officer) and Nishad Singh (Director of Engineering) who, together with Bankman-Fried, co-founded the business.  The WRS Silo and Dotcom Silo also have third-party equity investors, including investment funds, endowments, sovereign wealth funds, and families.  No single investor other than the co-founders owns more than 2% of the equity of any Silo.  *Id.* ¶ 10.

6.      The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens.  FTX US was founded in January 2020, is available to U.S. users, and according to statements by Bankman-Fried, had approximately one million users as of August 2022.  *Id.* ¶ 12.  The WRS Silo made loans and investments, including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.  *Id.* ¶ 17.  Upon information and belief, FTT is a cryptocurrency created by one or more of the FTX Debtors.

7.      The Alameda Silo is a "crypto hedge fund" with a diversified business that trades and speculates in digital assets and related loans and securities for the account of its owners, Bankman-Fried (90%) and Mr. Wang (10%).  The Alameda Silo operated quantitative trading funds specializing in crypto assets.  The Alameda Silo's strategies included arbitrage, market making, yield farming, and trading volatility.  The Alameda Silo offered over-the-counter trading services.  The Alameda Silo also made and managed other debt and equity investments.  *Id*. ¶ 22.

8.      The Venture Silo makes and manages private investments, which are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, in affiliated companies.  *Id.* ¶ 27.

9. The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua. FTX.com is a digital asset trading platform and exchange founded by Bankman-Fried, Mr. Wang, and Mr. Singh which commenced operations in May 2019. The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan. The FTX.com platform is not available to U.S. users. *Id.* ¶ 33. In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade those assets directly. The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend. *Id.* ¶ 34.

10. The FTX.com platform grew quickly to become one of the largest cryptocurrency exchanges in the world. *Id.* ¶ 35. Bankman-Fried apparently claimed that, by the end of 2021, around $15 billion of assets were on the platform, which handled approximately 10% of global volume for crypto trading at the time. Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users, but those figures have not been verified by Mr. Ray's team. *Id.*

11. Digital assets generally include cryptocurrency such as Bitcoin (BTC) and are transacted on digital ledgers known as a blockchain. Control over those sorts of digital assets is dependent upon control over the relevant "private key" (like a password or PIN). If a person

6

controls the relevant private key (a unique alpha-numeric code), that person can conduct transactions of the digital assets secured by that private key.[3]

12.    A digital asset exchange allows customers to convert fiat currency to digital assets, to store digital assets within provided wallets, and to exchange a digital asset for another form of digital asset.[4]

### B.  The FTX Debtors' Customer Contracts

13.    Section 8.2.6 of the FTX Trading Terms of Service with its customers, dated May 13, 2022, a copy of which is attached as **Exhibit A**,[5] provides:

> All Digital Assets are held in your Account on the following basis:
>
> (A) ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B) ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading***.
>
> (C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

---

[3]    Kevin Roose, *The Latecomer's Guide to Crypto*, N.Y. TIMES (March 18, 2022), https://www.nytimes.com/interactive/2022/03/18/technology/cryptocurrency-crypto-guide.html (hereinafter "*Guide to Crypto*").

[4]    *Guide to Crypto*.

[5]    https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf.

Ex. A (FTX Trading Terms of Service), p. 10, § 8.2.6 (emphasis added).

### C. Reported Misconduct of the Debtors' Management

14.    In May and June of 2022, according to news reports, Alameda suffered severe losses from many deals it was engaged in, including a $500 million loan on which its borrower defaulted.[6] *The New York Times* has reported that Bankman-Fried was heavily involved in the decision-making for all of Alameda's "big trades."[7]

15.    On or about November 2, 2022, *CoinDesk* published that a substantial part of Alameda's $14.6 billion in assets were held in FTT, the cryptocurrency created by the FTX Debtors, per Alameda's June 30, 2022, balance sheet.[8]

16.    *The Wall Street Journal* reported that Bankman-Fried said in investor meetings during the week of November 6 that Alameda owed FTX about $10 billion based on loans FTX extended to Alameda to fund risky bets.[9] The $10 billion came from money customers had

---

[6]    Angus Berwisk and Tom Wilson, *Exclusive: Behind FTX's fall, battling billionaires and a failed bid to save crypto*, REUTERS (Nov. 10, 2022, 5:46 P.M.), https://www.reuters.com/technology/exclusive-behind-ftxs-fall-battling-billionaires-failed-bid-save-crypto-2022-11-10/.

[7]    David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. TIMES (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html; Tracy Wang, et al., *Sam Bankman-Fried's crypto empire 'was run by a gang of kids in the Bahamas' who all dated each other*, FORTUNE (Nov. 11, 2022, 6:14 A.M.), https://fortune.com/2022/11/11/sam-bankman-fried-crypto-empire-ftx-alameda-run-gang-kids-bahamas-who-all-dated-each-other/.

[8]    Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 9, 2022 10:44 A.M.), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/

[9]    Vicky Ge Huang, et al., *FTX Tapped Into Customer Accounts to Fund Risky Bets, Setting Up Its Downfall*, WALL ST. J. (Nov. 11, 2022, 12:16 P.M.),

deposited on the exchange for trading purposes. *Id.* Bankman-Fried described the decision to move FTX customer property to Alameda as a "poor judgment call." *Id.* The $10 billion constituted more than half of the approximately $16 billion in customer funds on the FTX cryptocurrency exchange. *Id.*

17. According to a Reuters report dated November 9, 2022, Bankman-Fried issued an apology to all FTX employees via an internal messaging application that stated: "I'm deeply sorry that we got into this place, and for my role in it. That's on me, and me alone, and it sucks, and I'm sorry, not that that it makes it any better."[10] That same day, *The Wall Street Journal* reported that Alameda CEO Caroline Ellison—joined by Bankman-Fried and two other members of FTX Digital Markets Ltd.'s ("FTX Digital") management team (Messrs. Wang and Singh)—told Alameda employees that they were aware of the decision to send customer funds to Alameda.[11] Specifically, according to the report, Ms. Ellison stated that "FTX used customer money to help Alameda meet its liabilities." *Id.*

---

https://www.wsj.com/articles/ftx-tapped-into-customer-accounts-to-fund-risky-bets-setting-up-its-downfall-11668093732.

[10] Hannah Lang and Angus Berwisk, *Crypto's FTX CEO looking at all options as Binance deal collapses*, REUTERS (Nov. 10, 2022, 1:29 A.M.), https://www.reuters.com/markets/currencies/ftx-turmoil-causes-crypto-concern-sending-token-prices-sliding-2022-11-09/.

[11] Dave Michaels, et al., *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, WALL ST. J. (Nov. 12, 2022, 2:42 P.M.), https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238.

9

**A228**

### D. *Actions by Bahamian Regulators[12]*

18.     On November 10, 2022, the Securities Commission of the Bahamas suspended the business license of one of the Debtors' affiliates, FTX Digital, and froze its assets.  Simms ¶ 10. On that date, the Commission filed a petition in the Bahamas Supreme Court for an order that FTX Digital be wound up because (1) it was insolvent according to the Companies (Winding Up Amendment) Act, 2011, (2) the Bahamas Commission suspended its license, and (3) it was in breach of its duties under the Digital Assets and Registered Exchanges Act, 2020.  *Id.*

19.     On November 10, 2022, a hearing took place in the Bahamas Court.  The Bahamas Court issued an order directing that FTX Digital be placed into provisional liquidation and appointed Brian C. Simms as Joint Provisional Liquidator over FTX Digital (the "Provisional Liquidation Order").  On November 14, 2022, the Bahamian Court appointed Brian C. Simms, Kevin G. Cambridge, and Peter Greaves as Joint Provisional Liquidators.  Simms ¶ 16.

20.     On November 15, 2022, a Chapter 15 Petition for Recognition of a Foreign Proceeding was filed in the Bankruptcy Court for the Southern District of New York, No. 22-11516 (MEW) (the "chapter 15 case").

21.     In his declaration in support of the chapter 15 case, the Joint Provisional Liquidator of FTX Digital, Mr. Simms, asserted that "the Joint Provisional Liquidators' findings to date indicate that serious fraud and mismanagement may have been committed with respect to FTX

---

[12]    The information in this section of the Motion regarding Bahamian proceedings is taken from the *Declaration of Brian Cecil Simms KC in Support of Petition for Recognition Under Chapter 15 of the Bankruptcy Code* ("Simms") [D.I. 2], Nov. 15, 2022, in *In re FTX Digital Markets Ltd.*, a Debtor in a Foreign Proceeding, No. 22-11516 (MEW) (Bankr. S.D.N.Y.).  The U.S. Trustee does not have independent knowledge of any proceedings outside of the United States.

Digital and the FTX Affiliates."  Simms ¶ 17.  "FTX Affiliates" is defined in the Simms

Declaration to include the Debtors who filed their chapter 11 cases in this Court.[13]  *Id.* ¶ 14.

22.     On November 17, 2022, the above-captioned Debtors filed a motion in this Court to

transfer venue of the chapter 15 case to this Court.  D.I. 22.  On November 22, 2022, this Court

entered an order transferring venue of the chapter 15 case to this Court.  D.I. 131.

### E.  The Debtors' Chapter 11 Cases

23.     On the Petition Date, FTX Trading Ltd. and its debtor-affiliates filed the voluntary

petitions that initiated these cases.

24.     The U.S. Trustee has solicited for interest in serving on—but not yet formed—an

official committee of unsecured creditors.

25.     The only documents the Debtors filed on the petition date were their petitions.  The

first day declaration, which is traditionally filed with the petition in large chapter 11 cases in this

District, was not filed until six days later.  Nor were any motions or applications filed on the

petition date.  What are traditionally considered first day motions did not begin to be filed until

November 14, 2022, and continued to be filed through November 19, 2022.  The hearing to

consider the Debtors' first day relief was held on November 22, 2022.

26.     The petitions state that the Debtors' liabilities are between $10 billion and $50

billion.  D.I. 1.  Based on the information in the unaudited balance sheets addressed in Mr. Ray's

first day declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than

---

[13]    The U.S. Trustee has not verified ownership of the entities listed on the Debtors' "preliminary"
corporate structure chart or determined whether the entities are otherwise "affiliated."  Ray Ex. B
(preliminary corporate structure chart); *see* 11 U.S.C. § 101(2) (defining "affiliate").

debts for goods, services, or taxes, or owing to an insider, far exceed $5 million.  Ray ¶¶ 20, 25, 31, and 38.

27.     The Debtors' petitions each attached an "Omnibus Corporate Authority" signed by Bankman-Fried dated November 10, 2022.  That document reflects that Bankman-Fried "authorize[d], instruct[ed] and consent[ed] [to]" certain "corporate actions with respect to all members of the FTX Group," including the following:

- "the appointment of John J. Ray III (the "CEO") as Chief Executive Officer," whose power included authority "in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code . . . with respect to all members of the FTX Group;"

- the "appointment of Mr. Stephen Neal (if willing to serve) as the Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd," and of Alameda Reach Ltd. and West Realm Shires Inc.;[14] and

- "if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group."

D.I. 1.

28.     The Omnibus Corporate Authority also reflected that it was Bankman-Fried's "wish that the CEO [Mr. Ray] consult with [Bankman-Fried's] counsel at Paul, Weiss, Rifkind, Wharton

---

[14]   Mr. Neal is not mentioned in Mr. Ray's first day declaration as one of the newly appointed directors. Ray ¶ 47.

& Garrison LLP with respect to the foregoing director appointments" referenced in the Omnibus Corporate Authority.[15]  *Id.*

29.     Mr. Ray's first day declaration included the following facts regarding the Debtors' directors and officers:

  a.   Mr. Ray was appointed the CEO of the Debtors on the Petition Date, after Bankman-Fried resigned as CEO.  Mr. Ray does not indicate who appointed him.  Ray ¶ 1.  As noted above, the Omnibus Corporate Authority signed by Bankman-Fried reflects that he "authorize[d], instruct[ed] and consent[ed]" to Mr. Ray's appointment.  D.I. 1.

  b.   Mr. Ray's first official act was to authorize the chapter 11 filings of the Debtors and the commencement of these cases.  Ray ¶ 2.  But the Omnibus Corporate Authority attached to the Debtors' petitions was signed solely by Bankman-Fried.  D.I. 1.

  c.   Mr. Ray states that "new independent directors" have been appointed to what Mr. Ray calls the "the primary companies in the FTX Group," with one separate director being appointed to each of the WRS, the Alameda, and the Ventures Siloes and two other directors to the Dotcom Silo.[16]  Ray ¶ 47. Mr. Ray does not disclose who appointed these directors.  Mr. Ray does not indicate whether Bankman-Fried's counsel was consulted with respect to the appointments.  He also does not indicate whether these new directors are the only directors on the Debtors' boards or whether any directors from the prepetition period remain.

---

[15]   On or about November 18, 2022, Paul Weiss terminated its representation of Bankman-Fried, citing conflicts of interest.  *Paul Weiss Drops Ex-FTX CEO Bankman-Fried on Conflicts*, BLOOMBERG LAW (Nov. 21, 2022 11:01 A.M.), https://news.bloomberglaw.com/business-and-practice/paul-weiss-drops-ex-ftx-ceo-bankman-fried-as-client-on-conflicts.

[16]   With respect to the new directors referenced in Mr. Ray's declaration, there is no overlap of names between the four Silos of the Debtors' business.

13

**A232**

30.     Other than the replacement of Bankman-Fried as CEO by Mr. Ray, it is not clear what other officers or employees of the Debtors, if any, have been removed or replaced.  Nor have the Debtors disclosed whether they are investigating if any of the officers and employees who remain at the Debtors were involved in any of the misfeasance or malfeasance that Debtors may have committed, which, according to Mr. Ray's first day declaration, includes the following:

  a.   The Debtors' use of "software to conceal the misuse of customer funds."  Ray ¶ 65.

  b.   The absence of "appropriate corporate governance," including the absence of board meetings of certain Debtors.  *Id.* ¶ 46.

  c.   The absence of any accounting department.  *Id.* ¶ 58.

  d.   The existence of audit opinions for certain aspects of the Debtors' business over which Mr. Ray has "substantial concerns as to the information presented."  *Id.* ¶ 56.

  e.   The existence of unaudited balance sheets and financial statements as to which Mr. Ray does not have confidence.  *Id.* ¶¶ 18, 23, 28, 36 and 56.

  f.   The absence of any locatable unaudited financial statements for the Alameda or Venture Silos of the Debtors.  *Id.* ¶ 57.

  g.   The absence of centralized control of the Debtors' cash.  *Id.* ¶ 50.

  h.   The absence of an "accurate list of bank accounts and account signatories," and "insufficient attention to the creditworthiness of banking partners around the world."  *Id.*

  i.   The absence of "appropriate books and records, or security controls, with respect to [the Debtors'] digital assets."  *Id.* ¶ 65.  Mr. Ray reports that Bankman-Fried

14

**A233**

and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group, with certain exceptions. *Id.*

j. The Debtors engaging in "[u]nacceptable management practices," such as "the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world." *Id.* ¶ 65.

k. The absence of complete books and records for the Debtors' investments in assets other than cryptocurrency. *Id.* ¶ 69.

l. The absence of appropriate disbursement controls. Mr. Ray reports that "corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors." *Id.* ¶¶ 62-63.

m. The "absence of lasting records of decision-making." *Id.* ¶ 71.

n. The absence of liquidity forecasting. *Id.* ¶ 54.

o. The likelihood of "a multitude of intercompany claims." *Id.* ¶ 49.

p. The absence of information sufficient to determine who worked for the Debtors as of the Petition Date, and "unclear records and lines of responsibility" for such employees. *Id.* ¶ 59.

31.     Shortly after these cases were commenced, there were alleged hacks on the Debtors' exchange which "resulted in more than $600 million in digital assets leaving the exchange's wallets in a flurry of withdrawals."[17]  The Bahamian government stated in the wake of the hacks that it had seized assets of FTX Digital and moved same to a digital wallet it controlled for

---

[17]     Krisztian Sandor, *FTX Hack or Inside Job? Blockchain Experts Examine Clues and a 'Stupid Mistake'*, COINDESK (Nov. 21, 2022, 12:57 P.M.), https://www.coindesk.com/business/2022/11/14/ftx-hack-or-inside-job-blockchain-experts-examine-clues-and-a-stupid-mistake/.

safekeeping.[18] The Debtors contend that the Bahamian government's actions "flaunted" U.S. bankruptcy law. *Emergency Mot. Pursuant to Fed. R. Bankr. P. 1014(b) (I) to Transfer Chapter 15 Proceeding Relating to FTX Digital Markets Ltd. and (II) for a Stay* [D.I. 22] ¶¶ 6, 7.

## IV. BASIS FOR RELIEF

### A. *The Appointment of an Examiner Is Mandated*

32. Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a chapter 11 trustee, then:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court **shall** order the appointment of an examiner to conduct such an investigation of [the Debtors] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of [the Debtors] of or by current or former management of [the Debtors], if -
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; *or*
>
> (2) [the Debtors'] fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

33. Based on the information in the Debtors' petitions and in Mr. Ray's first day declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, substantially exceed the $5 million threshold of

---

[18] *Bahamas Regulator Confirms FTX Asset Seizure After Hack Accusation*, REUTERS (Nov. 18, 2022, 1:18 P.M.), https://www.reuters.com/technology/bahamas-regulator-says-it-assumed-control-digital-assets-ftx-2022-11-18/.

16

**A235**

Code section 1104(c)(2).[19]  Ray ¶¶ 20, 25, 31, and 38.  The custodial funds due to customers through the FTX US platform alone are over a hundred million dollars.  *Id.* ¶ 20.  Accordingly, the appointment of an examiner under that section to investigate the affairs of the Debtors is mandatory.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if the U.S. trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing bankruptcy court's decision denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86 (Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

34.     Although this Court has authority under Code section 1104(c)(2) to specify (and thereby effectively limit) the appropriate scope of an examination, the "as is appropriate" language in that statutory subsection does not confer discretion upon this Court to decide whether an examiner should be appointed once it is clear that the statute's monetary threshold is met.  *See Loral,* 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an

---

[19]   It is unclear whether each Debtor individually satisfies the $5 million debt threshold under section 1104(c)(2).  Accordingly, the U.S. Trustee requests that the Court direct the appointment of an examiner under section 1104(c)(1) for any debtor which does not meet the threshold.  The vagaries of the balance sheets of these interrelated Debtors should not limit the examiner's investigation.

examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 85 n.2 (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate). Here, given that there is a substantial basis to believe that Bankman-Fried and other managers of the Debtors mismanaged the Debtors or engaged in fraudulent conduct, this Court should authorize an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor[s] of or by current or former management of the debtor[s]." 11 U.S.C. § 1104(c).

### B. The Appointment of an Examiner Is in the Best Interests of the Debtors' Creditors and Other Parties in Interest

35. Finally, even if an examiner were not mandated under section 1104(c)(2), this Court should direct the appointment of an examiner under section 1104(c)(1) because the appointment would be in the best interests of the Debtors' estates, their creditors, and equity security holders. Here, the published news reports cited in this Motion, taken together with Mr. Ray's first day declaration, provide reasonable grounds to suspect that Bankman-Fried and others participated in actual fraud, dishonesty, or criminal conduct in the management of the Debtors. Additionally, although Bankman-Fried has been replaced as the Debtors' CEO as of the Petition Date, it is unclear how many of the Debtors' other officers who were in place prepetition—and may have participated in fraud, dishonesty, or mismanagement—remain.

36. An investigation by an examiner into the alleged conversion by the FTX Trading arm of the Debtors of $10 billion of customers' property to lend to its affiliate Alameda, in violation of the express provisions in FTX's customer contracts, and into the use of software to

conceal such misuse is unquestionably in the interests of the Debtors' creditors and other interests of the estates. The many instances of what Mr. Ray describes as a "complete failure of corporate controls and [] a complete absence of trustworthy financial information as occurred here" (Ray ¶ 5), such as those detailed in paragraph 30 of this Motion, also warrant examination.

37.     An appointment of an examiner would also be in the interests of the Debtors' creditors and other parties in interest in the Debtors' estates, consistent with Code section 1104(c)(1), because there is an actual conflict of interest between Debtors FTX Trading Ltd. and Alameda Research. FTX Trading has a claim against Alameda Research in the billions of dollars on behalf of its customers in connection with one or more loans of allegedly converted customer funds that FTX Trading had no right to make in the first instance. Such an immense, out-of-the-ordinary course claim of one Debtor against another, especially one that involves the alleged conversion of customer funds, calls out for independent scrutiny by an independent examiner.

38.     The interests of the Debtors' estates and their creditors are best served by permitting an independent examiner to investigate the Debtors' prepetition activities and to identify colorable claims that the estates may assert, including claims that may be asserted between Debtors. The Debtors' financial affairs and business operations need to be reviewed by a disinterested person with clear authority to untangle the mess and provide transparency to all parties in interest. This is especially true where, as here, there are colorable claims that certain of the Debtors misappropriated $10 billion of their customers' assets to fund the operations and investments of other Debtors.

39.     Even in their early stages, these cases have been highly contentious,[20] and the
parties affected by FTX's collapse are likely to have even more sharply diverging interests over
matters such as the ownership of particular assets and remedies.  For this reason, it is imperative
that the investigation be conducted not by any person who will be directly involved in these
disputes, but by a truly neutral examiner as the cases proceed.

40.     The U.S. Trustee understands that Mr. Ray and FTX's new management have done
valuable preliminary work in untangling some of these issues.  But the questions at stake here are
simply too large and too important to be left to an internal investigation.  Although the U.S. Trustee
has no reason to question the qualifications, competence, or good faith of Mr. Ray, as an officer of
the Debtors (and as an appointee of prior management), he cannot act as a true neutral, especially
as to parties whose objectives may conflict with those of these Debtors.

41.     This is not simply the U.S. Trustee's position.  Others have noted the important
distinctions between investigations conducted by independent examiners and those by fiduciaries
for economic stakeholders.  Indeed, the economic predispositions of debtors in possession and
committees are an important and intentional part of the Code's structure, but those predispositions
prevent their neutrality:

> Unlike examiners, neither trustees nor committees are neutrals charged with finding
> truth. They occupy adversarial roles and must advance the interests of particular
> constituencies.  Trustees of insolvent estates owe fiduciary obligations to general

---

[20]  *See, e.g.,* Amrith Ramkumar, *Bahamian Attorney General Defends Handling of FTX Collapse*, WALL
ST. J. (Nov. 27, 2022, 8:15 P.M.), https://www.wsj.com/articles/bahamian-attorney-general-defends-
handling-of-ftx-collapse-11669597384 (criticizing statements made by management and professionals
of the Debtors in these chapter 11 cases); Katanga Johnson, *FTX Tensions Intensify as Bahamas Blasts
Company's New Chief Ray,* BLOOMBERG NEWS (Nov. 28, 2022, 8:28 P.M.),
https://www.bloomberg.com/news/articles/2022-11-28/ftx-tensions-intensify-as-bahamas-blasts-
company-s-new-chief-ray (criticizing Mr. Ray's "intemperate statements" and "urg[ing] prudence and
accuracy in all future filings [in this bankruptcy court]").

creditors and are duty-bound to maximize the value of the estate. They are not neutrals as to any claims or defenses that affect the estate. Indeed, trustees' personal economic interests are purposely aligned with the goal of estate maximization. Similarly, creditors' committees consist of creditors from particular interested constituencies who serve and negotiate on behalf of those constituencies. As I have noted elsewhere, in the hands of a committee, investigations are generally used strategically to advance the committee's position in plan negotiations. Unsurprisingly, trustee- and committee-led investigations quickly and naturally fall into the adversarial model.

                    *       *       *

So far, examiner appointments in major Chapter 11 cases have been few and far between and reserved for the most elite lawyers. Recent examiners conducting inquisitorial investigations have been self-conscious in breaking new methodological ground, zealous in protecting their own reputations for integrity and good judgment, and cautious in their use of inquisitorial methods. Their investigations have been remarkably well executed and yielded successful results.

Daniel J. Bussel, *Ethics for Examiners*, 84 FORDHAM L. REV. 2073, 2074-75 (2016) (all footnotes

omitted).

42.     A section 1104 examination is also preferable to an internal investigation under the

facts of these cases because the findings and conclusions of the examination will be public and

transparent, which is especially important here because of the wider implications that FTX's

collapse may have for the crypto industry.

43.     Unlike robust investigations by bankruptcy examiners, "settlements in bankruptcy

[resulting from committee or trustee investigations] avoid assigning culpability, pretermit fact-

finding, and may manipulate consent doctrines in ways that undermine legitimacy in the eyes of the

public and aggrieved constituencies." *Id.* at 2075. With such a precipitous and devastating failure

in these cases affecting stakeholders worldwide, any investigation here must not only be legitimate

and independent but also must be seen as beyond reproach by stakeholders and the public. Every

party in interest, including Debtors' CEO, acknowledges that FTX's entire business is surrounded

by unanswered questions.  On this there is universal agreement.  But the questions here are much broader than in a typical chapter 11 case; they are not merely about where money flowed or who can sue whom.  Rather, they are larger questions about the fundamentals of these cases.  Was this an unsuccessful business or a successful fraud?  In other words, is there anything to save here?  Moreover, examiner reports in bankruptcy cases with potentially broad economic implications serve the public interest as well as those of the economic stakeholders.  Among others, the examiner reports in Lehman Brothers and New Century Financial[21] stand as examples of the bankruptcy system serving the public interest in transparency and accountability.

44.  If the Court is concerned about potential duplication of work already performed, it can permit the examiner to have access to any work product already created.  An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the Debtors' businesses while allowing the examiner to conduct the investigation.  This is particularly true as new management continues to confront post-petition hacks and diversion of assets by apparently malign actors, as discussed at the first day hearing.

45.  The U.S. Trustee acknowledges that parties in interest will have concerns about how much an examination will cost and how the examiner's investigation will intersect with FTX's newly undertaken internal investigation.  But those concerns do not negate the need for an examiner.  Instead, they can be resolved by the Court and the U.S. Trustee using the tools already at their disposal to supervise the examiner: budgets and information sharing protocols can be

---

[21]  Vikas Bijaj, *An Inside Look at a Subprime Lender's Collapse,* N.Y. TIMES (Mar. 27, 2008), https://www.nytimes.com/2008/03/27/business/worldbusiness/27iht-account.1.11463355.html ("The [examiner's] 580-page report is the most comprehensive document made public about the failings of a mortgage business.").

established, and the examiner and the Debtors can coordinate to ensure that nobody is duplicating

the work of the other.  These matters can be negotiated once an examiner is appointed.

## V. <u>CONCLUSION</u>

WHEREFORE the U.S. Trustee requests that this Court enter an order directing the

appointment of an examiner and granting such other and further relief as the Court finds just and

appropriate.

Dated: December 1, 2022
       Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: _/s/ Juliet M. Sarkessian_
Juliet M. Sarkessian
Trial Attorney
Benjamin A. Hackman
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
juliet.m.sarkessian@usdoj.gov
benjamin.a.hackman@usdoj.gov

-and-

David Gerardi
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ  07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov

23

**A242**

# EXHIBIT A

8.2     **Digital Assets**

8.2.1   The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoin (USD)" balance).

8.2.2   You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3   The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4   You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5   FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6   All Digital Assets are held in your Account on the following basis:

(A)     Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)     None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)     You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7   FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8   It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

10

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  | | |
|---|---|---|
| *In re*<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>    Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br><br>**RE: D.I. _____** |

## <u>ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER</u>

Upon consideration of the *Motion of the United States Trustee* (the "<u>U.S. Trustee</u>") *for*

*Entry of an Order Directing the Appointment of an Examiner* (the "<u>Motion</u>"); and finding that due

and sufficient notice of the Motion was given; and it appearing that the Court has jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this is a core proceeding under 28 U.S.C. §

157(b)(2); and after due deliberation and sufficient cause appearing therefor, based upon the record,

the Court finds that there is the basis for appointment of an examiner, pursuant to 11 U.S.C. §

1104(c).  Based on the foregoing, it is hereby ORDERED as follows:

    1.      The Motion is GRANTED.

    2.      The U.S. Trustee is directed to appoint an examiner (the "<u>Examiner</u>") pursuant to 11

U.S.C. § 1104(c).

    3.      The Examiner shall: (a) investigate any allegations of fraud, dishonesty,

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors and (b) otherwise perform the duties of an examiner set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation").

4.  The Debtors and any official committee(s) of unsecured creditors appointed (the "Committee(s)") shall fully cooperate with the Examiner in the performance of any of the Examiner's duties and the Investigation, and that the Debtors and the Committee(s) shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Investigation.

5.  The Debtors shall provide to the Examiner all non-privileged documents and information within their possession that the Examiner deems relevant to perform the Investigation. If the Examiner seeks the disclosure of documents or information as to which the Debtors assert a claim of privilege, or otherwise objects to disclosing, including on the basis that the request is beyond the scope of the Investigation, and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution.

6.  Neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties until the Examiner's report is filed with the Court.

7.  The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above), including, but not limited to, any federal, state or local government agency that may be investigating the Debtors, their management or their financial condition, and the Examiner shall use best efforts to coordinate with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations

conducted by such agencies.

8.     The Examiner may retain counsel and other professionals if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.

9.     The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for their expenses pursuant to 11 U.S.C. §§ 330, 331 and any administrative order governing interim compensation and reimbursement of expenses of professionals which may be entered in these cases.  Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in 11 U.S.C. § 330.

10.     Before commencing the Investigation, the Examiner shall meet and confer with representatives from the Committee(s), the Debtors, and any other party that the Examiner deems appropriate to discuss the Investigation.

11.     Within fifteen (15) days after entry of the order approving the appointment of the Examiner is entered on the docket in these cases, the Examiner shall propose a work plan and shall provide his or her estimated costs for the Investigation consistent with this Order, which shall be subject to the approval of the Court on ten (10) days' notice to all parties that have requested notice pursuant to Bankruptcy Rule 2002.  Notwithstanding the foregoing, the parties required to receive notice may waive such requirement in writing.

12.     The Examiner shall have the standing of a "party in interest" with respect to the matters that are within the scope of the Investigation and shall be entitled to appear and be heard at any and all hearings in these cases.

13.     Nothing in this Order shall impede the right of the U.S. Trustee or any other party in interest to request any other lawful relief.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref No. 176** |
| | **Hearing Date:  February 6, 2023 at 9:30 a.m. (ET)** |
| | **Objection Deadline:  January 25, 2023 at 4:00 p.m. (ET)** |

## DEBTORS' OBJECTION TO MOTION
## OF THE UNITED STATES TRUSTEE FOR ENTRY OF
## ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (this "Objection") to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [D.I. 176] (respectively, the "U.S. Trustee" and the "Motion" or "Mot."). Two joinders to the Motion have been filed:  on December 21, 2022, the State of Wisconsin Department of Financial Institutions ("Wisconsin") filed a joinder [D.I. 263] (the "Wisconsin Joinder"), and on January 3, 2022, the Vermont Department of Financial Regulation ("Vermont") filed a joinder [D.I. 339] (the "Vermont Joinder"). In support of the Objection, the Debtors rely upon the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24] (the "Ray First Day Declaration"), the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] (the "Ray Supplemental First Day Declaration"), and

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (the "Mosley First Day Declaration" and collectively with the Ray First Day Declaration and the Ray Supplemental First Day Declaration, the "First Day Declarations"); the *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date* [D.I. 510] (the "Dietderich Supplemental Declaration"); the *Supplemental Declaration of John J. Ray III in Support Of Debtors' Applications For Orders Authorizing The Retention And Employment Of Sullivan & Cromwell LLP, Alix Partners LLP And Quinn Emanuel Urquhart & Sullivan,* LLP [D.I. 511] (the "Ray Supplemental Declaration"); the *Declaration of James L. Bromley in Support of Debtors' Objection to Motion of the United States Trustee for Entry of Order directing the Appointment of an Examiner* submitted contemporaneously herewith; and evidence to be introduced at the hearing.

In support of this Objection, the Debtors respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.      There is no debate that these cases are complex.  There is no debate that these cases present issues of fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the affairs of the Debtors by past, and not current, management.  But this does not lead to the inevitable conclusion that an examiner should or must be appointed in these cases. Instead, precedent is clear that the appointment of an examiner is not mandatory as a matter of law—as this Court has repeatedly concluded.  The decision to appoint an examiner lies in the sound discretion of the Court.  In exercising that discretion, the question for the Court is whether the appointment of an examiner is *appropriate* in these cases; whether the appointment of an

examiner in these cases is *in the interests of creditors, equity holders, or other interests of the estates*.  The answer to this question is no.

2.        In the First Day Declarations and at the hearing before the court on November 22, 2022 (the "First Day Hearing"), the Debtors described the circumstances surrounding the abrupt failure of the FTX Group and the appointment of Mr. Ray as CEO and Chief Restructuring Officer of each of the Debtors as well as the appointment of an independent board of directors comprised of Matthew Doheny, Rishi Jain, Matthew Rosenberg, Mitchell Sonkin, and Joseph P. Farnan, Jr. (collectively, the "Board").  The evidence is uncontradicted that Mr. Ray and the Board are both qualified and independent.  The Court noted that fact:  "Mr. Ray is the one who runs the debtors, he makes the decisions with his board," and they "are all consummate professionals, who were not involved in the company's collapse."  (Bromley Decl. Ex. 1 at 50:3–7, 12–13.)   Indeed, it is difficult to imagine an examiner candidate whose qualifications exceed those of Mr. Ray.

3.        In the Ray First Day Declaration, Mr. Ray set forth the five core objectives of the Chapter 11 Cases:  (a) Implementation of Controls; (b) Asset Protection & Recovery;  (c) Transparency  and  Investigation;  (d) Efficiency  and  Coordination;  and (e) Maximization of Value (the "Core Objectives").  Since their appointment, Mr. Ray and the Board have directed the Debtors and their advisors to make material progress on each of the Core Objectives.  They have done so—substantial investigations are well underway in respect of each objective.  Following the appointment of the Official Committee of Unsecured Creditors (the "Committee"), appointed by the U.S. Trustee on December 15, 2022, the Debtors have welcomed the Committee, another fiduciary to the Debtors' estates, and their advisors into this exercise, and the Debtors are coordinating their efforts with the Committee.

4.      Surprisingly, the U.S. Trustee does not in the Motion propose the scope of mandate for the examiner it seeks to appoint.  Instead, the U.S. Trustee asks that an examiner be appointed and that once such examiner is identified, that individual will define the scope of her or his mandate.  This request, premised entirely on the faulty argument that the appointment of an examiner is mandatory, fails on its face.  In order for the Court to answer the question whether an examiner is appropriate and whether an examiner would benefit these estates, the scope of the mandate must be known.  Both the decision to appoint an examiner, and the scope of any such examination, are within the sole discretion of the Court.

5.      To buttress its argument that an examiner is mandatory, the U.S. Trustee also posits two positions that are inconsistent with the express language of 11 U.S.C. § 1104 ("Section 1104"), controlling precedent and logic.  First, the U.S. Trustee states that an examiner need be a "true neutral," (Mot. at ¶ 40 ("[Mr. Ray] cannot act as true neutral")), who should take into account the interests of "parties whose objectives may conflict with those of the Debtors," (*id*.).  The U.S. Trustee then states, with no evidence or support other than citation to a single law review article, that examiner reports are superior to investigations by committees or trustees (which presumably include debtors in possession) concluding that "examiner reports in bankruptcy cases with potentially broad economic implications serve the public interest as well as those of the economic stakeholders."  (Mot. at ¶ 43.)  These arguments also fail.  Section 1104 does not authorize the use of substantial estate assets to satisfy an undefined public interest or for a "true neutral," however that may be defined, to conduct an investigation that benefits potential defendants or wrongdoers.  This is simply not the law.

6.      The pieces of the FTX corporate puzzle are day by day being put back together under the supervision of new and independent management with the participation of the

statutorily mandated Committee. The appointment of an examiner would be duplicative of the efforts of Mr. Ray, the Board, the Debtors, their advisors, and the Committee and their advisors. This duplication of effort would come at an enormous cost and provide no benefit to the creditors, equity holders, or other interests of the Debtors' estates. The Debtors respectfully request that the Court deny the Motion.

## **BACKGROUND**

### I.     THE DEBTORS AND THEIR CHAPTER 11 CASES

7.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128]. On December 15, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code [D.I. 231].[2]

### II.     THE DEBTORS' NEW MANAGEMENT

8.     In the early morning hours of November 11, 2022, Samuel Bankman-Fried executed an Omnibus Corporate Authority (the "Omnibus Authority") in which he surrendered all powers and authority he had related to the Debtors. [D.I. 1 at 12.] In the Omnibus Authority, Mr. Ray was appointed CEO and Chief Restructuring Officer of each of the Debtors. (*Id.*) Mr. Bankman-Fried executed the Omnibus Corporate Authority after consultation with his father, Joseph Bankman, a Stanford law professor, and three personal lawyers:  another Stanford

---

[2]     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in in the First Day Declarations and the Supplemental Dietderich Declaration.

law professor, a leading criminal defense lawyer, and a leading international bankruptcy lawyer.[3] It was Mr. Ray, not Mr. Bankman-Fried, who ultimately decided for the Debtors to file for chapter 11 protection. (*Id.* ¶ 5.)

9. While Mr. Bankman-Fried and his counsel asked to be consulted on director appointments, and indeed offered candidate suggestions, Mr. Ray declined to engage with Mr. Bankman-Fried or his counsel. (Dietderich Supplemental Decl. ¶ 35.) Instead, Mr. Ray contacted, vetted, and appointed the members of the Board. (Ray First Day Declaration ¶¶ 47, 49.) Mr. Bankman-Fried and the other wrongdoers have no ongoing role with the Debtors. The record is clear that neither Mr. Ray nor the Board was hand-picked by Mr. Bankman-Fried. The record is also clear that subsequent to their appointment, Mr. Ray and the Board have provided full cooperation to criminal and regulatory authorities investigating FTX's collapse.

10. Mr. Ray has over 40 years of legal and restructuring experience. (*Id.* ¶¶ 4, 6.) He has been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate restructurings in history. (*Id.*) He has supervised situations involving allegations of criminal activity and malfeasance (*Enron*). (*Id.*) He has supervised situations involving novel financial structures (*Enron* and *Residential Capital*) and cross-border asset recovery and maximization (*Nortel* and *Overseas Shipholding*). (*Id.*) Nearly every situation in which Mr. Ray has been called to lead had previously been characterized by defects of some sort in internal controls, regulatory compliance, human resources, and systems integrity, including defects that gave rise to criminal prosecutions. (*Id.*) Notably, in two of Mr. Ray's prior engagements, Enron and Residential Capital, substantial examiner reports were prepared at a

---

[3]     Dietderich Supplemental Declaration ¶ 5.

collective cost of over $150 million. As Mr. Ray will testify at trial, the benefit of such reports to stakeholders are redundant with the debtor's independent examination and minimal at best given their inherent limitations.

## III. TWO COMPREHENSIVE INVESTIGATIONS

11.     The Motion fails to recognize the import of the fact that two comprehensive investigations are well underway. The first, being conducted by the Debtors and the Committee, is multifaceted and by and large corresponds to the Core Objectives announced by Mr. Ray and the Board at the outset of these Chapter 11 Cases. This investigation is focused, as it should be, on supporting the goals of accumulating the information necessary to create the basic corporate structures that the Debtors were lacking, identifying and securing assets, recovering assets, uncovering and pursuing claims against third parties and insiders, and maximizing the value of the Debtors' assets. The pursuit of these goals is in the interest of all stakeholders. Mr. Ray has testified before this Court and Congress with regard to the Debtors' progress with respect to the Core Objectives and the Debtors will continue to provide the Court and the public with updates as the case progresses.

12.     The second, being conducted by law enforcement and regulatory authorities, is about finding out whether crimes were committed in connection with the collapse of FTC and prosecuting those crimes. That investigation, with cooperation from the Debtors and their advisors, has already yielded substantial results in the form of one indictment, two plea deals, and a trial scheduled for October, with numerous publicly available announcements and updates from the prosecutors. To the extent that the public interest in implicated by these Chapter 11 Cases, the public interest is being ably represented by the law enforcement and regulatory agencies investigating the circumstances of FTX's collapse and bringing those responsible to justice.

A.    **The Debtors and Committee Investigation**

13.    Immediately after their appointment, Mr. Ray and the Board identified the Core Objectives and instructed their advisors to identify teams to take responsibility for each. The Debtors' pursuit of each of the Core Objectives necessarily involves substantial investigative efforts, which began on the Petition Date. Moreover, since the appointment of the Committee, the Debtors and their advisors have been working diligently to bring the Committee up to speed on the work that has taken place and are coordinating with them moving forward. The appointment of an examiner would duplicate this work and provide zero benefit to the creditors, shareholders, or the estates in general.

14.    The first objective, ***Implementation of Controls***, involves building accounting, audit, cash management, cybersecurity, human resources, risk management, and other systems that did not exist—or did not exist to an appropriate degree—prior to the Petition Date. To this end, the Debtors hired a new Chief Financial Officer, a new Head of Human Resources and Administration, and a new Head of Information Technology, all of whom are free from the taint that infected former management, have deep experience in their areas of core competency, and have managed other large-scale corporate failures. In addition, Mr. Ray engaged a team of third-party professionals in the areas of restructuring, forensic accounting, tax disciplines, and cybersecurity, including Sullivan & Cromwell, Quinn Emanuel, Landis Rath & Cobb, Alvarez & Marsal, AlixPartners, Ernst & Young, and a leading cybersecurity firm.

15.    The second objective, ***Asset Protection & Recovery***, involves working to locate and secure property of the estate. This includes assets that may be missing, misappropriated, or not readily traceable due to the lack of proper record-keeping. To this end, under the direction of Mr. Ray and the Board, the Debtors and their advisors have developed a detailed account of money flows and movements of assets from FTX's founding to the Petition

Date.  Approximately nine million customer accounts have been identified so far, with about 120 billion associated transactions.  Over $5 billion of cash, liquid cryptocurrency, and liquid investment securities, measured at Petition Date value, have been located to date.  The Debtors and their advisors continue to find more.  The investigative process supporting asset protection and recovery includes a comprehensive review of hot and cold digital wallets, with associated blockchain analysis.  This involves identifying and analyzing communications, financial transactions (including deposits and withdrawals), and relevant agreements and contracts around the world, aided by experts in forensic accounting.

16.     The Debtors and their advisors are also conducting a cybersecurity investigation utilizing experts in blockchain and cryptocurrency, cybersecurity, software engineering, information technology, and incident response.  The security of Debtors' information technology resources and computing environment—which was lacking in reasonable information security controls and governance—has been enhanced to defend against the risk of insider and external threats, and continues to be assessed as a result of the ongoing cybersecurity review and investigation.  Locating and securing assets and systems is highly technical work.  As a result of these efforts, hundreds of millions of dollars' worth of assets have been located and successfully transferred to cold storage.  By the same token, the analysis of possible claims is not just a simple matter of identifying wrongdoers who were siphoning customer funds.  Rather, the exercise requires the integration of technical, forensic, and legal expertise to deconstruct transactions and trace assets.

17.     The third objective, ***Transparency and Investigation***, involves piecing together the components of FTX Group's collapse on a historical, transactional, and systems basis.  The Debtors' investigative and cybersecurity teams are in the advanced stages of

gathering and reviewing all relevant material.  In doing so, as described in more detail below, they are coordinating closely with U.S. and foreign regulatory and law enforcement authorities. The review conducted to date has involved collecting dozens of terabytes of transaction records, deal documentation, communications and other data, reviewing hundreds of thousands of documents, and creating forensic images of dozens of computers and phones located around the world.

18.     The Debtors' investigation, which is now proceeding in consultation and coordination with the Committee and its advisors, will take into account all possible claims that the estates may have against third parties as well as against insiders who, whether through intentional malfeasance, gross negligence, or negligence, violated their duties to the Debtors. Among other things, potential avoidance claims are being investigated, including but not limited to claims relating to:  (1) pre-petition withdrawals from the FTX.com and FTX US exchanges, including withdrawals by insiders and certain individuals designated as VIPs; (2) purported investments made in the days and weeks preceding the Chapter 11 filings; (3) political donations and charitable grants, including more than $150 million in political spending during the first nine months of 2022 alone; (4) nearly $100 million of cryptocurrency withdrawals from FTX.com on November 10 and 11 by individuals purporting to be Bahamian residents, including withdrawals of funds originating with non-Bahamians; (5) hundreds of venture capital investments, including investments in entities affiliated with or controlled by insiders; (6) real estate and other assets purchased for use by insiders and their friends and family; and (7) purported debt repayments or asset pledges made during the period leading up to the Chapter 11 filings.

19.     The fourth objective, ***Efficiency and Coordination***, is focused on coordination with non-US jurisdictions.  The most extensive exercise to date has been the

situation involving FTX Digital Markets, Ltd. ("FTX DM"), which on November 10, 2022, was placed into provisional liquidation in The Commonwealth of The Bahamas ("The Bahamas") by the Securities Commission of the Bahamas ("SCB"). On November 10 and November 14, 2022, the Supreme Court of The Bahamas appointed three individuals to serve as joint provisional liquidators in respect of FTX DM (the "JPLs"). A substantial investigation was conducted by the Debtors and their advisors with respect to FTX DM and the actions of the SCB and JPLs with respect to Debtors' assets from and after November 10, 2022. Notwithstanding some initial litigation, the Debtors have been able to reach a cooperation agreement with the JPLs that will be heard by this Court on February 15, 2023. This accord would not have been possible if not for the investigation that preceded it.

20. The fifth and final objective, **_Maximization of Value_**, relates to realizing value from the Debtors' assets. This exercise dovetails with the other objectives. Assets that are identified and recovered must be analyzed to determine their highest and best value and the means by which such value is best realized. Claims relating to prepetition transactions that are identified must be balanced against the value, if any, received as part of those transaction. Central to this exercise are the investment banking advisors retained by the Debtors and the Committee. To date, the Debtors have sought and obtained permission to begin sale processes for certain businesses and have announced the creation of a task force to review the feasibility of restarting the Debtors' exchanges. This work is substantial and is ongoing.

### B.  Criminal Investigations

21. The Debtors have provided materials in response to hundreds of individual requests from the U.S. Attorney's Office for the Southern District of New York ("USAO SDNY"), the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading

Commission ("CFTC"), the U.S. House of Representatives, and numerous state and foreign regulatory and enforcement authorities.

22.      Within a month of the Petition Date, the USAO SDNY indicted Mr. Bankman-Fried and filed criminal informations against Ms. Ellison and Mr. Wang, alleging various crimes, including, among others, wire fraud and conspiracy to commit wire fraud. While Mr. Bankman-Fried has pleaded not guilty and a trial date has been set for October 2023, Ms. Ellison and Mr. Wang pleaded guilty and entered into cooperation agreements with the USAO SDNY. The USAO SDNY has made it clear in its public statements that its investigations continue.

23.      The existence of this major criminal investigation and prosecution presents a material obstacle to any examiner that would be appointed if the Motion were to be granted. As a practical matter, the pending criminal proceedings will limit materially, if not entirely, access by an examiner to Mr. Bankman-Fried, Ms. Ellison and Mr. Wang.

24.      In addition, the USAO SDNY is pursuing its own asset recovery efforts given that the victims of the criminal offenses investigated by USAO SDNY are coextensive with many of the Debtors' creditors. In particular, assets comprised of publicly traded stock and bank accounts have been seized by the USAO SDNY as being proceeds of the crimes with which Mr. Bankman-Fried has been charged. Under the criminal and civil asset forfeiture laws, USAO SDNY has the ability to forfeit the proceeds of the criminal offenses and to utilize the forfeited assets to compensate the victims of the crime. *See* 18 U.S.C. §§ 981, 982; 28 C.F.R. § 9.8.

25.      As bankruptcy laws and asset forfeiture laws provide for alternative mechanisms to recover the same assets that are both proceeds of a criminal offense and property of the Debtors' estate, the Debtors and their advisors are working with the USAO SDNY to

coordinate efforts to maximize the recoveries to the Debtors' creditors and the victims of the fraud, and to minimize unnecessary expenses in doing so.

*          *          *

26.      All of the foregoing has required the dedication of enormous resources, all for the benefit of the Debtors' creditors, shareholders, and estates in general. The Debtors' resources, however, are not unlimited. The appointment of an examiner, with a mandate to be determined, can be expected to cost these estates in the tens of millions of dollars. Indeed, if history is a guide, the cost could near or exceed $100 million. This sort of exercise is neither appropriate, nor beneficial to the Debtors' creditors, shareholders, or estates in general.

## IV.      THE U.S. TRUSTEE'S MOTION TO APPOINT AN EXAMINER

27.      On December 1, 2022, the U.S. Trustee filed the instant Motion seeking an order appointing an examiner pursuant to section 1104(c) of the Bankruptcy Code. (Mot. at 1.)

28.      On December 21, 2022, the State of Wisconsin Department of Financial Institutions filed the Wisconsin Joinder. [D.I. 263.] On January 3, 2022, the Vermont Department of Financial Regulation filed the Vermont Joinder. [D.I. 339.]

### ARGUMENT

## I.      APPOINTMENT OF AN EXAMINER IS NOT MANDATORY.

29.      The U.S. Trustee asserts that the "the appointment of an examiner under [Section 1104(c) of the Bankruptcy Code] to investigate the affairs of the Debtors is mandatory." (Mot. ¶ 33.) Not so. To the contrary, "this Court has repeatedly held that Section 1104(c)'s inclusion of the phrase 'as is appropriate' gives the Court discretion" to deny an examiner motion even if the dollar threshold of 1104(c)(2) is met. *In re Mallinckrodt PLC*, No. 20-12522, Hr'g Tr. at 40:5–7 (Bankr. D. Del. Nov. 23, 2021) (Dorsey, J.) (Bromley Decl. Ex. 2). In fact, this Court *sua sponte* confirmed its position on the non-mandatory nature of Section 1104(c)

during the omnibus January 11 hearing—"I do not believe it's mandatory." (Bromley Decl. Ex. 3 at 167:22–23.)

30.     Section 1104(c) of the Bankruptcy Code states, in relevant part, that: "the court shall order the appointment of an examiner to conduct such an investigation of the debtor *as is appropriate* . . . if – (1) such an appointment is in the interests of creditors, and equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated unsecured debtors, other than debts for goods, services, or taxes or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c) (emphasis added).

31.     As Judge Sontchi explained in *EV Energy Partners*, in every examiner motion, the movant bears the "burden of proof of establishing . . . some reason that it would be helpful to appoint an examiner." Hr'g Tr. at 197:3–5, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 16, 2018) (Bromley Decl. Ex. 4). Indeed, the movant must demonstrate that there is "an actual examination that needs to be done, an *appropriate* inquiry that needs to be pursued." *Id*. at 197:1–2 (emphasis added).

32.     In that case, certain equity holders moved for the appointment of an examiner to investigate, *inter alia*, "[s]ignificant and material conflicts of interest relating to a number of prepetition transfers," "related-party sales and transactions," and "[r]epeated failures to disclose items that may be required by the Securities and Exchange Commission or the Bankruptcy Code." Mot. ¶ 4, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 7, 2018). Judge Sontchi ultimately exercised the discretion afforded under Section 1104(c) and denied the request because the equity holders' proposed examination was not "an appropriate inquiry that need[ed] to be pursued." *Id.* at Hr'g Tr. at 197:3–5; *see also* Hr'g Tr. at 7:16–17, *In re Paddock Ents., LLC*, No. 20-10028 (Bankr. D. Del. June 17, 2020) (Silverstein, J.) ("[T]his

court has consistently ruled that Section 1104(c) is not mandatory.") (Bromley Decl. Ex. 5); *In re Spansion, Inc.*, 426 B.R. 114, 127 (Bankr. D. Del. 2010) (Carey, J.) (denying examiner appointment, despite satisfaction of dollar threshold, because it was "neither warranted nor appropriate, and would cause undue cost to the estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case"); Hr'g Tr. at 170:16–20, *In re Visteon Corporation*, No. 09-11786 (Bankr. D. Del. May 12, 2010) (Sontchi, J.) ("I think it would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner. There has to be an appropriate investigation that needs to be done.") (Bromley Decl. Ex. 6).

33. The U.S. Trustee ignores the weight of authority in the District of Delaware, including from this Court, holding that a bankruptcy court has discretion to deny appointment of an examiner even where the statutory debt threshold has been met. Instead, the U.S. Trustee relies solely on a handful of decisions outside of this Circuit. (Mot. ¶¶ 33–34.) Those cases, however, are inconsistent with this Court's precedent and are in no way binding. Indeed, even courts in the districts to which the U.S. Trustee points do not uniformly find that Section 1104(c) is mandatory when the statutory threshold is met. For example, bankruptcy courts in the Southern District of New York have routinely held that they "retain[] the discretion to deny a motion for appointment of an examiner," even where the statutory threshold has been met. *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) (Glenn, J.).

## II. APPOINTMENT OF AN EXAMINER IS NEITHER WARRANTED NOR APPROPRIATE.

34. In exercising its discretion, including when the dollar threshold of 1104(c)(2) is met, this Court asks whether there is an appropriate investigation for an examiner to conduct, based on whether appointment: (1) "is in the best interest of creditors," *Paddock*

*Ents.*, Hr'g Tr. at 9:7–8; (2) "would be harmful to the Debtors" or "would cause undue cost to the estate," *Spansion*, 426 B.R. at 128; and (3) "would delay the administration of [the] chapter 11 case," *id.*  As the moving party, the U.S. Trustee bears the burden to prove that an examiner should be appointed under Section 1104(c).  *Mallinckrodt*, Hr'g Tr. at 40:13–18 (Bromley Decl. Ex. 2).

35.    Here, the U.S. Trustee has failed to carry that burden.  Indeed, all factors weigh in favor of denying the request for an examiner.

**A.    Appointment of an Examiner Would Not Be in the Best Interest of Creditors.**

36.    The U.S. Trustee wrongly argues that the appointment of an examiner "would be in the best interests of the Debtors' estate, their creditors, and equity security holders," (Mot. ¶ 35), because "the questions at stake here are simply too large and too important to be left to an internal investigation," (Mot. ¶ 40).  This *ipse dixit* argument fails.  The U.S. Trustee continues, without judicial support that a mere "internal investigation" cannot be "neutral," (*id.*), or "public and transparent," (Mot. ¶ 42).  In so stating, the U.S. Trustee understates and misapprehends the breadth of the investigations into FTX that have been undertaken.

37.    While the Debtors—which are under entirely new management—are conducting their own investigation, they are also providing assistance to numerous government investigations, including, among others, investigations by USAO SDNY, the SEC, and the CFTC, as well as the U.S. House of Representatives.  Moreover, as the Creditors' Committee has stated, "[c]onsistent with its mandate, the Committee is working tirelessly to uncover the fraud in its entirety, recover as many assets as possible and is working with the Debtors to move as expeditiously as they can under the circumstances to make full and fair distributions to the Debtors' creditors, including its customers."  [D.I. 508 ¶ 1.]  All of these investigators are

aligned on the same mission: recovering the assets of the Debtors' estate and holding wrongdoers accountable for their harms to the Debtors and creditors alike.

38. This Court has found appointment of an examiner to be inappropriate where the examiner's role would be duplicative of other ongoing investigations. *See Paddock Ents.*, Hr'g Tr. at 8:9–9:8 (Bromley Decl. Ex. 5.). In fact, in *Paddock Enterprises*, Judge Silverstein denied the U.S. Trustee's examiner motion because the relevant parties in the case "ha[d] already begun . . . diligence" on the subject of the proposed examination. *Id.*, 8:12–13. Judge Silverstein explained that there would not "be anything gained by appointing an examiner," when there were two existing investigations being conducted by parties with the requisite "corporate and bankruptcy expertise." *Id.* Ultimately, Judge Silverstein concluded that it would not be "in the best interest of creditors to appoint" an examiner to duplicate the efforts of the preexisting investigations. *Id.* at 8:13–9:8. Similarly, Judge Sontchi has also rejected a U.S. Trustee request to appoint an examiner, reasoning that giving an examiner "carte blanche" to look into an issue already being examined by a creditors' committee, government regulators, and Congress would not be "appropriate." Hr'g Tr. at 76:25–77:8, *Am. Home Mortg. Holdings, Inc.*, No. 07-11047 (Bankr. D. Del. Oct. 31, 2007) (Sontchi J.) (Bromley Decl. Ex. 7).

39. Here, like in *Paddock Enterprises* and *American Home Mortgage Holdings*, the creditors would not benefit from an examiner investigation that would be duplicative of the investigations by the Debtors, Creditors' Committee, law enforcement agencies, and Congress. To the contrary, an examiner's investigation would impede those ongoing investigations by forcing investigators to compete with the examiner for access to witnesses and straining the capacity of the Debtors' management and workforce. Given that the U.S. Trustee "does not question the qualifications, competence, or good faith of Mr. Ray" (Mot.

at 3), and admits that Mr. Ray has selected advisors with the requisite "corporate and bankruptcy expertise," there will not "be anything gained by appointing an examiner," *Paddock Ents.*, Hr'g Tr. at 8:13–9:7 (Bromley Decl. Ex. 5). Indeed, the Wisconsin Joinder acknowledges that the Debtors' internal investigation alone "has been able to confirm" key facts even "[]though this is early days in the bankruptcy process." (Wisconsin Joinder ¶¶ 10, 14.)

40. Moreover, any examiner investigation is likely to be ineffectual as a tool for locating and recovering the assets of the estate—the most important investigative priority today. The U.S. Trustee does not contend otherwise. Not once in the Motion does the U.S. Trustee suggest that an examiner would assist creditors or the Debtor by empowering the estate to locate its assets. Indeed, there is no contention that creditors will receive another penny if an examiner is appointed and, given the substantial costs, an examiner will if anything cause creditor distributions to be reduced.

41. Meanwhile, even if an examiner's investigation could navigate around the dozens of ongoing investigations into the Debtors, the examiner's investigation would still fall short on its own terms because key witnesses—Messrs. Bankman-Fried and Wang, and Ms. Ellison—are likely unavailable as a result of the criminal charges against them. These witnesses, even those who have already pled guilty, likely have Fifth Amendment rights to withhold testimony from an examiner. *See In re Wilmington Tr. Sec. Litig.*, 2017 WL 9619319, at *2 (D. Del. Sept. 25, 2017) (upholding Fifth Amendment right not to testify in deposition where "[d]espite the plea agreement, [witness] could face criminal prosecution for possible other crimes revealed by the deposition testimony which were not the subject of the plea agreement"). Moreover, there is no evidence that an examiner could succeed in getting information from these witnesses that the Debtors, the Committee, and federal prosecutors cannot obtain themselves.

42.     Unable to otherwise demonstrate that appointing an examiner will serve the creditors, the U.S. Trustee raises the specter of conflicts of interest between the Debtors and "other interested parties" (Mot. at 3), and further argues that there may be interdebtor claims between "FTX Trading Ltd. and Alameda Research," (Mot. ¶ 37).  Again, it is mistaken.  The U.S. Trustee does not identify any actual conflict of interest between the Debtors and other parties, or amongst the Debtors, that would be resolved by the wide-ranging examination contemplated in the Motion.  (*See* Mot. ¶ 30 (listing potential avenues for investigation).)  That is because there is no such conflict:  the Debtors are focused on conducting a massive asset recovery and monetization effort for the benefit of *all* creditors of the FTX group and other stakeholders, including by developing a factual record to support litigation claims, if appropriate.  Accordingly, the interests of the bankruptcy estate and creditors are aligned.

43.     Furthermore, the possibility of interdebtor claims in a jointly administered bankruptcy is not itself enough to bar a single trustee—here, the Debtors as debtors-in-possession—from serving as fiduciary to all debtors.  *See In re BH & P*, Inc., 949 F.2d 1300, 1312 (3d Cir. 1991) ("[W]e are not prepared to say that interdebtor claims mandate disqualification of the trustee in every instance.").  In this case, the very exercise of tracking the estate's assets will necessarily develop the factual record for interdebtor claims, if any, and the possibility of such claims does not make an examiner appropriate.  Judge Sontchi recently denied an examiner motion that complained of "[s]ignificant and material conflicts of interest relating to a number of prepetition transfers."  Mot. ¶ 4, *In re EV Energy Partners*; *see id.* at Hr'g Tr. at 197:3–5 (Bromley Decl. Ex. 4); *see also Mallinckrodt*, Hr'g Tr. at 41:14-18 ("disagree[ing]" that "only an independent examiner can force the discovery that is needed to sort [] through the

morass of potential conflicts of interest . . ." and emphasizing role of the Court) (Bromley Decl. Ex. 2).

**B.    An Examination Would Be Harmful to Debtors and Result in Undue Cost.**

44.    Crucially, the U.S. Trustee completely ignores the harm to the Debtors— and ultimately the creditors—that would result from appointing an examiner.

45.    An examiner is particularly inappropriate here because of the fraught cybersecurity environment the Debtors face.  The Debtors' assets have already been targeted by hackers.  The more activity and actors there are in the Debtors' virtual environment, the greater the risk to the assets and sensitive data there.  Adding an examiner, who would certainly demand access to the cybersecurity environment, into the mix would risk substantial harm to the Debtors.

46.    Even if an examiner were appointed, the Debtors' investigation will continue:  "attorney[s] for a debtor-in-possession [are] obligated to investigate matters affecting the estate."  *In re Grasso*, 506 B.R. 626, 642 (Bankr. E.D. Pa. 2014), *vacated on other grounds*, 2014 WL 3389119 (E.D. Pa. July 11, 2014).  The last thing the Debtor and creditors need is another party competing with them for time and resources—especially given the cybersecurity perils the estate faces.

47.    In addition, history suggests that the cost of an examiner's investigation into a corporate crisis of this magnitude would diminish the Debtors' limited estate.  The examiner in the *Lehman* bankruptcy cost the estate over $100 million; *ResCap*'s examiner cost nearly $90 million; *Caesars*', nearly $60 million; and *Enron*'s, over $90 million.  The U.S. Trustee is not shy about the scale of the investigation it seeks:  the Motion characterizes the Debtors' efforts to date as "preliminary work," surgical in the face of "questions at stake [that] are simply too large and too important," to pass up a "robust investigation[]."  (Mot. ¶¶ 40, 43); *see also Am. Home Mortg. Holdings*, Hr'g Tr. at 76:25–77:13 (noting that a comprehensive

examiner's report would be "a $20 million report, and I'm not sure what it would accomplish") (Bromley Decl. Ex. 7). Moreover, when Debtors asked the U.S. Trustee about the proposed scope of an examiner, the U.S. Trustee refused to describe an appropriate scope for any examiner's investigation, stating in response to interrogatories from the Debtor that "[t]he scope of work is typically established at a hearing subsequent to the examiner's appointment." *Cf. Am. Home Mortg. Holdings*, Hr'g Tr. at 76:20–77:1 (denying examiner motion where "no real articulation of what it was that the movants wanted to be investigated by an examiner, and even if one were to sort of assume . . . I don't think that at this time giving someone sort of carte blanche to look into that issue will be appropriate") (Bromley Decl. Ex. 7).

48. While the U.S. Trustee suggests that this Court may appoint an examiner but limit its budget (Mot. ¶ 45), this Court has observed that "appointing an examiner and then giving that examiner no budget and no duties is tantamount to not appointing an examiner," *Am. Home Mortg. Holdings*, Hr'g Tr. at 75:22-24 (denying examiner motion rather than appointing and constraining examiner) (Bromley Decl. Ex. 7). Furthermore, budgets and information sharing protocols themselves entail transaction costs that are a further drain on the estate. Another bankruptcy court has denied an examiner motion given "the expense of an examiner and the delay required to complete the examiner investigation and report," and "the precarious financial situation present in th[e] case." *Dewey & LeBoeuf*, 478 B.R. at 639. This Court should likewise preserve the limited assets of the estate by denying the Motion.

### C. An Examination Would Delay the Administration of this Case.

49. Appointing an examiner at this stage would introduce significant delays—realistically, it would take weeks if not months for an examiner to get appointed, retain the necessary staffing to conduct an investigation of this size and complexity, negotiate a workplan and budget, and get up to speed on the facts of this case. These problems are particularly

compounded because of the cybersecurity obstacles that an examiner will need to surmount. Those delays would ultimately disadvantage creditors. It is neither feasible, nor appropriate, to suggest that the efforts of the Debtors and the Committee should be halted and put on a shelf until such time as an examiner is retained, its mandate is negotiated and approved, it gets up to speed, conducts its investigation, and delivers its report.

50. Where an examiner would be unable to match "the speed with which the case is progressing and the work" of other parties, an examiner motion should be denied. Hr'g Tr. at 46:4–6, *In re IdleAire Techs. Corp.*, No. 08-10960 (Bankr. D. Del. June 13, 2008) (Bromley Decl. Ex. 8). The Debtors' and other investigators' investigations, detailed above, have already been extraordinary undertakings. Those accomplishments distinguish this case from *In re Cred. Inc.*, No. 20-12836, Hr'g Tr. 97:11–98:24 (Bromley Decl. Ex. 9), in which this Court found an appropriate scope for an examiner's investigation. In *Cred*, untainted new management had not been fully installed, the debtor was not conducting any investigation, and the creditors' committee's purported investigation "must [have] be[en] in its very early stages" when the examiner was appointed. *Id.* at 97:19–98:7. Preferring to have only one investigation, this Court pulled funding from the creditors' committee's investigation to avoid "duplication of effort" between the creditor's committee and the examiner. *Id.* at 98:19–24. This case is also unlike *In re Celsius Network LLC*, in which the debtors, U.S. Trustee, and unsecured creditors committee all agreed on a "scope for the investigation of the Debtors by the examiner that is likely to avoid unnecessary duplication of efforts, costs, and delay." *Debtors' Response and Limited Objection to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* ¶¶ 4–5, *In re Celsius Network LLC*, No. 22-110964 (Bankr. S.D.N.Y. Sept. 8, 2022).

51.     Here, the best way to avoid unnecessary duplication of efforts, costs, and delay is to let the investigation by the Debtor—and coordinated investigations by the Creditors' Committee, law enforcement agencies, and Congress—proceed apace, without the interference of an examiner.  The Debtors are not only better situated than a third-party examiner to locate their own assets, but better positioned together with the Committee to timely act on information uncovered.  By contrast, the Debtors could not act on an examiner's findings to recover assets of the estate until the examiner disclosed those findings to the Debtors.  There is no appropriate investigation for an examiner to conduct that comports with "the speed with which th[is] case is progressing." *IdleAire*, Hr'g. Tr. at 46:4–5 (Bromley Decl. Ex. 8).

## CONCLUSION

The U.S. Trustee has not carried its burden of proving that an examiner should be appointed at this time, and the Motion must be denied.

Dated: January 25, 2023  
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FTX TRADING LTD., et al.,[1] | ) | Case No. 22-11068 (JTD) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF AN EXAMINER**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (this "Objection") to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 176] (the "Motion"), and in support thereof, respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

1. These Chapter 11 Cases, all agree, require a thorough investigation into a variety of issues, including "the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification number is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    Capitalized terms used in this Preliminary Statement that are not defined shall have the meanings ascribed to them later in the Objection or in the Motion, as applicable.

causes of action exist to remedy losses." Motion at 2. Indeed, the prepetition conduct of the Debtors and their former leaders are already under a microscope. No less than three government agencies have publicly announced and commenced investigations, and a congressional committee has begun its own independent investigation. Every day, major news publications are replete with information and analysis related to the Debtors' prepetition conduct and transactions. On the eve of filing these Chapter 11 Cases, all of the Debtors' senior management was terminated and replaced with an experienced, independent team led by John Ray – who has extensive expertise in forensic investigations – which team immediately began the necessary investigation and cooperation with the investigating governmental authorities. And, the U.S. Trustee appointed the nine-member Committee, which, immediately upon retaining professionals, began performing its statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . ." 11 U.S.C. § 1103(c)(2).

2.  Accordingly, in these circumstances, the question the Court ultimately must address is not *whether* an investigation should take place, but rather, *who* should conduct the investigation. As set forth below, that party should not be an examiner – and should be the Debtors and Committee, which are already deeply enmeshed in that task. The U.S. Trustee's arguments in favor of appointing an examiner to start the investigation anew do not hold up under scrutiny. Relying upon only its own speculation, the U.S. Trustee contends that the examiner's findings "*likely* would enjoy broader acceptance and credibility" than any of the other investigations currently being conducted. Motion at 3 (emphasis added). But, that subjective opinion aside, the U.S. Trustee fails to explain how any stakeholder in these Chapter 11 Cases would benefit from the appointment of an examiner. The examiner will not benefit the unsecured creditors of the Debtors' estates, who will be forced to pay the examiner's bill and, as discussed below, are more than adequately represented by the Committee, which is statutorily bound, as a fiduciary of the Debtors' estates, to investigate the Debtors' prepetition

conduct. Nor would the examiner benefit the general public – whose interests are not directly relevant for purposes of appointment of an examiner, in any event – because the public is being ably served through investigations by the Department of Justice, the Securities Exchange Commission, the Commodity Futures Trading Commission, and the United States Congress.

3.      In the unique circumstances of these Chapter 11 Cases, an examiner's investigation will delay progress and force the estates to incur significant incremental legal fees for a report with *no* evidentiary value. Notably, even after an examiner completes its investigation, the Committee will ultimately need to independently determine the merits of any claims and causes of action that may be asserted because the examiner cannot bring such claims. And, while previous mega bankruptcy cases, such as *Enron*, *Lehman, Residential Capital* and *Caesars Entertainment*, can guide the Court's understanding of the costs of an examiner – potentially as much as $50 to $100 million – these Chapter 11 Cases are readily distinguishable from those and other mega cases inasmuch as an examiner's report here is quite unlikely to expedite the conclusion of these cases. As discussed in greater detail below, this is not a case with multiple competing stakeholders in which negotiation or resolution might be aided by an examiner's report. Rather, these cases present a singular focus of discovering what transpired, so that the combined efforts of the Debtors and the Committee can maximize recoveries to all unsecured creditors.

4.      Accordingly, because (contrary to the U.S. Trustee's position) appointment of an examiner is not mandatory, this Court should find that it is not in the best interests of the Debtors' estates or their creditors to appoint an examiner here. The Debtors' current management and the Committee have already begun the very same investigation that would be conducted by an examiner. The Motion should be denied.

# BACKGROUND

### A.  The Chapter 11 Cases and the Debtors' Investigation

5.      On November 11, 2022, Samuel Bankman-Fried resigned from his position as chief executive of the Debtors, at which time John Ray was appointed to fill the position. *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24] (the "Ray Declaration") at ¶ 44. On that same date, and on November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

6.      In addition to Mr. Ray's appointment as CEO, new directors were appointed at new "silos" for each of the primary companies in the FTX group.[3] *See* Ray Declaration at ¶ 47. Each of the new directors are independent and have no connection to the Debtors' prepetition conduct. Under the direction of Mr. Ray and the Debtors' new management, the Debtors have been conducting an investigation into the downfall of the FTX enterprise and the prepetition fraudulent activity that unfortunately took place. Assisting the Debtors are able counsel and financial professionals, each of whom has extensive experience conducting forensic, financial and cryptocurrency related investigations in connection with the bankruptcy process.

7.      Nevertheless, well prior to its appointment of the Committee, the U.S. Trustee filed the Motion on December 1, 2022, seeking an order appointing an examiner to conduct an independent investigation into the "allegations of fraud, dishonesty, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange

---

[3]      The new directors include the Honorable Joseph J. Farnan as a Director of the Dotcom Silo and Chairman of the Board, Mitchell I. Sonkin as the Director of the WRS Silo, Matthew R. Rosenberg as the Director of the Alameda Silo, Rishi Jain as the Director of the Ventures Silo, and Matthew A. Doheny also as a Director of the Dotcom Silo. *See* Ray Declaration at ¶ 47.

customers' property, and whether colorable claims and causes of action exist to remedy losses." Motion at 2.[4]

### B. The Committee's Investigation

8.        On December 20, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. *See Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 261]. The U.S. Trustee's appointment was not done haphazardly. As acknowledged by counsel to the U.S. Trustee, the trustee received a "tremendous response" from people "located all over the world" who wanted to serve on the Committee. *See In re FTX Trading, Ltd.*, Dec. 14 Hr'g. Tr. at 13:4-10, annexed hereto as Ex. A.[5] From that group of creditors, the U.S. Trustee selected nine and empowered them to act as fiduciaries for all of the estates' unsecured creditors. The tremendous response received by the U.S. Trustee is not surprising. Unlike typical mega bankruptcy cases, which have complex and fully encumbered capital structures and warring factions of stakeholders, the vast majority of the creditors in these cases are similarly situated customers of the Debtors. Accordingly, not only does the Committee act as a fiduciary for all of the Debtors' unsecured creditors, it also practically, here, acts for the vast majority of the Debtors' stakeholders.

9.        Upon its formation, the Committee retained sophisticated advisors, including Paul Hastings LLP and Young Conaway Stargatt & Taylor, LLP as legal counsel, Jefferies Group, LLC as investment banker, and FTI Consulting, Inc. as financial advisor (collectively, the "<u>Committee</u>

---

[4]        Both the state of Wisconsin and the Vermont Department of Financial Regulation have since filed joinders to the Motion. *See The State of Wisconsin's Joinder to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 263], *The Vermont Department of Financial Regulation's Joinder to Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 339].

[5]        Relevant excerpts of transcripts cited herein are attached as **Exhibits A - K** to the Objection. Full transcripts are available upon request.

Professionals"). At the direction of the Committee, in addition to working to help stabilize the operational side of these Chapter 11 Cases, the Committee Professionals immediately began coordinating with the Debtors to investigate the facts and potential sources of recovery for unsecured creditors. To date, the Committee Professionals are efficiently reviewing over 55,000 documents received from the Debtors, are filing a joint application with the Debtors for authority to serve subpoenas to obtain information under Bankruptcy Rule 2004 and have been gathering information concerning myriad pertinent issues, including securing and investigating the Digital Assets previously and currently held on the FTX.us and FTX.com exchanges.

10. The Debtors and Committee plan to continue to work together and allocate resources efficiently in order to avoid duplication of efforts, to, among many other things, perform a forensic analysis of the relevant Debtor silos and the Debtors' assets and liabilities, conduct due diligence on the policies and procedures that allowed the fraud to occur, analyze the value received by the Debtors for the scores of prepetition transactions they entered into, assess the potential liability of the Debtors' equity holders, management, employees and their families, auditors, consultants, advisors and other third parties, and track every last dollar of missing funds.

**C. The Parallel Proceedings and Public Investigations**

11. In addition to the investigations currently being conducted by the Debtors and the Committee, numerous other proceedings and investigations are also substantially underway. To date, several governmental entities are pursuing civil and criminal proceedings against the Debtors' founders and prepetition management and certain Debtor entities, including *United States v. Bankman-Fried*, Case No. 22-cr-673 (S.D.N.Y.) (eight count indictment on claims of Wire Fraud, Conspiracy to Commit Wire Fraud, Conspiracy to Commit Money Laundering, Conspiracy to Commit Campaign Finance Violations, Conspiracy to Commit Securities, and Conspiracy to Commit

Commodities Fraud); *SEC v. Samuel Bankman-Fried*, Case No. 22-cv-10501(S.D.N.Y.) (alleging violations of section 17(a) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934); *SEC v. Ellison, Wang*, Case No. 1:22-cv-10794 (S.D.N.Y.) (alleging violations of section 17(a) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934); *CFTC v. Bankman-Fried, FTX Trading LTD, and Alameda Research LLC.*, Case No. 22-cv-10503 (S.D.N.Y.) (alleging claims of Fraud and Fraudulent Misstatements of Material Fact and Material Omissions). In connection with the criminal complaint brought by the United States, both Caroline Ellison (formerly CEO of Debtor Alameda) and Gary Wang (co-founder and 10% equity owner of FTX.com) have already plead guilty to Conspiracy to Commit Wire Fraud on Customers and Lenders, Wire Fraud on Customers and Lenders, Conspiracy to Commit Commodities Fraud, Conspiracy to Commit Securities Fraud and Conspiracy to Commit Money Laundering. *See* Case No. 22-cr-673 [ECF Nos. 6-9, 20, 22].[6]

## OBJECTION

12.     In support of its Motion, the U.S. Trustee argues that investigating "the alleged conversion by the FTX Trading arm of the Debtors of $10 billion of customers' property to lend to its affiliate Alameda . . . is unquestionably in the interests of the Debtors' creditors and other interests of the estates." Motion at ¶ 36. The Committee completely agrees. The Debtors' prepetition fraud must be investigated. But that does not mean the appointment of an examiner is necessary or appropriate. For the reasons set forth below, the U.S. Trustee has not satisfied its evidentiary burden to demonstrate that an examiner should be appointed here. *See In re Dewey & LeBoeuf LLP*, 478 B.R.

---

[6]     Indeed, the detailed charges against and allocutions by Wang and, especially, Ellison, demonstrate the advanced stage of the Government's investigation into their respective criminal activities.

627, 636 (Bankr. S.D.N.Y. 2012) ("The moving party has the burden to prove that an examiner should be appointed."). Accordingly, the Motion should be denied.

**I.    The U.S. Trustee has Not Shown that Appointment of an Examiner is in the Best Interests of the Debtors' Estates or their Creditors**

13.    The U.S. Trustee argues that appointment of an examiner is in the "best interests of the Debtors' estates, their creditors, and equity security holders." Motion at ¶ 35. Not so. Not only would an examiner *not* benefit any of the Debtors' true stakeholders (their unsecured creditors), but the appointment of an examiner would be an inefficient and costly waste of estate resources and will only serve to duplicate the investigation that the Debtors and the Committee (the statutory and neutral fiduciary appointed by the U.S. Trustee itself) have already been conducting.

**a.    The Debtors and the Committee Should Conduct the Investigation**

14.    Congress, through section 1103 of the Bankruptcy Code, provided the Committee with broad powers to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c)(2); 7 Collier on Bankruptcy ¶ 1103.05 (16th ed. 2022) ("The investigative authority granted to a committee is extremely broad and a committee may undertake whatever investigation is appropriate to enable it to fulfill its duty to monitor the operations of the debtor and participate in formulation of a plan.").[7]

---

[7]    As set forth more fully in the *Statement of Official Committee of Unsecured Creditors Regarding U.S. Trustee's Objections to Retention of Certain Professionals of Debtors* [Docket No. 508] (the "Committee Statement"), the interplay between sections 1106 and 1107 of the Bankruptcy Code does not preclude the Debtors from investigating their own misconduct, nor does it militate in favor of the appointment of an examiner here. *See* Committee Statement at ¶¶ 2-4 (citing *In re Johnson*, 546 B.R. 83, 163 (Bankr. S.D. Ohio 2016) (recognizing that section 1107's exemption does not mean "anything more than that a debtor in possession is *not required* to 'investigate itself'") (emphasis added); *In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("While pursuant to Section 1107(a) of the Code, a debtor in possession is *not required* to investigate and report under Sections 1106(a)(3) and (4), the debtor's directors bear essentially the same *fiduciary* obligation to creditors and shareholders as would a trustee for a debtor out of possession.") (first emphasis added)). Indeed, when sections 1103(c)(2), 1106(a)(3) and 1107(a) are read together, the natural reading is that the Debtors and/or the Committee can fulfill the investigative function that is exempted from the *duties* (not powers) of the debtor in possession. To give credence to the contrary interpretation

15. Consistent with its statutory duty, the Committee is already in the process of conducting the necessary investigation in order to not only explain what transpired at the Debtors, but to determine, as estate fiduciaries, how to maximize recoveries for the Debtors' customers and other unsecured creditors. Any appointment of an examiner would be duplicative of the investigation already taking place and would restart the investigation anew, wasting the momentum that the Debtors' new management achieved in the first months of these Chapter 11 Cases, and which the Committee has supplemented since its inception. *See In re Am. Home Mortg. Holdings, Inc.*, Case No. 07-11047, Hr'g Tr. at 77:2-8, annexed hereto as Ex. B (Bankr. D. Del. Oct. 31, 2007) (Sontchi, J.) (noting that because there were already ongoing investigations, the Court did not "think . . . there would be anything to be gained by appointing an examiner . . .").

16. The U.S. Trustee is simply wrong in contending, as applied here, that a creditors' committee (including this Committee) is not a neutral party because it is an advocate for general unsecured creditors and that an examiner is needed to be independent. *See* Motion at ¶ 41 (citing law review article to support contention that "the economic predispositions of debtors in possession and committees are an important and intentional part of the Code's structure, but those predispositions prevent their neutrality"). Although the U.S. Trustee's arguments *might* have some level of merit in a typical mega chapter 11 case – where the Committee represents but one constituency in a complex capital structure – such concerns are completely inapplicable in these Chapter 11 Cases. Here, as will be shown (to the extent disputed) at the hearing on the Motion, the vast majority (if not all) of the claims against the Debtors' estates are those of unsecured creditors. Therefore, the Committee is in the best position – and has a fiduciary responsibility – to represent the *entire* body of the Debtors'

---

propounded by the U.S. Trustee would lead to the absurd result of a trustee or examiner being appointed in *every* case under chapter 11 of the Bankruptcy Code.

creditors. The concern raised by the U.S. Trustee that certain groups of creditors may have potentially divergent interests from those of the Committee's constituents (*see* Motion at ¶ 41) does not exist here. *See In re Adelphia Communications*, Case No. 02-41729, Hr'g Tr. 7.63:8-7.64:4, annexed hereto as Ex. C (Bankr. S.D.N.Y. Feb. 6, 2006) (declining to appoint an examiner, noting that the creditors' committee was not conflicted in a manner that would necessitate the appointment of an examiner). In fact, the Committee's vested interest in maximizing recoveries for unsecured creditors actually buttresses the need for the Committee, with the Debtors, to conduct the investigation – not an examiner. In satisfying the Committee's fiduciary duty to the creditors of these estates, it will focus its efforts on investigating for the ultimate purpose of assessing claims and causes of action that have the greatest likelihood of inuring to the benefit of such creditors, rather than having an examiner drain resources of the estates investigating matters that, in the end, may not enhance the Debtors' estates (and that an examiner cannot prosecute, in any event).[8]

### b. An Examiner Will Not Benefit the Debtors' Stakeholders

17.     The U.S. Trustee contends in its Motion that an examiner is necessary to examine the "unanswered questions" behind the Debtors' alleged prepetition misconduct, which "are not merely about where the money flowed or who can sue whom," but relating to "the wider implications that FTX's collapse may have for the crypto industry." Motion at ¶ 42-43. First, "where the money flowed" and "who can sue whom" are *precisely* the questions upon which an investigation should focus in order to maximize the value of these estates. Second, the wider implications that FTX's collapse may have for the crypto industry are certainly of interest, but are not within the scope of the

---

[8]     Certain parties have raised concerns regarding the neutrality of the Debtors' new management and professionals, which concerns were rejected by the Court in the related context of the Debtors' professionals' retentions. Regardless, the Committee's role in the investigation of the Debtors' prepetition affairs ensures an investigation without any appearance of conflict or bias. The Committee is perfectly situated to conduct such neutral investigation itself and further act as a check on the investigative functions being conducted by the Debtors and their professionals in this regard.

investigative duties described in the Bankruptcy Code and are not costs that should be unnecessarily borne by the Debtors' estates.

18.     The Motion advocates for a limitless investigation that may not benefit creditors' recoveries, consistent with the U.S. Trustee's desire to serve the public interest through an examiner's investigation into certain systemic issues in the crypto industry. Motion at ¶¶ 42-43. Such an investigation is already being conducted by a number of government agencies, including the Securities Exchange Commission, the Department of Justice and the Commodity Futures Trading Commission and a congressional committee – not to mention journalists worldwide. Thus, the public is being served by those investigations without the need for the creditors of these Debtors to fund, through their potential recoveries, an investigation that does not have as its primary goal increasing those very recoveries. *See In re Washington Mut., Inc.*, *et al.*, Case No. 08-12229, Hr'g. Tr. at 98:12-100:6, annexed hereto as Ex. D (Bankr. D. Del. May 5, 2010) (Walrath, J.) (denying the appointment of an examiner where the creditor committee is "fully able to conduct the investigation" and the "debtor has been investigated to death" for both criminal and civil proceedings, and noting that it would be "[un]fair to the creditors in this case to be saddled with the cost of an investigation into systematic problems, that would only benefit future parties but not benefit the parties in this case.").

19.     Indeed, the U.S. Trustee sidesteps that it is the unsecured creditors that will pay for the examiner's investigation and report. Budgets or not, an appointed examiner will surely need to retain outside counsel, forensic accountants and financial advisors, among a slew of other professionals, all of whom (as will be proven at the hearing on the Motion), would be charging the estates millions of dollars in fees and expenses while just trying to catch up to where the investigation to date is already. The Debtors and the Committee have both already retained such professionals and

any work done by additional professionals retained by an examiner would be duplicative of work already done by the Debtors' and Committee's experts.[9]

20.     Finally, there are serious practical concerns that weigh strongly against an examiner conducting an investigation. First, an examiner does not adjudicate, but merely reports. Although an examiner's report may "paint[] a picture, his or her image of what happened in the case . . . and provide[] context for a debate," such report is ultimately hearsay, limiting its evidentiary value. *In re FiberMark, Inc.*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006) ("It is the duty of the parties to formulate a fuller version of the debate using the rules of evidence."). And while an examiner may be able to recommend claims or causes of action based on the findings in its report, an examiner itself is not able to bring such claims because it lacks standing to do so. *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 578 (3d Cir. 2003) ("One concern is that, like a trustee, an examiner would incur direct costs through its fees, so to that extent this remedy is inferior to the alternative of derivative suit by a creditors' committee. The more serious problem, however, is that it is less than obvious that § 1106(b) actually does permit examiners to initiate actions on the debtor's behalf. . . . Critically, [sections 1106(a)(3)-(4)] permit only investigating and reporting on that investigation – they stop far short of authorizing examiners to litigate based on their findings.").

21.     Indeed, although "painting a picture," as suggested by the *FiberMark* court (*see* 339 B.R. at 325), may be of some benefit in cases in which there are numerous stakeholders, each litigating and negotiating from its own unique position, that situation is not extant here. A non-binding

---

[9]     Pursuant to the proposed order that was filed with the Motion, an examiner would have fifteen days following the appointment to file a proposed work plan and cost estimate, after which parties will have ten days to object, and then, only after obtaining approval from the Court, the examiner is to meet and confer with the Debtors and the Committee regarding its investigation. The practical effect of all of this is that an examiner would not even *start* an investigation, at best, until mid-March – roughly 120 days after the Debtors and 75 days after the Committee began investigating the Debtors' affairs.

examiner's report that identifies certain facts and offers opinions on pertinent legal issues may influence the playing field in situations where there are competing stakeholders with various positions. By way of example, the examiner's report in the *Caesars Entertainment* bankruptcy cases helped identify facts and claims against a recalcitrant equity sponsor, ultimately resulting in a global settlement. *See In re Caesars Entertainment Operating Company, Inc., et al.*, No. 15-01145 (Bankr. N.D. Ill.) *Final Report of Examiner, Richard J. Davis* [Docket No. 3720] at 1-3, 6-11. Notably, the *Caesars* debtors had complicated capital structures including various tranches of secured debt and competing claims to assets as a result of a series of prepetition financial transactions implemented by the equity sponsor. *See id.* at 98-105. Here, to the contrary, there are only the unsecured creditors of the various Debtors that are seeking to maximize their recoveries from the estates, and, as a result, the possible value to be added by having an examiner paint a picture is greatly diminished and will not aid in expediting these cases.

22.     Because the Debtors and Committee are already in the process of conducting an investigation and, significantly, because any investigation conducted by an examiner will still have to be overseen and subject to diligence by the Debtors and the Committee – the parties who will ultimately have standing and need to make the decision whether any claims or causes of action should be prosecuted – an examiner investigation would be redundant and a waste of estate resources. The appointment of an examiner is simply not necessary here.

## II.     Appointment of an Examiner is Neither Mandatory Nor Appropriate

23.     The U.S. Trustee also asserts that appointment of an examiner is mandatory because the criteria set forth in section 1104(c)(2) of the Bankruptcy Code has been met. Motion at § IV.A. Although the U.S. Trustee in the Motion collects and relies upon authority to support its position from various courts outside of this Court and the Third Circuit, it fails to acknowledge the contrary authority of this Court. This Court has repeatedly held that an examiner's appointment is not mandatory simply

because the chapter 11 case meets the $5 million debt threshold set forth in the statute – and has said so in the context of these Chapter 11 Cases. *See In re FTX Trading, Ltd.*, Jan. 11, 2023 Hr'g. Tr. at 167:18-23, annexed hereto as Ex. E ("I think you're familiar with my position on the mandatory nature of the appointment of an examiner . . . For the record, I do not believe it's mandatory."); *see also In re CRED Inc., et al.* No. 20-12836, Hr'g. Tr. at 97:12-18, annexed hereto as Ex. F (Bankr. D. Del. December 18, 2020) (Dorsey, J.) ("I disagree with the UST's position that the appointment of an examiner is mandatory. The language of 1104(c) provides the Court with some discretion. It says that the Court shall appoint an examiner to conduct such an investigation of the debtor as is appropriate. So the question becomes: Is it appropriate in this case?").[10]

24.     Rather, the appropriate inquiry is whether an examiner has an *appropriate* investigation to pursue. *See In re EV Energy Partners*, No. 18-10814, Hr'g. Tr. at 196:22-25, annexed hereto as Ex. G (Bankr. D. Del. May 16, 2018) (Sontchi, J.) ("I don't believe, and I've said this in numerous cases and my colleagues have said it, that it's just mandatory to appoint an examiner, as long as someone asks for one."); *In re IdleAire Techs. Corp.*, No. 08-10960, Hr'g. Tr. at 45:11-15, annexed hereto as Ex. H (Bankr. D. Del. June 13, 2008) (Gross, J.) ("I don't think that [§ 1104(c)(2)] is mandatory based upon my reading of the legislative history . . . the language of the statute itself, and particularly, the as appropriate clause."); *In re Visteon Corporation, et al*., No. 09-11786, Hr'g. Tr. at 170:16-20, annexed hereto as Ex. I (Bankr. D. Del. May 12, 2010) (Sontchi, J.) ("[I]t would be

---

[10]     This Court in *CRED* followed the reasoning of Judge Glenn in *In re Residential Capital, LLC*, which held that a bankruptcy court has discretion to not appoint an examiner in factual circumstances where it is not appropriate. 474 B.R. 112, 118 n. 6 (Bankr. S.D.N.Y. 2012) ("For example, an examiner investigation might not be appropriate in cases where the SEC has completed a lengthy investigation and commenced an enforcement action laying out the specific misconduct of the debtor's prior management, or *where the company or its senior managers were indicted*, or where the creditors committee had already completed and reported on a lengthy investigation of its own.") (emphasis added). Here, where there have already been multiple indictments of the Debtors' prepetition management and multiple criminal investigations are in progress (in addition to the investigations by the Debtors' new management and the Committee), an investigation by an examiner is simply not appropriate.

an absurd result to find that in every case where the financial criteria is met and a party-in-interests asks, the Court must appoint an examiner. There has to be an appropriate investigation that needs to be done.").

25.     Where, as here, an investigation is already being conducted by the Debtors' newly-appointed and disinterested management and the Committee, an examiner's investigation is not only inappropriate, but would be "futile." *See In re Magna Entm't Corp.*, No. 09-10720, Hr'g. Tr. at 13:4-14:14, annexed hereto as Ex. J (Bankr. D. Del. Apr. 28, 2010) (Walrath, J.) ("Since all of the roles that an Examiner would play in this case have already been fulfilled [by the creditor's committee], I find it's a futile act and will not appoint an examiner."); *In re IdleAire Techs. Corp.*, Hr'g. Tr. at 45:2-8 (Bankr. D. Del. June 13, 2008) (Gross, J.) (declining to appoint an examiner under § 1104(c)(2) when the "[creditor's] Committee's doing a very, very capable job."); *In re ACandS, Inc.*, No. 02-12687, Hr'g. Tr. at 130:18-131:5, annexed hereto as Ex. K (Bankr. D. Del. Nov. 18, 2002) (Newsome, J.) (denying an investigation by an examiner because it was an "utter and complete waste of money and well as time" when other parties were already investigating "the very same set of transactions."). The Debtors and Committee should continue their investigation, without burdening the estates with the additional fees and costs of an examiner, especially because there can be no allegation by the U.S. Trustee that the Committee (let alone the Debtors) is not an impartial and capable fiduciary to carry out this task.[11]

---

[11]     In the event that this Court determines to appoint an examiner, the Committee reserves the right and opportunity to be heard with respect to the examiner's investigation, including its scope, timeframe, budget and the Committee's involvement in such investigation.

## CONCLUSION

WHEREFORE the Committee requests that this Court deny the Motion and grant such other and further relief as the Court finds just and appropriate.

Dated: January 25, 2023  
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mlunn@ycst.com
      rpoppiti@ycst.com

-and-

PAUL HASTINGS LLP
Kristopher M. Hansen*
Luc A. Despins*
Kenneth Pasquale*
Isaac S. Sasson*
John F. Iaffaldano*
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: krishansen@paulhastings.com
      lucdespins@paulhastings.com
      kenpasquale@paulhastings.com
      isaacsasson@paulhastings.com
      jackiiaffaldano@paulhastings.com

*Admitted pro hac vice*

*Proposed Counsel to the Official Committee of Unsecured Creditors*

**Exhibit A**

1

```
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,     .
                                   .
 5                                 .  Courtroom No. 5
                                   .  824 Market Street
 6            Debtors.             .  Wilmington, Delaware 19801
                                   .
 7                                 .  Wednesday, December 14, 2022
     . . . . . . . . . . . . . . .    11:00 a.m.
 8
                        TRANSCRIPT OF HEARING
 9          BEFORE THE HONORABLE JOHN T. DORSEY
            CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Adam Landis, Esquire
12                            Kimberly Brown, Esquire
                              Matthew Pierce, Esquire
13                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
14                            Wilmington, Delaware 19801

15                            Andrew G. Dietderich, Esquire
                              James L. Bromley, Esquire
16                            Brian D. Glueckstein, Esquire
                              Alexa J. Kranzley, Esquire
17                            SULLIVAN & CROMWELL LLP
                              125 Broad Street
18                            New York, NY 10004

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Danielle Gadson

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the U.S. Trustee:        Juliet Sarkessian, Esquire
                                 OFFICE OF THE UNITED STATES TRUSTEE
3                                844 King Street, Suite 2207
                                 Lockbox 35
4                                Wilmington, Delaware 19801

5   For the Bohemian
    Securities Exchange
6   Commission:                  Kenneth Aulet, Esquire
                                 BROWN RUDNICK LLP
7                                7 Times Square
                                 New York, New York 10036

8
                                 Blair Rinne, Esquire
9                                BROWN RUDNICK LLP
                                 One Financial Center
10                               Boston, Massachusetts 02111

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  devolve.  I agree with Your Honor, there has got to be a way

2  the professionals can work this out without getting into the

3  kind of accusations that are flying.

4          THE COURT:  All right.

5          MR. SHORE:  To be clear, we filed the pleading this

6  morning, Your Honor.  It attaches a declaration that Mr. Ray

7  could not have seen, nor counsel could have seen, which

8  belies this notion that what the commission was doing was

9  working with SBF.  In fact, the email they attach where SBF

10  says --

11          THE COURT:  Well, I'm not going to get into the

12  merits of it at this point, Mr. Shore.  We will talk about

13  that on the 6th if we get to it.

14          MR. SHORE:  Okay.  But recognize --

15          THE COURT:  Hold on, Mr. Shore.  I want to move on.

16          MR. SHORE:  Sure.

17          THE COURT:  Let's talk about the 16th.  We have the

18  motion objecting to the seal by the U.S. Trustee.  Is the

19  U.S. Trustee on the line, someone from the U.S. Trustee?

20          MS. SARKESSIAN:  Yes, Your Honor.  Juliet

21  Sarkessian for the U.S. Trustee.

22          THE COURT:  Ms. Sarkessian, I have some concerns

23  about that hearing going forward on Friday from a number of

24  perspectives.

25          Number one, the motion implicates individual

1 creditors and there is no creditor's committee yet.  I think

2 the creditor's committee would want to weigh-in on that

3 motion.  Do we know yet when the committee will be formed?

4      MS. SARKESSIAN:  Your Honor, first, I -- maybe

5 apology is not the right word, but we had hopes to have a

6 committee formed by this time.  We had a tremendous response

7 and people are located all over the world.  Unfortunately it

8 becomes a little bit difficult when people are in very

9 different time zones, and there is a lot of complicated

10 information, as I'm sure Your Honor can imagine.

11      So we are moving as expeditiously as possible.  You

12 know, and we hope to be filing a notice of appointment very

13 soon. I can't say anything more than that other than very

14 soon.

15      I do have concerns.  You know, they, obviously,

16 have to choose counsel.  So, you know, I think there

17 certainly is a reasonable possibility that they might not

18 have counsel by Friday or maybe they have it by Thursday, but

19 there is not, you know, as much time as one would like for

20 them to have.

21      So I mean Your Honor certainly brings up a valid

22 concern.  We had hoped it would be different.  We had hoped

23 that we would have a committee formed by this time, but the

24 reality is due to circumstances outside of our control it has

25 not yet happened.

**A293**

1          THE COURT:  Okay.  I also noticed the Trustee also

2  objected to a consolidated creditor matrix on similar grounds

3  on the redaction of the creditor information, I believe.

4          MS. SARKESSIAN:  Your Honor, that was the motion I

5  was talking about.

6          THE COURT:  Oh, okay.

7          MS. SARKESSIAN:  So there was two motions, seal

8  motions; one of them relates to the

9  indemnification/exculpation motion and I will allow the

10  debtor to address that, but understanding, based on

11  discussions as well as the agenda, is that they are agreeing

12  for that to be unsealed.

13          THE COURT:  Okay.

14          MS. SARKESSIAN:  With respect to the other motion

15  relates to the creditor matrix, schedules and statements, top

16  50 list, and pretty much any document in the case that would

17  have names or addresses of creditors or customer/creditors.

18          THE COURT:  Okay.

19          MS. SARKESSIAN:  So that is the motion I was

20  discussing that we did file an objection to.

21          THE COURT:  Okay.

22          MS. SARKESSIAN:  We have not technically filed an

23  objection to the other motion because they said, effectively,

24  they're -- I don't know if withdrawal is the right word, but

25  they're not going to pursue that relief on a final basis.

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .   Chapter 11
                              .
AMERICAN HOME MORTGAGE        .   Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware    .   (Jointly Administered)
corporation, *et al.*,        .
                              .   Oct. 31, 2007 (10:09 a.m.)
          Debtors.           .   (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**A296**

2

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DEBTORS' EVIDENCE | | | | |
| WITNESS: | | | | |
| Steven Dickman | 28 | 39 | | |
|  |  | 40 | | |

1    doesn't take a ton of time.  So - and I'm sensitive to this

2    issue and I know the Office of the United States Trustee is

3    sensitive, and I understand their position in connection with

4    shall meaning shall, and I think that's true, but I think in

5    order for - I would draw a bit of a distinction between what

6    Judge Walsh and Judge Balick have appeared to rule which is

7    simply that it's a best interest test.  I don't think that's

8    correct.  The best interest is in ©)(1).  It's not in ©)(2).

9    I think the financial criteria are important, and obviously,

10    they're met in this case, but that's only one piece of the

11    puzzle, and the other piece of the puzzle is that there has

12    to be an investigation to perform that's appropriate.  I

13    think the cases cited in the <u>Colliers</u> treatise discuss that.

14    I think that's a more nuance approach than sort of saying it

15    is what it is, and if you cry "examiner" in a crowded case,

16    you get one.  In this case, reading the motion carefully, I

17    really didn't see a request for any investigation.  There was

18    a complaint about practices.  A 2004 request for information

19    about individual loan files that we've already discussed, but

20    no real articulation of what it was that the movants wanted

21    to be investigated by an examiner, and even if one were to

22    sort of assume, okay, they want someone to examine the

23    debtors' practices in connection with loan origination and

24    servicing that may be violations of state or federal law, I

25    don't think that at this time giving someone sort of carte

1  blanche to look into that issue will be appropriate.  Again,

2  the Committee is extremely involved in this case.  There are

3  ongoing investigations, possibly by other governmental

4  entities.  There's obviously a lot of issues going on in

5  Congress right now in connection with these types of

6  practices that allegedly the debtor participated in, so I'm

7  not - I don't think in this case there would be anything to

8  be gained by appointing an examiner and giving that examiner

9  a budget and saying, I'd like you to investigate the debtors'

10  loan origination and servicing policies in connection with

11  whether it may have violated state or federal law.  I think

12  that's asking for a $20 million report, and I'm not sure what

13  it would accomplish.  So, with regard to the temporal

14  requirement, again, I'm not - I understand there are those

15  cases.  I think it would be more appropriate to deny the

16  motion without prejudice than to sort of say, Okay, I'm

17  granting the motion, but I'm not at this point going to

18  appoint an examiner.  Again, I think that's just tantamount

19  to denying the motion.  So, I'm going to do that.  I'm going

20  to deny the motion without prejudice to be brought again if

21  new facts arise or if the status of the case changes.  And

22  just an aside, I mean, I don't know what this case ultimately

23  ends up with, whether we end up in with a liquidating plan,

24  whether we convert to 7.  I mean, I know - I'm sure there are

25  discussions that I'm very happy to not be participating in

1    that may be focused on that, but my instincts tell me that to

2    the extent there's some real issues out here, that they are

3    going to be investigated by somebody in the future, and if

4    turns out that that's not the case, I'm certainly open to

5    hearing someone ask me to appoint someone to do that on

6    behalf of the debtors' estate at the appropriate time.  All

7    right?  Are there any other issues?  I'm going to - So, I

8    think we've addressed the issues raised by - Oh, there was

9    the issue of the injunction.  I think that's very easily

10    dealt with.  You can't get an injunction by filing a motion.

11    I've said it many times before.  You have to file an

12    adversary proceeding under Rule 7001, and you need to meet

13    the criteria to get an injunction and you have to support it

14    by evidence, and without that, I'll deny that.  So I'm going

15    to deny - For the foregoing reasons, I'm going to deny all

16    three motions, and I'd ask the debtors to submit a form of

17    order, please, under certification of counsel.

18          MR. BRADY: Your Honor, we will prepare forms of

19    order for each motion.

20          THE COURT: I think that turns me to cash

21    collateral.  I don't have those papers.  I know they came

22    over yesterday in connection with the motion to shorten,

23    which I granted, but I didn't actually save them, so -

24          MR. WAITE: Your Honor, I can hand up - I have a

25    copy of the motion and a copy of the order; is that helpful

**Exhibit C**

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3
                                       .
 4   IN RE:                            .    Case No. 02-41729
                                       .
 5   ADELPHIA COMMUNICATIONS,          .    New York, New York
                                       .    Monday, February 6, 2006
 6                       Debtors.      .    5:02 p.m.
     . . . . . . . . . . . . . . . .

 7

 8           TRANSCRIPT OF HEARING ON STIPULATION/MOTION
             BEFORE THE HONORABLE ROBERT E. GERBER
 9                 UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:   (On the Record)

11   For the Debtors:              Peter N. Wang, Esq.
                                   FOLEY & LARDNER, LLP
12                                 90 Park Avenue
                                   New York, New York 10016
13                                 (212) 682-7474

14   For the U.S. Trustee:         Elizabeth Austin, Esq.
                                   Assistant U.S. Attorney
15                                 OFFICE OF THE U.S. TRUSTEE
                                   33 Whitehall Street
16                                 New York, New York 10004
                                   (212) 510-0500

17
     (Appearances continued)
18
     Audio Operator:               Electronically Recorded
19                                 by Court Personnel

20   Transcription Company:        Rand Transcript Service, Inc.
                                   311 Cheyenne Road
21                                 Lafayette, New Jersey  07848
                                   (973) 383-6977

22
     Proceedings recorded by electronic sound recording,
23   transcript produced by transcription service.

24

25
```

```
 1   APPEARANCES:  (Continued)

 2
     For the Official Committee
 3   of Unsecured Creditors:      Daniel N. Zinman, Esq.
                                  KASOWITZ, BENSON, TORRES &
 4                                 FRIEDMAN, LLP
                                  1633 Broadway
 5                                New York, New York 10010
                                  (212) 506-1700
 6
     For the Official Committee
 7   of Equity Security-Holders: Gregory A. Blue, Esq.
                                  MORGENSTERN, JACOBS & BLUE, LLC
 8                                885 Third Avenue
                                  New York, New York 10022
 9                                (212) 308-5858

10   For the Fee Committee:       James A. Beldner, Esq.
                                  KRONISH, LIEB, WEINER
11                                 & HELLMAN, LLP
                                  1114 Avenue of the Americas
12                                New York, New York 10036
                                  (212) 479-6000
13
     For Boies, Schiller
14    & Flexner, LLP:             Michael L. Cook, Esq.
                                  David M. Hillman, Esq.
15                                SCHULTE, ROTH & ZABEL, LLP
                                  919 Third Avenue
16                                New York, New York 10022
                                  (212) 756-2000
17

18

19

20

21

22

23

24

25
```

Case 22-97408... Filed 02/03/61... Entered 03/25/2000... Page 89 of 433... Document 450

1                    I N D E X

2

ARGUMENT                                    Page
3        By Ms. Austin                         8
         By Mr. Zinman                        24
4        By Mr. Wang                          27
         By Mr. Beldner                       31
5        By Mr. Cook                          34
         Response by Ms. Austin               42
6
COURT DECISION                               46

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   appointment of an examiner on a volitional basis, I would not

2   do so here.  The appointment of an examiner is sometimes very

3   useful for a bankruptcy case.  In other cases, it is not and

4   can cost the estate millions of dollars that would be better

5   spent on creditor recoveries.

6         In Refco every party with a financial stake in the

7   case opposed the appointment of an examiner, but the U.S.

8   Trustee in that region wanted one and on appeal the Sixth

9   Circuit ruled that the appointment of an examiner was

10  mandatory, notwithstanding the creditors' wishes.  The

11  examiner cost the estate about $2 million.

12        Here the amount budgeted for the examiner

13  appointment is $350,000, an amount which, while stated as a

14  cap, is an amount that I fear plainly will be reached, if not

15  also sought to be exceeded.  That $350,000, even if not

16  enlarged further, may exceed by tens of thousands or hundreds

17  of thousands of dollars the incremental amount, if any, that

18  use of Amici and Echelon cost the debtors' estates.

19        BSF has a pending fee application that will be

20  opposed by a number of parties in this case who could conduct

21  the necessary discovery at least as well as an examiner.

22  They probably could do it better and cheaper, as they know

23  this case very well.  They have an economic interest in

24  spending their time wisely.  They have a head start on

25  knowing what BSF was asked to do and did and what disclosures

1   it made and didn't make and have an understanding from three-

2   and-a-half years of experience what the dynamics of this case

3   are.  And at least some have indicated that they will wish to

4   actively participate in the investigation, whether or not an

5   examiner is appointed and it is fair to assume that they will

6   feel the same when it comes to opposing the BSF fee

7   application.

8           Also, do not believe that any of the debtors, the

9   creditors' committee, or the fee committee are conflicted in

10  a way that would necessitate the appointment of an examiner

11  to get out all of the true facts.  They have all of the

12  incentive they need to litigate vigorously against BSF and

13  BSF has all the incentive it needs to litigate vigorously to

14  clear its name.  That is what the adversary process is all

15  about.

16          We do not have a situation here, as in <u>Leslie Fay</u>,

17  where a party would be investigating itself.  If the debtors,

18  creditors' committee, and fee committee don't do the

19  necessary inquiry, I feel comfortable that BSF will.

20          At least here we've already had a contested fee

21  application before the Court.  It is not clear to me what

22  purpose the appointment of an examiner would accomplish,

23  other than taking depositions that the parties in this case

24  could take themselves and will want to sit in on anyway.

25  Examiners' views are not infrequently welcomed by courts, but

1  they are not a substitute for the decisions of courts,

2  especially on matters of law or on matters where parties

3  might have different views that would be the grist for a

4  judicial decision.

5       Federal Rule of Bankruptcy Procedure 9031, captioned

6  "Masters not Authorized," expressly provides that FRCP 53

7  does not apply in cases under the code and, hence, prohibits

8  the appointment by bankruptcy judges of special masters.

9  Legal decisions and factual findings on any disputed facts

10 would be the province of the Court and not an examiner.

11      If, as I would examine -- if, as I would expect, one

12 or more of the creditors' committee, the fee committee, the

13 debtors, the U.S. Trustee's office, or BSF wish to weigh in

14 on the allowability of BSF's fees, after we know all of the

15 facts, it's hard for me to envision a scenario under which I

16 would deny any of them the opportunity to do so.  And such

17 efforts on their part to engage in the rights that they

18 blatantly have in that regard would overlap with the

19 examiner's inquiry if it were to have been authorized in

20 material respects.

21      Frankly, folks, the history of examiners in this

22 district and elsewhere has made me wary of appointing them

23 when other means could skin the cat.  This case already has

24 enough fiduciaries.  It does not need to spend another

25 $350,000 to accomplish ends that already can be easily

**A307**

1   addressed in what I believe to be a much more efficient and

2   economical manner.

3          As I have said in other contexts, litigation needs

4   and concerns cannot be swept under the rug, but they need to

5   be addressed in the most efficient and thoughtful way

6   possible.  For the foregoing reasons, approval of the

7   stipulation is denied and dealing with stipulation to the

8   motion for the appointment of an examiner to investigate the

9   subject matter stated therein, the motion is denied.

10          In the alternative, the creditors' committee and the

11  debtors request authority to investigate by means of Rule

12  2004 or through the discovery that's granted in connection

13  with any contested manner as BSF's spending fee application

14  plainly is.  That authority is granted to the extent it is

15  necessary.  All interested parties already have the right to

16  engage in any needed deposition or document discovery under

17  Bankruptcy Rules 9014 at Paragraph 8 in Footnote 2 of my Case

18  Management Order No. 3, entered back on July 26th, 2004.

19          BSF cross-motion for appointment of a mediator is

20  denied without prejudice.  It is premature to talk about the

21  resolution of the fee issues, the disclosure issues, or any

22  related issues until the parties in this case know all of the

23  facts and I know all of the facts.

24          I'm so ordering the record.  Any party who wants a

25  written order from which it can take an appeal and move for

**Exhibit D**

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 08-12229 (MFW)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


WASHINGTON MUTUAL, INC., et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            824 North Market Street

            Wilmington, Delaware


            May 5, 2010

            10:30 AM


B E F O R E:

HON. MARY F. WALRATH

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  BRANDON MCCARTHY

2

1

2    HEARING re Debtors' Objection to Proof of Claim Filed by Mellon

3    Investor Services LLC

4

5    HEARING re Objection to Proof of Claim No. 201 Filed by Scott

6    **A. Burr**

7

8    HEARING re Debtors' Twenty-Fourth Omnibus (Substantive

9    Objection to Claims

10

11    HEARING re Debtors' Twenty-Fifth Omnibus (Non-Substantive)

12    Objection to Claims

13

14    HEARING re Debtors' (Non-Substantive) Objection to Claim Number

15    574 Filed by Frank Whitemaine

16

17    HEARING re Debtors' Thirty-First Omnibus (Non-Substantive)

18    Objection to Claims

19

20    HEARING re Supplemental Motion of Debtors Pursuant to Section

21    362 of the Bankruptcy Code for Order Modifying Automatic Stay

22    to Allow Advancement Under Insurance Policies

23

24    HEARING re Debtors' Objection to Proof of Claim Filed by

25    Egencia LLC

3

1

2    HEARING re Debtors' Twenty-Eighth Omnibus (Substantive)

3    Objection to Claims Filed by Claimants Gregory Bushansky, Dana

4    Marra, Marina Ware, Ontario Teachers' Pension Plan Board and

5    Brockton Contributory Retirement System (Claim Nos. 999, 1001

6    1002, 1003, 2759, 2761 and 2763) Pursuant to Section 510(b) of

7    the Bankruptcy Code

8

9    HEARING re Debtors' Thirtieth Omnibus (Substantive) Objection

10   to Claims Filed by Claimants Walden Management Co. Pension

11   Plan, Metzler Investment and South Ferry LP #2 (Claim Nos.

12   2808, 2809, 3087 and 3448) Pursuant to Section 510(b) of the

13   Bankruptcy Code

14

15   HEARING re Debtors' Twenty-First Omnibus (Substantive)

16   Objection to Claims

17

18   HEARING re Debtors' Twenty-Sixth Omnibus (Substantive)

19   Objection to Proofs of Claim of Jay Agnes (Claim No. 2588) and

20   R.S. Bassman (Claim No. 3666)

21

22   HEARING re Debtors' Twenty-Seventh Omnibus (Substantive)

23   Objection to Claims (Claim Nos. 2889, 2890, 2891, 2893, 2894,

24   2896, 2897, 2898 and 2900)

25

4

1

2     HEARING re Debtors' Objection to Proof of Claim Filed by

3     Michael Scott Blomquist (Claim No. 3220)

4

5     HEARING re Application of the Debtors Pursuant to Sections

6     327(a) and 328(a) of the Bankruptcy Rule 2014(a) and Local Rule

7     2014-1 for Order Authorizing the Retention of Blackstone

8     Advisory Partners L.P. as Financial Advisor Nunc Pro Tunc to

9     April 9, 2010

10

11    HEARING re Motion and Supporting Memorandum of the Official

12    Committee of Equity Security Holders for the Appointment of an

13    Examiner Pursuant to Section 1104(c) of the Bankruptcy Code

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

5

```
 1

 2      A P P E A R A N C E S:

 3      WEIL, GOTSHAL & MANGES LLP

 4           Attorneys for the Debtors

 5           767 Fifth Avenue

 6           New York, NY 10153

 7

 8      BY:  BRIAN S. ROSEN, ESQ.

 9           ALEXANDER NG, ESQ.

10           KELLY DIBLASI, ESQ

11

12      WEIL, GOTSHAL & MANGES LLP

13           Attorneys for the Debtors

14           1300 Eye Street, NW

15           Suite 900

16           Washington, DC 20005

17

18      BY:  ALEX O. LEVINE, ESQ.

19

20

21

22

23

24

25
```

Case 1:23-cv-12345-MFW Case 23-10775-MFW Doc 569 Filed 08/07/23 Page 46 of 104 PageID #: 1461

6

1

2    RICHARDS, LAYTON & FINGER, P.A.

3         Attorneys for the Debtors

4         One Rodney Square

5         920 North King Street

6         Wilmington, DE 19801

7

8    BY:  CHUN I. JANG, ESQ.

9         MARK D. COLLINS, ESQ.

10

11   ELLIOTT GREENLEAF

12        Special Counsel to the Debtors

13        1105 Market Street

14        Suite 1700

15        Wilmington, DE 19801

16

17   BY:  ANDREW G. MIRISIS, ESQ.

18

19

20

21

22

23

24

25

7

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         One Bryant Park

6         New York, NY 10036

7

8    BY:  ROBERT A. JOHNSON, ESQ.

9         FRED S. HODARA, ESQ.

10        ROBERT J. BOLLER, ESQ. (TELEPHONICALLY)

11

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13        Attorneys for the Official Committee of Unsecured

14         Creditors

15        2029 Century Park East

16        Suite 2400

17        Los Angeles, CA 90067

18

19   BY:  PETER J. GURFEIN, ESQ.

20        BRIAN M. ROTHSCHILD, ESQ. (TELEPHONICALLY)

21        DAVID P. SIMONDS, ESQ. (TELEPHONICALLY)

22

23

24

25

8

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         Robert S. Strauss Building

6         1333 New Hampshire Avenue, N.W.

7         Washington, DC 20036-1564

8

9    BY:  SCOTT L. ALBERINO, ESQ. (TELEPHONICALLY)

10

11   PEPPER HAMILTON LLP

12        Attorneys for the Official Committee of Unsecured

13         Creditors

14        Hercules Plaza

15        1313 Market Street

16        Suite 5100

17        Wilmington, DE 19899

18

19   BY:  DAVID B. STRATTON, ESQ.

20

21

22

23

24

25

9

ASHBY & GEDDES, P.A.

    Attorneys for the Equity Committee

    500 Delaware Avenue

    Wilmington, DE 19899


BY:  GREGORY ALAN TAYLOR, ESQ.


BROWN RUDNICK LLP

    Attorneys for the Ad Hoc Group of Trust Preferred Holders

    One Financial Center

    Boston, MA 02111


BY:  JEREMY B. COFFEY, ESQ.


DLA PIPER

    Attorneys for FDIC, Receiver

    1251 Avenue of the Americas

    New York, NY 10020


BY:  JOHN J. CLARKE, JR., ESQ.

    THOMAS CALIFANO, ESQ.

10

```
 1

 2   LANDIS RATH & COBB LLP

 3        Attorneys for JPMorgan Chase

 4        919 Market Street, Suite 1800

 5        Wilmington, DE 19899

 6

 7   BY:  ADAM LANDIS, ESQ.

 8

 9   LOWENSTEIN SANDLER PC

10        Attorneys for Plaintiff, Ontario Teachers' Pension Plan

11        65 Livingston Avenue

12        Roseland, NJ 07068

13

14   BY:  MICHAEL s. ETKIN, ESQ.

15

16   SULLIVAN & CROMWELL LLP

17        Attorneys for JPMorgan Chase

18        125 Broad Street

19        New York, NY 10004

20

21   BY:  STACEY R. FRIEDMAN, ESQ.

22        JOSHUA J. FRITSCH, ESQ. (TELEPHONICALLY)

23

24

25
```

1

2    SULLIVAN & CROMWELL LLP

3        Attorneys for JPMorgan Chase

4        1888 Century Park East

5        Los Angeles, CA 90067

6

7    BY:  ROBERT A. SACKS, ESQ.

8

9    SUSMAN GODFREY LLP

10        Attorneys for the Equity Committee

11        Suite 3800

12        1201 Third Avenue

13        Seattle, WA 98101

14

15    BY:  JUSTIN A. NELSON, ESQ.

16

17    SUSMAN GODFREY LLP

18        Attorneys for the Equity Committee

19        654 Madison Avenue

20        5th Floor

21        New York, NY 10065

22

23    BY:  SETH ARD, ESQ.

24

25

12

```
 1

 2    WHITE & CASE LLP

 3         Attorneys for the Committee of Bondholders

 4         Wachovia Financial Center

 5         200 South Biscayne Boulevard

 6         Suite 4900

 7         Miami, FL 33131

 8

 9    BY:  THOMAS E. LAURIA, ESQ.

10

11    WILMER CUTLER PICKERING HALE & DORR

12         Attorneys for the Bank Bondholders

13         1875 Pennsylvania Avenue, NW

14         Washington, DC 20006

15

16    BY:  NANCY L. MANZER, ESQ.

17

18    YOUNG CONAWAY STARGATT & TAYLOR, LLP

19         Attorneys for FDIC, Receiver

20         The Brandywine Building

21         1000 West Street, 17th Floor

22         Wilmington, DE 19801

23

24    BY:  M. BLAKE CLEARY, ESQ.

25
```

Case 1:23-cv-00822-ADA Document 53-8 Filed 02/23/23 Page 50 of 361 PageID #: 1468

13

1

2    U.S. DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         844 King Street

5         Suite 2207

6         Wilmington, DE 19801

7

8    BY:  JOSEPH MCMAHON, ESQ.

9

10   ARENT FOX LLP

11        Attorneys for Creditor, Wilmington Trust

12        1050 Connecticut Avenue, NW

13        Washington, DC 20036

14

15   BY:  JEFFREY N. ROTHLEDER, ESQ. (TELEPHONICALLY)

16

17   BINGHAM MCCUTCHEN LLP

18        Attorneys for McKee Nelson

19        2020 K Street NW

20        Washington, DC 20006

21

22   BY:  KEVIN OTERO, ESQ. (TELEPHONICALLY)

23

24

25

14

1

2    BRACEWELL & GIULIANI LLP

3         Attorneys for the WMB Noteholder Group

4         225 Asylum Street

5         Suite 2600

6         Hartford, CT 06103

7

8    BY:  EVAN D. FLASCHEN, ESQ. (TELEPHONICALLY)

9         KATHERINE L. LINDSAY, ESQ. (TELEPHONICALLY)

10

11   DAVIS WRIGHT TREMAINE LLP

12        Interested Party

13        1201 Third Avenue

14        Suite 2200

15        Seattle, WA 98101

16

17   BY:  STEVEN CAPLOW, ESQ. (TELEPHONICALLY)

18

19   FOX, HEFTER, SWIBEL, LEVIN & CARROLL, LLP

20        Attorneys for Creditor, Old Republic/Zurich

21        200 West Madison Street

22        Suite 3000

23        Chicago, IL 60606

24

25   BY:  MARGARET M. ANDERSON, ESQ. (TELEPHONICALLY)

15

```
 1

 2     GIBSON DUNN & CRUTCHER

 3          Interested Party

 4          3161 Michelson Drive

 5          Irvine, CA 92612

 6

 7     BY:  KENNETH A. GLOWACKI JR., ESQ. (TELEPHONICALLY)

 8

 9     LOEB & LOEB LLP

10          Attorneys for Creditor, Wells Fargo, N.A.

11          345 Park Avenue

12          New York, NY 10154

13

14     BY:  WALTER H. CURCHACK, ESQ. (TELEPHONICALLY)

15          VADIM J. RUBENSTEIN, ESQ. (TELEPHONICALLY)

16

17     MILLER & CHEVALIER

18          Attorneys for Shearman & Sterling

19          655 Fifteenth Street, NW

20          Suite 900

21          Washington, DC 20005

22

23     BY:  STEVEN R. DIXON, ESQ. (TELEPHONICALLY)

24

25
```

16

MUNGER, TOLLES & OLSON LLP

     Interested Party

     355 South Grand Avenue

     35th Floor

     Los Angeles CA 90071


BY:  THOMAS B. WALPER, ESQ. (TELEPHONICALLY)


PATTERSON BELKNAP WEBB & TYLER LLP

     Attorneys for Creditor, Law Debenture Trust Company of

      New York

     1133 Avenue of the Americas

     New York, NY 10036


BY:  BRIAN P. GUINEY, ESQ. (TELEPHONICALLY)


PERKINS COIE LLP

     Interested Party

     1201 Third Avenue

     Suite 4800

     Seattle, WA 98101


BY:  BRUCE G. MACINTYRE, ESQ. (TELEPHONICALLY)

1

2    PILLSBURY WINTHROP SHAW PITTMAN LLP

3        Attorneys for Creditor, Bank of New York Mellon

4        1540 Broadway

5        New York, NY 10036

6

7    BY:  LEO T. CROWLEY, ESQ. (TELEPHONICALLY)

8        MARGOT P. ERLICH, ESQ. (TELEPHONICALLY)

9

10   SHEARMAN & STERLING LLP

11       801 Pennsylvania Avenue, NW

12       Suite 900

13       Washington, DC 20004

14

15   BY:  ELIZABETH PIKE, ESQ. (TELEPHONICALLY)

16

17   SIMPSON THACHER & BARTLETT LLP

18       Interested Party

19       425 Lexington Avenue

20       New York, NY 10017

21

22   BY:  MEGHAN E. CANNELLA, ESQ. (TELEPHONICALLY)

23

24

25

Case 1:23-cv-XXXXX-XXX Document XX Filed XX/XX/XX Page XX of XX PageID #: 1473

18

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Elliott Management

4         1901 Avenue of the Stars, 12th Floor

5         Los Angeles, CA 90067

6

7    BY:  K. JOHN SHAFFER, ESQ. (TELEPHONICALLY)

8         WILLIAM L. HOLT, ESQ. (TELEPHONICALLY)

9

10   SULLIVAN & CROMWELL LLP

11        Attorneys for JPMorgan Chase

12        1888 Century Park East

13        Los Angeles, CA 90067

14

15   BY:  ROBERT A. SACKS, ESQ. (TELEPHONICALLY)

16        HYDEE R. FELDSTEIN, ESQ. (TELEPHONICALLY)

17

18   WILMER CUTLER PICKERING HALE & DORR

19        Attorneys for the Bank Bondholders

20        1875 Pennsylvania Avenue, NW

21        Washington, DC 20006

22

23   BY:  LISA E. EWART, ESQ. (TELEPHONICALLY)

24        NANCY MANZER, ESQ. (TELEPHONICALLY)

25

Case 1:23-cv-00423-LJV-MTM Document 53-8 Filed 02/17/30 Page 113 of 433 PageID #: 1474

ALSO APPEARING:

MICHAEL BLOMQUIST (TELEPHONICALLY)

    In Propria Persona


DAN BULLOCK (TELEPHONICALLY)

    In Propria Persona


ANNA KALENCHITS (TELEPHONICALLY)

    Interested Party

1    the other day.  And it could certainly lead to strategic

2    filings of motions for appointment of trustees just to defeat a

3    motion for appointment of an examiner.  So that is of no moment

4    to my ruling on this motion.

5         As I have recently ruled orally, so you can't really

6    rely on it, but I will follow myself.  I do believe that

7    1104(c)(2) gives the Court some discretion, even if the debt

8    level is reached, and the discretion is that the Court has the

9    discretion to determine what appropriate investigation of the

10   debtor should occur and that, if the Court determines that

11   there's no appropriate investigation that needs to be

12   conducted, the Court has the discretion to deny the appointment

13   of an examiner.

14        The Courts have looked at various factors in

15   determining whether an appropriate investigation is warranted.

16   They include whether that investigation, that same

17   investigation, has already been conducted by other parties.

18   They have looked at whether the appointment of an examiner will

19   increase costs and cause a delay with no corresponding benefit.

20   Of course I've looked at the timing of the motion.  I've looked

21   at whether the motion is a litigation tactic, which includes

22   the consideration of the timing, not just how soon it is in a

23   case but whether it is timed such as to evidence a litigation

24   tactic.

25        I think in this case it's a very close call.  I don't

1    find that this is a litigation tactic, although it's been

2    suggested that the shareholders are simply seeking to delay

3    things while they replace management so that they can have --

4    or, excuse me, the directors -- board of directors, so that

5    they can tank the settlement.  I'll accept their motion as

6    being -- as they state it:  an effort to have an investigation

7    conducted by an independent third party to determine whether or

8    not the plan proposed by the debtor, or this global settlement

9    referred to by the parties, is appropriate and whether,

10    instead, prosecution of those claims would result in a greater

11    recovery for the estate.

12         Notwithstanding that, reviewing the factors, I think

13    it is clear that the motion has to be denied at this point.

14    First, it is clear to me that this debtor has been investigated

15    to death.  And I'm sure that even the most experienced and

16    talented examiner that the United States Trustee could appoint

17    would not find any stone unturned.  The investigations have

18    been conducted not only by the debtor and the creditors'

19    committee, but by -- the equity committee itself has done some

20    investigation; the Office of Thrift Supervision; the FDIC; the

21    government task force, including the U.S. Attorney for the

22    Western District of Washington; the Department of Labor; the

23    Department of Justice; the FBI; the IRS; the SEC; the Attorney

24    General for the State of New York; the class action plaintiffs;

25    Congress; the U.S. Treasury; and the President's Financial

99

1    Fraud Task Force have all taken a look at Washington Mutual.

2    It is true that their investigations exceeded the scope of what

3    this Court need concern itself with. They have talked about

4    systemic problems. They have investigated possible criminal

5    actions by the parties. In this case the Court is limited to,

6    as the equity committee suggests, the value of the estates and

7    how they will be distributed in this bankruptcy case.

8         I don't think it is fair to the creditors in this case

9    to be saddled with the cost of an investigation into systemic

10   problems, that would only benefit future parties but not

11   benefit the parties in this case. In this case specifically,

12   the debtor and the creditors' committee have investigated the

13   specific assets owned by the debtor, or that the debtor claims

14   it owns. The debtor has vigorously appeared in and prosecuted

15   its position in several adversaries in this case, in addition

16   to filing a claim in the FDIC receivership and prosecuting

17   claims it has in that forum. All of that information should be

18   available to the equity committee. And I don't want to hear

19   about obstacles being placed in their path to getting full and

20   open access to that information, whether it's documentary or

21   interviews with the debtors' management or others who have

22   conducted these investigations; and the same goes with the

23   creditors' committee, who's been actively involved in all of

24   this.

25        Again, the appointment of an examiner here really

100

1    would -- an examiner really would only have the task of

2    reviewing what others have already done.  I don't think there's

3    any original investigation left to be done.  So I think that's

4    just a waste of assets.

5         Secondly, I think the equity committee is fully able

6    to conduct the investigation that it seeks to have the examiner

7    conduct.  It has the benefit of Rule 2004, it has the benefit

8    of the discovery rules, because there are contested matters

9    presently and anticipated in which the equity committee could

10   fully avail itself of that discovery.  But, again, I'm strongly

11   urging the committee and the debtor to provide all the

12   information to the equity committee without testing the Court's

13   patience with discovery motions.

14        The -- again, the appointment of a third party to

15   conduct that investigation and to report to the Court its

16   conclusion is no substitute for the adversarial process extant

17   in bankruptcy court and the duty of the Court, after hearing

18   the views of the opposing parties, to make a decision as to

19   what assets the debtor owns, what the value of those assets is,

20   whether a settlement is reasonable, in resolving a conflicting

21   claim to those -- to ownership to those assets.

22        Finally, the timing of the motion.  I don't think that

23   this is a factor that I'll rely on in this case.  I think that

24   in other cases it's been evident that parties have been

25   litigating for many, many months, and only at the last minute

1   when a party thought it was going to lose did it file the

2   motion for a tactical reason.  In this case, the equity

3   committee is relatively new to this case, only since January,

4   and I don't think that the timing was meant -- is too late to

5   consider it, nor was it meant as a litigation strategy.

6          Let's see.  I don't know whether -- I'm not going to

7   accept the debtors' arguments or the committee's arguments

8   regarding delay here being a negative.  I'm not sure how

9   quickly the debtor honestly can proceed with its proposed plan

10  but, at any rate, I think there is sufficient time -- should be

11  sufficient time for the equity committee to conduct whatever

12  investigation it feels is relevant.  So I will deny the motion.

13         MR. ROSEN:  Your Honor, we have prepared a very short

14  order that says "Ordered that the motion is denied.  And it is

15  further ordered that this Court shall retain jurisdiction over

16  any and all matters arising from or related to the

17  implementation or interpretation of this order."  With that,

18  may I approach the bench?

19         THE COURT:  You may.  All right, I'll enter that

20  order.

21         MR. ROSEN:  Thank you.  That concludes this morning's

22  agenda.

23         THE COURT:  Well, before we conclude, where do we

24  stand on the 2019?  Did you send out a notice of a hearing on

25  that?

**Exhibit E**

```
 1                UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,     .
                                   .
 5                                 .  Courtroom No. 5
                                   .  824 Market Street
 6            Debtors.             .  Wilmington, Delaware 19801
                                   .
 7                                 .  Wednesday, January 11, 2023
     . . . . . . . . . . . . . . . .  9:00 a.m.
 8
                      TRANSCRIPT OF HEARING
 9            BEFORE THE HONORABLE JOHN T. DORSEY
              CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Adam Landis, Esquire
12                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
13                            Wilmington, Delaware 19801

14                            Andrew G. Dietderich, Esquire
                              James L. Bromley, Esquire
15                            Brian D. Glueckstein, Esquire
                              Alexa J. Kranzley, Esquire
16                            SULLIVAN & CROMWELL LLP
                              125 Broad Street
17                            New York, NY 10004

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:        Juliet Sarkessian, Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
3                               844 King Street, Suite 2207
                                Lockbox 35
4                               Wilmington, Delaware 19801

5  For the Movants:             David Finger, Esquire
                                FINGER & SLANINA, LLC
6                               1201 North Orange Street
                                Wilmington, Delaware 19801
7
   For the Committee:           Kris Hansen, Esquire
8                               Erez Gilad, Esquire
                                PAUL HASTINGS LLP
9                               MetLife Building
                                200 Park Avenue
10                              New York, New York 10166

11 For the Ad Hoc
   Committee of Non-US
12 Customers:                   Matthew Harvey, Esquire
                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                              1201 North Market Street
                                Suite 1600
14                              Wilmington, Delaware 19801

15 For Paradigm
   Operations:                  Sidney Levinson, Esquire
16                              DEBEVOISE & PLIMPTON LLP
                                919 3rd Avenue
17                              New York, New York 10022

18

19

20

21

22

23

24

25

1 scope of the retentions encompasses work that might be done

2 by an examiner. So we think that argument, sort of,

3 dovetails with the examiner motion and it makes sense to have

4 them both heard at the same time.

5         Our examiner motion has been on file since

6 December the 2nd. So, obviously, has had more than enough

7 time to address that. We recognize that committee counsel

8 has not been -- was retained on, I believe, December the

9 20th, but nevertheless, you know, there has been a good

10 amount of time to respond. So we would ask for that.

11         Absent in the alternative we would ask if Your

12 Honor has a date. We too were concerned about February the

13 8th not being adequate time with it being scheduled at 1 p.m.

14 So we were wondering if Your Honor has a date between the

15 20th, January 20th and the February the 8th that would have

16 more time available then the 8th.

17         The other thing I would say is that, you know, the

18 U.S. Trustee would need to get the reply on file three days -

19 - three business days prior to the hearing. So we would --

20 given how long parties have had our motion we would like to

21 have, at least, a week between when the objections are filed

22 and when our reply is due.

23         If, for example, Your Honor was to say put the

24 hearing on the 8th since our reply would be due February the

25 3rd we would want objections filed to January the 27th to

**A337**

1  give us one week.

2         THE COURT:  Okay.  All right.  I do think I need

3  to -- the 20th doesn't work, I don't think, for this.  It's

4  too soon.  There is outstanding discovery.  If it hasn't

5  already been issued it will be issued, I assume.

6         Are you taking any discovery?

7         MS. SARKESSIAN:  I have received no discovery. I

8  am trying to imagine what possible discovery there could be

9  against the U.S. Trustee, but I have not received any.

10         We have not seen an objection, so we don't know

11  who their witnesses are.  We have no idea if they're, in fact

12  -- Your Honor, the U.S. Trustees position is that this is

13  mandatory under the code and, therefore, there is not a need

14  to have any evidence.  It's legally mandatory.  Nevertheless,

15  we understand that the parties may want to put on evidence,

16  but we don't know who they plan to put on, what they plan to

17  put on; we have no idea.

18         THE COURT:  I think you're familiar with my

19  position on the mandatory nature of the appointment of an

20  examiner.

21         MS. SARKESSIAN:  Yes, Your Honor.

22         THE COURT:  For the record, I do not believe it's

23  mandatory.

24         MS. SARKESSIAN:  Yes.

25         THE COURT:  Let's do this: I think the 8th -- I

**A338**

168

1    want to make sure we have a full day. I am going to

2    reschedule this for February 6th which is Monday of that

3    week.  We will start at 9:30 a.m. The debtors and the

4    committee's responses will be due by the 25th.  Then the

5    Trustee will have until the 1st.

6          So you have a week, Ms. Sarkessian, for your

7    reply.

8          MS. SARKESSIAN:  Yes, Your Honor.  Thank you.

9          THE COURT:  Then we will have the hearing on the

10    6th.  If there is a -- pretrial orders are always helpful for

11    me.  So if there is -- if we're going to have an evidentiary

12    hearing on the 6th let's have a pretrial order by close of

13    business on the 3rd.  So 5 p.m. on the 3rd.

14          Mr. Bromley and Mr. Hansen, one, if you are going

15    to take discovery of the U.S. Trustee, please, do that

16    immediately so that Ms. Sarkessian knows that she needs to do

17    some discovery work.

18          Ms. Sarkessian, in light of my view on the

19    mandatory nature of the appointment of an examiner I don't

20    know if that now opens up for you your desire to take

21    discovery of the debtors, but if you do you should do that,

22    obviously, as soon as possible.

23          MS. SARKESSIAN:  Understood, Your Honor.

24          THE COURT:  Did I miss anything?  Did I cover all

25    of the issues?  Do I have all of the dates that we need for

**A339**

**Exhibit F**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
      IN RE:                          .
 4                                    .   Case No. 20-12836 (JTD)
      CRED INC., et al.,              .
 5                                    .   Courtroom No. 5
                                      .   824 North Market Street
 6                                    .   Wilmington, Delaware 19801
                                      .
 7                        Debtors.    .   December 18, 2020
      . . . . . . . . . . . . . . .   .   9:30 A.M.
 8

 9            TRANSCRIPT OF TELEPHONIC SECOND DAY HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtors:          Scott Cousins, Esquire
                                COUSINS LAW LLC
13                              Brandywine Plaza West
                                1521 Concord Pike, Suite 301
14                              Wilmington, Delaware 19803

15                              - and -

16                              James Grogan, Esquire
                                Mack Wilson, Esquire
17                              PAUL HASTINGS LLP
                                600 Travis Street, Fifty-Eight Floor
18                              Houston, Texas 77002

19    Audio Operator:          Jason Spencer

20    Transcription Company:   Reliable
                                1007 N. Orange Street
21                              Wilmington, Delaware 19801
                                (302)654-8080
22                              Email: gmatthews@reliable-co.com

23
      Proceedings recorded by electronic sound recording, transcript
24    produced by transcription service.

25
```

```
1    TELEPHONIC APPEARANCES (Continued):

2    For the Debtors:          G. Alexander Bongartz, Esquire
                               Derek Cash, Esquire
3                              PAUL HASTINGS LLP
                               200 Park Avenue
4                              New York, New York 10166

5                              - and -

6                              Austin Prouty, Esquire
7                              PAUL HASTINGS LLP
                               1117 S. California Avenue
8                              Palo Alto, California 94304

9    For Jaime Shiller:        David Silver, Esquire
                               SILVER MILLER
10                             11780 W Sample Road
                               Coral Springs, Florida 33065
11

12   For the U.S. Trustee:     Hannah McCollum, Esquire
                               Joseph McMahon, Jr., Esquire
13                             John Schanne, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
14                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
15                             Lock Box 35
                               Wilmington, Delaware 19801
16

17   For UpgradeYa:            Matthew Pierce, Esquire
                               LANDIS, RATH & COBB LLP
18                             919 Market Street, Suite 1800
                               Wilmington, Delaware 19801
19

20   For Krzysztof Majdak,     Joseph Sarachek, Esquire
     and Philippe Godineau:    THE SARACHEK LAW FIRM
                               101 Park Avenue, 27th Floor
21                             New York, New York 10178

22   For the Committee:        Joseph Evans, Esquire
                               Timothy Walsh, Esquire
23                             Darren Azman, Esquire
                               MCDERMOTT WILL & EMERY LLP
24                             340 Madison Avenue
                               New York, New York 10173
25
```

```
1   TELEPHONIC APPEARANCES (Continued):

2   For Thomas Arehart:       Hollace Cohen, Esquire
                              Carl Neff, Esquire
3                             FISHERBROYLES LLP
                              445 Park Avenue, Ninth Floor
4                             New York, New York 10022

5
    For Maple Partners LLC:   Lucian Murley, Esquire
6                             SAUL EWING ARNSTEIN & LEHR LLP
                              1201 North Market Street, Suite 2300
7                             Wilmington, Delaware 19801

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MATTERS GOING FORWARD:

**Cash Management.** Motion to Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Post Petition Intercompany Balances; (III) Waiving Requirements of Section 345(b) of the Bankruptcy Code; and (IV) Granting Related Relief [Docket No. 7, 11/08/20]

**Ruling:  Order Entered**

**Employee Wages.** Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief [Docket No. 11, 11/08/20]

**Ruling:  Order Entered**

**Motion to Extend.** Debtors' Motion for Entry of Order Extending Time to File Schedules and Statements of Financial Affairs [Docket No. 67, 11/18/20]

**Ruling:  Order Entered**

**Bar Date Motion.** Motion of Debtors, Pursuant to Bankruptcy Code Sections 105(a), 502, and 503 and Bankruptcy Rule 2002, for Entry of an Order (I) Fixing Deadline for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof [Docket No. 52, 11/17/20]

**Ruling:  128**

**Bid Procedures Motion.** Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases [Docket No. 65, 11/18/20]

**Ruling:  Order Entered**

**MACCO Retention Application.** Debtors' Application for Entry of an Order Authorizing Employment and Retention of MACCO Restructuring Group LLC as Financial Advisor for Debtors, Effective Nunc Pro Tunc to Petition Date [Docket No. 57, 11/17/20]

1   **Ruling: Order Entered**

2   **Teneo Retention Application.** Debtors' Application for Entry
    of an Order Authorizing Employment and Retention of Teneo
3   Capital LLC as Investment Banker for Debtors, Effective Nunc
    Pro Tunc to November 16, 2020 [Docket No. 63, 11/18/20]

4
  **Ruling: Order Entered**
5

6   **Paul Hastings Retention Application.** Debtors' Application for
    Entry of an Order Authorizing Employment and Retention of Paul
    Hastings LLP as Counsel to Debtors, Effective as of Petition
7   Date [Docket No. 64, 11/18/20]

8   **Ruling: Taken Under Advisement**

9   **Sonoran Capital Retention Application.** Debtors' Motion for
    Entry of an Order (I) Authorizing Employment and Retention of
10   Sonoran Capital Advisors, LLC to Provide Debtors a Chief
    Restructuring Officers and Certain Additional Personnel and
11   (II) Designating Matthew Foster as Debtors' Chief
    Restructuring Officer [Docket No. 95, 12/1/20]

12
  **Ruling: Taken Under Advisement**
13

14   **Creditor List.** Motion of Debtors for Entry of Interim and
    Final Orders (I) Authorizing Debtors to File a Consolidated
    List of Debtors' 30 Largest Unsecured Creditors, (II)
15   Authorizing Debtors to Serve Certain Parties by E-Mail, (III)
    Authorizing Debtors to Redact or Withhold Publication of
16   Certain Personal Identification Information, and (IV) Granting
    Related Relief [Docket No. 6, 11/08/20]

17
  **Motion to Seal.** Motion to File Under Seal Certain
18   Confidential Information Pursuant to Order (I) Authorizing
    Debtors to File A Consolidated List of Debtors 30 Largest
19   Unsecured Creditors, (II) Authorizing Debtors to Serve Certain
    Parties by E-Mail, (III) Authorizing Debtors to Redact or
20   Withhold Publication of Certain Personal Identification
    Information On An Interim Basis, And (IV) Granting Related
21   Relief [Docket No. 61, 11/18/20]

22   **Ruling: Orders Entered**

23   **Motion to Convert.** Motion of Krzysztof Majdak and Philippe
    Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b)
24   (I) Dismissing the Cases; (II) Converting the Cases to a
    Chapter 7 Liquidation; or (III) Appointing a Chapter 11
25   Trustee [Docket No. 62, 11/18/20]

  **Ruling: 94**

1  DEBTORS' WITNESS(s)

2  **CHRISTOPHER WU**

3       Direct examination by Mr. Grogan      10

4       Cross-examination by Mr. McMahon    15

5       Cross-examination by Mr. Sarachek   15

6       Cross-examination by Mr. Peirce     22

7       Redirect examination by Mr. Grogan  24

8

9  **PABLO BONJOUR**

10       Direct examination by Mr. Grogan      26

11       Cross-examination by Mr. McMahon    36

12       Cross-examination by Mr. Sarachek   41

13       Cross-examination by Mr. Pierce     43

14       Cross-examination by Mr. Silver     51

15       Redirect examination by Mr. Grogan  54

16  **MATTHEW FOSTER**

17       Direct examination by Mr. Grogan      57

18       Cross-examination by Mr. McMahon    61

19       Cross-examination by Mr. Pierce     63

20       Redirect examination by Mr. Grogan  65

21       Redirect examination by Mr. Cousins  66

22

23

   EXHIBITS:                           ID   Rec'd

24  Declaration of Daniel Schatt           10

25  Declaration of Christopher Wu         15

**A346**

1  Declaration of Pablo Bonjour                              35

2  Debtor's Exhibit 38 – Thirteen Week Cash Forecast         41

3  Declaration of Matthew Foster                             56

4  Declaration of Joshua Segall                             106

5  Declaration of Mark Friedler                             106

6  Trustee's Exhibit – Alexander Motion to Dismiss          144
                        Alexander Complaint

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          And four, the benefits derived by the appointment

2  of a trustee, balanced against the costs of that appointment.

3          See In Re Reserves Resorts Spa and Country Club,

4  LLC, Case Number 12-13316, nineteen -- a 2013 decision by

5  Judge Gross.

6          The evidence presented was that -- the evidence

7  presented before me in this case raises serious questions

8  about the conduct of the debtors' affairs pre-petition.

9  However, the debtor has removed the pre-petition management

10 of the company and replaced them with independent

11 professionals, including an independent member of the board

12 and the only board member, Mr. Lyons, having heard -- and

13 appointed Mr. Lyons as the only board member.

14         Having heard the testimony of Mr. Lyons and the

15 other professionals retained to run the debtors and market

16 the company for sale, I am convinced of their independence.

17 Although retained initially by prior management and equity

18 holders, no evidence was established to question that they

19 are, indeed, independent.  Moreover, the Official Committee

20 of Unsecured Creditors appointed in these cases have entered

21 into a plan support agreement setting out a valid proposal

22 for moving these cases forward.

23         Certain creditors and the U.S. Trustee, however,

24 still express reservations about allowing these independent

25 professionals to conduct the debtors' affairs, as they move

1  forward with a proposed plan.  I disagree with those

2  concerns.

3         However, I want to be perfectly clear that, if the

4  two equity security holders take any actions to either

5  replace Mr. Lyons as the independent director or try to

6  dilute his control of the board by appointing additional

7  members of the board without first seeking permission from

8  the Court, I will immediate appoint a Chapter 11 Trustee.

9  Therefore, for these reasons, I find that it would be

10  inappropriate at this time to appoint a Chapter 11 Trustee.

11         As for the appointment of an examiner, this is a

12  more difficult question.  I disagree with the UST's position

13  that the appointment of a -- of an examiner is mandatory.

14  The language of -- the language of 1104(c) provides the Court

15  with some discretion.  The Court -- it says that the Court

16  shall appoint an examiner to conduct such an investigation if

17  the -- of the debtor as is appropriate.  So the question

18  becomes:  Is it appropriate in this case?

19         The creditors' committee has taken the position

20  that they are conducting an investigation, although I will

21  note that they have just been appointed, and any

22  investigation must be in its very early stages of this case.

23  I'm also mindful of the fact that the -- some of the

24  creditors of the company are distrustful of the situation and

25  have concerns about the conduct of the previous management of

1    this company.

2              Therefore, I'm going to agree with Judge Glenn in

3    In Re Residential Capital, LLC, 474 B.R. 112, 119-120

4    (S.D.N.Y. 2012), in which he recognized that, quote:

5              "The only dispute as to whether the creditors'

6    committee should be permitted to conduct an investigation

7    without an examiner being appointment" --

8              The creditors' committee is ably represented in

9    these cases and no party questions the creditors' committee's

10   professionals' ability to competently and expeditiously

11   complete an investigation.  Nonetheless, Judge Glenn

12   determined in that case that appointment of an examiner was

13   appropriate, and I will do the same here.  I think

14   appointment of an examiner to conduct an investigation of the

15   pre-petition conduct of the debtors is appropriate.

16             And therefore, I will enter an order requiring

17   that that be done.  The parties should confer and submit an

18   appropriate form of order.

19             And in the form of order, I want to make clear, I

20   do not want any duplication of effort.  Since I'm appointing

21   an examiner to conduct an investigation, there's no need for

22   the creditors' committee to conduct a parallel investigation.

23   So I would not approve any fees associated with the

24   creditors' committee conducting that investigation.

25             Are there any questions?

**Exhibit G**

1

unit
UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:
                          .  Chapter 11
                          .
                          .  Case No. 18-10814 (CSS)
EV ENERGY PARTNERS, *et al.*,   .
                          .  Courtroom No. 6
                          .  824 North Market Street
                          .  Wilmington, Delaware 19801
                          .
         Debtors.         .  May 16, 2018
. . . . . . . . . . . . . . . . . .  10:00 A.M.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtors:         Brad Weiland, Esquire
                      Jeffrey Zeiger, Esquire
                      William Arnault, Esquire
                      Casey McGushin, Esquire
                      Travis Bayer, Esquire
                      KIRKLAND & ELLIS
                      300 North LaSalle
                      Chicago, Illinois 60654

                      - and -

                      Laura Davis Jones, Esquire
                      PACHULSKI STANG ZIEHL & JONES
                      919 North Market Street
                      Wilmington, Delaware 19801

Audio Operator:         Al Lugano

Transcription Company:   Reliable
                      1007 N. Orange Street
                      Wilmington, Delaware 19801
                      (302)654-8080
                      Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1   APPEARANCES (Cont'd):

 2

 3   For Roger Kent:              Stuart Brown, Esquire
                                  Derrick Farrell, Esquire
 4                                DLA PIPER
                                  1201 North Market Street
 5                                Wilmington, Delaware 19801

 6   For Ad Hoc Committee:        Philip Dublin, Esquire
                                  AKIN GUMP
 7                                One Bryant Park
                                  Bank of America Tower
 8                                New York, New York 10036

 9   For EnerVest:               Alan Moskowitz, Esquire
                                  GIBSON DUNN
10                                200 Park Avenue
                                  New York, New York 10166
11

12   For U.S. Trustee:           Hannan McCollum, Esquire
                                  OFFICE OF U.S. TRUSTEE
13                                844 King Street
                                  Wilmington, Delaware 19801
14
     For JPMorgan Chase          Elisha Graff, Esquire
15                                SIMPSON THACHER
                                  425 Lexington Avenue
16                                New York, New York 10017

17

18

19

20

21

22

23

24

25
```

1    priority rule, because the unsecured creditors are not

2    receiving more than they're entitled to.  And I think it was

3    definitely filed in good faith and none of the arguments,

4    numerous arguments made in support, to say it wasn't filed in

5    good faith, don't hold any water.

6            On 1126, I think the debtors are correct that they

7    did not have to solicit equity in this case because equity is

8    not receiving a distribution under the plan on account of its

9    interests, because they're not entitled to anything.  And the

10   cases that deal with class-skipping, et cetera, aren't

11   applicable, and there have been numerous cases in this

12   district and, otherwise, that have allowed just this

13   behavior.

14           What would have been accomplished by having the

15   equity be a vote here?  They probably would have voted "no."

16   Almost certainly would have voted "no," and we would have

17   been in a cram down, and we would have had a valuation

18   hearing, and they would have found to be out of the money,

19   and the absolute priority rule, with regard to equity, would

20   have been satisfied, so it would have been fair and

21   equitable, so it's just a waste of time.

22           With regard to the disclosure statement, I think,

23   frankly, there's an argument to be made that equity that's

24   not in the money doesn't have standing to object to a

25   disclosure statement, because the whole point of the

1   disclosure statement isn't to generally inform the world of
2   the facts of the case; it's to provide the investors with the
3   information they need to know how to vote.  If you don't
4   vote, a disclosure statement is really irrelevant.

5          But even throwing that aside, I still think the
6   disclosure statement contains more than enough information.
7   It's already a telephone book, for those of us who remember
8   what telephone books are, and, you know, there has to be a
9   limit on what you have to put in a disclosure statement.  I'd
10  like to see shorter confirmation orders, shorter DIP orders,
11  and shorter disclosure statements, all of which would be to
12  the benefit of society as a whole.  So, I'm not -- I think
13  the disclosure statement here is more than adequate.

14         And, you know, there's really no reason to go back
15  into transactions that occurred in 2014 and 2015 that just
16  aren't relevant to the plan that's before the voters.  This
17  is a little -- kind of all over the place, but there's a lot
18  of cover.  There's a lot I didn't mention, but in all those
19  instances and in all those arguments, I reject the equity
20  holders' position and affirm the debtors'.

21         Real quick, on appointment of the examiner -- and
22  this goes to the "there's no there there" -- you don't -- I
23  don't believe, and I've said this in numerous cases and my
24  colleagues have said it, that it's just mandatory to appoint
25  an examiner, as long as someone asks for one.  I think there

**A355**

1  has to be an actual examination that needs to be done, an

2  appropriate inquiry that needs to be pursued and I think the

3  Movant in a motion to appoint an examiner has the burden of

4  proof of establishing something, some reason that it would be

5  helpful to appoint an examiner and I just -- I don't see

6  anything here whatsoever to appoint an examiner.

7  　　　　　Now, all this, of course, you know, it would

8  certainly be better if there was more value here for the

9  unsecured creditors, as well as equity.  We can't -- the

10  Court is powerless to create value out of thin air, and all I

11  can do in connection with determining value is weigh the

12  evidence as it's presented to me and do the best I can.  And

13  I may be wrong, and it may be a situation here where equity

14  is entitled to more, but based on the evidence I have, I am

15  sorry to say that I don't believe they are, and that they are

16  fortunate to be getting the 5 percent that they're getting.

17  　　　　　And it's interesting even though -- talking about

18  fiduciary duties -- I mean, even though all the evidence

19  indicated to the Board that this -- that equity was out of

20  the money, this Board fought very, very hard to get some

21  return to its equity holders, perhaps even breaching their

22  fiduciary duties to their creditors in the process.  But I

23  think that that speaks volumes to the integrity of the Board

24  in this situation and is another reason that it's clear to me

25  that they have acted with robust corporate governance and

**A356**

**Exhibit H**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                        .    Case No. 08-10960(KG)
                              .
IDLEAIRE TECHNOLOGIES         .
CORPORATION,                  .    824 North Market Street
                              .    Wilmington, DE  19801
                              .
                              .
          Debtor.             .    June 13, 2008
. . . . . . . . . . . . . .    4:03 p.m.
```

TRANSCRIPT OF EXAMINER MOTION
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Sullivan Hazeltine Allinson, LLC
                         By:  WILLIAM D. SULLIVAN, ESQ.
                         4 East 8th Street, Suite 400
                         Wilmington, DE  19801

                         Holland & Knight, LLP
                         By:  JOHN J. MONAGHAN, ESQ.
                         10 St. James Avenue
                         Boston, MA  02116

Audio Operator:          Leslie Murin

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd.):

For Majority Lenders/          Akin, Gump, Strauss, Hauer & Feld,
DIP Lender:                     L.L.P.
                               By:  SCOTT ALBERINO, ESQ.
                                    ABID QURESCHI, ESQ.
                               1333 New Hampshire Ave, NW
                               Washington, DC  20036

                               Young Conaway Stargatt & Taylor,
                                LLP
                               By:  ROBERT S. BRADY, ESQ.
                               The Brandywine Building
                               1000 West Street
                               17th Floor
                               Wilmington, DE  19801

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID L. BUCHBINDER, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE  19801

For the Committee:             Saul Ewing LLP
                               By:  MARK MINUTI, ESQ.
                                    JEREMY WILLIAM RYAN, ESQ.
                               222 Delaware Avenue
                               Suite 1200
                               Wilmington, DE  19801

TELEPHONIC APPEARANCES:

For Wells Fargo Bank:          Kelley Drye & Warren LLP
                               By:  JENNIFER CHRISTIAN, ESQ.
                               101 Park Avenue
                               New York, NY  10178

                               Ropes & Gray, LLP
                               By:  ANNELIESE H. PAK, ESQ.
                               1211 Avenue of the Americas
                               New York, NY  10036-8704

**J&J COURT TRANSCRIBERS, INC.**

**A359**

1          THE COURT:  Good afternoon.

2          MS. CHRISTIAN:  Good afternoon.  We are counsel for

3   Wells Fargo Bank National Association as Indenture Trustee and

4   Collateral Agent for the debtors' 13 percent senior secured

5   notes.

6          THE COURT:  Yes.

7          MS. CHRISTIAN:  Your Honor, we join in the Majority

8   Secured Noteholder Group's objection, and respectfully request

9   that the U.S. Trustee's motion for appointment of an examiner

10  be denied or, alternatively, that the motion be adjourned until

11  a sale process is complete.

12         THE COURT:  Thank you.

13         MS. CHRISTIAN:  Thank you.

14         THE COURT:  Thank you for that.  Well, I have read

15  all of the submissions, a lot of the underlying cases.  We have

16  a very and unusually, I think, complete record in this case at

17  this point.  I even went back and read legislative history, and

18  I am going to deny the motion for the appointment of the

19  examiner.

20         I do take note of the fact that on the first day of

21  this case Mr. Buchbinder stood here all alone virtually and

22  heroically, I think, argued the points that have made the way

23  now for a Creditors' Committee to step in and continue, I don't

24  want to say necessarily the fight, but certainly, the

25  investigation, and I think the one thing that's clear is it's

1  somewhat unclear whether or not from the cases Section
2  1104(c)(2) of the Code mandatorily requires the appointment of
3  an examiner whereas here the debts exceed $5 million.  There
4  are some persuasive decisions on both sides.

5          In fact, in one case that I read I thought that was
6  particularly well written, Judge Wedoff of the Northern
7  District of Illinois in the In re:  UAL case found that it was
8  mandatory.  But in this district the cases have almost
9  consistently held otherwise.  Judge Walsh in S.A.
10 Telecommunications found that the provision is not mandatory.
11 I don't think that it is mandatory based upon my reading of the
12 legislative history, and just as the parties have pointed out,
13 the language of the statute itself  and, particularly, the as
14 appropriate clause.

15         And I also noted that in another case we had a
16 visiting judge, Judge Newsome, it was the AC&S case in which
17 Judge Newsome, although he found that the appointment of an
18 examiner in these circumstances is mandatory, he told the
19 examiner that he wasn't going to do any work, and, in fact, I
20 think he used the expression not a penny for the examiner.

21         So I'm not about to really undertake a futile act or
22 appointment someone who is not going to be taking action,
23 because we have, I think, highly competent counsel, and now
24 I've learned a financial advisor -- highly competent financial
25 advisor representing the Creditors' Committee and doing the

1   very investigation that an examiner would be doing under these

2   circumstances, and I'm similarly persuaded by the fact that not

3   only is an examiner appropriate here, but it probably would be

4   inappropriate given the speed with which the case is

5   progressing and the work that's already been done by the

6   Committee, and the fact that negotiations are about to begin.

7   I just think the record is just full, replete with evidence

8   that the Committee's doing a very, very capable job.

9           In addition, I will also note that the Court

10  recently, at the request of the debtor, appointed counsel for

11  outside directors, and I think that may have some significance,

12  and perhaps the Court will hear from the outside directors as

13  to their views on the transactions.

14          And the bottom line is this.  We're going to have a

15  sale hearing.  It's going to be a strenuous sale hearing, I

16  suspect.  And to the extent the Committee and any other

17  interested parties have not been provided cooperation in their

18  investigation, to the extent there hasn't been a very

19  significant shopping of this, marketing of this company, all of

20  that is going to make it much more difficult for the Court to

21  approve a sale, and the Court's agenda, speaking of agendas, in

22  this case is that there be a complete record upon which the

23  Court is able to make a determination that the sale is fair.

24  That will be happening, and, obviously, the more cooperation

25  that there is with the Committee and the United States Trustee

## Exhibit I

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-11786-CSS

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


VISTEON CORPORATION, et al.


           Debtors.


- - - - - - - - - - - - - - - - - - - -x


           United States Bankruptcy Court

           824 North Market Street

           5th Floor

           Wilmington, Delaware


           May 12, 2010

           10:05 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

2

HEARING re Motion for Relief from Automatic Stay Filed by

Luther Gilford


HEARING re Seventh Omnibus Objection of Visteon Corporation and

Its Affiliated Debtors to Proofs of Claim (Duplicate Note

Claims, Duplicate Claims, and Cross-Debtor Duplicate Claims

(Substantive))


HEARING re Eighth Omnibus Objection of Visteon Corporation and

Its Affiliated Debtors to Proofs of Claim (Incorrect Debtor

Claims (Non-Substantive))


HEARING re Ninth Omnibus Objection of Visteon Corporation and

Its Affiliated Debtors to Proofs of Claim (Amended Claims and

Equity Claims (Non-Substantive))


HEARING re Tenth Omnibus Objection of Visteon Corporation and

Its Affiliated Debtors to Proofs of Claim (Claims to be

Adjusted (Substantive))


HEARING re Debtors' Objection to Proofs of Claim Filed by

Visteon UK Pension Trust Limited (as Trustee of the Visteon UK

Pension Plan) and the Board of the Pension Protection Fund

3

1

2      HEARING re Motion of the Debtors for Entry of an Interim Order

3      (i)Authorizing Use of Cash Collateral; (ii)Granting Adequate

4      Protection to Pre-Petition Secured Lenders; and (iii)Scheduling

5      Final Hearing

6

7      HEARING re Motion of Panasonic Electric Works Corporation of

8      America for an Order Compelling Debtors to Assume or Reject Its

9      Pre-Petition Contract

10

11     HEARING re Emergency Motion of the Official Committee of

12     Unsecured Creditors for Leave to Conduct Discovery Pursuant to

13     Fed. R. Bankr. P. 2004

14

15     HEARING re Motion for Order Authorizing the Official Committee

16     of Unsecured Creditors to File Emergency Motion of the Official

17     Committee of Unsecured Creditors for Leave to Conduct Discovery

18     Pursuant to Fed. R. Bankr. P. 2004 Under Seal

19

20     HEARING re Debtors' Third Motion to Extend Their Exclusive

21     Periods to File and Solicit Votes for Their Chapter 11 Plan

22

23     HEARING re Motion of the Official Committee of Unsecured

24     Creditors to Terminate Debtors' Exclusive Periods to File and

25     Solicit Votes for Their Chapter 11 Plan

4

1

2    HEARING re Motion of the Ad Hoc Equity Committee in Visteon

3    Corporation for Order Directing the Appointment of Examiner

4    Pursuant to Section 1104(c)(2) of the Bankruptcy Code

5

6    HEARING re Motion of Various Shareholders for an Order

7    Appointing an Official Committee of Equity Security Holders

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

5

```
1
2    A P P E A R A N C E S :
3    KIRKLAND & ELLIS LLP
4         Attorneys for Debtors and Affiliated Debtors
5         601 Lexington Avenue
6         New York, NY 10022
7
8    BY:   MARC KIESELSTEIN, ESQ.
9
10   KIRKLAND & ELLIS LLP
11        Attorneys for Debtors and Affiliated Debtors
12        300 North LaSalle
13        Chicago, IL 60654
14
15   BY:   ANDREW B. BLOOMER, ESQ.
16         ANDREW R. MCGAAN, ESQ.
17         JAMES J. MAZZA, JR., ESQ.
18
19   KIRKLAND & ELLIS LLP
20        Attorneys for Debtors and Affiliated Debtors
21        655 Fifteenth Street, N.W.
22        Washington, DC 20005
23
24   BY:   JUDSON BROWN, ESQ.
25
```

6

PACHULSKI STANG ZIEHL & JONES LLP

     Attorneys for Debtors and Affiliated Debtors

     919 North Market Street

     17th Floor

     Wilmington, DE 19899

BY:   JAMES E. O'NEILL, ESQ.

BROWN RUDNICK LLP

     Co-Counsel to Official Committee of Unsecured Creditors

     Seven Times Square

     New York, NY 10036

BY:   HOWARD STEEL, ESQ.

     ROBERT J. STARK, ESQ.

BROWN RUDNICK LLP

     Co-Counsel to Official Committee of Unsecured Creditors

     City Place 1

     185 Asylum Street

     Hartford, CT 06103

BY:   HOWARD L. SIEGEL, ESQ.

7

```
 1
 2    ASHBY & GEDDES, P.A.
 3           Co-counsel to Official Committee of Unsecured Creditors
 4           500 Delaware Avenue
 5           Wilmington, DE 19899
 6
 7    BY:    WILLIAM P. BOWDEN, ESQ.
 8           GREGORY A. TAYLOR, ESQ.
 9
10    DEWEY & LEBOEUF LLP
11           Attorneys for Ad Hoc Committee of Equity Holders
12           1301 Avenue of the Americas
13           New York, NY 10019
14
15    BY:    MARTIN J. BIENENSTOCK, ESQ.
16           PHILIP M. ABELSON, ESQ.
17
18    BUCHANAN INGERSOLL & ROONEY LLP
19           Attorneys for Ad Hoc Committee of Equity Holders
20           The Brandywine Building
21           1000 West Street
22           Suite 1410
23           Wilmington, DE 19801
24
25    BY:    MARY F. CALOWAY, ESQ.
```

8

1

2    U.S. DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         844 King Street

5         Suite 2207

6         Wilmington, DE 19801

7

8    BY:   JANE M. LEAMY, TRIAL ATTORNEY

9

10   BINGHAM MCCUTCHEN LLP

11        Attorneys for Wilmington Trust FSB, as Administrative

12         Agent for Pre-Petition Term Lenders

13        One Federal Street

14        Boston, MA 02110

15

16   BY:   P. SABIN WILLET, ESQ.

17        AINSLEY G. MOLONEY, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

9

BINGHAM MCCUTCHEN LLP

     Attorneys for Wilmington Trust FSB, as Administrative

      Agent for Pre-Petition Term Lenders

     399 Park Avenue

     New York, NY 10022


BY:   AMY L. KYLE, ESQ.

     MICHAEL J. REILLY, ESQ. (TELEPHONICALLY)


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

     Attorneys for Wilmington Trust FSB, as Administrative

      Agent for Pre-Petition Term Lenders and Mason Capital

      Management LLC

     1201 North Market Street

     18th Floor

     Wilmington, DE 19899


BY:   DEREK C. ABBOTT, ESQ.

10

```
 1

 2   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 3         Attorneys for Mason Capital Management LLC

 4         1285 Avenue of the Americas

 5         New York, NY 10019

 6

 7   BY:   ALAN W. KORNBERG, ESQ.

 8

 9   CONNOLLY BOVE LODGE & HUTZ LLP

10         Attorneys for Ford Motor Company

11         The Nemours Building

12         1007 North Orange Street

13         Wilmington, DE 19899

14

15   BY:   MARC J. PHILLIPS, ESQ.

16         KAREN C. BIFFERATO, ESQ.

17

18   MILLER CANFIELD PADDOCK & STONE, PLC

19         Attorneys for Ford Motor Company

20         150 West Jefferson

21         Suite 2500

22         Detroit, MI 48226

23

24   BY:   STEPHEN S. LAPLANTE, ESQ.

25         (TELEPHONICALLY)
```

11

```
 1
 2   EDWARDS ANGELL PALMER & DODGE LLP
 3        Attorneys for Law Debenture Trust Company of New York
 4        919 North Market Street
 5        Suite 1500
 6        Wilmington, DE 19801
 7
 8   BY:  R. CRAIG MARTIN, ESQ.
 9
10   DECHERT LLP
11        Attorneys for Law Debenture Trust Company of New York
12        1095 Avenue of the Americas
13        New York, NY 10036
14
15   BY:  STEVEN B. SMITH, ESQ.
16
17   FOX ROTHSCHILD LLP
18        Attorneys for Working Group of the Informal Noteholder
19         Committee
20        Citizens Bank Center
21        919 North Market Street
22        Suite 1300
23        Wilmington, DE 19899
24
25   BY:  JEFFREY M. SCHLERF, ESQ.
```

12

```
 1

 2     WHITE & CASE LLP

 3            Attorneys for Working Group of the Informal Noteholder

 4             Committee

 5            Wachovia Financial Center

 6            200 South Biscayne Boulevard

 7            Suite 4900

 8            Miami, FL 33131

 9

10     BY:   THOMAS E. LAURIA, ESQ.

11

12     WHITE & CASE LLP

13            Attorneys for Working Group of the Informal Noteholder

14             Committee

15            1155 Avenue of the Americas

16            New York, NY 10036

17

18     BY:   J. CHRISTOPHER SHORE, ESQ.

19            ANDREW C. AMBRUOSO, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

13

```
 1
 2    BAYARD, P.A.
 3          Attorneys for Cypress Management Master, L.P., Lenado
 4           Capital Advisors LLC and Goshawk Capital Corp.
 5          222 Delaware Avenue
 6          9th Floor
 7          Wilmington, DE 19801
 8
 9    BY:   CHARLENE D. DAVIS, ESQ.
10          JUSTIN R. ALBERTO, ESQ.
11
12    SONNENSCHEIN NATH & ROSENTHAL LLP
13          Attorneys for Cypress Management Master, L.P. and Goshawk
14           Capital Corp.
15          1221 Avenue of the Americas
16          New York, NY 10022
17
18    BY:   ARTHUR H. RUEGGER, ESQ.
19
20
21
22
23
24
25
```

14

SONNENSCHEIN NATH & ROSENTHAL LLP

        Attorneys for Cypress Management Master, L.P. and Goshawk

         Capital Corp.

        233 South Wacker Drive

        Suite 7800

        Chicago, IL 60606


BY:   ROBERT E. RICHARDS, ESQ.


KRAMER LEVIN NAFTALIS & FRANKEL LLP

        Attorneys for Aurelius Capital Master, Ltd., ACP Master,

         Ltd. and Aurelius Convergence Master, Ltd.

        1177 Avenue of the Americas

        New York, NY 10036


BY:   THOMAS MOERS MAYER, ESQ.

        PHILIP BENTLEY, ESQ.

        STEPHEN ZIDE, ESQ.

15

1

2    YOUNG CONAWAY STARGATT & TAYLOR, LLP

3         Attorneys for Aurelius Capital Master, Ltd., ACP Master,

4          Ltd. and Aurelius Convergence Master, Ltd.

5         The Brandywine Building

6         1000 West Street

7         17th Floor

8         Wilmington, DE 19801

9

10   BY:   M. BLAKE CLEARY, ESQ.

11        MARIS J. FINNEGAN, ESQ.

12

13   MCGUIREWOODS, LLP

14        Attorneys for Ford Motor Company

15        625 Liberty Avenue

16        23rd Floor, EQT Plaza

17        Pittsburgh, PA 15222

18

19   BY:   MARK E. FREEDLANDER, ESQ.

20

21

22

23

24

25

16

```
 1

 2    MORRIS JAMES LLP

 3          Attorneys for Nissan Trading Corp., USA

 4          500 Delaware Avenue

 5          Suite 1500

 6          Wilmington, DE 19899

 7

 8    BY:   CARL N. KUNZ, III, ESQ.

 9

10    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11          Attorneys for Visteon UK Pension Trustees Limited

12          One Rodney Square

13          Wilmington, DE 19899

14

15    BY:   ANTHONY W. CLARK, ESQ.

16

17    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

18          Attorneys for Informal Group of Noteholders

19          One Bryant Park

20          New York, NY 10036

21

22    BY:   ROBERT J. TENENBAUM, ESQ.

23          (TELEPHONICALLY)

24

25
```

17

ANDREWS KURTH LLP

     Attorneys for Ad Hoc Committee of 12.25% Noteholders

     450 Lexington Avenue

     New York, NY 10017


BY:   PAUL N. SILVERSTEIN, ESQ.

     JONATHAN I. LEVINE, ESQ.

     (TELEPHONICALLY)


DUANE MORRIS LLP

     Attorneys for Patrick N.Z. Rona

     1540 Broadway

     New York, NY 10036


BY:   PATRICK N.Z. RONA, ESQ.

     (TELEPHONICALLY)

18

1

2　HONIGMAN MILLER SCHWARTZ & COHN LLP

3　　　　Attorneys for General Motors

4　　　　2290 First National Building

5　　　　660 Woodward Avenue

6　　　　Detroit, MI 48226

7

8　BY:　JOSEPH R. SGROI, ESQ.

9　　　　(TELEPHONICALLY)

10

11　MCDONALD HOPKINS LLC

12　　　　Attorneys for Ad Hoc Committee of Investors

13　　　　505 S. Flagler Drive

14　　　　Suite 300

15　　　　West Palm Beach, FL 33401

16

17　BY:　TINA M. TALARCHYK, ESQ.

18　　　　(TELEPHONICALLY)

19

20

21

22

23

24

25

19

1

2    GOLDBERG, KOHN, BELL, BLACK, ROSENBLOOM & MORITZ, LTD.

3         Attorneys for Johnson Controls

4         55 East Monroe Street

5         Suite 3300

6         Chicago, IL 60603

7

8    BY:   DANIELLE W. JUHLE, ESQ.

9         (TELEPHONICALLY)

10

11   VORYS, SATER, SEYMOUR & PEASE LLP

12        Attorneys for Showa Aluminum

13        52 East Gay Street

14        Columbus, OH 43215

15

16   BY:   ROBERT A. BELL, JR., ESQ.

17        (TELEPHONICALLY)

18

19   WILLKIE FARR & GALLAGHER LLP

20        Attorneys for Law Debenture Trust Company of New York

21        787 Seventh Avenue

22        New York, NY 10019

23

24   BY:   JENNIFER HARDY, ESQ.

25        (TELEPHONICALLY)

1  this phrase -- some judge did -- but this really is "crying

2  examiner in a crowded room", and it should be denied.  Thanks,

3  Your Honor.

4       THE COURT:  All right, anyone else?  Mr. Bienenstock,

5  reply?

6       MR. BIENENSTOCK:  Yes, Your Honor.  I'm delighted

7  with what I heard, because the creditors' committee apparently

8  feels that they can rewrite the Bankruptcy Code and argue to

9  Your Honor that because the equity holders have competent

10  counsel and financial advisors, they said, that's a defense to

11  an examiner motion.  No, that's a defense, perhaps, to a motion

12  to establish a statutory committee.  The Code doesn't have any

13  balancing test, any defense that if parties are adequately

14  represented, that that's a defense to the appointment of an

15  examiner.

16       Similarly, Mr. Willett has asked the Court, what will

17  the world think.  What will others think?  It doesn't matter.

18  The Code doesn't say appoint an examiner when there's five

19  million dollars of debt unless other people will think bad

20  thoughts.  We have a right.  I'm tickled pink that my

21  adversaries have felt the need to construct out of the clear

22  blue sky defenses that don't exist.  And I think what that

23  tells the Court is that we're entitled to an examiner to

24  investigate the things we asked for, and we hope the Court will

25  grant them.

1        THE COURT:  Thank you.  Excuse me.  All right, the

2    issue, of course, before the Court, is whether to appoint an

3    examiner, pursuant to the motion in front of the Court.  And

4    the statute which is applicable, of course, is 1104(c).  "If

5    the Court does not order the appointment of a trustee," which I

6    have not, "then at any time before the confirmation ... on

7    request of a party in interest ... and after notice and a

8    hearing, the court shall order the appointment of an examiner

9    to conduct such an investigation of the debtor as is

10   appropriate, including" and then it goes on, "if such

11   appointment is in the interests of creditors" equity holders,

12   et cetera, "or the debtor's fixed, liquidated, unsecured debts

13   ... exceed $5,000,000."  It's a troubling -- well, troubling,

14   it's a somewhat ambiguous statute notwithstanding the fact that

15   it says "shall", because it immediately limits the scope of

16   that "shall".  I don't think it's true, and I think it would be

17   an absurd result to find that in every case where the financial

18   criteria is met and a party-in-interest asks, the Court must

19   appoint an examiner.  There has to be an appropriate

20   investigation that needs to be done.

21        Now, it's -- until someone does an investigation, of

22   course, you don't know whether an investigation really needed

23   to be done or not.  But at some point there has to be a level

24   of smoke, if you will -- not a lot but more than none, more

25   than just a whiff of smoke -- but some sort of indication, some

1  sort of allegation or facts that make the Court think in a

2  whole that, hmm, somebody needs to look into this independently

3  and tell the Court what's going on.  It's easy in Lehman or

4  Revco to figure out that somebody's got to figure this out.

5  But not every case that has over five million dollars of

6  nontrade needs an examiner.

7          This case does not need an examiner.  We are in a

8  good old fashioned brawl, all right?  We all know it.  And the

9  prize is an automobile company -- excuse me, a parts -- well,

10  an automobile manufacturer of parts -- with a nice healthy

11  client.  Kind of a rarity, but it's nice to have.  And we're

12  going to fight.  There's going to be a fight.  Well, let's get

13  to it.  And I don't think there's any reason to keep tiptoeing

14  around it.  Equity thinks they're in the money.  They're going

15  to come to confirmation and they're going to try to prove it.

16  Mr. Willett's clients have an issue with what's on the table.

17  They're going to come in and litigate it.  The bondholders like

18  what's on the table or support it; they're going to come in and

19  litigate it.  There are no hidden motivations, here.  There are

20  hidden agendas, here.  I think this is just a good old

21  fashioned fight over a debtor that has some value, if it's

22  restructured.  It's a good company with a bad balance sheet.

23  That's what it looks like.  Maybe that's wrong.  Maybe it's a

24  good company with a good balance sheet.  But that's what

25  confirmation is going to tell us.

**Exhibit J**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
MAGNA ENTERTAINMENT CORP.,      .    Case No. 09-10720(MFW)
*et al.*,                       .
                                .    April 20, 2010(10:37 a.m.)
        Debtors.               .    (Wilmington)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

REDROCK ADMINISTRATIVE          .
SERVICES LLC, RACING AND        .
GAMING SERVICES, LTD., AMWEST   .
ENTERTAINMENT, LLC, BETTOR      .
RACING, INC.,D/B/A ROYAL RIVER  .
RACING, AND THE ELITE TURF      .
CLUB, N.V.,                     .
                                .
        Plaintiffs,            .
                                .
    v.                          .    Adv.Proc.No. 09-51155(MFW)
                                .
MAGNA ENTERTAINMENT CORP.,      .
PACIFIC RACING ASSOCIATION,     .
INC., MEC LAND HOLDINGS         .
(CALIFORNIA), INC.,GULFSTREAM   .
PARK RACING ASSOC., INC., LOS   .
ANGELES TURF CLUB, INC., AND    .
THE SANTA ANITA COMPANIES,      .
INC.,                           .
        Defendants.            .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

MAGNA ENTERTAINMENT CORP.,      .
                                .
        Plaintiff,             .
                                .
    v.                          .    Adv.Proc.No. 09-52212(MFW)
                                .
PA MEADOWS, LLC, PA MEZZCO,     .
LLC, and CANNERY CASINO         .
RESORTS, LLC,                   .
                                .
        Defendants.            .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**A387**

```
ALAMEDA COUNTY AGRICULTURAL        .
FAIR ASSOCIATION, et al.,          .
                                   .
          Plaintiffs,              .
                                   .
     v.                            .    Adv.Proc.No. 10-50193(MFW)
                                   .
MAGNA ENTERTAINMENT CORP,          .
et al.,                            .
                                   .
          Defendants.              .
```

                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MARY F. WALRATH
          UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Brian S. Rosen, Esq.<br>Weil, Gotshal & Manges LLP |
| For Certain Equity<br>Holders: | Donna Harris, Esq.<br>Pinckney, Harris & Weidinger |
| For the Creditors<br>Committee: | Kenneth Eckstein, Esq.<br>Josh Brody, Esq.<br>Kramer, Levin |
| For the U.S. Trustee: | Mark Kenney, Esq.<br>U.S. Trustee's Office |
| For PNC Bank: | Michael Gallerizzo, Esq.<br>Gebhart & Smith |
| For Florida DPBR: | Jason Powell, Esq.<br>Ferry, Joseph |
| For Santa Anita: | Derek Abbott, Esq.<br>Morris, Nichols, Arsht & Tunnell |
| For Certain Creditors: | Gregg Galardi, Esq.<br>Skadden, Arps |
| For MI Developments: | Lee Attanasio, Esq.<br>John Hutchinson, Esq.<br>Sidley, Austin |

3

| | |
|---|---|
| For Texas Racing Commission: | Casey Roy, Esq. Attorney General's Office |
| For the Mayor & City Council: | David Sommer, Esq. Gallagher, Evelius & Jones |
| For MID: | Michael Burke, Esq. |
| For State of Maryland: | Greg Cross, Esq. |
| For FC Gulfstream Park: | Carl N. Kunz, III, Esq. Morris, James |
| For MRTEP: | Brian Esters, Esq. Abato, Rubenstein & Abato |
| For the Grand Prairie Sports Corp. | John Middleton, Esq. Haynes & Boone, LLP |
| For Faracon Capital: | David A. Fidler, Esq. Klee, Tuchen, Bogdanoff & Stern |
| For the Regents of Univ. of California: | Eric Behrens, Esq. University of California |
| For the Los Angeles County Tax Collector: | Barry S. Glaser, Esq. Steckbauer, Weinhart, Jaffe |

| | |
|---|---|
| Audio Operator: | Brandon McCarthy |
| Transcriber: | Elaine M. Ryan (302) 683-0221 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

4

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gregory Rayburn | | 19 | 57 | 61 |
| | | 37 | | 62 |
| | | 40 | 64 | 64 |
| | | 45 | | |
| Timothy Harkness | | 84 | | |
| | | 92 | | |
| | | 93 | | |
| Rocco Liscio | | 104 | 125 | 132 |
| | | 110 | 129 | 137 |
| | | 114 | | |
| Evan Gershbein | | 140 | 142 | |

**A390**

1        MS. HARRIS: If I may, Your Honor, the comments from
2    counsel have been false.  The truth of the matter is, is that
3    the shareholders have been involved in this process for
4    months and months and months by contacting Kramer, Levin
5    directly in trying to be a part of that process.  When the
6    settlement was announced, was the first time that we realized
7    that we needed serious valuation, and through the proper
8    channels, we went to the Office of the U.S. Trustee first,
9    attempted to contact that office, contact persons at Kramer,
10   Levin to get things done, and when that was not permitted,
11   the shareholders came and found an attorney because Your
12   Honor said that a motion had to be filed, and we did that.
13   We did all of that promptly.  With respect to the plan
14   confirmation, Your Honor, there is still an objection.  We
15   are still entitled to discovery, and I frankly find it very
16   hard to believe that financing is going to end on April 30th
17   if there's no confirmation hearing today.  Well, two issues,
18   one is if they can get me the documents by the end of this
19   week and Your Honor's amenable, we can get a confirmation
20   hearing on a little bit later.  The second thing is, however,
21   I find it very hard to believe that any financier is going to
22   let this case drop just before the Preakness, which is when
23   the money for the debtors, you know, we've got big money here
24   for the debtors for the financiers just on that one day, and
25   so, you know, if MID's going to say that they're not going to

**A391**

1    finance it through the Preakness, then I think we have a

2    different issue, which is a breach of fiduciary duty issue

3    that really calls for an Equity Committee at that point.

4            THE COURT: Well, let me make this ruling on the

5    motion for the appointment of an Equity Committee or in the

6    alternative for appointment of an Examiner.  I agree with the

7    Committee and the debtors that this is just too late in the

8    game for such a motion to be filed.  It should have been

9    filed more promptly.  Clearly, at the time the settlement was

10   announced, if the equity had a problem with that, they should

11   have acted more promptly.  With respect to the request for

12   discovery, I'm going to reserve on that.  I think we'll hear

13   testimony today, and I think the shareholders who have filed

14   an objection will have ample time to contest the debtors' and

15   Committee's submissions on valuation and other issues, but I

16   will not foreclose if we do not finish today the opportunity

17   for some discovery.  With respect to the Examiner, I will

18   make the same ruling I did previously.  I think that the

19   Committee has acted in whatever role the Examiner would have

20   been instructed to act, namely they have investigated the

21   serious allegations regarding the interested parties and the

22   secured lenders' position.  I am fully aware of the extensive

23   work done by the Committee in this regard, and that that was

24   ultimately settled.  I make no comment on the settlement

25   because that's what I'll hear at the confirmation hearing.

1    But I think at this late date to appoint an Examiner to do

2    the same thing would just be a waste of assets of the estate.

3    With respect to the request to appoint an examiner just to do

4    a valuation, again, I will hear the valuation testimony and

5    the Equity Committee's objection to that, I assume, they will

6    be cross-examining on that point, but at this point, I just

7    don't think the appointment of an Examiner is warranted,

8    although I do agree that the Bankruptcy Code Section, because

9    of the amount of non-trade unsecured debt, would suggest it's

10   mandatory, I think the Court does have discretion with

11   respect to what the role of an Examiner would be, and since

12   all of the roles that an Examiner would play in this case

13   have already been fulfilled, I find it's a futile act and

14   will not appoint an Examiner.

15        MS. HARRIS: Your Honor, simply with respect to the

16   issue of the actions of the equity holders from the point

17   that the settlement was announced, I do have a witness here

18   who can tell the Court exactly what was done and how things

19   proceeded before - in order to maybe enlighten the Court with

20   respect to that issue, if the Court is so inclined, before

21   making that ruling.

22        THE COURT: No, I think just based on the timing of

23   it, I think too long of a delay has occurred.  Okay?

24        MS. HARRIS: Thank you, Your Honor.

25        THE COURT: I do not foreclose any 503(b)(3) declaim

**A393**

1    as suggested by the debtor to the extent the equity

2    shareholders make a substantial contribution.

3         MR. ROSEN: Yes, Your Honor. With that, Your Honor,

4    if I could turn to - I think it was, item 28 on the agenda,

5    which is the plan itself. Your Honor, as you are very, very

6    well aware, this has been a very long and winding road to get

7    to this point in time in the case. This restructuring

8    started on a pre-petition basis several years ago, including

9    through the debtors' efforts to do something that has been

10   referred to as the debt elimination plan, which was the sale

11   of certain assets and the reduction of indebtedness, but that

12   was unsuccessful. We went through several bridge loans on a

13   pre-petition basis to try and get us to a certain point in

14   time on a restructuring, and that ultimately proved to be

15   unsuccessful, and when liquidity dried up, Your Honor, these

16   Chapter 11 cases were commenced, and even then there had been

17   many turns. If the Court will recall, there was an initial

18   effort to finance MEC as a bridge loan to certain sales and

19   certain sales processes, and when the Creditors Committee was

20   formed, they sought to extend that sales process, and I think

21   Mr. Eckstein argued on several occasions how additional time

22   really needed to be had so that Miller Buckfire and all the

23   professionals in the case could do their job to actively

24   market the assets. Also, the Creditors Committee agreed with

25   MEC and had their own views with respect to certain

**Exhibit K**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .          Chapter 11
                                .
ACandS, Inc,                    .
                                .
        Debtor.                 .      Bankruptcy #02-12687 (RJN)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                        Wilmington, DE
                        November 18, 2002
                          10:05 a.m.

                        TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE RANDALL J. NEWSOME
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                     Laura Davis Jones, Esq.
                                Pachulski., Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                Alan J. Kornfeld, Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                Beth Levine, Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801



2

|  | |
|---|---|
| 1 | David Killalea, Esq. |
| | Gilbert, Heinz & Randolph |
| 2 | Ste  700 |
| | 1100 New York Ave., N.W. |
| 3 | Washington, DC 20005 |
| 4 | Jerome Randolph, Esq. |
| | Gilbert Heinz & Randolph |
| 5 | 200 E. Randolph Drive |
| | Chicago, IL 60601 |
| 6 | |

For Traveler's Casualty:    Barry R. Ostrager, Esq.
& Surety Company    Simpson, Thacher & Bartlett
   425 Lexington Ave.
   New York, NY 10017

Mary Beth Forshaw, Esq.
Simpson, Thacher & Bartlett
425 Lexington Ave.
New York. NY 10017

Bryce Friedman, Esq.
Simpson, Thacher & Bartlett
425 Lexington Ave.
New York, NY 10017

Eric Schwartz, Esq.
Morris, Nichols, Arsht
Tunnel1
1201 N. Market St.
Wilmington, DE 13899

For Asbestos Plaintiffs:    Nancy W. Davis, Esq.
   Ness, Motley, PA
   28 Bridgeside Blvd.
   Mt. Pleasant, SC 29464

For Asbestos Claimants:    Marla Eskin, Esq.
Committee    Campbell & Levine, LLC
   1201 North Market St.-Ste. 1501
   Wilmington, DE 19801

Philip E. Milch, Esq.
Campbell & Levine, LLC
1700 Grant Building
310 Grant Street
Pittsburgh, PA 15219

3

| | | |
|---|---|---|
| 1 | For IREX Corporation: | Kevin Gross, Esq. |
| 2 | | Rosenthal Monhait, Gross & Goddess. PA |
| | | 919 Market Street-Ste. 1401 |
| 3 | | Wilmington, DE 19899 |
| 4 | | David Critchlow, Esq. |
| | | Pillsbury, Winthrop, LLP |
| 5 | | One Battery Park Plaza |
| | | New York, NY 10004 |
| 6 | | |
| | | Richard L. Epling, Esq. |
| 7 | | Pillsbury, Winthrop, LLP |
| | | One Battery Park Plaza |
| 8 | | New York, NY 10004 |
| 9 | For U.S. Trustee: | Frank J. Perch, III, Esq. |
| | | Office of U.S. Trustee |
| 10 | | 844 King Street-Ste. 2313 |
| | | Lock BOX 35 |
| 11 | | Wilmington, DE 19801 |
| 12 | Audio Operator: | Sherry A. Johnson |
| 13 | Transcribing Firm: | Writer's Cramp, Inc. |
| | | 6 Norton Rd. |
| 14 | | Monmouth Jct., NJ 08852 |
| | | 732-329-0191 |

15  Proceedings recorded by electronic sound recording, transcript
16  produced by transcription service.

17

18

19

20

21

22

23

24

25

4

Index

<table>
<tr><td></td><td></td><td></td><td></td><td></td><td>Further</td></tr>
<tr><td></td><td>Direct</td><td>Cross</td><td>Redirect</td><td>Recross</td><td>Redirect</td></tr>
</table>

Witnesses For
 Traveler's:

<table>
<tr><td>Mr. Gresham</td><td>14</td><td></td><td></td></tr>
<tr><td>Mr. Hipolett</td><td>23</td><td>50</td><td>67</td></tr>
<tr><td>Mr. Killalea</td><td>75</td><td></td><td></td></tr>
<tr><td>Ms. Pickle</td><td>86</td><td>88</td><td></td></tr>
</table>

Witnesses For The
 Asbestos Committee:

<table>
<tr><td>Mr. Bergman</td><td>38</td><td>106</td></tr>
</table>

Witnesses For The
 Debtor:

<table>
<tr><td>Mr. Hipolett</td><td>50</td><td>67</td></tr>
<tr><td>Mr. Rooney</td><td>89</td><td>95</td></tr>
</table>

EXHIBITS:                                    Marked   Received

<table>
<tr><td>D-B</td><td>Support Services Agreement</td><td>88</td></tr>
<tr><td>D-C</td><td>IREX 2001 Annual Report</td><td>83</td></tr>
<tr><td>T-1</td><td>E-mail-Blevins to Terry Griffin</td><td>83</td></tr>
<tr><td>T-2</td><td>Blevins Memo</td><td>79</td></tr>
<tr><td>T-3</td><td>E-mail-Joe Rice to Scott Gilbert</td><td>81</td></tr>
<tr><td>T-4</td><td>Ltr-Xazan to Killalea</td><td>84</td></tr>
<tr><td>T-6</td><td>E-mail-Kazan to Scott Gilbert</td><td>78</td></tr>
<tr><td>T-11</td><td>ACandS Motion</td><td>24</td></tr>
<tr><td>T-16</td><td>Demand Loan Agreement</td><td>27</td></tr>
<tr><td>T-17</td><td>Long Term Agreement</td><td>25</td></tr>
<tr><td>T-27</td><td>SPI Registration Statement</td><td>34</td></tr>
<tr><td>T-28</td><td>SPI Registration Statement</td><td>35</td></tr>
<tr><td>T-32</td><td>IREX 1998-10K</td><td>35</td></tr>
<tr><td>T-33</td><td>IREX 1998-8K</td><td>62</td></tr>
<tr><td>T-34</td><td>IREX 1999-10K</td><td>32</td></tr>
</table>

SUMMATION BY:

THE COURT: Finding      129

1   Indeed, the Committee represents all Unsecured Creditors in

2   this case.   The unsecured general trade debt is nominal, and

3   as the Court has noted no separate Committee has been

4   appointed.   To appoint an Examiner with the broad powers that

5   Traveler's seeks would be to reward Traveler's in a way that

6   neither the plain language of the Code or its intent require,

7   and allow Traveler's to use this statute to manipulate the

8   process to further its goal to delay if not defeat its own day

9   of reckoning.   Thank you.

10          MR. OSTRAGER:   Sixty seconds, Your Honor?

11          THE COURT: No.   We'll stand in recess for a few

12   minutes.

13      (Recess)

14          THE CLERK:   All rise.

15          THE COURT:   All right.   I'm prepared to rule on the

16   matter before me.   This Chapter 11 case is before the Court

17   pursuant to a Motion to Appoint an Examiner filed by

18   Traveler's casualty & Insurance company pursuant to Section

19   1104(C) of the Bankruptcy Code.   That statute states in

20   pertinent part as follows.   "If the Court does not order the

21   appointment of a Trustee under this Section, then at any time

22   before the confirmation of a plan, and on request of a Party-

23   In-Interest or the United States Trustee, and after notice and

24   a hearing, the Court shall order the appointment of an

25   Examiner to conduct such an investigation of the Debtor as is

1    appropriate, including an investigation of any allegations of

2    fraud, dishonesty, et cetera and so forth."

3        The facts before the Court are as follows.  A number of

4    transactions have been discussed by way of testimony here

5    today that raise red flags under the avoiding powers of the

6    Trustee, Sections 544 through 550.  Those transactions,

7    however, have been investigated first by forensic accountant

8    hired by the pre-petition Committee in this case to

9    investigate IREX and presumably the SPI spin, as well as the

10   2001 sale to Lancaster Acquisition of ACandS, or the ACandS

11   assets .  The transactions have been investigated quite

12   obviously by Traveler's in quite extensive detail.  They've

13   taken depositions.  They've taken depositions in the course of

14   this proceeding as well,  The Traveler's now asks that another

15   investigation take place, even though they have said that the

16   evidence is irrefutable that certain transactions that

17   occurred were either fraudulent transfers and/or preferences.

18   An Examiner investigating these transactions would almost

19   certainly need the assistance of an attorney, and probably the

20   assistance of an accountant if not a financial advisor and an

21   accountant.  In the meantime, the Creditors' Committee in this

22   case has taken the quite clear position that they intend to

23   investigate these transactions as well, thus making

24   potentially four different investigations on the very same

25   sets of transactions.  This would appear to the Court to be

1  utter and complete waste of money as well as time, and

2  completely contrary to the best interest, as far as I can

3  tell, of the Creditor community as a whole who do not, other

4  than   Traveler's, support this motion, as well as a waste of

5  the   Debtor's  meager  assets.

6  The statute, as the In Re: pevco DSE case at 898 F. 2nd.

7  498, 6th Circuit (1990) does require where there is more than

8  $5,000,000 of debt the appointment of an Examiner. To that

9  extent the motion is granted.   However,  it is further ordered

10  that the Examiner appointed by the U.S. Trustee is not to

11  perform any task or take up any duty or in any way perform any

12  work without further order of the Court.    That order is to

13  ensure that the Committee is allowed to proceed with its

14  investigation, that the coverage action where the real stakes

15  in this case lie is permitted to proceed, and that those

16  matters be completed before putting yet another cop on the

17  beat in this case.   So if the U.S. Trustee can find someone to

18  accept the appointment under those circumstances, I will sign

19  an Order.   But only under those circumstances.   That does in

20  fact appoint an Examiner.   That's my disposition of this.

21  Anybody have any questions?

22  MR. PERCH:   Yes, Your Honor.

23  THE COURT:   Okay, Mr. Perch.

24  MR. PERCH:   Good afternoon, Your Honor.   Frank Perch

25  for the United States Trustee.   Your Honor, the U.S. Trustee

132

1   is required in the statute to appoint an Examiner if the Court

2   directs one to be appointed.  And we will, of course, consult

3   with all of the interested parties who wish to provide input

4   regarding the appointment of the Examiner, as the statute

5   requires.  I would like to inquire of the Court, because it

6   may be of assistance to the U.S. Trustee in this process,

7   whether with respect to the Court's ruling that the Examiner

8   is not permitted to perform any further duties until further

9   order of the Court, would the Court entertain a petition from

10  the Examiner who is appointed seeking leave to be authorized

11  to perform such tasks?  Or would the Court only hear from

12  other parties with respect to authorizing the Examiner to do

13  something?

14          THE COURT:  I would be most -- especially now, at

15  this point, I -- when I say they're not authorized to do

16  anything, I mean anything other than get appointed.  That's

17  all that this person is going to do.  It is as though they

18  were just like the old days of having a stand-by Chapter 11

19  Trustee under old XI.  This will be a stand-by Examiner who

20  Hill not begin to function until the Court orders him to.

21  There is not going to be one penny of fees that is spent by

22  this Examiner of any kind.  So does that answer **your** question?

23          MR. PERCH:  I understand the Court's position, Your

24  Honor.  Yes, thank you.

25          THE COURT:  And I don't anticipate that the Examiner

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FTX TRADING LTD., *et al.*, | ) Case No. 22-11068 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 176** |

## LIMITED OBJECTION AND RESPONSE OF THE JOINT PROVISIONAL LIQUIDATORS OF FTX DIGITAL MARKETS LTD. TO THE MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

Brian C. Simms KC, Kevin G. Cambridge, and Peter Greaves (the "**Joint Provisional Liquidators**" or the "**Foreign Representatives**"), in their capacities as joint provisional liquidators of FTX Digital Markets Ltd. ("**FTX Digital**" or the "**Chapter 15 Debtor**") and foreign representatives of the provisional liquidation (the "**Bahamian Provisional Liquidation**") of FTX Digital pending in the Supreme Court of The Bahamas pursuant to the Companies (Winding Up Amendment) Act 2011, by and through their undersigned counsel, submit this limited objection and response (the "**Response**") to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [D.I. 176] (the "**Motion**")[2] filed by Andrew R. Vara, United States Trustee for Regions Three and Nine (the "**U.S. Trustee**").  In support of this Response, the Joint Provisional Liquidators respectfully submit as follows:

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these chapter 11 cases (the "**Chapter 11 Cases**"), a complete list of the above captioned debtors and debtors in possession (the "**Chapter 11 Debtors**") and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Chapter 11 Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms used but not defined herein have the meaning set forth in the Motion.

## PRELIMINARY STATEMENT

1.      By the Motion, the U.S. Trustee seeks the appointment of an examiner with an unlimited mandate to "investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors." While, the Joint Provisional Liquidators share the U.S. Trustee's specific concerns articulated in the Motion regarding the Chapter 11 Debtors' prepetition conversions of customer funds, the U.S. Trustee has instead proposed an examiner with nearly unlimited investigatory powers that could cost the Chapter 11 Debtors' estates tens of millions of dollars for little or no benefit to the estates and their parties-in-interest.[3] Even were the Motion more narrowly tailored to specific issues concerning admitted conversions of customer funds by the Chapter 11 Debtors' management, it is unclear whether the appointment of an examiner is even needed at this time. Numerous governmental entities and criminal prosecutors, Mr. Ray and his team, and the official committee of unsecured creditors (the "**Committee**") are all already investigating the very same conduct and will all, in one way or another, make their conclusions known. As such, the Court can deny or at least defer the Motion. But, to the extent that the Court agrees that an examiner is warranted at this time, the scope of his or her investigation (1) should be strictly limited to determining which individuals within the Chapter 11 Debtors' prepetition enterprise had knowledge of any conduct relating to the misuse of customer funds prior to the Petition Date, (2) should be subject to an appropriately limited budget and periodic reporting to

---

[3]      The Joint Provisional Liquidators submit that the determination of the "wider implications" of the Chapter 11 Debtors' prepetition conduct are not the appropriate inquiry in a chapter 11 proceeding and are perhaps best left for the regulators and legislators. The focus here should be solely on how the issues to be investigated affect the estates and their stakeholders.

2

**A405**

the Court, and (3) must result in a final report to be filed within the first half of 2023 to allow these

Chapter 11 Cases to proceed expeditiously.

## LIMITED OBJECTION AND RESPONSE

**I.     The Appointment of an Examiner is Inappropriate and is Not in the Best Interest of Creditors and the Chapter 11 Debtors' Estates**

2.     Section 1104(c) of the Bankruptcy Code provides that:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor ***as is appropriate***, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C.S. § 1104(c) (emphasis added).  The qualifier "***as is appropriate***" in section 1104(c) of

the Bankruptcy Code provides the Court with discretion to refrain from appointing an examiner

when doing so would be inappropriate, and the appointment of an examiner is inappropriate when

doing so would result in unnecessary costs and delay.  This is supported by the legislative history

of the statute, in which Congress explained that the "standards for the appointment of an examiner

are the same as those for the appointment of a trustee; *the protection must be needed, and the cost*

*and expense must not be disproportionately high*."  H.R. Rep. No. 95-595, at 402 (1977), *reprinted*

*in* 1978 U.S.C.C.A.N. 5963, 6359 (emphasis added).  Here, the Motion as drafted fails in three

AMERICAS 119134415

ways to demonstrate that the appointment of an examiner is appropriate or is in the best interest of creditors and the Chapter 11 Debtors' estates under section 1104(c)(1).[4]

3.    ***First***, the Court must be convinced that an examiner is necessary to justify burdening the estate with excessive costs and expenses, and that is clearly not the case here. The Chapter 11 Debtors are already responsible for the "implementation of controls," "asset protection and recovery," "the investigation into claims against the founders and third parties," "cooperation with insolvency proceedings of subsidiary companies in other jurisdictions," and "the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of business, investments and property around the world."[5] The Chapter 11 Debtors further have assured the Court that prepetition wrongdoers have all been properly removed and displaced by restructuring professionals who have assumed fiduciary responsibility for the FTX companies.[6] The U.S. Trustee himself has expressed that he "has no reason to question the qualifications, competence, or good faith of Mr. Ray" and stated that "Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues."[7] Moreover, the Committee – an estate fiduciary – can undertake an appropriate investigation[8] and, unlike an examiner, exercise rights to actively pursue claims and remedies to vindicate the interests of its constituency if further wrongdoing is uncovered. Finally, the United States Department of

---

[4]    While the United States Trustee also argued in the Motion that the appointment of an examiner is mandatory, *see* Mot. ¶¶32-34, this Court "do[es] not believe it's mandatory." Jan. 11, 2023 Hr'g Tr. at 167:22-23, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 13, 2023) [D.I. 489].

[5]    Decl. of John J. Ray III in Supp. of Chapter 11 Petitions and First Day Pleadings ¶49 [D.I. 24] (the "**First Day Declaration**").

[6]    *See* First Day Decl. ¶¶46-76 (describing actions taken since Mr. Bankman-Fried's departure, including the appointment of independent directors).

[7]    Mot. ¶40.

[8]    *See* 11 U.S.C. § 1103(c)(2).

4

Justice (the "**DOJ**"), the United States Securities and Exchange Commission (the "**SEC**"), and the United States Commodity Futures Trading Commission (the "**CFTC**") are also conducting their own investigations in connection with the charges brought against Mr. Bankman-Fried and related parties[9] and the DOJ is actively participating in these Chapter 11 Cases.[10]

4.    Given all the foregoing, the Joint Provisional Liquidators believe that Mr. Ray and his team, the Committee, the DOJ, the SEC, and the CFTC should be given the opportunity to conduct their investigations and report to the Court, as they have been doing without the presence of an examiner.  *See* Oct. 31, 2007 Hr'g Tr. at 77:2-8, *In re Am. Home Mortg. Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Nov. 14, 2007) [D.I. 1997] (noting that because there were already ongoing investigations, the Court did not "think … there would be anything to be gained by appointing an examiner …"); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) (denying motion to appoint examiner where debt threshold was met and "the Debtor and its professionals conducted an appropriate inquiry and analysis of the facts and circumstances of this case").

5.    ***Second***, any benefit that the appointment of an examiner might yield will be far outweighed by the incurrence of disproportionately high costs and expenses that could be imposed on the Chapter 11 Debtors' estates.  Indeed, the very cases the U.S. Trustee seeks to draw a parallel to (*e.g.*, *Lehman Brothers*) illustrate why adding another team of professionals to be paid by the

---

[9]    *See United States of America v. Samuel Bankman-Fried, a/k/a SBF*, 22-CR-00673, (S.D.N.Y. Dec. 9, 2022) [D.I. 1]; *Securities and Exchange Commission v. Samuel Bankman-Fried*, 22-CV-10501 (S.D.N.Y. Dec. 13, 2022) [D.I. 1]; *Commodity Futures Trading Commission v. Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, Alameda Research LLC, Caroline Ellison, and Zixiao "Gary" Wang*, 22-CV-10503 (S.D.N.Y. Dec. 21, 2022) [D.I. 13]; *see also In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 6, 2023) [D.I. 203] (DOJ providing notice of seized assets).

[10]    *See* Jan. 4, 2023 Hr'g Tr., *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 5, 2023) [D.I. 375].

5

estate – particularly at such an early point in the Chapter 11 Cases – could be imprudent. For example, the total examiner costs in the *Lehman Brothers* and *Caesar's Entertainment* bankruptcies exceeded $59 million and $34 million, respectively.[11] Given that the Chapter 11 Debtors' liquidity profile here remains uncertain by their own admission,[12] it seems inappropriate to impose increased costs on the estates by appointing an examiner with unlimited scope and duration.

6.  ***Third***, the appointment of an examiner could unnecessarily stall these Chapter 11 Cases until the issuance of the examiner's final report.[13] Examiner investigations typically last at least several months, and tend to delay key restructuring efforts while parties await an examiner's report. For example, in another set of cryptocurrency chapter 11 cases pending in the Southern District of New York, *Celsius Network*, an examiner has been appointed, the examiner's final report remains outstanding, and the cases have not progressed expeditiously.[14]

7.  Accordingly, the Joint Provisional Liquidators submit that the most prudent approach would be to allow the Chapter 11 Debtors' new management, the Committee, the DOJ, the SEC, the CFTC, and all other parties in interest to coordinate and conduct their own

---

[11] *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. 2012) [D.I. 27571]; *In re Caesars Entertainment Operating Co., Inc.*, No. 15-01145 (Bankr. N.D. Ill. 2016) [D.I.s 5624, 5625, 5628].

[12] First Day Decl. ¶40.

[13] *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) (denying motion to appoint an examiner because, among other things, an examiner "would delay the administration of this chapter 11 case").

[14] *In re Celsius Network, LLC*, No. 22-10864 (MG) (Bankr. S.D.N.Y. Sept. 14, 2022) [D.I. 820] (directing the appointment of an examiner), *In re Celsius Network, LLC*, No. 22-10864 (MG) (Bankr. S.D.N.Y. Nov. 22, 2022) [D.I. 1438] (informing court that completion of the examiner's final report by the initial deadline would be infeasible and requesting an extension of more than one-month); *In re Celsius Network, LLC*, No. 22-10864 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) [D.I. 1562] (approving request for extension of deadline to file examiner's final report until January 17, 2023); *In re Celsius Network, LLC*, No. 22-10864 (MG) (Bankr. S.D.N.Y. Jan. 11, 2023) [D.I. 1851] (approving request for an additional extension of deadline to file examiner's final report until January 30, 2023).

AMERICAS 119134415

investigations of the Chapter 11 Debtors' prepetition conduct before any examination is commenced under section 1104(c) of the Bankruptcy Code.

## II.    If an Examiner Is Appointed, the Scope of Such Examiner's Investigation Should Be Extremely Limited

8.      Even if the Court were to conclude that appointment of an examiner is warranted at this time, the Court "retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration." *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990). It is a court's "duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings. To that end, the Bankruptcy Court may exercise its discretion to limit the scope of the examiner's investigation . . . ." *In re Loral Space & Commc'ns, Ltd.*, No. 04 CIV. 8645RPP, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004). Here, the scope of the examination requested by the U.S. Trustee is patently overly broad and will inevitably result in a fishing expedition, at unjustifiable costs to the estates, without any certainty of any benefit to the estates.

9.      If the Court is persuaded to appoint an examiner, however, the Joint Provisional Liquidators urge the Court to exercise its discretion and appropriately limit the scope of the examiner's inquiry so as not to disrupt or delay the timeline of these Chapter 11 Cases or unnecessarily deplete the estates' uncertain resources. *See* Order Directing Appointment of Examiner Under 11 U.S.C. §§ 1104(c) and 1106, *In re Asarco LLC*, No. 05-21207 (Bankr. S.D. Tex. Mar. 4, 2008) (court, although determining it was compelled to appoint an examiner, appointed examiner with no present duties). The Joint Provisional Liquidators believe that the scope of any examination should be strictly limited to determining which individuals had knowledge of the Chapter 11 Debtors' conversions of customer funds that have now led to the guilty pleas of two former officers and the indictment of a third. To be clear, there seems to be little utility at this point of determining *whether* a fraud occurred given, among other things, the

AMERICAS 119134415

Chapter 11 Debtors' admissions before Congress and this Court. The question, however, of *who* knew of or participated in the conduct remains unclear given the implausibility of the notion that only four people in the world – Messrs. Bankman-Fried, Wang, and Singh and Ms. Ellison – had any knowledge of what was going on. Thus, if an examiner is appointed, that examiner should be charged with vetting the Chapter 11 Debtors' current fiduciaries to ensure that all are not, in the Chapter 11 Debtors' words, "compromised individuals." In particular, given that the Chapter 11 Debtors may seek to restructure, a clean bill of health could be critical to the eventual reorganization or sale of the FTX businesses, and that process may require unpacking *who* knew about the fraud and *when*. Indeed, an examiner may be in the best position to reach those conclusions, as the order appointing an examiner can expressly provide that the examiner has the power to access and, if necessary, waive privileges as to all documents and information relevant to the investigation. *See In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. Apr. 8, 2002) [D.I. 2838] at 3 (providing that the examiner would have "the power to waive, on an issue-by-issue basis, the attorney-client privilege of the debtors' estates with respect to pre-petition communications relating to matters to be investigated by the Examiner hereunder . . ."); *In re Washington Mutual, Inc.*, 08-12229 (MFW) (Bankr. D. Del. Aug. 10, 2010) [D.I. 5258] (all privileged communications and work product ordered to be disclosed to the examiner without destroying the privilege as to third parties).

## CONCLUSION

WHEREFORE the Joint Provisional Liquidators requests that the Court deny the Motion and grant such further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank.]*

Dated: January 25, 2023

*/s/ David T. Queroli*
**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
David T. Queroli (No. 6318)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
queroli@rlf.com

-and-

**WHITE & CASE LLP**

Jessica C. Lauria (admitted *pro hac vice*)
J. Christopher Shore (admitted *pro hac vice*)
Brian D. Pfeiffer (admitted *pro hac vice*)
Mark Franke (admitted *pro hac vice*)
Brandon Batzel (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 819-8200
jessica.lauria@whitecase.com
cshore@whitecase.com
brian.pfeiffer@whitecase.com
mark.franke@whitecase.com
brandon.batzel@whitecase.com
brett.bakemeyer@whitecase.com

Thomas E Lauria (admitted *pro hac vice*)
Richard S. Kebrdle (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone:     (305) 371-2700
tlauria@whitecase.com
rkebrdle@whitecase.com

*Attorneys for the Joint Provisional Liquidators of FTX Digital Markets Ltd. (in Provisional Liquidation)*

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   FTX TRADING LTD., et al.,   .  Case No. 22-11068 (JTD)
                                 .
 5                               .
                                 .  Courtroom No. 5
 6                               .  824 Market Street
                   Debtors.      .  Wilmington, Delaware 19801
 7                               .
                                 .  Monday, February 6, 2023
 8   . . . . . . . . . . . . . . .  9:30 a.m.

 9                       TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:           Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
13                             919 Market Street, Suite 1800
                               Wilmington, Delaware 19801
14
                               James L. Bromley, Esquire
15                             Christopher Dunne, Esquire
                               SULLIVAN & CROMWELL LLP
16                             125 Broad Street
                               New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Jermaine Cooper

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:      Juliet Sarkessian, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3                             844 King Street, Suite 2207
                              Lockbox 35
4                             Wilmington, Delaware 19801

5  For the Committee:         Kenneth Pasquale, Esquire
                              PAUL HASTINGS LLP
6                             MetLife Building
                              200 Park Avenue
7                             New York, New York 10166

8  For JPLS Bahamas:          Christopher Shore, Esquire
                              WHITE & CASE LLP
9                             1221 6th Avenue
                              New York, New York 10020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    <u>MOTION</u>:                                                    <u>PAGE</u>

3    Agenda
4    Item 1: Motion of the United States Trustee for          28
             Entry of an Order Directing the Appointment
5            Of an [D.I. 176; Filed 12/1/22]

6            Court's Ruling:                                  135

7

8    WITNESSES CALLED
     BY THE DEBTOR:                                           <u>PAGE</u>

9
         <u>KEVIN COFSKY</u>
10       Direct examination by Mr. Bromley                    32
         Cross-examination by Ms. Sarkessian                  67
11

12   <u>EXHIBITS</u>:                                                  <u>PAGE</u>

13   Joint Exhibits 2, 3, and 8                               28

14   Joint Exhibits 1, 4 through 7, and 9 through 23          30

15   Debtor's Exhibit 1                                       31

16

17

18

19

20

21

22

23

24

25

**A415**

1          (Proceedings commence at 9:33 a.m.)

2        (Call to order of the Court)

3            THE COURT:  Now you can hear me.  Okay.

4            One small change on the pretrial order is you

5    identified me as the Chief Bankruptcy Judge at one point, and

6    I had to correct that, so ...

7            MR. LANDIS:  Your Honor, no battlefield promotion.

8        (Laughter)

9            THE COURT:  I don't want it, either.

10        (Laughter)

11            MR. LANDIS:  I'm sure your time will come.

12            So, with that, Your Honor, I would cede the podium

13    to Ms. Sarkessian, the movant, and we'll proceed following

14    her lead.

15            THE COURT:  Okay.  And just a reminder for those on

16    Zoom, this is a formal court proceeding.  You are

17    participating in a formal manner, so you need to keep your

18    video off unless I call on you to speak, and your audio

19    should remain off at all times.  Disruptions will not be

20    tolerated and you will be removed if you interrupt the

21    proceedings.

22            So, with that, Ms. Sarkessian, go ahead.

23            MS. SARKESSIAN:  Thank you, Your Honor.  Good

24    morning.  For the record, Juliet Sarkessian on behalf of the

25    U.S. Trustee.

1      THE COURT:  Are there microphones on there, too?

2 Okay.  You might need to pull it a little closer to you.

3      MS. SARKESSIAN:  Okay.  Hopefully, this is working.

4      THE COURT:  I can hear you now, yeah.

5      MS. SARKESSIAN:  So, Your Honor, the -- counsel for

6 the parties-in-interest had discussed and we wanted to

7 present to you a proposal that we would each start with not

8 more than a ten-minute opening, if it pleases the Court,

9 followed by evidence and then closing statements.  Is that

10 acceptable to Your Honor?

11      THE COURT:  Yes, absolutely.  Yeah.

12      MS. SARKESSIAN:  Thank you, Your Honor.

13      Also, Your Honor, in the joint pretrial order, the

14 U.S. Trustee included two motion in limine.  Would Your Honor

15 -- when would Your Honor like to hear those?

16      THE COURT:  Well, before we start the evidence.  So

17 let's do the openings and then we'll do the motions in limine

18 and then we'll go from there.

19      MS. SARKESSIAN:  Thank you, Your Honor.

20      The U.S. Trustee has moved to appoint an examiner

21 in these cases under both 1104(c)(1) and 1104(c)(2).  As the

22 U.S. Trustee has argued in its motion and reply, Section

23 1104(c)(2) of the Bankruptcy Code mandates the appointment of

24 an examiner in a debtor's case if:

25      There is no trustee appointed;

1          No Chapter 11 plan has been confirmed;

2          A party-in-interest or the U.S. Trustee has

3    requested the appointment of an examiner;

4          And the debtor has fixed, liquidated, unsecured

5    debts other than for debt -- debts for which services or

6    taxes or owing to an insider that exceed $5 million.

7          All of these elements have been made in this case.

8    I think everybody can agree there's no trustee and there's no

9    Chapter 11 plan and the U.S. Trustee has requested an

10   examiner.

11         The -- all of the objectors -- the debtors, the

12   committee, and the joint provisional liquidators -- have all

13   stipulated that the five-million-dollar threshold has been

14   met under 1104(c)(2) for three debtors:  West Realm Shires

15   Inc., FTX Trading Ltd., and Alameda Research, LLC.

16         As to the other debtors, the objecting debtors do

17   not stipulate that the five-million-dollar threshold has been

18   met because they are not currently in a position to make that

19   determination; however, the objecting parties stipulate they

20   are not contesting the examiner motion on the basis that the

21   five-million-dollar threshold has not been met for those

22   other debtors.

23         So, based on the stipulated facts alone, the U.S.

24   Trustee believes that the Code does mandate the appointment

25   of an examiner in these cases under 1104(c)(2).

1          The objectors argue that, in addition to the

2     elements that I've just set forth, the Code has an additional

3     requirement, which is that the Court find the appointment of

4     an examiner is appropriate in these cases.  While the U.S.

5     Trustee believes that the evidence will establish that an

6     examiner is appropriate in these cases, the U.S. Trustee does

7     not believe that the Code requires a finding of

8     appropriateness for either (c)(2) or (c)(1) for the reasons

9     set forth in the U.S. Trustee's reply brief, which I will

10    touch on.

11          The objectors' reading of the statutes would mean

12    that the only time that (c)(2) would be applicable is if the

13    five-million-dollar threshold was met and it was not in the

14    best interests of the creditors to have an examiner because,

15    if it was, then it would go under (c)(1).  But the -- so

16    that, even though it was not in the best interests of the

17    creditors, it was nevertheless appropriate to appoint an

18    examiner.

19          So that -- if appropriateness is a requirement,

20    that would be the only time that (c)(2) would apply.  It's

21    not in the best -- the threshold has been met.  It's not in

22    the best interests of the creditors, but it's somehow still

23    appropriate.  That is -- it's rather difficult to imagine

24    what that situation would be.

25          In addition, the wording of 1104(c) is that:

1          "-- the court shall order the appointment of an

2          examiner to conduct such an investigation of the

3          debtors as is appropriate" --

4          I will note that it does not say if it is

5     appropriate, which is different, and that's how the objectors

6     are interpreting it.  The U.S. Trustee, along with the

7     majority of the published opinions have -- that have

8     addressed that issue do not interpret "as is appropriate" to

9     mean if it is appropriate, but rather "as is appropriate" to

10    modify the term directly before it, which is "an

11    investigation."  So, in other words, "as is appropriate"

12    relates to the scope of the investigation, an appropriate

13    scope of the investigation, not whether an examiner shall be

14    appointed if the requirements of 1104(c)(1) or (c)(2) are

15    met.

16         And I think it's also important to note that

17    1104(c)(2) does not provide for the examiner -- for an

18    examiner in every case in which a debtor has debts that

19    exceed 5 million; it's much more narrow than that.  To be

20    counted to the 5 million, it has to be unsecured, fixed,

21    liquidated, and for debts other than goods, services, or

22    taxes, and not be owing to an insider.  Not being for goods

23    or services is a pretty significant factor.  So it's much

24    more stringent than just having over $5 million in debt.

25         That's my way, Your Honor, of saying that

1    1104(c)(2) does not mandate that an examiner be appointed in

2    every case in which the debtor has more than $5 million in

3    debt and anybody requests it.  That would be virtually every

4    case that's before this Court, I would imagine.  But it's

5    much more narrow than that.  And here, again, they've

6    stipulated there's no question that that five-million-dollar

7    threshold, with all of the qualifying terms, have been met,

8    at least for the three, and they're not contesting for the

9    others.

10          So, Your Honor, I would ask, if the Court is now

11    prepared to make a ruling on whether 1104(c)(2) mandates the

12    appointment of an examiner in these cases because, if the

13    Court so rules, then there would be no need for an

14    evidentiary hearing.

15          THE COURT:  Well, I'm not going to make that ruling

16    now, but I will give you the opportunity to argue that in

17    closing.

18          MS. SARKESSIAN:  Thank you, Your Honor.

19          Your Honor, the U.S. Trustee also believes that the

20    requirements for 1104(c)(1) have been met because the

21    appointment of an examiner is in the best interests of

22    creditors and other parties-in-interest, as has been

23    demonstrated by the testimony of Mr. Ray, Mr. Mosley by way

24    of declarations which we will be admitting, as well as Mr.

25    Ray's testimony before the House Financial Services

1  Committee.

2       And the U.S. Trustee will reserve the remainder of

3  the argument for closing, unless Your Honor has any questions

4  at this time.

5       THE COURT:  Okay.  No, I'll save my questions for

6  closing.  Thank you.

7       MS. SARKESSIAN:  Thank you, Your Honor.

8       MR. BROMLEY:  Good morning, Your Honor.  Jim

9  Bromley of Sullivan & Cromwell on behalf of the FTX debtors,

10  and may it please the Court.

11      Your Honor, the question that the United States

12  Trustee has posited, whether or not we are in a world of

13  mandatory rulings here, is one that, unfortunately, the U.S.

14  Trustee mischaracterizes, in terms of both the statute and

15  the statutory language and the precedent that exists.

16      If you focus first on the statute, Your Honor,

17  before you get to (c)(1) or (c)(2), the word "appropriate,"

18  it's in the statute; "as is appropriate" is the phrase.  And

19  that phrase, "as is appropriate," has not been determined by

20  the Revco decision in the Sixth Circuit, the only circuit

21  decision that the U.S. Trustee hangs so many hats on.

22      In fact, if you go to the Revco decision, it's

23  about 3 pages long.  The 20 minutes that the Sixth Circuit

24  spent on writing the Revco decision should not be controlling

25  the decision as to whether or not this Court or any other

1   court should be appointing an examiner as a mandatory manner

2   so long as the five-million-dollar threshold is met.

3          Notwithstanding the U.S. Trustee's most recent

4   comments, the five-million-dollar is but a peppercorn when

5   you're dealing with super-mega cases like we have here.

6          God bless you.

7          So, when we're talking about cases of this size and

8   scope and magnitude, it's virtually certain that a five-

9   million-dollar threshold is going to be met; and, therefore,

10  under the rule that is proposed by the U.S. Trustee, it's

11  virtually certain that an examiner is going to be appointed

12  in every case.

13         And remember, Your Honor, we may be sitting here

14  today with the U.S. Trustee, but the statute is written in

15  terms of any party-in-interest or the U.S. Trustee.  The vast

16  majority of examiners are requested by parties-in-interest

17  who have a particular point to advocate, a particular ax to

18  grind.  If we simply adopted the United States Trustee's

19  point that, if you meet the five-million-dollar threshold,

20  that an appointment of an examiner is mandatory, then we're

21  going to have an examiner in virtually every case.

22         And indeed, the precedent here in the District of

23  Delaware is very instructive and virtually ignored by the

24  U.S. Trustee.  Court after court in matter after matter,

25  including Your Honor, have ruled that 1104 does not require

1    the appointment of an examiner if the five-million-dollar has

2    been met; Judge Sontchi, Judge Walrath, Judge Gross, Judge

3    Carey, yourself, Judge Silverstein.  This is not

4    happenstance; this is a rule in the District.

5            The U.S. Trustee makes a great deal of hay about

6    the fact that there's not a written decision, a published

7    decision.  That, with all due respect, ignores the practice

8    that we all engage in, which is that we have here, in case

9    after case, situations where we ask bankruptcy judges to make

10   rulings, and many of those rulings come from the bench.  And

11   we consistently look at those rulings as binding precedent.

12   And it's not as if one decision came out or one comment came

13   out.  But we have a consistency here over a fifteen-year

14   period and longer, even back to Judge Walsh.  That is what

15   the law is here in the District of Delaware.

16           And we shouldn't lose sight of what's happening

17   here today.  This isn't about FTX.  This is about the United

18   States Trustee's Office out of Washington looking to make a

19   matter of national policy and using --

20           MS. SARKESSIAN:  Your Honor --

21           MR. BROMLEY:  -- this case --

22           MS. SARKESSIAN:  -- I'm sorry.  I'm going to object

23   to that.

24           THE COURT:  It's opening.  He can -- we'll see if

25   he can sustain it with evidence, but I'll -- he can make

1    whatever comments he likes in opening.

2         MR. BROMLEY:  So, Your Honor, what we are looking

3    at here is not about FTX.  As a matter of fact, since we've

4    been in your -- in front of Your Honor since November 11th, I

5    would say 80 or 90 percent of the time we have spent in court

6    has been dealing with issues that have been raised by the

7    United States Trustee, whether it has to do with the creditor

8    matrix, whether it has to do with 2004 requests that we

9    filed.  We had an objection filed over the weekend to a 2004

10   request to take discovery from Sam Bankman-Fried.  What the

11   U.S. Trustee is doing here in this case is seeking, not

12   simply to be a watchdog, but to be a participant in a manner

13   that effectively replacements the Official Committee of

14   Unsecured Creditors, that they themselves have appointed.

15        There is nothing in the statute that talks about a

16   true neutral.  There's nothing in the statute that talks

17   about there needing to be an independent party that is

18   standing outside of the four corners of the debtors when the

19   facts will show that the four corners of these debtors is

20   controlled by an independent chief executive officer, an

21   independent board of directors, both of whom were appointed

22   after the petition date -- or on the petition date and after.

23        The facts are going to show, Your Honor, that it is

24   not appropriate in this case, it is not appropriate in this

25   case to appoint an examiner, it's not appropriate in this

1    case to conduct any investigation at this moment in time.

2           Mr. Ray will testify that there are enormous

3    efforts that have been made since the beginning of the case

4    to investigate the facts and circumstances that gave rise to

5    these filings.  Mr. Ray is going to testify that the

6    cybersecurity environment that characterizes these debtors is

7    unique; that to allow anyone else into that cybersecurity

8    environment will jeopardize the security of everything that

9    has gone forward and everything that will go forward.

10          With all due respect, the U.S. Trustee's Office

11   views this as if we have a warehouse full of sacks of

12   potatoes.  We do not.  We have a virtual environment that is

13   filled with code.  And even looking at that code puts at risk

14   everything about the cybersecurity environment.  The

15   investigation is not simply a legal investigation, it's not

16   simply an accounting investigation.  It is a technology

17   investigation.

18          The facts and circumstances here make it very

19   clear, Your Honor, that, if there is a case where an examiner

20   is not appropriate, it's this case.  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Anyone else wish to make an opening?

23          MR. PASQUALE:  Good morning, Your Honor.  Ken

24   Pasquale from Paul Hastings for the Official Committee of

25   Unsecured Creditors.

**A426**

1          Let me just start by saying -- and I'll save some

2    time -- I agree with Mr. Bromley's comments with respect to

3    the discretionary nature of the statute.  I'll perhaps talk

4    some more about that in closing.  But I only wanted to make a

5    couple of very brief points in opening.

6          We all recognize that this is a unique case, and

7    it's unique in two particular ways, I believe, with respect

8    to the U.S. Trustee's motion for an examiner:

9          First, as Mr. Bromley just alluded to and we will

10   hear testimony regarding, the debtors are controlled by

11   entirely new management and boards of directors that were

12   installed literally on the eve of the bankruptcy cases.  None

13   of the alleged bad actors remain with the company.  The new

14   management group's task is, not only to investigate what

15   happened pre-petition, as would an examiner, but also, unlike

16   an examiner, to act upon that investigation and, with the

17   committee, evaluate and prosecute claims to maximize

18   recoveries for all of the stakeholders of these estates.

19         Secondly, unlike many other cases involving fraud

20   in which an examiner was found to be appropriate, here,

21   there's only one class of creditors:  The unsecured

22   creditors.  These debtors do not have any secured debt.  It's

23   the committee's statutory and fiduciary obligation to

24   investigate what occurred pre-petition for the benefit of

25   those unsecured creditors, customers and other creditors

1  alike.

2          And given the capital structure here, the committee

3  has no incentive or reason to use an investigation for a

4  strategic advantage in plan negotiations or otherwise, as the

5  U.S. Trustee asserts in her motion -- in its motion.  Excuse

6  me.  The committee is perfectly positioned to investigate in

7  these cases with the debtors and, as necessary, individually.

8          Accordingly, Your Honor, and as you'll hear in

9  closings and after the proof, we do not believe it is

10 appropriate in the circumstances of this case to appoint an

11 examiner.  And unless the Court has questions now, I'll

12 reserve further comments for closing.

13          THE COURT:  Okay.  Thank you.  No questions.

14          MR. PASQUALE:  Thank you, Your Honor.

15          MR. SHORE:  Good morning, Your Honor.  Chris Shore

16 from White & Case on behalf of the joint provisional

17 liquidators in the Bahamian proceedings of FTX Digital

18 Markets.

19          We don't intend to put on any evidence today and

20 will reserve argument for closing.

21          THE COURT:  Okay.  Thank you.

22          Anyone else?

23     (No verbal response)

24          THE COURT:  All right.  Ms. Sarkessian.

25          MS. SARKESSIAN:  Thank you, Your Honor.  May I

1   address the motions in limine at this time?

2   THE COURT:  Yes.

3   MS. SARKESSIAN:  Your Honor, the U.S. Trustee has

4   two motions in limine:

5   The first one relates to the scope of the testimony

6   of Mr. Ray.  Based on information that the debtors' counsel

7   has provided to the U.S. Trustee concerning the scope, it

8   appears that he will be testifying as a fact witness about

9   his opinion on the usefulness of examiners in bankruptcy

10  cases in general or perhaps just in the bankruptcy cases in

11  which he's been involved.  Now such testimony should not be

12  admissible for the following reasons:

13  First of all, this is really in the nature of

14  expert testimony.  And Mr. Ray is not qual -- he has not been

15  put forward as an expert witness and I do not believe he is

16  qualified as an expert witness on whether examiners are

17  helpful in bankruptcy cases.

18  In addition, such testimony is also not relevant

19  under Federal Rule of Evidence 401 as to whether an examiner

20  should be appointed in these cases.  Under 1104, the standard

21  for appointment of an examiner is not whether it's been

22  helpful in other cases.  It is a legal issue as to whether

23  the requirements of 1104(c) have been met.

24  The utility of examiners in general is a policy

25  issue for Congress; it is not for the trier-of-fact or the

1    trier-of-law.  It is not relevant to consider usefulness of

2    examiners in other bankruptcies because it does not inform

3    the Court regarding the factors to be considered here.

4            So -- and balancing under 403 the probative value

5    of any of Mr. Ray's testimony on this issue is outweighed by

6    the danger of confusing the issues, undue delay, and wasting

7    time.  He does not have an examiner report in this case.  He

8    is giving us subjective opinion of examiner reports in other

9    cases.  That's my understanding of what his testimony is to

10   be.  And it is not relevant to whether an examiner should be

11   appointed here.

12           And then our other motion in limine relates to

13   exhibits, it's a related motion, essentially, because I

14   understand Mr. Ray is going to be testifying about the

15   exhibits to which we object.

16           So, Your Honor, should I allow other parties to

17   address this first motion in limine?

18           THE COURT:  Let's do the first one and then we'll

19   go to the second one.  Thank you.

20           MR. BROMLEY:  Your Honor, Jim Bromley from Sullivan

21   & Cromwell.

22           I don't know that I would characterize Ms.

23   Sarkessian's comments as a motion in limine.  It's more of an

24   objection to particular testimony that's not yet occurred.

25           I can assure the Court we are not going to offer

1  Mr. Ray as an expert, so I agree that we have not submitted

2  an expert report or we're seeking to elicit some sort of

3  expert opinion from Mr. Ray.  I should -- I can assure the

4  Court we're not going to do either of those things.

5          With respect to Mr. Ray's prior experience, we

6  believe it's absolutely relevant, critical, not confusing for

7  Mr. Ray to talk about the two circumstances where he has run

8  into examiner.  Mr. Ray is the chief -- former Chief

9  Executive Officer of Enron and the former Chief Executive of

10 Residential Capital.

11         Both of those matters involved preparation and

12 filing of substantial expert reports at costs totaling nearly

13 $200 million.  Mr. Ray was responsible for prosecuting

14 claims.  As you will hear in his testimony, he reviewed the

15 reports and has views as to -- and these aren't opinions,

16 these are his personal experiences -- as to whether or not

17 the reports were helpful or relevant to him in his -- the

18 exercise of his duties.

19         So this is -- this goes directly to his own

20 experience.  We're not talking about him looking at reports

21 that he has not had experience with.  These are two matters,

22 two very important matters, which, frankly, qualified Mr. Ray

23 himself as a person with a great deal of experience in

24 dealing with Chapter 11 and one of the reasons he's here,

25 right?  One of the reasons he's in the role that he is.

**A431**

1        If there's any particular questions about that

2   experience that Ms. Sarkessian finds objectionable, then I

3   think she has the right to make objections at the time on

4   whatever evidentiary basis may exist at the time.  But to,

5   right now, simply prohibit him from testifying because they

6   are, neither relevant, nor -- or could potentially lead this

7   Court to confusion, we believe simply is not justified.

8        THE COURT:  Okay.  Thank you.

9        All right.  On this motion, it's difficult for me

10  to make a determination in a vacuum as to what the testimony

11  is going to be that might be objectionable.

12        I would note that, if Mr. Ray is going to be

13  testifying about his experience in other cases and how it

14  might -- his perception at least of what the efficacy or

15  usefulness of examiners are in these types of cases, I think

16  would fall under Rule 701, which is opinion testimony by a

17  lay witness based on his personal perception; and so,

18  therefore, I would allow that testimony to go forward.

19        But Ms. Sarkessian, you're free to object during

20  the course of the testimony to any questions you think are

21  inappropriate.

22        MS. SARKESSIAN:  May I move on to my second motion

23  in limine --

24        THE COURT:  Yes --

25        MS. SARKESSIAN:  -- Your Honor?

1          THE COURT:  -- of course.

2          MS. SARKESSIAN:  And Your Honor, just to -- again,

3   Juliet Sarkessian for the U.S. Trustee.  Just to make sure to

4   preserve all objections, we will be having a continuing

5   objection to Mr. Ray testifying about his experience in other

6   cases or what his opinions are about the usefulness of

7   examiner reports in other cases.  I just want to put that on

8   the record.

9          THE COURT:  It's noted, so you don't have to raise

10  it every time he answers a question.

11         MS. SARKESSIAN:  I may --

12         THE COURT:  You can -- I'll give you a continuing

13  objection on that.

14         MS. SARKESSIAN:  Okay.  I may still object a few

15  times, Your Honor.

16         THE COURT:  That's fine.  That's fine.

17         MS. SARKESSIAN:  Okay.  So the second issue has to

18  do with exhibits.  So, Your Honor, we were able to stipulate

19  to -- is it 23 joint exhibits, I believe?  And I certainly

20  appreciate all the parties' efforts in that regard.

21         On Friday, the debtors filed a declaration of Mr.

22  Glueckstein, an attorney with Sullivan & Cromwell, in further

23  support of the debtors' objection to the motion of the U.S.

24  Trustee to appoint an examiner.  It attached 3,855 pages,

25  it's the three binders, large binders, and what's attached.

22

1          The first exhibit we do not object to.  The first

2   exhibit is just a -- something that Mr. Sam Bankman-Fried

3   signed, a corporate authorization that's actually part of all

4   of the petitions.  I don't think it needs to be separately

5   admitted.  It's admitted in Exhibit 1A, B, and C.  But apart

6   from that, what Mr. Glueckstein attaches are the examiner

7   reports in Enron and Residential Capital.

8          So, first of all, this filing was untimely.  The

9   objections to the examiner report and all responding papers

10  were due on January the 25th, and this was filed February the

11  3rd, one business day before the hearing.  And I can assure

12  Your Honor that I did not have an opportunity to review three

13  hundred -- 3,833 pages of documents.

14         These also were not identified in response to the

15  debtors' -- I'm sorry -- in the debtors' response to the U.S.

16  Trustee's discovery.  So one of the interrogatories the U.S.

17  Trustee had -- there were very few -- but one of them was

18  please set forward all the exhibits that you will use at

19  trial.  There was nothing about -- they listed some things,

20  but there was nothing about anything from Enron or ResCap or

21  anything of that nature.

22         In addition, these documents are hearsay.  They

23  don't fall under any hearsay exception.  We don't have the

24  author of the document to lay a foundation for the documents

25  -- or the authors -- excuse me -- which would be the

 1   examiners.  And they're also completely irrelevant to the

 2   issue that is before this Court, which is appointment of an

 3   examiner in these cases.

 4        Of course, as Your Honor knows, we don't think any

 5   of this would be relevant under (c)(2).  But even under

 6   (c)(1), the best interests of the creditors, it's not

 7   relevant what an examiner in another case put in his or her

 8   report.

 9        And I'd like to respond to, in the joint pretrial

10   order, the debtors set forth their statement about why they

11   believe these examiner reports should -- could come in.

12        So the first thing they indicated was that the

13   Judge can take -- Your Honor can take judicial notice of

14   these reports.  The U.S. Trustee agrees that Your Honor can

15   take judicial notice of the fact that examiners were

16   appointed in these other cases and that they issued reports

17   that were filed with the Court.  We have no problem with

18   that.  But that does not make them -- that does not make the

19   content of the reports admissible.

20        They also argue that these are admissible as

21   business records of the relevant debtors -- I assume they

22   mean Enron and Residential Capital -- under Federal Rule of

23   Evidence 803(6).

24        Now 803(6) is a document that is kept in the

25   ordinary course of regularly conducted activity of a

1   business, organization, occupation, or calling, and that

2   making the record was a regular practice of that activity,

3   and that all these conditions are shown by the testimony of a

4   custodian or other qualified witness or by certification that

5   complies with Federal Rule of Evidence 902(11) or (12).  None

6   of these elements are present.

7            An example of a business record -- and I'm sure

8   Your Honor is, you know, very familiar -- an invoice would be

9   an example of a business record, not a report created by a

10  court-appointed examiner.  That is not a business record.

11  And you also don't have any person to lay the foundation --

12  well, again, I assume it would be the examiner -- to lay the

13  foundation that this is somehow a business record.

14           The last thing that the debtors set forth is 807,

15  which is the residual exception.  The U.S. Trustee does not

16  believe that the requirements for this exception have been

17  met.  And in order to meet this exception, you would also

18  still need to lay a foundation.  You would need to have the

19  examiners in Enron and Residential Capital who wrote these

20  reports testify to establish the foundation to meet 807.

21           Also, 807(b) requires that the proponents give an

22  adverse party reasonable notice of the intent to offer the

23  statement.  And Your Honor, the U.S. Trustee did not receive

24  reasonable notice here.

25           So, Your Honor, that -- those are the reasons why

1  we believe that the exhibits to Mr. Glueckstein's declaration

2  that was filed at Docket 611 should not be admitted, other

3  than the first exhibit, which, again, does not need to be

4  separately admitted because it's already part of Exhibit 1A,

5  B, or C.

6          THE COURT:  Okay.  Thank you.

7          MR. BROMLEY:  Your Honor, I am happy that the U.S.

8  Trustee is willing to stipulate that Your Honor can take

9  judicial notice that examiner reports were prepared in the

10 Enron and Residential Capital matters.  And in fact, if we

11 had had that conversation Friday, maybe we could have avoided

12 some of this.

13         But the fact is, Your Honor, these are business

14 records of Enron and Residential Capital.  Ms. Sarkessian is

15 absolutely incorrect that either 803 or 807 requires that the

16 author of a document be present and able to testify.  The

17 basic construct of records of regularly conducted activity

18 are that the testimony that would be necessary to admit such

19 a document is an exception to hearsay would be sufficient if

20 it was provided by a custodian of such document.

21         Now it is naive to think that, in a case such as

22 Residential Capital or Enron or, indeed, FTX, that the

23 epitome of a business record is an invoice.  The business of

24 those entities and the business of this entity is winding

25 down its business.  The records of regularly conducted

1    activity of Chapter 11 debtors include, by definition, those

2    matters that are prepared and filed on court dockets.

3          When it comes to the custodian of that document --

4    or these documents, Mr. Ray is present in court and was the

5    chief executive of both of those entities and is qualified to

6    testify that these documents, indeed, were maintained by each

7    of Enron of Residential Capital in the ordinary course of

8    their business, which, at the time, was liquidating and

9    winding down.

10         Now, that being said, Your Honor, the purpose of

11   the use of these examiner reports is not to point to Page 532

12   and say that, on such and such a date, such and such a thing

13   happened.  The reason these reports are present in court and

14   are sitting here in front of you is so that Mr. Ray can

15   testify that, yes, these reports were something that he

16   considered during the course of his work in each of those

17   entities, and that among the obligations that he had was to

18   maximize recovery on assets and the use to which he put those

19   reports.

20         He is not going to be testifying about any

21   particular fact or assertion in any of the Enron or

22   Residential Capital reports.  It's merely the fact that they

23   existed and that he considered them.  So he is not going to

24   be testifying in a manner that would require us to introduce

25   either of the reports for the truth of the matter asserted in

1  those reports, merely for the fact that Mr. Ray consulted

2  with, read, and considered those reports during the course of

3  his obligations of the Chief Executive of each of Enron and

4  Residential Capital.

5          THE COURT:  All right.  All right.  On this one,

6  I'm not going to allow the -- other than Exhibit 1, I'm not

7  going to allow the two reports to be admitted into evidence

8  for a number of reasons:

9          One, I don't believe there was fair notice to the

10  U.S. Trustee that these exhibits were going to be introduced.

11          Two, I don't see how they're relevant to the issues

12  before me today.

13          Three, they are hearsay.  They certainly don't fit

14  within a business record exception, which requires, under

15  Rule 803, that they be a record of regularly conducted

16  activities.  And certainly, an examiner report is not a

17  regularly conducted activity of an entity.

18          So, for those reasons, I will not allow them into

19  evidence.  But Mr. Ray can testifying, obviously.  I've

20  already ruled he can testify about his work as a -- in other

21  cases where there were examiner reports introduced, and he

22  can testify about his experience in that regard without

23  reference to the reports, the specific information contained

24  in those reports.  Okay?

25          All right.  Ms. Sarkessian, is that -- are we done

1    with motion practice at this point and we're moving on to the

2    evidence?

3              MS. SARKESSIAN:  Yes, Your Honor, at least from the

4    U.S. Trustee's standpoint.

5              THE COURT:  Okay.

6         (Pause in proceedings)

7              MS. SARKESSIAN:  Your Honor, our -- the testimony

8    of witnesses will be coming in by way of declarations that

9    have been marked as exhibits:

10             So that's Mr. Ray's declaration, that's at Docket

11   24, and another one at Docket 92, which are Joint Exhibits 2

12   and 3, as well as his testimony before Congress, which is

13   Joint Exhibit 8 and is on the docket at 371.

14             In addition, Mr. Mosely of Alvarez & Marsal, Mr.

15   Edgar Mosely, by way of his deposition [sic] in support of

16   first-day pleadings, which is Joint Exhibit 4 and Docket 93.

17             THE COURT:  Any objection?

18             UNIDENTIFIED:  No objection, Your Honor.

19             THE COURT:  They're admitted without objection.

20        (Joint Exhibit 2 received in evidence)

21        (Joint Exhibit 3 received in evidence)

22        (Joint Exhibit 8 received in evidence)

23             MS. SARKESSIAN:  And Your Honor, we did list Mr.

24   Ray as a witness for us, so we are not going to be asking him

25   any questions initially.  But to the extent that I understand

1    the debtors will be putting him on, we reserve the right to

2    cross-examine and then to go beyond -- if Your Honor permits,

3    to go beyond the scope of their direct and use him as our

4    witness, which, again, we did put in a -- we did file the

5    notice that he would be a witness and we did reserve that

6    right in our notice.

7              THE COURT:  Is there any objection?

8              UNIDENTIFIED:  No, Your Honor.

9              THE COURT:  Okay.

10             UNIDENTIFIED:  No objection.

11             THE COURT:  All right.

12             MS. SARKESSIAN:  Thank you.

13             THE COURT:  Thank you.

14         (Participants confer)

15             MS. SARKESSIAN:  I'm sorry.  I'm sorry, Your Honor.

16   My colleague reminded me I need to move for the admission of

17   all of the exhibits, 1 through 23.  And I'm not sure with

18   respect to Mr. Glueckstein's declaration, how they want to

19   handle that, because it's only a piece of it that's coming

20   in.  But we would move for the admission of Exhibits 1 to 23.

21             THE COURT:  Okay.

22             MS. SARKESSIAN:  Thank you, Your Honor.

23             THE COURT:  Any objection?

24             UNIDENTIFIED:  Your Honor, we have no objection to

25   admission of Exhibits 1 to 23.

1          THE COURT:  Okay.

2          UNIDENTIFIED:  With mister -- in terms of the

3   exhibits to Mr. Glueckstein's declaration that Your Honor is

4   willing to accept, we would submit that it should be

5   submitted separately and not simply with the petitions as

6   filed.

7          THE COURT:  All right.

8          MR. SHORE:  And on behalf of the JPLs, there was a

9   stipulation which was included in the pretrial order that

10  what was coming in today was for the purposes of this hearing

11  only and was not going to be coming in for al lpurposes in

12  the cases.

13         THE COURT:  All right.  That's fine.

14      (Joint Exhibit 1 received in evidence)

15      (Joint Exhibits 4 through 7 received in evidence)

16      (Joint Exhibits 9 through 23 received in evidence)

17         THE COURT:  So, with the exhibit, do you want to

18  mark that as a debtors' exhibit then separately, Debtors'

19  Exhibit Number 1, as opposed to a --

20         UNIDENTIFIED:  We will --

21         THE COURT:  -- joint exhibit?

22         UNIDENTIFIED:  -- Your Honor.

23         THE COURT:  Any objection?

24         MS. SARKESSIAN:  No, Your Honor.  I would just --

25  right now, it's attached to Mr. Glueckstein's declaration

 1  with the 3,800 pages, so ...

 2         THE COURT:  Okay.

 3         MS. SARKESSIAN:  Can we just have -- I don't know -

 4  - I don't know how to do that technically, but I don't want

 5  that entire thing being -- coming in as an exhibit.

 6         THE COURT:  No, understood.  We'll just submit

 7  Exhibit 1 to Mr. Glueckstein's declaration as a separate

 8  exhibit as Debtors' Exhibit Number 1.

 9         MS. SARKESSIAN:  Thank you, Your Honor.

10      (Debtors' Exhibit 1 received in evidence)

11      (Participants confer)

12         THE COURT:  Any other evidence, Ms. Sarkessian?

13         MS. SARKESSIAN:  I'm sorry, Your Honor?

14         THE COURT:  Any other evidence?

15         MS. SARKESSIAN:  No.

16         THE COURT:  Okay.

17         MS. SARKESSIAN:  No, Your Honor.

18         THE COURT:  Thank you.

19         Mr. Bromley.

20         MR. BROMLEY:  Your Honor, the debtors would like to

21  call John J. Ray, III to the stand.

22         THE COURT:  Okay.  Mr. Ray, please come forward,

23  take the stand and remain standing, please.

24         THE ECRO:  Please raise your right hand.  Please

25  state your full name and spell your last name for the court

1   record, please?

2           THE WITNESS:  John J. Ray, III.  Last name R-a-y.

3   JOHN J. RAY, III, WITNESS FOR THE DEBTORS, AFFIRMED

4           THE ECRO:  You may be seated.

5           Your Honor.

6           THE COURT:  Thank you.

7           Mr. Bromley, you may proceed.

8           MR. BROMLEY:  Thank you, Your Honor.

9                           DIRECT EXAMINATION

10  BY MR. BROMLEY:

11  Q    Mr. Ray, what's your current occupation?

12  A    I'm owner of an advisory firm called Owl Hill Partners,

13  and I'm also Chief Executive Officer of FTX.

14  Q    And could you please give a brief summary of your

15  educational background?

16  A    Yes.  I graduated in 1980 from the University of

17  Massachusetts.  In 1982, I graduated from Drake University

18  Law School, initially admitted in Iowa, Nebraska, and still

19  admitted in good standing in the State of Illinois.

20  Q    And could you please give the Court a short summary of,

21  say, the first ten years of your professional career?

22  A    The first ten years, I began at Touche Ross, an

23  accounting firm, doing tax work as a lawyer.

24      Thereafter, I moved on to become an associate at Mayer,

25  Brown & Platt, now known as Mayer Brown, in Chicago Illinois,

1   practicing in -- initially, in the employee benefits and

2   securities area.  The practice included M&A work, primarily.

3        Thereafter, I departed private practice and became

4   employed by a private company.

5   Q    And what private company were you employed by?

6   A    Initially, it was Waste Management, now known as WMX.  I

7   began there in 1988, and worked there, either for Waste

8   Management, Inc. or one of its operating subsidiaries, as

9   general counsel of the various operating units, including

10  certain of their public subsidiaries, again, for

11  approximately ten years.  The practice included their

12  corporate governance, securities law matters.  And then, at

13  the operational level, a variety of -- you know, managing

14  complex litigations and other investigatory matters relative

15  to the company's operations.

16  Q    And after Waste Management, what did you do?

17  A    After Waste Management, the company was sold.  I then

18  became general counsel of a company called Fruit of the Loom,

19  also based in Chicago, Illinois.  I was general counsel and

20  chief administrative officer of that company.

21  Q    And when did you first come in contact with Chapter 11?

22  A    The company, unfortunately, shortly after I got to the

23  company, the company went into bankruptcy.  The company had a

24  number of operational issues that led to the Chapter 11, and

25  very quickly became embroiled in issues relative to the chief

1  executive officer of the company who, at the time, had loans

2  that were guaranteed by the company prior to my joining the

3  company, and they became quickly issues in the Chapter 11.

4  Q    And did you have any role in investigating anything

5  with respect to the CEO?

6  A    I did.  I mean, ultimately, you know, within days,

7  really, of the filing, the chief executive officer was

8  dismissed by the board.  I then became the most senior

9  officer of the company and ran the Chapter 11 for

10 approximately 26 months after the case was confirmed.

11      The creditors asked me to stay on to prosecute a

12 variety of claims, including the claims related to the chief

13 executive officer, which I did.  We litigated those at cases

14 in a couple different jurisdictions including the Federal

15 District Court in New York to recover the monies that were

16 loaned to the chief executive officer.

17 Q    And what was the result of those efforts?

18 A    We got our money back.

19 Q    And after Fruit of the Loom what did you do?

20 A    After Fruit of the Loom I took a liking to Chapter 11.

21 It sort of fit, essentially, you know, my business

22 experience, my legal experience, and I took on a variety of

23 Chapter 11 cases either as a chief restructuring officer or,

24 in many cases, such as a liquidating trustee of post-

25

1  confirmation trusts primarily to prosecute claims related to

2  the bankruptcy.

3      A number of those cases involved prosecuting claims

4  against accountants, and directors, and officers.  And I

5  certainly can take you through those cases.

6  Q    Can you do that for us?

7  A    Yes, please.

8      First case that -- of course of, you know, no notoriety

9  and you've heard many comments in the last few months over,

10 of course, was Enron.  I became a chairman of the board of

11 Enron and chief executive officer.  That began in 2004.

12     From 2004 through 2008 it was primarily the time period

13 in which those cases were prosecuted.  The company still was

14 very, very complex in Chapter 11.  I wouldn't say that much

15 was accomplished in the Chapter 11, but much was left over in

16 the Chapter 11.  We still owned a public utility in Oregon,

17 the Portland Utility Company.  We still owned International

18 Energy business.  We still had several thousand employees,

19 and we still were plaintiff in over a thousand cases.

20     Those cases were a wide variety.  Virtually, every

21 single bank in America, some outside North America were

22 defendants in cases that were brought that were either fraud

23 cases or avoidance actions.  And then, there was cases

24 against law firms, accounting firms, including Anderson.

25 Vinson & Elkins is a law firm that was a suit in those cases,

 1  but it's a massive list of cases where the company was

 2  appointive recovering for various misfeasance, malfeasance,

 3  fraud, negligence, and really the waterfront of events that

 4  occurred during the Chapter 11 that were ultimately

 5  prosecuted.

 6        We recovered in litigation proceeds about --

 7            MS. SARKESSIAN:  Your Honor, I'm going -- I was

 8  waiting for the next question, but I'm going to object to

 9  this testimony based on relevance.

10            THE COURT:  I think he's giving his background.

11  I'll overrule.

12            THE WITNESS:  We recovered, you know, over $5

13  billion in litigation recoveries against just the banks

14  alone, and the overall recoveries in the case were, you know,

15  approximately $26 billion, which is double the plan of

16  recovery that was estimated in the disclosure statement.

17            From there, I took on a number of other cases.  I

18  was the litigation trustee at a company called Hayes Lemmerz.

19  Hayes Lemmerz was in bankruptcy a couple of times.  I was

20  involved with Hayes Lemmerz I.  My sole role in that capacity

21  was to sue the officers and directors for breach of their

22  fiduciary duty, ultimately settling with the directors

23  related to that action.  We also sued the accounting firm

24  related to Hayes Lemmerz.

25

**A448**

1          Other cases that I have been involved in; I was,

2   essentially, the chief executive officer of Nortel which is a

3   cross border case where we had conflicts between the United

4   States operations for Nortel, the Canadian operations, and

5   the operations outside of the United States in Canada that

6   involved 19 separate subsidiaries.  A very complex case

7   involving a myriad of intercompany transactions that was, you

8   know, somewhat complex that went on for an extended period of

9   time due to the issues between the various silos within that

10  Nortel estate.

11          I also was in Overseas Shipping Group [ph] CEO,

12  CRO, about the same time from 2012 to 2015.  That case,

13  another Chapter 11 case.  The principal problem in that case

14  was the company had understated its tax liability by

15  somewhere between $300 million and $500 million.  They had

16  achieved that status by obtaining a legal opinion from a very

17  prominent firm in New York, and that legal opinion, to which

18  they relied on, was the vehicle under which they avoided

19  those taxes.

20          So, ultimately, you know, our mission in Overseas

21  Shipping Group, you know, beyond the Chapter 11 was to take

22  on the issues surrounding, you know, the tax opinions that

23  were in the view of the company and, ultimately, the

24  creditors that involved malpractice by that law firm.

25

```
 1              The case was somewhat unique in the sense that it
 2   has one sort of similarity with FTX.  Almost immediately upon
 3   filing the case and discovering, of course, the legal opinion
 4   and the faulty nature of that legal opinion, we went into the
 5   Internal Revenue Service.  I went in with council at the time
 6   and walked over to the offices over at the IRS on around
 7   about 8th and 56th Street in New York and we walked and we
 8   self-reported that liability, which was somewhat startling,
 9   you know, to the service, but it was my obligation, you know,
10   as an officer of the company to go in and report that.  Of
11   course, the reactions from the Internal Revenue Service were
12   unique.  There was no particular form for that.  Very
13   startling for the IRS to see someone come in and self-report
14   a liability that was half a billion dollars.
15              MS. SARKESSIAN:  Your Honor, I don't think this is
16   relevant, but I would object to Mr. Ray testifying about what
17   was in the head of IRS agents, whether they were surprised.
18              THE COURT:  I'll sustain that.
19              MS. SARKESSIAN:  Thank you.
20              THE WITNESS:  Ultimately, after Overseas Shipping,
21   I moved on to, you know, Residential Capital.  Residential
22   Capital was, essentially, a mortgage case.  It was a
23   subsidiary of General Motors.  I was appointed as the
24   litigation trustee for that case and prosecuted over a
25   hundred separate legal actions related to indemnification and
```

1  breech of contract related to the sale of mortgages to

2  Residential Capital in the tens of billion of dollars that

3  ultimately were faulty and, in some cases, fraudulent, and we

4  litigated those for several years and I presided over that

5  litigation.

6  BY MR. BROMLEY:

7  Q    So, Mr. Ray, to take it back a bit, in Enron, when you

8  the CEO, were you aware that examiner reports had been

9  prepared in connection with that case?

10  A    Yes.  I was made very aware of those reports.  The

11  reports, when I became affiliated with Enron, almost

12  immediately on my joinder, we were in the middle of somewhat

13  of a skirmish related to those reports because various

14  parties were attempting to use those reports to get access to

15  those reports.

16       There was, you know, essentially, fights over whether

17  or not they should be redacted.  There were, in effect, on

18  the criminal trials that were yet to have occur as well as

19  the use of those reports that the parties had substantial

20  disputes over.

21            MS. SARKESSIAN:  Your Honor, I'm continuing

22  objection to the relevance of this testimony.

23            THE COURT:  Overruled.

24  BY MR. BROMLEY:

25

1  Q     And Mr. Ray, do you have a sense of the cost of the

2  Enron estate reports?

3         MS. SARKESSIAN:  Your Honor, again, I object as

4  irrelevant.

5         THE COURT:  Overruled.

6         THE WITNESS:  The Enron report was $90 million.

7  BY MR. BROMLEY:

8  Q     Now, moving on to Residential Capital, was there an

9  examiner report in Residential Capital?

10 A     There was.

11 Q     And are you familiar with that report?

12 A     Yes, I am.

13 Q     And do you know what the cost of that report was?

14 A     The cost of that report was approximately $100 million.

15 Q     And do you use that report at all in your collection

16 efforts?

17        MS. SARKESSIAN:  Your Honor, again, I object for

18 relevance.

19        THE COURT:  Overruled.

20        THE WITNESS:  Neither in Enron, nor in Residential

21 funding and Residential Capital did I make use of that report

22 for distinctively different reasons, but neither case did I

23 use those reports.

24 Q     And what was the reason you didn't use it in Enron.

25        MS. SARKESSIAN:  I'm sorry, Your Honor, I have to

1   object again based on relevance.

2            THE COURT:  Overruled.

3            THE WITNESS:  Multiple reasons in Enron.  You

4   know, first, when you review the Enron report, which I

5   believe is, in my experience, characteristics of many of the

6   reports, they're very topical, they're very general.  They're

7   almost, sort of, a curated, you know, gathering of statements

8   that failed to take real positions relative to what occurred.

9            MS. SARKESSIAN:  Your Honor, I have a different

10  objection here.  I believe that the witness is testifying now

11  not just about an Enron report, but more generally, in

12  addition, he is testifying about the contents of the Enron

13  report, and Your Honor has ruled that those reports are not

14  to be admitted and, therefore, he cannot testify about the

15  contents.

16           THE COURT:  Mr. Bromley.

17           MR. BROMLEY:  I would ask the witness to limit

18  your comments with respect to the Enron report, not other

19  reports.  With respect to the contents, Mr. Ray is testifying

20  as to not what the contents were, but how he used those

21  reports in the exercise of his duties.

22           THE COURT:  You can testify about how you use the

23  reports, but don't talk about the contents of the reports.

24           THE WITNESS:  Yes, Your Honor.

25           I did not use the reports because they were, you

 1  know, very shallow.  I mean, sort of a mile wide inch deep

 2  and, and ultimately --

 3          MS. SARKESSIAN:  Again, Your Honor, I think that

 4  relates to the contents of the report.

 5          THE COURT:  Well, he can characterize -- he can't

 6  really talk about how he used them, he can't characterize how

 7  he perceived those reports.  So, I'll overrule that.

 8          MS. SARKESSIAN:  Thank you, Your Honor.

 9          THE WITNESS:  You know, ultimately, the

10  information that was in the report was, you know, it didn't

11  go far enough relative to about what I needed to do to

12  prosecute the actions.  The reports are somewhat ambivalent

13  in the conclusory sense, and ultimately the evidence --

14          MS. SARKESSIAN:  Objection, Your Honor, he's

15  testifying about the contents again; what the conclusions

16  were.

17          THE COURT:  He's not telling me what the

18  conclusions were, he's saying that he did not find the

19  conclusions helpful to him.  I think that's appropriate, and

20  I'll overrule the objection.

21          THE WITNESS:  But ultimately, I had to spend, you

22  know, all of the time to investigate and, ultimately,

23  prosecute those actions, and the reports themselves did not

24  aid in that investigation.

25          Relative to Residential Capital, somewhat of a

 1  different story there.  Residential Capital largely was

 2  focused on their company transactions involving the parent

 3  company GMC who still owned the equity in the company.  So, a

 4  shareholder was still present during the Chapter 11 and there

 5  was an investigation related to that existence.

 6          The ResCap is notable for, frankly, for what it

 7  didn't cover.  When you read that report, very, very

 8  extensive report, you can take an eye full over there.  It's

 9  a very deep report.  But, ultimately, the tens of billions of

10  dollars' worth of mortgage fraud in terms of the mortgages

11  that were sold to the company that I prosecuted, it yielded

12  over a billion three in recoveries which included, you know,

13  over a hundred cases in two trials; a jury trial and a bench

14  trial.  There's not a single word in that report related to

15  those actions, so --

16          MS. SARKESSIAN:  Your Honor, I'm going to object.

17  He's talking about the content of the documents again.

18          THE COURT:  Now you're getting into the content of

19  the document.  I'll sustain the objection.

20          MS. SARKESSIAN:  Thank you.

21  BY MR. BROMLEY:

22  Q    Mr. Ray, I'd like to just touch on, based on a couple

23  of the other matters that you mentioned just briefly.  In

24  connection with the Nortel case, did you have a cooperative

25  relationship with the creditors committee in that?

1          MS. SARKESSIAN:  I'm going to object on relevance,

2   Your Honor.  I'm sorry to keep making the same objection, but

3   I feel it's necessary.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.  A very cooperative

6   relationship.  We worked hand and glove.

7   BY MR. BROMLEY:

8   Q     And was that including in investigating the prosecuting

9   claims?

10  A     Yes.  We did that really on a joint basis.  You know,

11  at the end of the day, you know, we're debtors there for, you

12  know, the benefit of creditors.  So, we worked very

13  cooperatively.

14  Q     What was the ultimate recovery to the Nortel creditors.

15         MS. SARKESSIAN:  I'm sorry, Your Honor.  I'm going

16  to object for the record on relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  It was capped at 100 percent.  It

19  certainly could have been higher.

20  BY MR. BROMLEY:

21  Q     Mr. Ray, I'd like to turn your attention now to FTX.

22  A     Yes.

23  Q     Prior to your appointment to your current position, did

24  you have any connections to FTX?

25  A     No.  I did not.

1   Q      Did you have any connections to Sam Bankman-Fried?

2   A      No.  I did not.

3   Q      Or Gary Wang.

4   A      No.

5   Q      Or Caroline Ellison.

6   A      No.

7   Q      Nishad Singh.

8   A      No.

9   Q      Ryan Salame.

10  A      No.

11  Q      Did you have connection with any of the executives at

12  FTX?

13  A      No.

14  Q      Did you have any connection with Mr. Bankman-Fried's

15  parents?

16  A      No.

17  Q      Can you tell me how you chose the members of the boards

18  of directors?

19  A      Each of the members of the board of directors was

20  somewhat curated.  Each of them has their independent.  First

21  of all, they had no involvement with FTX, similar to my

22  position.  We needed an independent board in place

23  immediately.

24        So, really, within hours of my appointment, I saw the

25  need to have an independent board, so I contacted several

1   individuals who I knew that had diverse experiences who

2   collectively as a group would form the ideal board to govern

3   the situation.

4   Q    Mr. Ray, in your first day declaration you described

5   generally the state of FTX when you arrived, but can you just

6   summarize that for the Court today?

7   A    The company, you know, was really unlike any other I've

8   ever seen.  Not a single list of anything.  You know,

9   normally, you come in and there's a bank account list -- but

10  there's personnel who you speak to about these things.

11  There's lists of assets.  There's balance sheets.  There's

12  income statements.  There's professionals.  There's

13  insurance.  There's just nobody to turn to really in the

14  company, just a complete void, massive scramble for

15  information.

16        And fortunately, you know, we had the services of, you

17  know, firms at my disposal who ultimately could become what

18  I've described as an army of soldiers of women and men who

19  have been dedicated to putting this together.

20              MR. BROMLEY:  Your Honor, I'd like to put up on

21  the screen a demonstrative.

22              THE COURT:  Okay.

23  BY MR. BROMLEY:

24  Q    Do you have that in front of you, Mr. Ray?

25  A    Yes.  I do.

**A458**

1  Q     Now, Mr. Ray, could you just help walk us through this

2  starting first with the debtor's advisors --

3              MS. SARKESSIAN:  Your Honor, I'm just, again,

4  going to put on the record my objection to this testimony as

5  not being relevant.

6              THE COURT:  I'm not even sure what the testimony

7  is yet.  Let me hear the testimony first.

8              MS. SARKESSIAN:  Okay, Your Honor.

9  BY MR. BROMLEY:

10 Q    Mr. Ray, with respect to the group that's debtor's

11 advisors, are they participating at your direction in an

12 investigation and series of investigations with respect to

13 FTX?

14 A     Yes.  I mean, the first thing, obviously, to observe

15 here is the center of this wheel and I am one with the

16 directors are empowered to deal with this, you know, sort of

17 circle of different advisors and different fiduciaries as

18 well as, you know, other parties here.  But to your bottom

19 left to answer your question are the debtor's advisors and

20 it's really a multiple set of advisors because of the

21 technical, highly technical, nature of this case.

22      It's also driven by the lack of professionals that were

23 ongoing and that I could rely on, the existed on a pre-

24 petition basis.  So, either there was an absence of

25 consultants, or professionals, or those professionals were

1    not reliable such that we had to replace those.

2         So, obviously, starting at the top of the hour, you

3    know, Sullivan & Cromwell is our main bankruptcy lawyers.

4    Immediately, at the time of the filing with haste, we

5    employed Quinn Emanuel, and we did that for purposes of not

6    only the bankruptcy expertise, but they had one of the more

7    renowned lawyers in the country and investigatory work, Mr.

8    Bill Burke.  He's in this courtroom.

9         Yes.  We brought on Ernst & Young because the company,

10   on a worldwide basis, did not have reliable accounting

11   professionals.  In some cases, we didn't have income

12   statements and balance sheets at all.  All of this had to be

13   recreated.  And as you'll see in a moment to the far right of

14   me, you know, since the IRS, who's investigating various tax

15   positions taken by the company, and Ernst & Young was brought

16   in to do that, so we really needed the sort of books and

17   records.

18        Down below, of course, is the Landis firm whose counsel

19   here in Delaware and all, also available for other purposes

20   relative to the debtor's cases, down below is Perella

21   Weinberg Partners, the investment bankers to sell the

22   portfolio.  This is the portfolio of roughly $5 billion of

23   approximately four hundred investments that were made over a

24   myriad of, you know, industries and in a relatively sort time

25   period from October of 2021 primarily to the petition date.

1          Then below that, is Alvarez & Marsal restructuring

2    professionals that are really sort of the backbone along with

3    Sullivan & Cromwell relative to almost everything that has to

4    be achieved in these cases.

5          We also brought on AlixPartners.  AlixPartners, you

6    know, another well renowned firm that had a particular

7    expertise related to investigations, and tracing, and certain

8    skill sets that were essential given what had happened in the

9    company, and their particular expertise was essential

10   relative to the underlying investigations that have led to

11   not only our future prosecution of the avoidance actions, but

12   they've aided immensely the investigation in replying to the

13   regulatory stories that I'll get into in a moment.

14         And then last, but not least, is Sygnia.  Sygnia is a

15   highly technical cybersecurity firm.  This case, you know, is

16   about cybersecurity or the failure of cybersecurity.  This

17   firm was needed to protect what was a crumbling shell of

18   securities around assets that are highly vulnerable, and

19   their services were critical, as we saw, in the waking hours

20   of the morning of the 11th as these petitions were being

21   filed, you know, hacking was occurring.  So, this firm, you

22   know, is not only instrumental in stopping that but also

23   rebuilding an environment that's highly sensitive to this day

24   because of the nature of crypto assets and the vulnerability

25   of crypto assets.

1     You know, over the last year there's been something

2 worldwide reported about $4 billion worth of crypto that's

3 been hacked and so these folks are essential for us to have

4 some integrity in our systems to allow us to preserve assets

5 and to repair what was a dangerous, dangerous environment

6 relative to the storage of hot wallets and other wallets

7 related to the companies crypto.

8 Q     Now, Mr. Ray, what steps have been taken to replace

9 prior management?

10          MS. SARKESSIAN:  I'm sorry.  Now that his

11 testimony is over, I would like to renew my objection.

12 Obviously, under 1104(c)(2), the U.S. Trustee does not

13 believe any of Mr. Ray's testimony is relevant, but even

14 under (c)(1) as to whether this is in the best interest of

15 the creditors.  The fact that the debtors have a lot of

16 retained professionals and they're working together is not

17 relevant to the issue as to whether an examiner should be

18 appointed even under (c)(1).

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm sorry.  Could you repeat the

21 question?

22 BY MR. BROMLEY:

23 Q     Sure.  What steps have been taken to replace prior

24 management?

25 A     Prior management has been terminated.  There's no one

1   that was in a control position that today is in a control

2   position whatsoever.  That was eliminated, you know,

3   immediately on my taking control.

4   Q    Now, when you took control, the omnibus corporate

5   authority, which is Debtors Exhibit 1, referenced a request

6   for Mr. Bankman-Fried to consult with his counsel at Paul

7   Weiss regarding director appointments.  Did you ever consult

8   with Paul Weiss.

9   A    No, I did not.

10  Q    And why not?

11  A    I didn't think it was in the best interest of the

12  estate to consult with lawyers for someone we now know has

13  been charged with crimes.

14  Q    Now, Mr. Ray, I'd like to throw your attention on the

15  demonstrative to the lower right-hand corner, federal,

16  criminal, and regulatory authorities.  Do you see that?

17  A    Yes.  I do.

18  Q    Are you familiar with criminal and regulatory

19  investigations that are ongoing?

20  A    Yes.  I am.

21  Q    And what have you directed the company and your

22  advisors to do with respect to those investigations?

23  A    I made it very, very clear from the beginning of my

24  taking control, on virtually the day of the control, that we

25  would do whatever the Government request relative to

 1  cooperation.

 2       We believe that, ultimately, not only is that, you

 3  know, required but we believe that, you know, it's in the

 4  best interest of creditors to allow these regulatory

 5  authorities to get full access to the information on a real

 6  time basis as we're learning about what happened in the

 7  company.  They're virtually getting information, again, real

 8  time, and we believe that was sort of fundamental to our, you

 9  know, mission here which is to maximize value for the

10  creditors.

11  Q     And do you receive regular reports on the materials

12  that have -- and cooperation that's been given to the

13  investigative authorities?

14  A     Virtually, daily.

15  Q     I'd like to -- I'll come back to the slide in a moment,

16  but I'd like to turn to the next one.  You familiar with this

17  slide?

18  A     Very much so.

19            MS. SARKESSIAN:  Your Honor, I'm going to, again,

20  object on relevance.

21            THE COURT:  Overruled.

22  BY MR. BROMLEY:

23  Q     And Mr. Ray, what does this slide --

24  A     The first part of it, it talks really about -- speaks

25  to the volume, the massive amount of data that we have

1  produced.  As you can see, we've collected ten terabytes of

2  data, over twenty-seven million documents.  We've provided an

3  analysis of several hundred thousand documents.  We've

4  interviewed and received pro offers of 24 current and former

5  employees.  And then, we've also provided an analysis

6  relative to the transactions inside the companies databases.

7       The companies databases include a couple of different

8  databases of primarily primary databases, the AWS System

9  which Amazon Web Services, where we housed some of the

10  wallets, the hot wallets.  And the database itself is in the

11  millions of terabytes of date so it's a vast resource of

12  information, unfortunately, in a somewhat unconstructed

13  environment which requires, you know, the assistance of, you

14  know, people like Alvarez and people like AlixPartners to

15  sift through these terabytes to ultimately provide useful

16  data to the regulatory authorities.

17  Q    Are you familiar with the cooperation that's been given

18  to the U.S. Attorney's Office for the Southern District of

19  New York and the Department of Justice's National Crypto-

20  Currency Enforcement Team?

21  A    Yes.  Our teams have been involved with, you know,

22  virtually daily requests.  As you can see, we've had over 150

23  requests from the Southern District, produced substantial

24  amounts of information, and provided substantial cooperation

25  relative to instances where they wanted specific information

1  related to certain actions, prehistoric actions, for the

2  company.

3       So, it's virtually an ongoing exercise, but the last,

4  you know, roughly 90 days have been an extremely intense

5  effort to provide the information that the Government has

6  requested which, obviously, you know, yielded substantial

7  results in record time.

8  Q    Now, Mr. Ray, are you familiar with how these requests

9  come in from the Department of Justice?

10 A    Yes, I am.  I am familiar with how they contact the

11 company.  They do that through Sullivan & Cromwell primarily.

12 Q    And have you ever -- are you aware of any instances

13 where full cooperation was not given immediately?

14 A    That wouldn't be tolerated.

15 Q    I'd like you to turn your attention to the next slide.

16 Now in addition to the Southern District of New York, the

17 U.S. Attorneys Office, you are familiar with other U.S.

18 Attorneys Offices that have submitted information requests?

19 A    We have had full participation.  You know, we have had

20 numerous requests, as shown by this chart, from other

21 prosecutors around the country.  The Securities & Exchange

22 Commission has had a number of requests; again, all

23 cooperative presentations that have been provided.  The CFTC

24 has been extremely active here in connection with their

25 investigation and have submitted over 150 requests.

1    On a state basis, not shown on this chart, but we have

2    entered into dozens of cease and desist orders with respect

3    to licenses around the world, the money transaction sector,

4    licenses that were maintained by the company.  So, this chart

5    really doesn't show the full gambit of the things that we

6    have done to cooperate on a state, you know, and local basis,

7    as well as these particular federal agencies.

8    Q    If I could draw your attention to the next slide.

9    A    Yes.  This is really what I am referring to.  We self-

10   reported to 26 state regulators.  We produced a mountain of

11   documents there as well. We have been in regular contact with

12   these agencies; not leaving it to the agencies to come to us.

13   You know, we have taken a pro-active effort to work with

14   them.  We have hosted update calls with these agencies.  They

15   are almost treating these agencies, in effect, like they're

16   own committee, if you will, in giving them real time

17   information.

18        MS. SARKESSIAN:  Objection, Your Honor.

19        THE COURT:  Overruled.

20   BY MR. BROMLEY:

21   Q    Now in addition to the various states and state

22   authorities have you -- are you aware of additional requests

23   that have come from Congress and non-US authorities?

24   A    Yes.  I have been very active and personally involved in

25   these requests.  As everyone has reported, I testified in

1  front of Congress, but leading up to that congressional

2  testimony we have had 100 requests from the Financial

3  Services Committee.  We have requests from the Senate as well

4  and follow-up testimony that has been provided to the House

5  Financial Services Committee and then we've also been

6  involved in regulatory requests from outside the United

7  States.

8       They are listed here and pretty extensive requests that

9  stem from our international operations.  We have exchanges

10 that, for example, are in Japan and Singapore, Cyprus, we

11 have European operations where we host a European exchange.

12 So, all of these agencies relate to the operations outside

13 the United States, and they've been very active in terms of

14 requests as well as us responding to those requests.

15 Q    And since the -- you're aware of the appointment of the

16 creditors committee in these cases?

17 A    Yes, I am.

18 Q    And so what has been the level of cooperation with the

19 creditors committee since its appointment?

20 A    Well, I'd like to think it's a model of how a company

21 should work with the creditors committee.  My approach really

22 is a, sort of, partnership approach with the creditors

23 committee.  We have numerous requests from the committee.

24 They have been in place, I think, for less then probably a

25 full 45 days; something to that effect.

1        So, had a head start, if you will, which is helpful.

2   That head start allowed us then to really put the committee

3   in a position right away where they could, you know, be a

4   true partner with us in this whole process, this journey

5   we're on to figure out where we are going with the assets and

6   the recoveries here.

7        So, we have lots of calls, almost hourly contact between

8   the professionals and the committee, and the debtors. I

9   personally had a call with members of the creditor committee.

10  I have also given my contact information, on a personal

11  level, to the co-chairs of the committee with a full invite

12  for them to call me at any time related to any requests that

13  they might have or any views that they might have that they

14  would like to share with me on a personal basis. So, we

15  really have a, I think, hopefully what should be a model for

16  cooperation in this important mission.

17  Q    Now let's go back for a moment to the directors that

18  were appointed. Did you appoint the directors with any,

19  keeping in mind the potential for any conflicts between

20  silos?

21  A    Yes. Its no coincidence that the way we establish the

22  director positions. It is not one board. They often

23  function to get information at the same time just for

24  efficiencies and clarity as to the information, but each

25  director is the director of a separate silo. So, they have

1   duties as a director, for example, of the Alameda silo.  The

2   other directors do not.

3       There is a director, for example, for West Realm Shires.

4   So, each of the directors there is, you know, one silo or

5   there is two directors on a silo, but each of these

6   directors, essentially, have their own silo and their own

7   responsibilities related to -- their silo in a subsidiary is

8   beneath it.  There is also a subsidiary director for those

9   silos who is separate as well.

10  Q    Do you have separate board meetings for the directors in

11  the separate silos?

12  A    We have joint meetings which are informational for all

13  the directors and then we have separate meetings for the

14  directors related to their unique silo.  So, we actually put

15  presentations together that only deal with that director and

16  that director's unique silo information.  And we do that for

17  a few reasons.

18      One is that we want to really give in depth information

19  related to that silo to that particular director, but we also

20  want to create an environment under which that director can

21  raise any issue whatsoever with respect to their silo versus

22  any other silo or any other issue that exists in the FTX

23  environment.

24      So, we want to create an efficient process which allows

25  all the directors to share ideas, and share their

1   experiences, and share access to the host, you know, of

2   professionals we have, but we also have a very sterile

3   environment where each director gets to spend, you know,

4   quality time relative to the specific information that

5   relates to that particular silo.

6        For example, if there are assets that are in that silo,

7   not in another silo, or if there are intercompany claims, for

8   example, that directors want to discuss in their silo, vis-à-

9   vis other silos, they have got the environment and the forum

10  to do that outside of the presence of the other directors.

11  So that is really the model we created.

12  Q    Now, Mr. Ray, I would like to go back to the

13  cybersecurity environment that you mentioned a few minutes

14  ago.  Now, when -- is there a physical location right now

15  where FTX is located, the company?

16  A    No, there is not.  The company was described, and I

17  think we referred to it in the first day petitions, as

18  located in the metaverse, but we have no physical location

19  whatsoever.

20  Q    So, the investigations work that has been taking place

21  so far how does that take place in the metaverse?  How does

22  that investigation take place?

23  A    Carefully because all of our data is stored in the

24  cloud.  Its stored electronically.  This isn't a case where,

25  for example, like Enron where we owned 100,000 square foot

1   facility, and we owned a forklift, and we hired a forklift

2   operator to go get the documents when someone required them.

3   This requires someone to go into our data environment to do

4   their day job.

5   Q    Now on the first day of the case we received relief that

6   provided indemnities for certain individuals who were

7   accessing that environment.  Do you recall that?

8   A    Yes, I do.

9   Q    Why was that indemnity required?

10  A    The reason for that, and its very extensive and I will

11  try to keep it focused and brief, is you're allowing and

12  requiring, more importantly, you know, professionals to enter

13  into a highly fragile computerized database where things can

14  happen and go wrong pretty quickly.  If you open up that

15  database, you're subjecting yourself to third-party hacks.

16  You are subjecting yourself to inadvertent errors.

17       You know, I guess the word sometimes that might come to

18  mind is, sort of, thick fingers or whatever.  You literally

19  could hit the wrong key in this environment and destroy

20  hundreds of millions of dollars' worth of value because you

21  mis-Q'd letters to a code, a key if you will, a password that

22  allow you to open up a wallet.

23       This is an environment that has to be very cleansed,

24  very clinical.  This is not something for people to bounce

25  around in without creating tremendous amounts of risk;

1   external risks, internal risks.  So, it's a laboratory that

2   you have to work in very, very carefully.

3   Q    So, I would like to show you another demonstrative.

4   This -- you are familiar with this slide?

5   A    Yes, unfortunately.

6   Q    And so could you please describe what this is depicting?

7   A    Well this depicts, you know, a couple few different

8   things.  As you can see, the bricks around this wall shows,

9   you know, the state of what our AWS environment was at the

10  time of the petition; a very loose environment, one that is

11  probably a case study for how not to have a controlled

12  environment for crypto.  Its very vulnerable.  We had a hot

13  wallets in a system where multiple people had access to

14  passwords, wallets, you know, sitting in a system that are

15  accessible virtually by anyone who could access that data

16  system.

17       So, there is multiple access points into an environment

18  that literally held billions of dollars' worth of the

19  company's assets.  And as you can see to the right there is a

20  few different, you know, words set out in red print there,

21  you know, prepetition.  This environment allowed insiders to

22  freely transfer assets of the company with  no accountability

23  and no tracing. Literally, one of the founders could come

24  into this environment, download half a billion dollars' worth

25  of wallets onto a thumb drive, and walk off with them and

1    there would be no accounting for that whatsoever.  Virtually

2    unthinkable, really, in a controlled environment.

3         What you will see down below is that, you know, while we

4    were securing this environment that the petition date, we

5    signed the power that gave me the right to advise on the

6    filing of this. It was done at 4:24 a.m. in the morning on

7    the 11th.  By 7 o'clock in the morning I was reviewing

8    petitions.  By 10 o'clock we were filing the first petitions.

9    By early afternoon we had, I think, achieved most of the

10   filings of the petitions.  Then throughout that day those

11   early hours, within six, seven hours, you know, we were doing

12   the normal first day petition filing.

13        One of our team -- one of our advisors, not someone

14   inside the company, one of our advisors that we had hired,

15   detected movement of crypto off of our wallets.  So,

16   immediately, effectively, on the filing we had, you know, an

17   issue with the crypto being stolen from the company.  At the

18   same time, you know, there were efforts.  At the time we

19   didn't fully realize what was transpiring, but there was

20   efforts by the provisional liquidators to also secure assets

21   for the protection of customers.  This was all happening

22   simultaneously.

23        So, your normal first day petition, as chaotic as

24   sometimes can be, this was something that I have never

25   experienced.  It all stems from the failure of this system

**A474**

1  and a lack of integrity related to this system.  We were

2  fortunate enough, because of the professionals we had, to

3  stop the crypto being stolen.

4      We were fortunate, of course, that the provisional

5  liquidators were also able to capture some of this value held

6  in custody in the Bahamas that, presumably, could have also

7  been stolen in this time period.  Those hacks went on

8  virtually all night long.  I think they somehow ceased around

9  4 to 5 a.m. the following day.  We had over 100 people on the

10 phone trying to stop these hacks because at that point you

11 have no passwords. You don't know where the wallets are in

12 this environment.

13     Someone described the wallet, sort of, in this AWS

14 system as, sort of, needles in a haystack of needles.  We

15 don't have the wallets.  We don't have the passwords.

16 Obviously, some people did have passwords that were accessing

17 these.  So, it was really 48 hours of what I can only

18 describe as pure hell.

19         THE COURT:  Mr. Bromley, before you continue, how

20 much longer do you think you have?

21         MR. BROMLEY:  I would say another 15 minutes.

22         THE COURT:  We will go ahead and finish-up and

23 then we will take a recess before we do cross.

24         MR. BROMLEY:  Thank you, Your Honor.

25 BY MR. BROMLEY:

1    Q    Mr. Ray, can you take a look at the next slide.  So, Mr.

2    Ray, could you describe the computing environment at FTX

3    today?

4    A    We have created, you know, the environment, you know, as

5    it should be.  I mean we have hired experts in computer

6    science and cryptography.  I mentioned the Sygnia group as

7    well as the Alvarez & Marsal group that have been essential

8    to rebuilding the brick walls around these wallets to give

9    them some security.

10        We have gotten access to the code, the controls and the

11   data to prevent any further loss by way of hacking.  We have

12   moved hot wallets into what is called cold storage to secure

13   those.  We have also gone off to exchanges where wallets are

14   contained and moved those wallets over to a controlled

15   environment.

16        So, this first exercise, with the assistance of computer

17   experts, is to provide integrity to the environment, increase

18   the security, move those wallets into cold storage and secure

19   the assets for the benefit of customers and creditors.  That,

20   of course, involves, you know, the analytics that these

21   experts use to find wallets and also what is key here is to –

22   – we're doing a tracing analysis in to look at unauthorized

23   transfers of crypto that either were in wallets or in the

24   environment itself; all with the goal –– this isn't, sort of,

25   a study for study sake.  There is a purpose here to what this

1  is beyond just the integrity of the system and maintaining

2  it, and securing the assets.

3      This is, effectively, to also, you know, recoup those

4  assets to investigate who moved assets and for what purpose,

5  the source of the funds for those assets, whether that is

6  external or on an inter-company basis.  When we are

7  investigating who did that, the potential misconduct, the

8  wrongdoers, the claw back opportunities, really, to that.

9  And, of course, in the process of that all of the evidentiary

10  work that we are doing to cooperate with the Government is

11  not an exercise for exercise sake.

12      There is no, sort of, billing code that just says

13  cooperate with the Government.  We look at all of our

14  cooperation really on an end-use basis.  What do we do with

15  that information, what is the buy product of that

16  investigation.  The by-product is always with an asset in

17  mind or recovery in mind.  Its not sharing for sharing sake.

18  Its how do we use that information that we provided to

19  ourselves and to regulatory authorities to then synthesize it

20  in a way that provides us with the tools that we need to

21  recover on avoidance actions, to inevitably file actions

22  related to, you know, misfeasance or malfeasance against

23  insiders, for example.

24      Then, obviously, you know, there is the compliance with

25  our Chapter 11 obligations and disclosure.  You know, that is

1  an ongoing obligation that we have and that is fulfilled

2  through this very exercise.  Then lastly, as I mentioned, our

3  by-product of that leads to sharing evidence and cooperating

4  with the authorities.

5      This is an ongoing, you know, circular effort, right,

6  you know, answers, we get questions, we provide information,

7  that information gets synthesized, that turns into new

8  inquiries, new questions, and we're continuing to evolve in

9  the process.  We have been at it 90 days. Its night and day.

10 When you see this environment today it's a very simple chart,

11 but to get from where we were 90 days ago, which I would

12 describe as pure hell, to where we are today is pretty

13 satisfying.

14 Q    Mr. Ray, do you think there would be a danger of

15 introducing a new party into the environment?

16        MS. SARKESSIAN:  Objection.  His opinion on this

17 issue is not relevant to the Court's determination regarding

18 appointing an examiner.

19        THE COURT:  Overruled.

20        THE WITNESS:  There is a danger.  You know, beyond

21 the -- we have a lot of seats at the table.  We are happy to

22 feed all those people at the table, but what is unique about

23 this, you know, is this controlled environment.  This isn't

24 some, you know, lawyer exercise, you know, where we bring in

25 a well-healed professional who observes some misconduct by

1   people.

2          Literally you have to operate in this laboratory

3   to investigate, to secure these assets, and to develop a

4   process of translating this data into recoverable assets for

5   customers.  This is just too fragile of an environment for me

6   to accept, you know, yet another seat at the table of someone

7   who just bounces into this environment and puts ourselves at

8   risk.  We have come too far to allow that to happen in my

9   mind.

10          MR. BROMLEY:  That's all I have for this witness

11  at the moment, Your Honor, reserving time for redirect.

12          THE COURT:  All right.  Thank you.

13          Let's go ahead and take a 15-minute recess.  We

14  will reconvene at 11:25.

15      (Recess taken at 11:11 a.m.)

16      (Proceedings resumed at 11:27 a.m.)

17          THE COURTROOM DEPUTY:  All rise.

18          THE COURT:  Thank you, everybody.  You may be

19  seated.  We are back on the record.

20          Whenever you're ready.

21          MS. SARKESSIAN:  Thank you, Your Honor.  And for

22  the record Juliet Sarkessian on behalf of the U.S. Trustee.

23                     CROSS-EXAMINATION

24  BY MS. SARKESSIAN:

25  Q    Good morning, Mr. Ray.

1  A      Good morning.

2  Q      So, Mr. Ray, what -- in Enron when was it that you were

3  appointed?

4  A      In 2004.  I believe July of 2004.

5  Q      And was that after the plan had been confirmed?

6  A      It was prior to the confirmation date.

7  Q      Was it after the examiner's report had been filed?

8  A      Yes.

9  Q      And prior -- so, prior to that time, July 2004, you had

10  no involvement with the Enron case?

11  A      That's correct.

12  Q      You did not lead an investigation of the Enron debtors,

13  did you?

14  A      I lead the prosecution of those cases, yes.

15  Q      What type of actions were you prosecuting?

16  A      Virtually all types.  There was accounting malpractice,

17  legal malpractice, breach of fiduciary duty, crime.  There

18  were actions against insurance carriers for failure to pay.

19  There was avoidance actions.  I mean virtually, you know, any

20  type of affirmative recovery that one could think of.

21  Q      Now you testified something to the effect that you did

22  not feel that the examiner reports in Enron, or ResCap were

23  particularly useful to you in your roles?

24  A      That's correct.

25  Q      So, do you know whether the Courts in those cases viewed

1  the examiner reports as being helpful?

2  A    No, I don't.

3  Q    You don't know either way?

4  A    I don't know either way.

5          MS. SARKESSIAN:  Your Honor, since -- ordinarily I

6  wouldn't do this, but since Mr. Ray testified about his

7  opinion as to whether these examiner reports in these other

8  cases were helpful, I would like to bring to the Court's

9  attention what the Courts stated in the confirmation order in

10 Enron as well as a transcript in the ResCap case.  I can –

11         MR. BROMLEY:  Objection.  That is not evidence.

12         MS. SARKESSIAN:  It's not evidence, Your Honor,

13 but he testified about his opinion and these orders and

14 transcripts are part of the Court record.  And the Court can

15 take judicial notice of them.

16         THE COURT:  Well, I think you argued earlier I

17 could take judicial notice that they were filed and not the

18 content of those documents, right?

19         MS. SARKESSIAN:  That is true, but at least with

20 respect to an order, an order says what it says.

21         THE COURT:  Well, if it's an order I will take

22 judicial notice of the order. If its in a transcript I will

23 not take judicial notice of the transcript.

24         MS. SARKESSIAN:  So, the order that we have is in

25 -- that one is Enron.  It's the findings of fact and

1  conclusions of law.

2            MR. BROMLEY:  I don't have --

3            MS. SARKESSIAN:  I'm sorry.

4            THE COURT:  Do you want to produce a copy?

5            MR. BROMLEY:  And can I also ask are you done with

6  the witness?

7            MS. SARKESSIAN:  No.

8            MR. BROMLEY:  Well, what does this have to do with

9  --

10           MS. SARKESSIAN:  Oh, I'm sorry.  I apologize

11 because I was actually going to ask the witness about it, but

12 he's right, since the witness didn't know I can do this

13 later.

14           THE COURT:  You can do this later, yes.

15 BY MS. SARKESSIAN:

16 Q    Now, Mr. Ray, you talked about appointing directors,

17 correct?

18 A    Yes, I did.

19 Q    And your power to appoint directors came from the

20 omnibus corporate authority that was signed by Mr. Sam

21 Bankman-Fried, is that correct?

22 A    In part.

23 Q    What is the other part?

24 A    At that point I was the only officer of the company.

25 And pursuant to that power I was able to -- I had the power

1  to nominate directors and elect them.

2  Q    So, when you say the power, you mean the omnibus

3  corporate authority?

4  A    Yes.

5  Q    And that is Debtor's Exhibit 1.  I can -- do you have

6  Exhibit 1? Do you have a binder up there?

7  A    I do.

8  Q    If you could turn to Exhibit 1A, please.  That is the

9  petition of West Realm Shires Inc.

10        (Audio interference)

11             MS. SARKESSIAN:  I'm sorry?

12             THE COURT:  Whoever that was kick them out,

13  please.

14  BY MS. SARKESSIAN:

15  Q    If you look at the top of the page it has the ECF page

16  numbers. So, if you could turn to page 11 of 20, please.

17  Does that say omnibus corporate authority at the top?

18  A    Yes, it does.

19  Q    Is that the omnibus corporate authority that gave you

20  the authority to appoint directors for the debtors?

21  A    Yes.

22  Q    If an examiner is appointed, if the Court appoints an

23  examiner in this case, would you cooperate with that

24  examiner?

25  A    I will follow whatever orders are issued by this Court.

1  Q    Assuming that you were directed to cooperate with the

2  examiner would you do so?

3  A    Can you explain what you mean by "cooperation?"

4  Q    If the examiner needs documents, for example, that the

5  debtors have would you provide those documents to the

6  examiner?

7  A    I think there might be some caveats to that but, yes.

8  Q    Are there other things that you would not provide to the

9  examiner if he or she asked?

10          MR. BROMLEY:  Objection, Your Honor; speculation.

11 There needs to be a question.

12          MS. SARKESSIAN:  That's a fair objection.

13          THE COURT:  Okay.

14 BY MS. SARKESSIAN:

15 Q    You had testified that -- I believe you had testified

16 that all -- I don't want to misstate your words.  Did you

17 testify that all former management has been terminated?

18 A    I said that any former management that was in a control

19 position has been terminated.

20 Q    Okay.  But there still are some officers currently at

21 the debtors that were present prior to the petition date,

22 correct?

23 A    There are employees that are employed who were also

24 employed prepetition.  They're not officers of the company.

25 Q    We do have a stipulation -- I would point to we have a

**A484**

1  stipulated fact that there are certain officers that still

2  remain.  Are you saying that is inaccurate?

3  A    I am saying that you may be confusing titles with, you

4  know, officer positions which are different in a corporate

5  context and sometimes get confused.  For example, the general

6  counsel of the company is a title.  I have not stripped that

7  person of their title, but they don't function as general

8  counsel or officer of the company. I certainly haven't

9  appointed him as officer post-petition.

10  Q    So, you are saying that there are some individuals who

11  hold officer titles at the debtor that were there

12  prepetition.

13  A    That are not in control positions of the company.

14  Q    What do you mean by "control position?"

15  A    Positions of control.

16  Q    Could you elaborate a little further?

17  A    Controlling the actions of the company, making decisions

18  related to the company's business or operations.

19       Is that sufficient?

20  Q    Yes.  Thank you.

21       Are you aware that -- you had given some testimony

22  regarding cooperating with various State Attorney General

23  Offices and the like.  Is that correct?

24  A    Yes.

25  Q    And are you aware that certain State Attorney General

74

1  Offices or other State agencies have, in fact, joined in the

2  U.S. Trustee's motion to appoint an examiner?

3  A    I believe there was two joinders; I think Wisconsin and

4  one other state, yes.

5  Q    You don't recall there was a third one more recently?

6  A    If you say so.

7  Q    Okay.  It attached a bunch of letters from other State

8  agencies. You didn't see that?

9           MR. BROMLEY:  Objection, Your Honor.

10          MS. SARKESSIAN:  I was asking did you see that,

11  the attached letters from other State agencies supporting the

12  joinder?

13          THE WITNESS:  Yeah.  I don't know which ones you

14  are referring to.  I did review two of them. If there is a

15  third, I will take your word for it.  I did read the two that

16  were filed.  There is a third, I may not have read it.

17  BY MS. SARKESSIAN:

18  Q    Joinder of the Texas State Securities Board.  You didn't

19  see that?

20          MR. BROMLEY:  Your Honor, can I just ask the

21  relevance of this?  I mean we're happy to stipulate that the

22  Texas joinder was filed.

23          MS. SARKESSIAN:  Your Honor, he testified --

24          THE COURT:  I've seen it too and I've seen the

25  letter.

**A486**

1        MS. SARKESSIAN:  He testified about how, you know,

2   he's assisting them, and I think its relevant that they are

3   joining in the motion.

4        THE COURT:  I get that point, but I don't know

5   what else he can elaborate on.  He said he didn't see the

6   third one. I have seen it, so I know it's out there.

7        MS. SARKESSIAN:  Thank you, Your Honor. I just

8   wanted to make sure if I said Texas he might have said, oh,

9   yes, now I remember.

10        THE COURT:  Okay.

11   BY MS. SARKESSIAN:

12   Q   Are you aware of any State agencies that have objected

13   to the motion to appoint an examiner?

14   A   I think -- didn't you just say that two states, three

15   states had objected to --

16   Q   No, joined.

17   A   Oh, joined.

18   Q   I'm asking are you aware of any that objected?

19   A   No, I am not.

20   Q   Now your firm is called Owl Hill Advisory, correct?

21   A   That's correct.

22   Q   And are you the only employee of Owl Hill?

23   A   Yes.

24   Q   Okay.  So, you are -- among your services some of the

25   services you're doing relate to ongoing investigations of

1  various prepetition actions?

2  A    I'm sorry, in what case are you referring to?

3  Q    I'm sorry, FTX.  In FTX is one of the services you are

4  currently performing is investigating certain actions that

5  took place prepetition?  Is that something you are doing?

6  A    Well, in my capacity as CEO of the company I am

7  overseeing, you know, every aspect of the company's business

8  operations including investigations related to prepetition

9  conduct.

10 Q    Okay.  But you are not personally conducting any of that

11 yourself?

12 A    It depends on the topical matters, but in some cases I

13 am.

14 Q    Are there other employees at the debtor that are

15 performing those functions?

16 A    Yes.

17 Q    And are you overseeing them?

18 A    Yes.

19 Q    And you are billing on an hourly rate in this case, is

20 that correct?

21 A    That's correct.

22 Q    Do you know approximately the amount of fees that your

23 firm has incurred to date in connection with the services you

24 performed for the debtors?

25 A    Through what date?

1   Q    Through any date, today or the end of last year, or

2   whatever date you might have information on.

3   A    The most recent date I would have information on is the

4   period from November 11th, which was the start of the

5   engagement, through December 31st.  That approximate amount,

6   excluding the expenses, is $690,000 which is simply the

7   number of hours spent times the hourly rate.

8   Q    Have you looked at the examiner's report in Celsius

9   Network?

10  A    Yes, I have.

11  Q    Are you aware of how many times that report references

12  FTX?

13  A    I did not do a word count.

14  Q    But you did notice that there were references?

15  A    I'm sure there was the word "FTX."  Again, I didn't do a

16  word count.

17  Q    Did you look at the examiner's report in the Cred case?

18  A    No, I did not.

19  Q    Have you ever been an examiner?

20  A    No, I have not.

21  Q    Have you ever represented an examiner as counsel?

22  A    No, I have not.

23              MS. SARKESSIAN:  I'm sorry, Your Honor, could I

24  have a moment, please?

25              THE COURT:  Sure.

 1              MS. SARKESSIAN:  Your Honor, my cross is

 2    completed.  I can wait until after to deal with the order in

 3    the Enron case.

 4              THE COURT:  Let's see if there is any redirect.

 5              MR. BROMLEY:  No redirect, Your Honor.

 6              THE COURT:  Thank you.

 7              Mr. Ray, thank you.  You may step down.

 8        (Witness excused)

 9              MS. SARKESSIAN:  Your Honor, I'm going to hand

10    these out.

11              THE COURT:  Okay.

12              MS. SARKESSIAN:  Your Honor, may I approach?

13              THE COURT:  Yes.

14              MS. SARKESSIAN:  Should I give a copy as well?

15              THE COURT:  Yes.

16              MS. SARKESSIAN:  I should mark this U.S. -- well,

17    it's not an exhibit.

18              THE COURT:  This is for impeachment purposes only.

19              MS. SARKESSIAN:  Yes.  Effectively, yes.

20        (Pause)

21              MS. SARKESSIAN:  So, this is the findings of fact

22    and conclusions of law confirming the supplemental modified

23    fifth amended joint plan of affiliated debtors pursuant to

24    Chapter 11 of the United States Bankruptcy Code and related

25    relief in Enron, Southern District of New York Case No. 01-

1 16034.  The date is -- I don't have the docket number on

2 this, I apologize.

3          THE COURT:  I noticed at the top it says not for

4 publication.

5          MS. SARKESSIAN:  Yes.

6          THE COURT:  What is the effect of that on my

7 ability to take judicial notice of this document?

8          MS. SARKESSIAN:  I understand, Your Honor.  Like I

9 said, I -- my colleague tells me it is available on the

10 Bankruptcy Court's website.  Why does it say not for

11 publication? It is available on the Bankruptcy Courts

12 website.

13          THE COURT:  But not on the docket?

14          MS. SARKESSIAN:  It pre-dates -- the problem is

15 the date apparently.  Its from 2004.  I think that is what

16 the issue was, Your Honor.

17          THE COURT:  Okay.

18          MS. SARKESSIAN:  I mean it's, obviously, not a

19 written decision, but, again, Mr. Ray was allowed to testify

20 as to his opinion as to whether the examiner report was

21 useful.  And it would seem to me that the Judge's opinion on

22 that matter is, at least, equally relevant.

23          MR. BROMLEY:  Your Honor, we're not -- I don't

24 know that this is the Judge's opinion.  It says not for

25 publication.  I don't even know what part of it -- its 130

1    pages or 63 pages.

2              MS. SARKESSIAN:  Yes.  I will point that out.

3              MR. BROMLEY:  Okay.

4              MS. SARKESSIAN:  So I would first point out on

5    page 101, in the first full paragraph, fifth line down, the

6    Court states, "The ENA examiner has provided valuable

7    services to the estates of ENA and its subsidiaries in

8    satisfaction of his duties imposed by the Court."

9              MR. BROMLEY:  First of all, Your Honor, there were

10   four examiner reports, this references one examiner.  It

11   doesn't say the report was helpful, it just says the

12   examiners provided services.  We don't know who wrote this.

13   Proposed findings of fact and conclusions of law are

14   generally drafted by counsel and we haven't had a chance to

15   look at it.

16             We object to use of this -- and we're not even

17   sure what the use of it is for.  It doesn't impeach Mr. Ray

18   because he said he hadn't seen it.  So --

19             MS. SARKESSIAN:  Well, Your Honor, I mean, the

20   U.S. Trustee's position is that all of Mr. Ray's testimony is

21   completely irrelevant and we objected, obviously, repeatedly

22   to him giving his opinion about whether he thought the

23   examiner reports were useful in the two cases he was involved

24   in.  In Enron, it was after the fact; he came in after the

25   reports were filed.

1         So, again, if he's allowed to provide that

2  testimony, I think the Court can take judicial notice of an

3  order of the Court, findings of fact and conclusions of law

4  that was signed by the Judge with these findings.  And there

5  is some other provisions I would read about some of the other

6  examiners, but --

7         MR. BROMLEY:  Your Honor --

8         MS. SARKESSIAN:  -- I started with that one.

9         MR. BROMLEY:  -- Mr. Ray's testimony was opinion

10  testimony:  it's his own experience as to whether or not

11  these reports were helpful to him in a job that he conducted

12  and an effort that he was supervising.  I am sure that there

13  are people who think that the examiner report was helpful.  I

14  think Mr. Batson, who earned $9 million writing it, probably

15  thought it was helpful, but none of that is relevant to this

16  case.

17         MS. SARKESSIAN:  I agree that none of this is

18  relevant --

19         MR. BROMLEY:  No, this is --

20         MS. SARKESSIAN:  -- to this case --

21         MR. BROMLEY:  -- Mr. Ray is the chief executive

22  officer of FTX.

23         THE COURT:  All right, hold on.  Well, the problem

24  I have is, one, it says not for publication.  I have no idea

25  where this came from, I have no testimony where it came from;

1  so it's not authenticated.  It has an electronic signature,

2  but that doesn't tell me much unless I have something.

3  Usually, there's a web address that is identified on it or it

4  comes from the docket and there's a docket entry identified

5  on the document.

6          And, frankly, I mean, what you just read to me is

7  not -- I'll take it for what it is, what you just read to me,

8  but I don't think I can take judicial notice of this given

9  the way it's being presented to me.  I need to have some

10  authentication of the document, I don't have any.

11          MS. SARKESSIAN:  Your Honor, could I just speak to

12  my colleague for one minute?

13          THE COURT:  Sure.

14      (Pause)

15          MS. SARKESSIAN:  Your Honor, we do have the web

16  address where it came from.  Would it be helpful if we

17  forwarded this to you?

18          THE COURT:  I think, unfortunately, the only way

19  to do this is to have your colleague take the stand.

20          MS. SARKESSIAN:  Unfortunately, this colleague did

21  not personally download the document, another colleague did

22  that's not present in the courtroom and is in another state.

23          THE COURT:  That's a problem.

24          MS. SARKESSIAN:  Yeah.  Okay, Your Honor.  So

25  we'll -- there's nothing further to be done by this.  I

1    understand Your Honor's ruling and, again, normally I would

2    never do anything with these types of documents because I

3    think it is completely irrelevant to the issues before the

4    Court, but, again, because of Mr. Ray's testimony -- and I

5    agree, you know, I think it's a little bit different to say,

6    well, other people might have thought that the report was

7    helpful, but the Court's opinion is more important than other

8    people's opinions, I would think --

9              THE COURT:  I understand your point.

10             MS. SARKESSIAN:  Thank you, Your Honor.  Are we

11   moving on to --

12             THE COURT:  Yes.

13             MS. SARKESSIAN:  -- final arguments?

14             THE COURT:  Do you have any other evidence?

15             Well, I guess we're on -- you weren't done with

16   your evidence.  Do you have any other evidence, Mr. Bromley?

17             MR. BROMLEY:  No, Your Honor.

18             THE COURT:  Okay.  Any --

19             MR. SHORE:  Just one clarification before the

20   evidence is closed.  Again, Chris Shore for the Joint

21   Provisional Liquidators.

22             It's unclear whether and to what extent the

23   presentation that was given is coming into evidence or not,

24   and normally I wouldn't care since it would just be coming in

25   for this proceeding, but there was on that global -- or the

 1  -- I guess it was the first page of the chart which showed

 2  all the corporate logos and the admin burn that's going on,

 3  there was a line that went out that said other fiduciaries

 4  and listed the JPLs.  And I want the record to be very clear,

 5  I don't think the implication was being made, but the chart

 6  shows it that the JPLs are fiduciaries for the debtors;

 7  they're a fiduciary for the Chapter 15 debtor, that's all.

 8          THE COURT:  Well, those were demonstratives; they

 9  weren't admitted into evidence, so they're not part of the

10  record.

11          MR. PASQUALE:  Ken Pasquale for the committee,

12  Your Honor.  We have no additional evidence.  Thank you.

13          THE COURT:  Thank you.

14          Any rebuttal?  Ms. Sarkessian?

15          MS. SARKESSIAN:  Oh, I'm sorry.  I'm sorry, Your

16  Honor, I didn't hear you.

17          THE COURT:  Any rebuttal evidence?

18          MS. SARKESSIAN:  No --

19          THE COURT:  Okay.

20          MS. SARKESSIAN:  -- no rebuttal evidence.

21          THE COURT:  All right.  So we can go to closings.

22          MS. SARKESSIAN:  Thank you, Your Honor.  Again,

23  for the record, Juliet Sarkessian on behalf of the U.S.

24  Trustee.

25          And, Your Honor, I am going to make sure I'm not

1   repeating my opening argument, but I think that -- we've had

2   some evidence today and I'll speak about that in a minute,

3   but of course the U.S. Trustee's position, as I did indicate

4   -- I am repeating my opening -- under 11 -- the requirements

5   for 1104(c)(2) have been met and in fact the only facts that

6   could have been disputed were stipulated by the debtors and

7   the other objectors.  And, therefore, the U.S. Trustee

8   believes that an examiner is mandated.  Of course, the scope

9   of such examination will be decided -- if Your Honor was to

10  appoint an examiner, the scope would be dealt with after

11  that, but --

12           THE COURT:  Don't I need to do that beforehand?  I

13  mean, how do I determine as is appropriate if I don't know

14  what the proposed scope of the examination is?

15           MS. SARKESSIAN:  Well, of course, Your Honor, the

16  U.S. Trustee does not believe that the as is appropriate

17  relates actually to the scope of the examination and not to

18  whether an examiner should be appointed.  And the number of

19  cases --

20           THE COURT:  Well, it has to point to one -- it has

21  to apply to one or the other, doesn't it?  I mean --

22           MS. SARKESSIAN:  Yes, it's a scope -- yes, it

23  applies to the scope of the investigation.

24           THE COURT:  So that's my question, I don't know

25  what scope you're asking me to grant.  How would I know how

1    to do that?  I can't just say I'm going to appoint an

2    examiner and do what?

3            MS. SARKESSIAN:  Well, Your Honor, I understand

4    that in other cases, I believe that included Residential

5    Capital, you know, the Court said that will be -- appointing

6    the examiner -- and that -- Residential Capital did actually

7    think that the as is appropriate was a requirement that had

8    to be found and they found it was appropriate, but the Court

9    nevertheless said, okay, the scope will be dealt with, you

10   know, now the parties get together, the U.S. Trustee appoints

11   -- you know, nominates and appoints an examiner, and then the

12   examiner meets with the parties and they talk about the scope

13   and then they come back to the Court.

14           But, Your Honor, I am happy to give you -- I

15   circulated last night to all the other parties -- because

16   we've had a number of questions about scope, so last night we

17   said, all right, here are some examples -- we can't say that

18   this is every -- here's some examples of the types of things

19   that would -- you know, excuse me, an examiner could

20   investigate.

21           So, number one, the facts and circumstances

22   surrounding the misuse of customer funds prepetition;

23   identifying the individuals and entities that were involved

24   in that or who knew about it or should have known about it;

25   and determining whether any of those individuals remain

1   employed at the debtors or otherwise have some continuing

2   involvement in the debtors' affairs.

3          Also investigating any actions taken by the

4   debtors, their officers, directors, employees, or others to

5   conceal the misuse of customer funds, including by way of

6   software.  That was something that Mr. Ray in his first day

7   declaration talked about the use of software to hide, to

8   conceal the misuse of customer funds.  And then, again,

9   whether such individuals remain employed at the debtors.

10          Also investigating who was responsible for the

11   debtors' corporate controls and governance; the gathering and

12   maintaining of financial information; systems integrity; the

13   control of the debtors' cash; maintaining the security of the

14   debtors' digital assets, maintaining the security of customer

15   cash and customer digital assets, and what actions were taken

16   or not taken by the debtors, their directors, officers,

17   employees, or others in that regard; and determining whether

18   any individuals or entities who were responsible for such

19   failures remain employed by the debtor or have continuing

20   involvement in the debtors' affairs.

21          And, again, this is picking up on Mr. Ray's first

22   day declaration where he talked about just a complete -- I

23   believe complete lack of these various controls and financial

24   information, and all of these issues that he said was the

25   worst thing he had ever seen, even worse than Enron.

1          So that would be who was responsible for that.

2    Who turned a blind eye?  So that would be another area.

3          Also, just I think more generally, investigating

4    all allegations of fraud, dishonesty, incompetence,

5    misconduct, mismanagement of the debtors by their officers,

6    directors, employees, or others; determining whether any

7    individuals or entities who committed fraud, dishonesty,

8    incompetence, misconduct, et cetera, remain at the debtors or

9    have continuing involvement with the debtors' affairs; and

10   then also investigating the facts and circumstances revolving

11   around all of the hacks of the debtors' exchanges that

12   occurred both before the petition date and after the petition

13   date, determining what individuals or entities were

14   responsible for those hacks and, separate issue, what

15   individuals or entities on behalf of the debtors were

16   responsible for preventing such hacks, whether those persons

17   -- whether they were negligent in the performance of their

18   duties and whether those individuals remain employed by the

19   debtors; and then, finally, shedding transparency into the

20   relationship between the FTX entities and the Celsius

21   entities.

22         Again, this is not meant to be a comprehensive

23   list, but I'm providing it, as I did provide to the other

24   parties yesterday evening, these are the types of things that

25   we could see an examiner looking into in these particular

1    cases.

2              THE COURT:  So pretty much anything and everything

3    that happened prepetition is what you're asking for?

4              MS. SARKESSIAN:  We're not -- Your Honor is the

5    final determiner of the scope of the examiner, not the U.S.

6    Trustee.  These are just things that we think would make

7    sense, but scope could be different.

8              And I will also point out, Your Honor, that, you

9    know, there was testimony by Mr. Ray about securing -- having

10   secured wallets and that, you know, having an examiner could,

11   I guess, create some type of a security risk, I think was

12   what he was saying.

13             Number one, I mean, I certainly hope there

14   wouldn't be any security risk with any examiner.  I mean,

15   obviously, we would appoint an appropriate person.  But a lot

16   of these issues I don't think would even involve having to

17   look into -- I really don't understand a whole lot about the

18   system, Your Honor, I'll have to admit, but, you know,

19   looking into cold wallets, hot wallets, any of the --

20             THE COURT:  Well, you wanted him to investigate

21   what happened with the customer funds, which would require

22   investigating what happened with the cold wallets, the hot

23   wallets, and all the -- and the entire computerized system of

24   the debtors, wouldn't it?

25             MS. SARKESSIAN:  I'm not a technology expert, Your

1  Honor.  I think that some of it could be -- I also don't know
2  what type of documentation there is of that.  I think some of
3  that could be done without actually getting into wallets.
4  It's certainly -- I mean, because there will be transfers --
5  once the money is taken from the wallets, it was then
6  transferred to Alameda, is my understanding -- I don't mean
7  to be testifying, but that's my understanding.  And it may be
8  that there's things that could be traced as to how it got to
9  Alameda that would not require actually going into the
10 wallets themselves, but I am very -- I am not the type of
11 person that could really clarify that, I'm sorry, Your Honor,
12 I don't understand how that works well enough.  Obviously,
13 any examiner appointed would have to be somebody that was
14 very knowledgeable about that area, about cryptocurrency, and
15 we think certainly that would be appropriate to have somebody
16 who's very knowledgeable about cryptocurrency.
17          But to the degree that that type of investigation
18 is needed, I feel very confident that the debtors, along with
19 their professionals, will take very step to make sure that
20 all -- that there's no compromise of any system, that all
21 security that's needed is there and protected, and that they
22 would, hopefully, cooperate with the examiner as much as
23 possible.  The examiner can't get access to this unless the
24 debtors give the examiner access, there's no other way for
25 the examiner to do it.  So it would be -- the debtors would

**A502**

1   be supervising this.  There should not be any type of a

2   security risk under the circumstances.

3          THE COURT:  Well, let's talk about your view on

4   the mandatory nature of 1104.  So 1104 says that, if I don't

5   appoint a trustee, that an examiner, under (c), can be

6   appointed and the appointment -- and I should take into

7   account an investigation of the debtor, as is appropriate.

8   So what does that mean, as is appropriate?

9          I know you say that doesn't mean if appropriate,

10  but doesn't as is appropriate also mean as is necessary,

11  isn't that the same --

12         MS. SARKESSIAN:  Well, that would relate --

13         THE COURT:  -- aren't those the same thing?

14         MS. SARKESSIAN:  -- well, that would relate to the

15  scope.  Well, I guess, Your Honor, I think what Your Honor is

16  getting to -- and please correct me if I'm wrong -- is that

17  there are other parties here that are conducting

18  investigations and we're well aware of that.  The debtor is

19  conducting an investigation with its professionals,

20  presumably -- I understand that the committee is doing the

21  same.

22         And I think, in that regard, what's relevant is

23  that the Code talks about, you know, if these elements are

24  met, an examiner shall be appointed.  It doesn't say an

25  examiner shall be appointed unless the debtor is

 1   investigating itself or, you know, unless there's new

 2   management at the debtor or unless there's a committee that

 3   can undertake that process.  I mean, even -- my understanding

 4   is, Your Honor, in Cred, there was a committee and there was

 5   new management and Your Honor still appointed an examiner.

 6   And there are other cases that we cited in our reply papers

 7   and probably our moving papers as well where -- I mean,

 8   there's creditors committees in most cases.

 9          Clearly, the Congress was aware that the creditors

10   committee has the ability under the Code to conduct

11   investigations, but they nevertheless approved 1104(c)(1) and

12   (2) and said, you know, under this circumstance, it's an

13   examiner that has to do it, it's not good enough to have a

14   committee do it, it's not good enough to have a debtor, even

15   if it has new management to do it.

16          THE COURT:  Well, in Cred, I indicated first that

17   I didn't think it was a mandatory obligation under 1104.

18   And, two, there was still -- the two main founders of that

19   company were still in charge; they had appointed an

20   independent director, but they were still there and running

21   things, which informed my decision on whether or not I should

22   appoint an examiner in that case.

23          So let me ask you a hypothetical here.  Say a

24   debtor meets the debt threshold under 1104(c)(2) and, a week

25   before the confirmation hearing, a creditor comes in and says

1    we want you, Judge, to appoint an examiner because we think

2    there was -- something happened at the firm, we don't know

3    exactly what it was, but we think there's something wrong and

4    we want an examiner.  Am I obligated to appoint an examiner

5    in that circumstance and put off confirmation of the plan for

6    however long it takes the examiner to do a report?

7            MS. SARKESSIAN:  Well, Your Honor, I think, first

8    of all, I don't think the Code provision requires that

9    confirmation not go forward, it doesn't say that if an

10   examiner is -- I understand why it would make sense to do

11   that, but I don't think that that's a requirement.

12           THE COURT:  How could I confirm a plan if I've

13   appointed an examiner to let me know whether there was

14   insiders who did something wrong?

15           MS. SARKESSIAN:  Well, so I think -- so UAL Corp.,

16   which is a bankruptcy, Northern District of Illinois, back

17   from 2004 actually, I think, addressed that issue.  They said

18   that if you have a situation in which the case where the debt

19   exceeds the threshold and, you know, parties sought an

20   appointment of an examiner to investigate a private dispute

21   -- that's how the Court put it, a private dispute with the

22   debtor that does not raise issues as to the quality of the

23   debtor's management, the Court could limit the scope of the

24   investigation to, quote, "whether there is good cause to

25   engage in the inquiry suggested by the movant," close quote.

1   So -- and that's 307 --

2           THE COURT:  Well, that would be an inquiry into

3   whether I should appoint an examiner.

4           MS. SARKESSIAN:  No.  I think -- I thought what

5   the Court was saying is you do appoint an examiner, an

6   examiner looks to see -- if somebody comes in and makes

7   allegations that seem to be, you know, motivated by, you

8   know, a litigation tactic or something that doesn't seem to

9   be in good faith, then the Code provision does state that an

10  examiner still has to be appointed if that threshold is met,

11  but the examiner can look into are there any grounds for

12  these allegations, I mean, is there anything.  And of course,

13  if it's found that there are, then, presumably, the scope

14  would be -- the Court would expand the scope to look into

15  those allegations that the examiner found there, you know,

16  might be something there.

17          THE COURT:  Well, what if the creditor comes in

18  and says we think there was a $10,000 fraudulent transfer to

19  an insider of the company, we want an examiner to investigate

20  that, but the debtor is on the verge of administrative

21  insolvency and, if I appoint an examiner, it's going to push

22  them over the edge, do I still have to appoint an examiner

23  then too?

24          MS. SARKESSIAN:  I mean, Your Honor, under the

25  Code provision that would appear to be the case.  We don't

1   have that situation here, obviously.

2          THE COURT:  Well, what I'm trying to get at is,

3   are there exceptions, which means that there are -- there is

4   some discretion that has to be applied and determining when

5   and how to apply that discretion should be on the Court,

6   should it not, not on an examiner appointed who then tells me

7   whether or not he thinks I should appoint an examiner further

8   to investigate?

9          MS. SARKESSIAN:  Well, the Court does have

10  discretion if it falls under (c)(1) of 1104.  I mean, if the

11  threshold -- and, again, remember, Your Honor, the threshold

12  is not $5 million in debt, it's $5 million in a very

13  particular kind of debt, which is not every case, but if that

14  occurs --

15         THE COURT:  It would be quite a few of them in

16  this court.

17         MS. SARKESSIAN:  If that occurs, if that threshold

18  is met and the other things -- you know, there's not a

19  confirmed plan, there's not a trustee, there is no discretion

20  in the statute, that is the U.S. Trustee's view, that is the

21  view of the only Circuit Court that ruled on this, and the

22  few District Courts that have ruled have reversed the

23  Bankruptcy Court under these saying there is no discretion,

24  they must be appointed.

25         Now, I understand -- I certainly understand the

1    Court's concern that someone might be, again, acting in an

2    abusive manner, you know, acting for -- under -- for a

3    wrongful purpose.  Again, that's certainly not this

4    situation.  I think that's one of the things that -- well,

5    wrongful purpose or that the -- they're not really asking for

6    an examiner, I mean, they're not -- there's nothing to

7    examine.  Like some of these cases in this district where it

8    was part of the plan confirmation and a party was trying to

9    get an examiner appointed to basically look at legal issues

10   or like in Mallinckrodt where there were allegations that

11   counsel representing certain tort claimants had done things

12   that were improper -- of course, that was not the debtor, it

13   has to be actions by the debtor.

14          And so that we do have some -- it has to actually

15   fit.  Somebody actually has to be asking for an examiner to

16   actually investigate the debtors, the action of the debtors,

17   not something else, not a legal issue.  But if it does fall,

18   if they meet all of the requirements of 1104(c)(2), the U.S.

19   Trustee believes that there is no discretion by the Court,

20   that that's what Congress intended.  And we cite and we go

21   through the legislative history in our reply brief, that was

22   what -- this was a compromise where there were certain

23   parties that wanted to have trustees appointed automatically

24   in all large cases, that didn't happen, this was the

25   compromise that an examiner would have to be appointed under

1    these circumstances.

2           THE COURT:  Let's talk about kind of the overall

3    scheme of 1104 because 1104 says you don't even get to

4    1104(c) unless the Court decides not to appoint a trustee.

5    So why would the appointment of a trustee obviate the need

6    for an examiner?

7           MS. SARKESSIAN:  Well, the trustee has the ability

8    to conduct all sorts of investigations, I mean, that's part

9    of what a trustee does.

10           THE COURT:  And a trustee is someone who is

11   appointed who is independent --

12           MS. SARKESSIAN:  Independent.

13           THE COURT:  -- no connection with the company

14   before they filed for bankruptcy, all of the attributes that

15   we have with Mr. Ray and the independent directors who've

16   been appointed in this case.

17           MS. SARKESSIAN:  But, Your Honor, there is a

18   difference between a trustee and new management.  I mean,

19   again, the Code doesn't -- so 1104(c) doesn't say unless

20   there's new management or unless there's a committee that can

21   conduct the investigation.

22           And I think that it's very important that a -- the

23   difference is an examiner or a trustee and certainly it would

24   stick with an examiner.  An examiner has to prepare a report

25   and that is a public-facing report.  It is independent and

1   does not represent any constituency.  Yes, Mr. Ray did not

2   have a prior connection with the debtors; he was appointed by

3   Mr. Sam Bankman-Fried and he is the CEO of the debtors, he

4   does represent a constituency that is the debtors, he is not

5   independent, not like an examiner.

6            And even though a committee -- I mean, a committee

7   also represents a constituency, but, again, Congress was

8   aware, it gave committees the ability to do investigations,

9   they don't file reports with the Court.  It's very different

10  than an examiner.  They can settle, so can the debtor.  The

11  debtor can investigate things; it can investigate claims and

12  settle without that investigation ever becoming public.

13            THE COURT:  Well, they'd have to file a 9019

14  motion.

15            MS. SARKESSIAN:  They do have to file a 9019

16  motion, but it is not the same -- and I've seen many a 9019

17  motion -- that is not the same thing as an examiner's report.

18  This is -- again, this is what Congress decided needed to be

19  done under these circumstances.

20            And even, Your Honor, honestly, even if you say,

21  all right, you're reading as is appropriate to mean if

22  appropriate, this is a case where -- it's hard to imagine

23  that it's not appropriate.  I mean, I will use, for example,

24  Judge Sontchi in -- I'm sorry --

25            UNIDENTIFIED SPEAKER:  In Visteon.

1          MS. SARKESSIAN:  In <u>Visteon</u>, thank you.  Judge

2   Sontchi, there he did not believe that (c)(2) was mandatory

3   and there he said that -- he also -- he didn't -- it seemed

4   unclear as to, you know, what actually was being asked of the

5   examiner to do and I believe this was also -- if it wasn't at

6   confirmation, it was close to it -- but Judge Sontchi said,

7   quote, "At some point, there has to be a level of smoke, if

8   you will; not a lot, but more than none, more than just a

9   whiff of smoke."

10          And let's compare that to what Mr. Ray said in his

11   declaration that's being admitted as Exhibit 20, paragraph 9,

12   saying that FTX's situation is a dumpster fire.

13          So we don't have a situation where there doesn't

14   really seem to have been any wrongdoing that somebody is

15   coming in and asking for an examiner for an improper purpose

16   -- again, this is assuming, I am for a moment assuming, which

17   of course the United States Trustee does not agree to, but if

18   as is appropriate means it has to be appropriate, we think

19   it's very appropriate here and of course we think for the

20   same reasons that it's in the best interest of the creditors.

21          We understand that Mr. Ray was not prior

22   management, but, again, 1104(c) nowhere, whether it's under

23   (c)(1) or (c)(2), it doesn't say unless you have new

24   management, unless there's a committee, unless you have

25   federal and state agencies doing their own investigation.

1    None of that is in there, none of that -- those elements are

2    relevant to whether or not an examiner should be appointed.

3    And, again, because an examiner, it is public-facing, it does

4    do -- he or she does do a report.

5            I'd like to talk a little bit about -- hold on

6    just one moment, Your Honor.  I don't want to go out of order

7    and confuse things.

8         (Pause)

9            MS. SARKESSIAN:  Right.  So, again, Residential

10   Capital, which again is one of the cases that the objectors

11   do rely on, it's one of the written opinions that says it's

12   not mandatory, but even there the Court said when it did

13   appoint an examiner, it said it must be appointed, quote,

14   "notwithstanding the ability of any other party to

15   effectively and expeditiously investigate the debtor," close

16   quote.

17           So we're not the -- you know, the fact that there

18   is a committee or are other people that can do it is not

19   relevant once the elements have been -- the elements of

20   1104(c) have been met.

21           And, again, an examiner is required to publish a

22   report, a committee -- the committee has discretionary

23   ability to investigate, it's not required, and they are

24   certainly not required to file any report, and conducting an

25   investigation is specifically removed from the list of the

1   debtor-in-possession duties under 1107(a).  So, again, the

2   fact that there's new management, none of that is relevant.

3          And it's not novel to appoint an examiner in

4   situations in which you have governmental, you know, law

5   enforcement or regulatory agencies conducting their own

6   investigation; that happens all the time.  Those agencies

7   will not be filing a report with this Court as to the results

8   of their investigation; it's a completely separate function

9   that they are performing.

10          The debtors also talk about -- again, talk about

11  the law of this district.  He cited a Third Circuit opinion

12  saying there is no such thing as law of the district; that

13  just doesn't exist.  He also said the bench rulings are

14  binding precedent, they're not binding precedent.  In fact, I

15  mean, Judge Walrath won't even let you quote back her own

16  bench rulings to her.  I'm not saying that that -- you know,

17  I'm not saying that all the Judges are like that, but it's

18  not -- it's not binding precedent certainly.

19          I want to talk a little bit about the cost issue.

20  Cost is not mentioned anywhere in 1104.  This is not a case

21  like Dewey & LeBoeuf in which -- I mean, Your Honor asked

22  about converting to a Chapter 7 -- that was a case in which

23  the Court indicated that the cost of an examiner would result

24  in the case -- the debtor's cases being converted to a

25  Chapter 7 and most likely becoming administratively

1   insolvent.  That is absolutely not this case.  In fact,

2   Exhibit 15, which is the debtors' interim financial update as

3   of December 31st of last year, which was -- I want to -- they

4   haven't filed any monthly operating reports, it was their way

5   of filing something along those lines, although it doesn't

6   comply with a monthly operating report, but on page 11 it

7   shows the debtors having unrestricted cash of over 1.2

8   billion.  That does not -- that's apart from custodial cash,

9   that's apart from restricted cash.

10          So this is not a situation in which these debtors'

11  cases are going to be converted or they're going to become

12  administratively insolvent because there's an examiner.  That

13  doesn't mean that there's no budget for the examiner, of

14  course there's going to be a budget for the examiner.  But

15  there's no reason to believe that the cost of the examiner

16  doing an investigation is going to be more than the debtors'

17  professionals conducting an investigation.

18          And I point to Exhibit 10, which is a supplemental

19  declaration of Mr. Dietderich of Sullivan & Cromwell.  It

20  attaches the list of professionals that worked on and billed

21  time -- they haven't filed their fee application yet, but

22  billed time on the matter.  There were over 150 individuals,

23  of which 30 have billing rates of over $2,000 an hour.

24          So to the extent an examiner is doing certain

25  investigations, to prevent duplication that should mean that

1   the debtors' professionals can cut back on what they're doing

2   in that regard.

3          I will also say that the debtors' arguments

4   regarding the cost of an examiner should not be given weight

5   because the U.S. Trustee, in one of its discovery requests,

6   asked for documents reflecting any budget or estimate of the

7   cost of an investigation to be performed by the debtors'

8   professionals of any of the events leading up to the debtors'

9   Chapter 11 filing; fraud, bad acts, et cetera.  The response

10  to that was an objection to say -- they did not provide the

11  information and it said, quote, on the grounds that it is

12  irrelevant to the examiner motion.  Well, we agree, but the

13  debtors can't have it both ways.  They can't say, oh, it's

14  going to be so costly to have an examiner based on examiners

15  in other cases, but at the same time not be willing to

16  produce their budget or estimate for what it's going to cost

17  for the debtors' professionals to do the same kind of

18  investigation.

19          THE COURT:  Well, I can take my own experience and

20  say -- given the scope of what you laid out earlier, the

21  proposed examiner investigation, I can give you a ballpark of

22  what it's going to cost and it's going to be in the tens of

23  millions, if not hundreds of millions of dollars to do that

24  investigation because they're going to have to hire all the

25  same types of experts, financial advisers, cybersecurity

1   advisers, crypto advisers, who are all going to have to do

2   the same thing that the debtors already started to do and the

3   committee has already started to do and the Government has

4   already started to do.

5           It's going to be -- if it's the scope that you're

6   asking me for, it's going to be expensive.  Or, the

7   alternative is, I have complete discretion, right?  I mean, I

8   could say, okay, I'll appoint an examiner; your budget is

9   $10,000.  Are you going to find somebody to take the job?

10          MS. SARKESSIAN:  No, Your Honor, but I think

11  that's effectively the same thing as not appointing an

12  examiner.

13          THE COURT:  Doesn't that show why 1104(c) really

14  doesn't make any sense to be a mandatory obligation by the

15  Court that it's not subject to discretion?  Because it's kind

16  of the same as Rule 65 injunctions -- or is it -- I think

17  it's 65(d) says, if the Court imposes an injunction -- it's

18  different for -- a little different for a debtor in a Chapter

19  11, but if the Court imposes an injunction under Rule 65, if

20  you read the language of Rule 65, I think it's (d), it says

21  you have to impose a bond, but courts have almost universally

22  said I can set the bond at whatever.

23          If I can set the bond at a dollar, then certainly

24  I can say you don't need to set a bond at all, especially if

25  you have a case where you have an individual suing a major

1   corporation and the individual is successful in getting an

2   injunction, then you're going to impose a billion dollar bond

3   on that party who can't do it and then they lose their case?

4   No, we can't do that.

5            So courts have universally said that's not a

6   mandatory obligation, even though the language, if you read

7   it the way you propose reading here, would make it mandatory.

8            So there's always discretion by the Court, right?

9            MS. SARKESSIAN:  Your Honor, we would not agree.

10   And, again, other cases in the District Courts, the few --

11   there have not been a lot, but the few District Courts and

12   the one Circuit Court that have ruled on this disagree, and

13   the District Courts were reversing -- and the Circuit Court

14   as well, I believe -- were reversing the determinations by

15   the Bankruptcy Court that there was discretion under

16   1104(c)(2) and said, no, there's not.  It says what it says,

17   shall means shall; this is what Congress wanted.

18            Now --

19            THE COURT:  But I can set the budget at whatever I

20   want.

21            MS. SARKESSIAN:  Well, if it's set to the point as

22   the equivalent of not having an examiner, then the statute

23   really hasn't been complied with.  I mean --

24            THE COURT:  All it says is I have to appoint an

25   examiner, it doesn't say I have to give them a $100 million

1   budget.

2          MS. SARKESSIAN:  Well, we would hope that Your

3   Honor would not provide no budget for the examiner, if Your

4   Honor was to appoint an examiner, because that's, again,

5   effectively not appointing an examiner.  But I understand the

6   point Your Honor is making.  Just a few other things I'd like

7   to mention.

8          Again, if Your Honor was looking under -- if we

9   look under (c)(1), the best interests of the creditors or,

10  another way to say it, whether -- again, if one was to use

11  the as is appropriate as meaning if appropriate, we do

12  believe that there is plenty here.  And I think part of this

13  shows the joinders that were filed to the U.S. Trustee's

14  motion to appoint an examiner, there were joinders filed.

15  There was one by Texas State Securities Board and Department

16  of Banking, that's at 600 on the docket, and they attached

17  letters from state agencies or attorney general's office from

18  15 states and D.C. supporting the joinder, it was a total --

19  when you add the other joinders that were filed before, 18

20  states and the District of Columbia.

21         And what the Texas joinder said was that Texas is

22  currently undertaking an investigation of the debtors for

23  violations in connection with transactions of business in

24  Texas and with Texas accountholders.  And then they say, this

25  will require constant access to information and documentation

1    in connection with its investigation and it would benefit

2    from working with and gaining this information from a neutral

3    third party investigator who focuses on investigating the

4    debtors as opposed to running the debtors' business.

5              And, you know, Mr. Ray has a lot of jobs here and,

6    you know, we have a situation where the debtors' schedules

7    and statements have yet to be filed and they were -- it's

8    been -- you know, they filed the cases on November 11th, we

9    have no schedules and statements; we have no monthly

10   operating reports, we have this, I want to call it a faux

11   monthly operating report that they filed; we have no 2015.3

12   rule statements, they have not been filed.

13             So we're missing a lot of very basic documents in

14   this case and my hope would be that Mr. Ray could focus on

15   doing that and have the examiner focus on doing an

16   investigation as to what happened prepetition.  They also --

17   the examiner also has to look at the acts that happened post-

18   petition as well when Mr. -- shortly after Mr. Ray came on

19   board.  But that, I think, is what these joinders are saying,

20   let him focus on that, which I think is a great idea, let the

21   examiner focus on doing an examination and investigation.

22             Another thing that -- I'm sorry, I think I already

23   mentioned that in -- and I do want to clarify, the list that

24   I gave Your Honor about possible things for the examiner to

25   investigate was simply that, it was simply examples.  We are

1   not -- we have not taken a position and we don't feel that

2   this is the right time, we haven't taken the position, oh,

3   yes, it has to do all of these things, but because we were

4   asked repeatedly by other counsel what is the scope, what do

5   you have in mind, these were some examples.  And, you know,

6   Your Honor is the ultimate -- you will, will ultimately

7   determine that.  I do not want to say that we're insisting

8   that each one of these things be investigated or that these

9   are the only things, you know, this was what we came up with

10   to give Your Honor and to give other folks an idea about what

11   could be appropriate for an examiner to look into.

12          Your Honor, I believe that is my argument, unless

13   Your Honor has any further questions.

14          THE COURT:  No other questions.  Thank you very

15   much.

16          MS. SARKESSIAN:  Thank you, Your Honor.

17          MR. BROMLEY:  Good afternoon, Your Honor, Jim

18   Bromley of Sullivan & Cromwell.

19          Your Honor, the U.S. Trustee makes a very clear,

20   policy-driven argument that the Court has zero discretion

21   under Section 1104(c)(2).  If the $5 million threshold is

22   met, which is going to be met in virtually every large case,

23   certainly in every mega case and certainly in every super-

24   mega case, the import of the U.S. Trustee's argument is that

25   this Court and no other court has discretion to determine

1   whether or not an examiner should be appointed.  That is

2   simply not a realistic or accurate reading of the statute or

3   the precedent.

4            And it is, frankly, Your Honor, disconcerting

5   because there are two places where discretion, we believe,

6   matters, one is with Your Honor and that 1104 and the

7   language which phrase -- and particularly the phrase as is

8   appropriate provides you with discretion, but, frankly, Your

9   Honor, in the discretion to have brought this motion to begin

10  with and that resides with the Office of the U.S. Trustee.

11           There is zero evidence that's been put on before

12  Your Honor today about whether or not (c)(1) has been

13  satisfied by the movant, who bears the burden.  Nothing but

14  conclusory statements that because Mr. Ray had put in a

15  declaration that said that there's some sort of fraud that

16  has occurred here, period, full stop, it is in the best

17  interests of creditors under (c)(1) for an examiner to be

18  appointed.  And keep in mind, the U.S. Trustee moves under

19  both (c)(1) and (c)(2).  We believe there's zero evidence

20  under (c)(1).

21           Mr. Ray testified for over an hour, an hour and a

22  half, and the gravamen of his testimony is that it is not in

23  the best interest of creditors, stakeholders, or the estate

24  for an examiner to be appointed.

25           Mr. Ray testified that he is independent, that his

1  directors are independent, that he has, at his direction,

2  commanded a group of highly sophisticated professionals to

3  take care of a highly technical and dangerous environment.

4  That environment was so dangerous that on the day that these

5  cases were commenced, that over $400 million were stolen,

6  because of the condition that the prior management left the

7  company in, in that security environment.

8          If it was not for the immediate action of Mr. Ray

9  and those advisors under his direction, this company would

10  simply have faded away, been stolen, bled dry and yet, the

11  U.S. Trustee stands here and says, I don't really understand

12  these technical things.  It's going to be okay.  I'm sure

13  they'll work on it.  I'm sure it'll be fine.

14          And then the U.S. Trustee stands up today and

15  says, Well, I haven't said anything about scope.  Now I'm

16  going to read to you what the scope is, and it's everything,

17  everywhere, all at once.

18          We have in front of you, Your Honor, two sets of

19  examiner reports from two other mega, super-mega-cases.

20  Those binders represent $200 million.  That's it.

21  $200 million.

22          And the U.S. Trustee says, We'll, you have $1.2

23  billion of unrestricted cash on your balance sheet.  You

24  should spend some -- a lot of that and completely replace

25  everything that's being done with a new set of professionals

1   who are going to do the exact same thing, with no evidence

2   that any of those professionals or this examiner to be

3   appointed would be any more independent, any more qualified,

4   any more able to secure these assets.  It's simply going to

5   be the duplication of effort and an enormous amount of

6   expense.

7           The fact that we may have $1.2 billion of

8   unrestricted cash is not the point.  We need $8 billion of

9   unrestricted cash.  We do not have enough money to pay back

10  all of our creditors.  And the U.S. Trustee, for pure

11  purposes of public policies, because bleach and sunshine is a

12  public policy that we need here, says that we should spend

13  tens, or even hundreds of millions of dollars to provide some

14  guidance to states that have written one paragraph that said,

15  We agree with what they said before.

16          And the evidence that Mr. Ray has put on, and is

17  uncontradicted, is that we have done nothing over the past 90

18  days, other than cooperate and provide massive amounts of

19  information to warrant regulators all around the world.

20          THE COURT:  Well, let me ask you a question.  You

21  mentioned bleach and sunshine, so let me ask you about one

22  issue that the U.S. Trustee raises, which is that under 1106,

23  if I appointed an examiner, there'd be a public report filed.

24          MR. BROMLEY:  Uh-huh.

25          THE COURT:  And what is the view of the debtors in

**A523**

1    this case of the need to provide the creditors in this case

2    with something that shows them what's been done:  what

3    investigations have been undertaken, how they were

4    undertaken, and what the results of those investigations are,

5    because under 1107, a debtor-in-possession doesn't have that

6    obligation.

7            MR. BROMLEY:  Well, there are two things, Your

8    Honor, right.  One is what we've already done and we continue

9    to do and then there's what the Bankruptcy Code provided in

10   other sections.  So, what we have already done is one of the

11   exhibits, which we agreed to jointly, is a very extensive

12   presentation that the debtors made to the Creditors'

13   Committee.  It is not normal course in a case of this size or

14   substance that when you meet with the Creditors' Committee,

15   that you publish the same day for the public, the complete

16   contents of the presentation that we made.  We did that.  We

17   will continue to do things like that.

18           It is the view of Mr. Ray and the management of

19   the directors that there is -- this is a different case.  We

20   need to approach that in a different way.  Do we have a

21   specific schedule of things that we're going to say and at

22   what point?  No.  But are we going to continue to follow in

23   those footsteps that we've already set forth?  Yes, we will.

24           In addition, Your Honor, we have an obligation to

25   put together a disclosure statement.  That disclosure

1   statement in a case like this is going to be a recitation of

2   everything that has taken place.  And it'll be up to you,

3   Your Honor, to determine whether the information set forth in

4   that disclosure statement is adequate, under the

5   circumstances.

6           We believe that in order for us to confirm a plan,

7   we're going to have to put together a disclosure statement

8   that brings that bleach and sunshine to this situation.  So,

9   we believe that -- well, and I will note, 1106 and 1107 and

10  1104 do not require in every circumstance that there be a

11  public report.  When we talk about the debtors furthering

12  public policy, we have spent, literally, tens of millions of

13  dollars, complying with public policy by reporting to the

14  Congress, to the House, to the Senate, to the U.S. Attorney's

15  Office in the Southern District of New York and three other

16  Districts.  It has led to the indictment of three individuals

17  who led the company in record time.  There have been lawsuits

18  already filed by the SEC and the CFTC.

19          When you talk about the debtors dedicating assets

20  to transparency to the public process, I don't think you can

21  find a case where debtors have done anything matching what

22  these debtors have done in the first 90 days of the case.

23  And will we continue to do that?  Yes, we will.

24          What Mr. Ray testified to is that on a daily

25  basis, we receive emails that, in substance, say, We would

**A525**

1   like you to look at these transactions, these individuals,

2   and get us this information in 24 hours.  And what that

3   requires, Your Honor, is us to actually go in -- and when I

4   say, "us," it's the entirety of the investigations team -- to

5   go into this virtual environment and track down the

6   information that's being requested by the authorities.  It's

7   not simply going into a warehouse and picking things off of a

8   shelf.  It's interpreting code.  It's making sure that when

9   the code is discovered and accessed, it doesn't trigger

10  things that Mr. Ray was talking about that might damage the

11  assets.

12          We don't have -- there are no wallets.  There are

13  no keys.  There are no buildings.  Everything we have is a

14  series of zeros and ones and any time that environment is

15  accessed, it creates risk that damage will occur.  And so

16  every time we're going into that environment, the

17  investigation exercise is also securing assets.  It's also

18  figuring out whether there are claims as to whether or not

19  the issues that we're finding in the environment have some

20  explanation that's other than a mistake or incompetence or

21  inexperience.  Maybe it's fraud.  You don't know that.

22          When we talk about fraud in court, we also talk

23  about badges of fraud.  You don't have badges of fraud in the

24  same way when you're sitting there and having digital experts

25  in Israel and in the United States trying to figure out why

1     the code was changed from X to Y, by whom, who had the right

2     to change it, who had access to it; all of that is a

3     consolidated exercise that takes place every single day.  So,

4     quite honestly, the idea that we are able to simply hand over

5     that environment to an examiner is naive.

6              Mr. Ray said he will comply with any order of this

7     Court and I know he will and I know we all will.  But the

8     idea that there's going to be some ability to find somebody

9     else out there and put together a team and have that team

10    operate as independently and as effectively as the team

11    that's in place and then write a report, simply means that

12    we're going to add on top of this, months, if not years of

13    additional time and tens of millions, if not hundreds of

14    millions of additional cost.

15             And who bears that cost?  The creditors,

16    Mr. Pasquale's clients.

17             We should not be sitting here duplicating the same

18    thing that is happening every single day because the U.S.

19    Trustee believes that there's a policy point of view that

20    1104 says that it's mandatory no matter what.  And the

21    slippery slope of that mandatory argument is not in this

22    courtroom.  It's not because the U.S. Trustee is going to be

23    an advocate or pushing a particular agenda.  I don't believe

24    that.

25             But 1104 doesn't stop at the U.S. Trustee.  It

**A527**

 1   says, "party in interest or the U.S. Trustee."  Any case law

 2   that is established in this case that says, "mandatory" means

 3   mandatory, means that every single Chapter 11 case with more

 4   than $5 million worth of debt is going to be at risk of being

 5   held hostage at confirmation, at the first disclosure

 6   statement hearing, at any point in time.  It will just become

 7   a weapon in the arsenal of every party in interest, because

 8   if you take the discretion away from the Courts, the weapon

 9   is only in the hands of those who are in the courtroom.

10          And the idea that we will then be reduced to

11   saying the only choice that the Courts have to say is, you

12   know, No, I'm not going to give the examiner a budget.  Well,

13   I think that's a -- and as the Courts have continually ruled,

14   here in Delaware, that's a silly decision to make.  Because

15   the point is, it's not as if 1104 doesn't provide the

16   language.  It does.  And the history of 1104, the legislative

17   history that was cited, I think incorrectly by the U.S.

18   Trustee, illustrates that point.

19          There's not a Court that's really gone into this

20   in any level of detail.  The Revco case, with all due

21   respect, 1990, the drugstore case, there's two and a half

22   pages.  Not much analysis, they don't mention the words "as

23   is appropriate" and they don't go into the legislative

24   history.  That's not much of a Circuit decision in my mind.

25          What happens in that situation, if you read 1104,

1    1104(c) says, "if a trustee hasn't been appointed."  1104(e)

2    says that the U.S. Trustee shall move for a trustee in

3    certain circumstances.  They haven't done that.  They have to

4    move under 1104(a).  No one's moved for a trustee under

5    1104(a).  Why is 1104 even there?  Why is it bounced back and

6    forth between trustee and examiner?

7              Because the pre-Code rule was trustees were

8    appointed and the United States decided, to our credit, that

9    debtors-in-possession were a better way of reorganizing

10   companies than putting them in the hands of Securities and

11   Exchange Commission and trustees.

12             1104 is a backstop in case things don't work out.

13             THE COURT:  I just think 1104 might be a leftover

14   from the days when we used to have a Chapter 10 and a

15   Chapter 11.

16             MR. BROMLEY:  I think that's right, Your Honor.

17             The point being is, notwithstanding the fact that

18   I think that's the legacy, the introductory language, "as is

19   appropriate" is not irrelevant.  The U.S. Trustee reads,

20   "shall" and ignores "as is appropriate."  Whether "as is

21   appropriate" modifies investigation, appoint, or examiner,

22   this Court has the discretion to determine whether it's

23   appropriate.

24             In our view, an examiner is not appropriate.  In

25   our view, a report is not appropriate.  Thank you, Your

1   Honor.

2              THE COURT:  Mr. Pasquale?

3              MR. PASQUALE:  Thank you, Your Honor.  Ken

4   Pasquale, again, for the Committee.

5              Mr. Bromley really hit on all of the key points

6   and we couldn't agree more with all of his arguments, but do

7   I think there are a few particularly important points that

8   I'd like to reemphasize if I may, and I'll be as brief as I

9   can.  The U.S. Trustee, first of all, concedes.  We heard

10  Ms. Sarkessian in her closing say that she recognizes the

11  Committee's statutory authority to do an investigation under

12  1103(c)(2) of the Bankruptcy Code.  And as you heard Mr. Ray

13  testify, the Committee has been doing that.

14             The Committee was appointed on December 15th.

15  It's not even been two months yet.  And in that time, as

16  Mr. Ray testified to some extent, the Committee has been

17  working lockstep with the debtors to understand what happened

18  pre-petition and more importantly, perhaps, and it all ties

19  together, and it's one of the points I really want to make to

20  the Court is, the investigation doesn't stand alone.  It fits

21  in with the rest of what this case will need to be and,

22  ultimately, what do distributions look like to the creditors

23  of these estates?

24             And so, the investigation informs the next steps

25  in this case, including whether there'll be what we've been

1   calling a "2.0 some type of reorganization" or whether it

2   will just be monetizing the assets of this company.  That's

3   all to be determined and the investigation, again, informs

4   all that.

5              So, what have we done as a committee in the less

6   than two months since the U.S. Trustee appointed the group?

7   As you heard Mr. Ray say, we served extensive discovery

8   requests on the debtor.  We did it informally.  We still

9   don't see a need to have to come to the Court for that.

10  We've been working cooperatively.  And we have been

11  prioritizing our requests with the debtors and receiving

12  prompt responses to what we ask.

13             Over 70,000 pages or 70,000 documents, excuse me,

14  have been produced, as you heard Mr. Ray testify, that have

15  previously been produced for the regulators.  We are

16  efficiently reviewing those documents, doing targeted

17  searches on any number of issues that we become aware of or

18  know from Mr. Ray's prior testimony before Congress and first

19  day here.

20             We are evaluating what the debtors, their pre-

21  petition relationships with their professionals.  And by

22  that, I mean their attorneys, their accountants, their

23  auditors that were in the process of coordinating with

24  debtors' counsel on the next steps there, which will be

25  pursuing discovery, ultimately evaluating potential claims.

1          We have filed a joint 2004 motion for authority to

2    serve subpoenas on insiders and related parties.  I think

3    that's on for Wednesday this week to be heard.  That's an

4    obvious avenue necessary for investigation.  And these are

5    just some of the things, of course, Your Honor, but I think

6    the last, and I think this is really important, and Mr. Ray

7    testified, is with respect to the cybersecurity environment.

8          The Committee does not have access to the AWS and

9    the system for the very reasons Mr. Ray testified; however,

10   we've had excellent coordination and cooperation from the

11   debtors' cybersecurity experts.  And our committee members,

12   of course, are very knowledgeable in this area, as customers

13   of the debtors, and this is their business so to speak, and

14   are consistently bringing issues to us that we bring to the

15   debtors and we're very quickly getting answers to those

16   inquiries.  So, the system is working.

17         The investigation process is working and there's,

18   in our view, and as you've heard argument, would not be

19   appropriate in these circumstances to appoint an examiner

20   when things are proceeding the way the Code has designed them

21   to proceed with the Committee exercising its statutory

22   authority.

23         Now, I do want to touch, Your Honor, on the costs.

24   The United States Trustee said there's no evidence that the

25   costs will be more if an examiner is appointed, but I think

1   it's obvious that it would.  So, the debtors and the

2   Committee would not just sit idly by if an examiner were to

3   perform its own examination.  At a minimum, we'd have to work

4   with that examiner.  We have to provide information to the

5   examiner.  We have to coordinate with the examiner.  And

6   there's obviously incremental costs that would be incurred in

7   that process.  There's no other way that they could proceed.

8           And I think I did mention this in opening, Your

9   Honor, but I do want to mention it again, given the capital

10  structure here where there is no other creditor group that

11  our unsecured creditors would be competing with, there's no

12  incentive for our Committee to do anything but what I will

13  call, you know, an "unbiased investigation."  The

14  investigation is not going to be used for any adversarial

15  purpose, which again, was argued by the U.S. Trustee in the

16  motion.

17          Continuing with the issue of the costs, Your

18  Honor, we do think it's entirely inappropriate for an

19  examiner to be appointed in order to, for the purpose of

20  issuing a report that satisfies some public interest outside

21  of these cases for the very simple reason, as Mr. Bromley

22  mentioned:  the cost of an examiner will come out of the

23  unsecured creditors' recoveries.  There's no denying that the

24  work that we're doing is, you know, that there's a

25  significant cost to that work, but it's necessary work and

1   the examiner -- excuse me -- an examiner's investigation

2   would just be over and above what is already being done and

3   those costs that are being incurred.

4          I think Judge Walrath in the Washington Mutual

5   case said it well on that particular point, not only

6   acknowledging that the Committee was well-positioned to do

7   the investigation, but quote -- excuse me, not quote yet --

8   that it would not be, and here's the quote:

9          "It would not be fair to the creditors in this

10  case to be saddled with the cost of an investigation into

11  systematic problems that would only benefit future parties,

12  but not benefit the parties in this case."

13         And that's Exhibit D to our objection.  It's the

14  transcript, page 98, starting at line 12.

15         I think that's exactly the situation here.  Given

16  the investigation's already going on by the congressional

17  committees, CFTC, SEC, the prosecutors, the public interest

18  is being well-served in all of those ways.  Our purpose here

19  is to investigate for the benefit of the stakeholders in

20  these estates.

21         I think the only other thing I really wanted to

22  mention, Your Honor, if I may, is just with respect to Your

23  Honor's question about the report.  Mr. Bromley mentioned,

24  entirely correctly, there will a disclosure statement in that

25  case.  That disclosure statement will detail the results of

1    the investigation.

2           We, as the Creditors' Committee, have an

3    obligation in that context to make a recommendation to

4    creditors as to the provisions of the plan that that

5    disclosure statement will describe and we, of course, take

6    that obligation seriously.  That document will explain the

7    results of the investigation.

8           I'll mention, also, of course, as is the

9    Committee's obligation, to the extent that we're able,

10   subject to confidentiality and other privileges and the like,

11   the Committee will be providing information on its website,

12   which is now up and running, and to the extent practicable,

13   on social media, as well.  So, we will take all necessary

14   steps to inform creditors of what's transpiring, again, with

15   the obvious limitations around confidentiality and keeping in

16   mind work product and the fact that this investigation will

17   be used to evaluate claims going forward to maximize

18   recoveries to creditors.

19          I think that's all I have, Your Honor, for now,

20   unless you have any questions?"

21          THE COURT:  No questions, thank you.

22          MR. PASQUALE:  Thank you.

23          THE COURT:  Mr. Shore?

24          MR. SHORE:  Thank you, Your Honor.  Chris Shore

25   from White & Case for the JPLs.  I'll try not to be

1   duplicative here.

2              At the end of the day, what's before the Court are

3   questions of law and questions of fact, but it's kind of hard

4   to ignore that, based upon the U.S. Trustee's brief and the

5   first half of Mr. Ray's testimony, that the policy

6   implications of this are coming to the fore and what we do

7   about examiners in big cases.

8              I'm going to start with a simple proposition.

9   There is, in fact, zero policy reason to support the U.S.

10  Trustee's interpretation of the statute.  According to the

11  U.S. Trustee, we're out -- we're at -- when you get outside

12  of (c)(1), the Court has already determined that it is not in

13  the best interests of the estate to have an examiner, and we

14  move into (c)(2) land.  In every case with $5 million of

15  funded debt, a party in interest, including the U.S. Trustee

16  who would have no economic stake in the outcome of the case,

17  needs to file a motion and everybody in the case must have an

18  evidentiary hearing like this -- this is not free -- and

19  there must be an examiner appointed, then we'll all figure it

20  out later.

21              In fact, none of the case law supports that.  All

22  the cases dispose of that issue the way Your Honor was asking

23  questions in one of two ways.  They use the word "as is

24  appropriate" to modify "must appoint" or they say, "as is

25  appropriate" modifies "investigation."

1          On the mandatory point, I'm not going to repeat

2   what counsel have already said on that, except to say in

3   their reply brief, the U.S. Trustee charges that the JPLs

4   wrongly quote the legislative history in H.R. 95-595.  That's

5   not accurate.  We, in fact, write down -- wrote down exactly

6   what it said there.  I think their point is that it's not

7   binding legislative history, which again, is wrong if you

8   look at 92 (indiscernible) 2688, which lists the legislative

9   history, H.R. 595 is listed there.

10          I think what the U.S. Trustee is arguing is that

11   because of the debates on the floor after the initial bill,

12   somehow that's the binding legislative history here.  But

13   I'll be -- make very clear, no legislative history at all

14   that addresses the point that they're trying to make, that

15   whether you call it weaponizing or empowering parties in

16   interest, or someone with no economic stake in a case to

17   bring the case to a halt, nobody, none of these senators or

18   representatives were saying that on the floor.  So, there is

19   no support for this kind of policy idea that "shall" means

20   "shall."  It's going to have to come down to the text of the

21   statute.

22          And I'll focus on the -- an examination, as is

23   appropriate.  The U.S. Trustee bears the burden of showing

24   what an examination is -- an investigation is appropriately.

25   Give you the contours of what's going to go on and we can

1   have a debate about whether or not that is appropriate.  And,

2   in fact, the motion, as we point out in our papers, just

3   says, I want it to the fullest extent of the statute, as

4   written.

5            Now, courts have not accepted that.  Courts

6   generally look to what I list as five things when we're

7   trying to figure out what an appropriate examination is.

8   They ask, first:  Is there really a need for an examination

9   here?  And I'll get to the smoke point in a bit.  What is the

10  scope of what the examiner is going to be doing?  What is the

11  cost of the examination on the estate?  What is the

12  appropriate duration of it?  And then, ultimately, we get to

13  a report:  How are we going to be using it in the case and

14  how we'd deal with issues like privilege and whether it's

15  hearsay or not; all those kinds of issues get resolved.

16  Again, the U.S. Trustee is silent on that and, of course,

17  I've got some problems.

18           First of all, it seems easy to say in that case,

19  We need an examiner report.  There's a dumpster fire.

20           No, we're all standing around right now in a

21  burning that is -- that a building that is burnt to the

22  ground and two of the three principals of the company have

23  pleaded guilty to arson.  So, do we really need to spend a

24  hundred million dollars for an examiner to come in and say,

25  The building burned down?  We know it burned down.  We know

1   there were no corporate controls.  We know, based upon the

2   pleas of two of the three principals, that frauds occurred

3   here.

4          So, the U.S. Trustee has done nothing, other than

5   posit that there is smoke, without really answering the

6   question:  So, who cares?

7          Obviously, there needs to be an investigation to

8   determine who's responsible for that, and I trust that the

9   U.S. Trustee and the debtors are working on that, and if

10  monies need to be clawed back, they'll be clawed back.  But

11  we don't really need to know the "why" here.

12         Second, appropriate scope.  I agree with Your

13  Honor, how can you appoint an examiner, especially on the

14  topics we're talking about, unless we know what the scope is

15  or how can the U.S. Trustee do it?  Should there be an

16  accountant?  Should it be a cryptocurrency guru?  Should it

17  be a cybercrimes investigator?  Should it -- right -- should

18  it be a corporate controls expert?

19         How do you get to the issue of an appointment

20  without knowing what the scope's going to be?  I don't think

21  I've ever seen blank-check case is which was basically being

22  posited here, where the Court directed the U.S. Trustee:

23  Just appoint somebody who's examinery [sic] and then we'll

24  figure out what he or she is going to be doing.

25         There has to be real context around this,

1   particularly when we're talking about the next point, which

2   is cost and duration.  There are cases, I was in ResCap where

3   Judge Glenn kicked the can down the road and there were

4   reasons for that.

5          There are three reasons why you can't kick the can

6   down the road here without giving the examiner, which you

7   said, if it's going to be a $10,000 investigation, an

8   examiner needs to know that when picking up the charge.

9   First, with respect to the $1.2 billion in cash, I think

10  that's a little misleading.  As the U.S. Trustee points out

11  in the reply, or actually in the moving papers, there is an

12  issue as to what if this is customer funds and where the

13  customers are and everything else.  So, it's not fair to say

14  that the debtors have, in fact, free access to use all the

15  cash they're listing as "unrestricted."

16         Second on this, assume it is $1.2 billion of cash

17  that can pay admin claims, that first chart was breathtaking.

18  The number of individuals who are already involved, that

19  didn't list the Committee advisors, right.  This case is

20  burning superhot.  We'll find out just how superhot when the

21  fee apps start coming in.  But the comfort that there's going

22  to with $1.2 billion in available cash doesn't answer the

23  question of how much distributable value is there going to be

24  in this case and how is a hundred-million-dollar examination

25  going to relate to that.

**A540**

1          Third, and I agree with Mr. Pasquale, the concept

2   of deduping, we'll just point an examiner and everybody else

3   is going to sit -- that never happens.  The Committees

4   continue to work.  The debtors continue to work.  And,

5   actually, he focused on Mr. Ray's testimony about that

6   second, or the second and third demonstrative, where he lists

7   all the work they're doing to coordinate with the requests.

8          That's what's going to happen with an examiner,

9   too.  The request is going to come in to Mr. Bromley:  I need

10  70,000 documents.  They're going to go through and say, Well,

11  what do we do with privilege?  What do we do with these

12  documents?  How do we control the data so that it's secure?

13  And it's just all going to continue to build; in other words,

14  the hundred million dollars is additive, not subtractive from

15  other work that goes on.

16          And, finally, appropriate form and use.  There is,

17  in my experience, no evidentiary value to an examiner's

18  report.  It just kind of comes out.  And whether Your Honor

19  would feel that that was important or not, I don't know how

20  important it is when we're not dealing with a case with

21  insiders *in situ* and, rather, we have a whole new group

22  coming in.  And sometimes it helps courts with doing things

23  like, has the plan been proposed in good faith and things

24  like that.  I just haven't heard anything articulated by the

25  United States Trustee that would go to that issue.

1          It's not going to, as the U.S. Trustee seems to

2    posit, lead to an indictment.  The Court can't indict anybody

3    here, nor can an examiner indict anybody here, so the

4    government authorities who are doing their investigations

5    aren't going to get any help out of the report.

6          And then, finally, on this point of important

7    public interest in looking at this, this is not a case in

8    which governments are sitting behind; in other words, there's

9    not somebody out there protecting the public.  As seen, the

10   Congress is looking at it, the CFTC, the SEC, the IRS, all

11   the State Governments.  They don't need to outsource their

12   work to the creditors of the debtor, because the irony of the

13   position here is that the creditors, who are just going to

14   want to get their fiat currency and crypto back, are going to

15   be forced to bear the cost of an examination that's only

16   going to tell them the who, what, when, where, and why they

17   lost money, but not actually give the money back.  You can't

18   tax them to answer questions that no creditor is coming

19   forward and saying, We want answers to.  We're willing to

20   pay, as customers, for an investigation into this work.

21          If the U.S. Trustee or other government agencies

22   want work, it looks like -- or want answers, it looks like

23   they're getting the participation they need from the debtors

24   and I'm sure that will continue.

25          So, from the perspective of the JPLs, whether

1    you're looking at a mandatory or an inappropriate

2    investigation, I don't think the U.S. Trustee has met their

3    burden here to really explain why we should all be paying for

4    that.

5              THE COURT:  Thank you.

6              Ms. Sarkessian, rebuttal?

7              MS. SARKESSIAN:  Is this your phone?

8              UNIDENTIFIED SPEAKER:  No.

9              UNIDENTIFIED SPEAKER:  I think that one is

10   actually mine.  Don't hold me to it.

11             MS. SARKESSIAN:  Thank you, Your Honor.  Again,

12   for the record, Juliet Sarkessian on behalf of the U.S.

13   Trustee.  I have just a few points to reply to.  I think

14   they're all mostly comments that debtors' counsel made, so

15   we're winding back the clock a few minutes.

16             So, one thing that debtors' counsel indicated was

17   that the U.S. Trustee had put in no evidence to show that

18   we've complied 1104(c)(1).  So, our evidence is the

19   declarations of Mr. Ray.  Now, we didn't put him on the stand

20   and have him, you know, make those statements, but those are

21   in evidence.  And paragraph 5 of his first day declaration

22   says, quote:

23             "Never in my career have I seen such a complete

24   failure of corporate controls and such a complete absence of

25   trustworthy financial information, as occurred here.  From

**A543**

1  compromised systems integrity, faulty regulatory oversight

2  abroad, to the concentration of control in the hands of a

3  very small group of inexperienced, unsophisticated, and

4  potentially compromised individuals, this situation is

5  unprecedented," close quote.

6           And that's just, you know, one piece of what he

7  says in this one declaration and then, also, of course, his

8  testimony before Congress.  So, that is all in evidence, even

9  if we didn't put on a live witness today and that goes to the

10 best interests of the creditors.

11          And, again, if one is looking at the "as is

12 appropriate," the way that certain cases have looked at it,

13 and Your Honor has looked at it in the past, it also

14 establishes that it is appropriate to have an examiner.  This

15 is not a case where, you know, there's not a whiff of smoke

16 about wrongdoing.  There's, as Mr. Ray said, a dumpster fire.

17          Debtors' counsel also mentioned this report that

18 they gave to the creditors that was then filed on the court

19 docket, which is our Joint Exhibit 9, and, you know, yes,

20 they are correct, that they did file it on the docket.  It's

21 20 pages.  It's a PowerPoint.  There's a lot of charts and

22 pictures.  I'm not saying there's no information in it, but

23 it doesn't compare to something like an examiner's report.

24          So, the debtor -- both, the debtor and I believe

25 some other counsels, were referring to, you know, $5 million

 1    worth of debt.  Any case -- is, you know, the U.S. Trustee

 2    going to be required to file a motion for an examiner in any

 3    case with $5 million worth of debt?

 4          It's not just $5 million worth of debt.  There's a

 5    lot of restrictions and that is not every case with

 6    $5 million worth of debt.

 7          But in addition, I just want to be clear, the U.S.

 8    Trustee is not required to file a motion for an examiner.  It

 9    is under 1104(e), there are certain situations in which the

10    U.S. Trustee would be required to file a motion for a

11    trustee, but there is nothing requiring it.  The Code says we

12    can -- we can file a motion, but we're not required to.

13          And I think that, you know, one can see throughout

14    the years, the U.S. Trustee is not filing examiner motions in

15    every case in which the debt is over $5 million, again, of

16    any debt or specific debt.  It is discretionary.  The U.S.

17    Trustee does, when it feels it's the right thing to do.

18          One counsel cited to the Washington Mutual

19    transcript at page 98.  In that case, Judge Walrath said that

20    the debtors had been, quote, "investigated to death," close

21    quote, and that she could not imagine any examiner finding

22    one unturned stone.  At that's page 9 -- excuse me,

23    transcript 98, lines 12 to 17.

24          That is not where we are in this case.  The

25    debtors just, you know, filed a few months ago.  The U.S.

1   Trustee filed a motion to appoint an examiner 11 days after

2   the first day hearing, 20 days after the petition date.  The

3   debtors, even at this point, are nowhere near being

4   investigated to death.

5          Also, debtors' counsel and some other counsel

6   brought up that there will be a -- the disclosure statement

7   filed at some point, possibly, depending on what happens.  A

8   disclosure statement is not a report of an independent

9   examiner.  I mean, there's no comparison to those two things.

10  Clearly, Congress knew that in Chapter 11 cases, debtors file

11  disclosure statements.  Again, 1104(c) doesn't say, Unless

12  the debtor has or may file a disclosure statement.  What it

13  says is, After the plan is confirmed, you can't make the

14  motion, I mean, well, it's -- it wouldn't meet the

15  requirements.  But there isn't a disclosure statement here

16  and it's irrelevant to 1104(c).

17         And, Your Honor, there's two other things I want

18  to point out.  At the end of Mr. Bromley's argument, he said

19  the debtors' view is a report is not appropriate.  We just

20  want that to be very clear that the debtors have no intention

21  of filing any report as to whatever investigation they may be

22  doing; whereas, of course, an examiner is required to do

23  that.

24         And, finally, Your Honor, it is -- the U.S.

25  Trustee agrees that Your Honor has the discretion to set the

1    scope and a budget for any examiner, if you were to appoint

2    an examiner.  But the Court should not abuse discretion in

3    such a way that it completely eviscerates 1104(c)(2), as it's

4    been approved by Congress.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              All right.  I'm going to take a recess here and

8    I'd like to see counsel for the four parties in chambers in

9    my -- in the conference room over here and then I'll come

10   back on the record after that.

11        (Recess taken at 1:09 p.m.)

12        (Proceedings resumed at 1:20 p.m.)

13             THE COURT:  We're back on the record, Jermaine?

14        (No verbal response)

15             THE COURT:  Okay.  We're back on the record.

16             So, I requested to see the parties in chambers

17   just to have a brief discussion about whether there was a way

18   to find a path towards a consensual resolution of this motion

19   and parties have indicated they want to discuss that and come

20   back to me later.  So, I'm encouraging them to do that.

21             In the meantime, I'm going to take the matter

22   under advisement and we'll wait to hear from the parties.

23             I think we have another hearing scheduled on

24   Wednesday and maybe by then the parties can give me a status

25   report on where this issue is.  And I told them to ensure

1   that there's no concern about my being upset about somebody

2   who holds up the process.  I told them that if anybody

3   objects to resolving it, I will rule on it.

4          They should contact chambers, let my judicial

5   assistant or my courtroom deputy know that there has been an

6   objection -- debtors' counsel can do that -- don't tell me

7   who's objected.  Just tell me there's been an objection and

8   then I will go forward with a ruling on the underlying

9   motion.

10         So, with that, do we have -- I think we have some

11  other housekeeping issues before we adjourn.  Just to make

12  sure.  There was some stuff -- some retention apps that need

13  to be moved -- potentially, moved?

14         MR. LANDIS:  Your Honor, we will -- Adam Landis

15  for the record, from Landis Rath & Cobb -- we will file an

16  amended agenda for the hearing on Wednesday, but we believe

17  it's only one matter that will need to go forward.

18         THE COURT:  Okay.  That's the objection to the

19  2004 again?

20         MR. LANDIS:  That's correct, Your Honor.

21         THE COURT:  And that's -- I assume there's no

22  witnesses for that?

23         MR. LANDIS:  There are none.  And we would ask the

24  Court's indulgence to do that virtually.

25         THE COURT:  Yes, that can be done virtually.  If

**A548**

1  there's no witnesses, it can be done virtually.

2          Okay.  Anything else, then, before we adjourn?

3       (No verbal response)

4          THE COURT:  All right.  Well, thank you all very

5  much.  I appreciate the arguments.  It was an interesting,

6  interesting argument.  Thank you.

7          COUNSEL:  Thank you, Your Honor.

8       (Proceedings concluded at 1:23 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of our

5  knowledge and ability.

6

7  /s/ William J. Garling                    February 6 2023

8  William J. Garling, CET-543

9  Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                    February 6, 2023

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17  /s/ Mary Zajaczkowski                     February 6, 2023

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22  /s/ Coleen Rand                           February 6, 2023

23  Coleen Rand, CET-341

24  Certified Court Transcriptionist

25  For Reliable

**Exhibit A**

**Statement of Issues to be Presented on Appeal [Bankr. D.I. 1123]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  | : |  |
|---|---|---|
|  | : |  |
|  | : |  |
| *In re* | : | Chapter 11 |
|  | : |  |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-11068 (JTD) |
|  | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : | Re: D.I. 746, 805, 809 |
|  |  |  |

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

Appellant Andrew R. Vara, the United States Trustee for Region 3 (the "U.S. Trustee"), pursuant to Fed. R. Bankr. P. 8009(a)(1), submits this statement of the issues to be presented on appeal with respect to this Court's February 21, 2023 *Order Denying Motion for the Appointment of an Examiner* [D.I. 746]:

**District Court Case No.**

1:23-cv-00241 (CFC)

**Appellant**

Andrew R. Vara, solely in his capacity as United States Trustee for Region 3

**Appellees**

FTX Trading Ltd., *et al.*

Official Committee of Unsecured Creditors

Joint Provisional Liquidators of FTX Digital Markets Ltd.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

1

The following issue will be presented on appeal:

Did the bankruptcy court err in denying the United States Trustee's motion to appoint an examiner under 11 U.S.C. § 1104(c)?

Dated: March 20, 2023
   Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: */s/ Benjamin Hackman*
Benjamin A. Hackman
Trial Attorney
Juliet M. Sarkessian
Trial Attorney
Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
juliet.m.sarkessian@usdoj.gov
benjamin.a.hackman@usdoj.gov

-and-

David Gerardi
Trial Attorney
Robert J. Schneider, Jr.
Trial Attorney
Department of Justice
Office of the United States Trustee
One Newark Center
1085 Raymond Boulevard, Suite 2100
Newark, NJ 07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov
robert.j.schneider@usdoj.gov

2

**A553**

```
                                              Page 1

 1               UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3                          )  CASE NO: 20-32519
                            )
 4    NEIMAN MARCUS GROUP    )  Houston, Texas
      LTD LLC,               )
 5                           )  Friday, May 29, 2020
                             )
 6          debtor.          )  10:29 a.m. to 4:16 p.m.
                             )
 7                           )
      ----------------------------)
 8
 9                           TRIAL
10           BEFORE THE HONORABLE DAVID R. JONES
                 UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:
13    For debtors:           JEFFREY J. ZEIGER
                             CHAD HUSNICK
14                           Kirkland & Ellis LLP
                             300 North LaSalle
15                           Chicago, IL 60654
16    For Marble Ridge:      EDWARD S. WEISFELNER
                             Brown Rudnick LLP
17                           7 Times Square
                             New York, NY 10036
18
      For Ad Hoc Group:      EMIL A. KLEINHAUS
19                           Wachtell, Lipton, Rosen & Katz
                             51 West 52nd Street
20                           New York, NY 10019
21    For Disinterested      TODD G. COSENZA
      Managers:              Willkie Farr & Gallagher LLP
22                           787 Seventh Avenue
                             New York, NY 10019
23
      For Official Committee  RICHARD M. PACHULSKI
24    Of Unsecured Creditors:  Pachulski Stang Ziehl & Jones LLP
                             10100 Santa Monica Blvd.
25                           Los Angeles, CA 90067
```

```
                                                        Page 2

 1    Owner of 7.125%          DAVID HARGREAVES
      Debentures due 2028      Pro Se
 2

      For Davidson Kempner:    PATRICIA B. TOMASCO
 3                             Quinn Emanuel Urquhart & Sullivan
                               711 Louisiana Street, Suite 500
 4                             Houston, TX 77002
 5    For the Trustee:         Henry Hobbs
                               U.S. TRUSTEE
 6                             515 Rusk Street, Suite 3516
                               Houston, TX 77002
 7

 8    Courtroom Deputy/ECRO:   VRIANA PORTILLO
 9    Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
10                             Mineola, NY 11501
                               Tel: 800-727-6396
11

12

13    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                         Page 3

 1                              INDEX

 2    WITNESSES           DIRECT    CROSS    REDIRECT      RECROSS

 3

 4    MARC BEILINSON        53       103       120

 5                                   110

 6                                   115

 7

 8

 9    EXHIBITS                                            RECEIVED

10    Debtor's Exhibits 620-1 and 620-2                      18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 188

1    make sure that I was educated and that I had not missed

2    anything.

3           During the examination of Mr. Beilinson, it became

4    very apparent to me that I have a huge problem.  I had taken

5    a lot of comfort that I had a well-intentioned, competent,

6    interested, engaged, independent board -- not board, but

7    group of independents.  At least with respect to half that,

8    I cannot make that finding.  And I am extremely concerned

9    about what I heard today.  I could not imagine anything

10   worse, and I want that to echo to everyone concerned.  If I

11   hear that again, my respect for Willkie Farr will not keep

12   me from issuing a show cause order.  I hope that message is

13   conveyed.  I do not want to see a fiduciary to this estate

14   ever appear in front of me ever again unprepared,

15   uneducated, and borderline incompetent.  Never.

16          There are 13,000 people that are depending upon

17   smart, educated, well-paid, competent people to come to a

18   hearing prepared.  I didn't get that at all today.  I'm

19   disappointed.  There are 13,000 employees that should feel

20   like they got short-changed today.

21          With respect to the requirements under 1104, I

22   find that the appointment of an examiner is not in the

23   interest of creditors or any equity security holders, or

24   other interests of the estate.  It makes no sense to me.  I

25   shouldn't have to do this.  The issues are simple.  They are

Page 189

1    straightforward.  If anybody were actually looking at this,

2    the issues that need to be examined are extremely

3    straightforward.  They may be complicated to accomplish, but

4    not to be able to identify them is really troublesome.

5           However, I do not read 1104 as Mr. Husnick does.

6    And while I want to impart a good-faith requirement in the

7    filing of the motion, and if there were such a requirement,

8    I would find that the motion was not filed in good faith.  I

9    have been reminded on one other occasion by my appellant

10   court that I do not have the ability to read into a clear

11   statute that which does not exist, even though to this day I

12   still believe I was correct.

13          But if I read the language of 1104, it is

14   absolutely clear to me that the appointment under 2 is not

15   discretionary.  It is mandatory.  And while I agree that

16   there is no record regarding the existence of the required

17   debt level, there is also no genuine dispute that it exists.

18   Quite frankly, you could not have checked the box for

19   complex case treatment without exceeding that threshold.

20   And so, while maybe technically it is correct, I find that

21   the requirement has been satisfied.

22          I am left in the position of having to appoint an

23   examiner for something, at least on the papers, that I

24   shouldn't have to.  And Mr. Pachulski, this is where I'm

25   going to turn to you.  You will not remember, but 20 some

Page 190

1    odd years ago, I met you in a case in the Central District

2    of California in front of Judge Bluebond.  And my guess is

3    you had a thousand cases since then, and I was a baby lawyer

4    and certainly nothing that you would have ever paid

5    attention to.

6            But you pulled me aside when I was making a huge

7    mistake and you gave me some advice.  And I've never

8    forgotten that.  The advice was also right.  And one day at

9    a Bar function, I'll remind you of the story and see if you

10   remember the case, but I wish that you could whisper

11   something in my ear today that makes this right, because I'm

12   struggling, so I'm going to make an ask.

13           I heard what you said about the Committee and I

14   got it.  I fully understand that you have a divergence of

15   interest and that this may be the hardest assignment that

16   you've ever gotten.  You're also one of the best committee

17   lawyers that I've ever seen.  I have absolute confidence

18   that you are up to the task.  I want you to undertake what I

19   know you can do so well.  I want to feel confident that when

20   I get a report about what either exists or doesn't exist,

21   that I can have confidence in it.  And if it's got your name

22   on it, then I will have that confidence.

23           So the ask is -- and I understand that you're the

24   name on the firm and your job is to go get the cases and

25   then other folks in your firm do the work.  And I'm not

Page 191

1    making light of it.  I got.  I understand how firms work.

2    I'm not that far removed.

3            I need what is inside your head in this case, and

4    that's the ask.

5            MR. PACHULSKI:  Your Honor, I'm -- oh, I'm sorry,

6    Your Honor.

7            THE COURT:  No, go ahead.

8            MR. PACHULSKI:  I'm actually touched by what you

9    said, and I think I know the case.  I'm trying to remember

10   the facts, but I -- ironically, I haven't had a lot of cases

11   before Judge Bluebond, so I have a lot of experience, but I

12   think I have an idea of it.

13           THE COURT:  Hmm.

14           MR. PACHULSKI:  But I do want to tell you

15   something which there is no reason you should've known.  And

16   then we can go on to exactly what you'd like me to do.  Last

17   Thursday, I confirmed the case before Judge Zurzolo.  It was

18   probably the largest individual case ever in the United

19   States.  It's an individual who had $6 billion in debt.  And

20   it took most of my time for nine months.  And that and

21   another case got resolved.  And so literally, as of Thursday

22   afternoon, I had 100 percent of my time, which I thought

23   wouldn't last long, but it felt kind of good, to be honest,

24   because I billed a lot of time on that one case, and as I

25   said, another case.

Page 192

1            And so when I pitched the Committee, Your Honor,

2     with Mr. Pomerantz and a couple of my other partners, I

3     actually committed to give 100 percent of my time to that

4     case, to this case.

5            THE COURT:  Good.

6            MR. PACHULSKI:  That's how important I thought it

7     was.  I take seriously the 13,000 employees, and as I said,

8     I take very seriously the other employees.  And as compared

9     to having my name on, what they may or may not mean, if I

10    get in a case, I get in a case.  So I've given the

11    commitment to the Committee.  I'm going to do anything I

12    have to do to come up with a great result, which is, by the

13    way, Your Honor, why I thought out of the box, that an

14    examiner should be appointed.  And no one really addressed

15    this, but I felt very strongly that this is the best case

16    for everybody.

17           And again, there's so much fighting in this case.

18    I've been in a week, and I looked at it and Jeff Pomerantz

19    looked at it -- someone I have incredible respect for, who

20    was my protégé until now, I'm basically his -- and said,

21    we've got to do something here.  We cannot let something bad

22    happen here.  And so that's why we came up with it.

23           But whatever it is Your Honor would like me to do,

24    and whatever commitment you want me to make, I'm going to do

25    it, A, because you've asked, and I totally respect Your

Page 193

1    Honor and what you've accomplished on your own, which is

2    being one of the very, very finest jurists in the country at

3    any level; but also because I have -- I feel an obligation

4    to the constituents in this case, primarily my Committee,

5    but to get the case done.

6            So whatever it is you want me to do, I will do.

7    I'm disappointed if an examiner isn't appointed, because I

8    think it would -- whether you use the --

9            OPERATOR:  Our system will end this conference in

10   five minutes.  To extend this conference -- your conference

11   has been extended for 60 minutes.

12           THE COURT:  My apologies again.  Mr. Pachulski?

13           MR. PACHULSKI:  Yes, I'm here, Your Honor.

14           THE COURT:  Sorry.  It's because we didn't shut

15   the phone off at noon, it gives us that every hour.  So, my

16   apologies.

17           MR. PACHULSKI:  Well, I'm not sure where I left

18   off, so I apologize --

19           THE COURT:  You were telling me that you're going

20   to go out, give me 100 percent.  You're going to go through,

21   do the claim analysis, and then you're going to let me know

22   what the problems are.  I also am confident that you bring

23   all sorts of risk to everyone that you talk to.  I'm not

24   concerned about a lack of risk in the case.

25           MR. PACHULSKI:  Okay.  As I said, if that's what

Page 194

1    Your Honor wants me to do.  I gave the commitment to the

2    Committee and I will also give the commitment to Your Honor.

3            THE COURT:  I very much appreciate --MR.

4    PACHULSKI:  We'll do what has to be done in this case.

5            THE COURT:  I very much appreciate it, and that's

6    what I want done.

7            With respect to the request for an examiner, let

8    me do this.  Let me tell you what I'm -- because I do think

9    that I have a requirement to appoint an examiner.  Mr.

10   Weisfelner, I'll give you the benefit of my thinking, and

11   then I'll give you an option.

12           If I continue on with the appointment of an

13   examiner, I'm going to appoint the examiner, I'm going to

14   ask for an individual that has experience in being a

15   director of an entity.  I want a three-week examination of

16   whether or not the independents are doing their job, with

17   another week to write a report, with a budget of $100,000.

18           I'm not asking you whether or not you agree with

19   that.  That's going to be my answer, if you want me to

20   proceed with the motion.  If you strategically want to

21   withdraw the motion without prejudice, I will certainly

22   allow you to do that.  But, again, I'm just trying to be as

23   transparent as I can be.  I ask for it from you and I try to

24   do the same.

25           MR. WEISFELNER:  And Your Honor, I appreciate the

Page 195

1    question.  As Your Honor may or may not agree today, I have

2    a client and I am duty-bound, I believe, before I give you

3    an answer -- although I think I know what the answer is -- I

4    really need to consult with Marble Ridge before I respond.

5            THE COURT:  Let me ask you this.  Is this

6    something you can do in 10 or 15 minutes?

7            MR. WEISFELNER:  I believe so.

8            THE COURT:  All right.  Why don't we take a break?

9    And if I could -- Mr. Hobbs, if I could ask you to remain on

10   the phone.  I'm simply going to take a break.  I'll mute my

11   phone.  I'll turn off my camera.  And we'll come back at,

12   Mr. Weisfelner, 4:15?

13           MR. WEISFELNER:  Yes, Your Honor.  I think that

14   would be more than enough time.

15           THE COURT:  All right.  Thank you.

16           MR. HOBBS:  I'll be here, Your Honor.

17           THE COURT:  Thank you.

18           MR. WEISFELNER:  Thank you, Your Honor.

19           OPERATOR:  Line muted.

20           (Recess)

21           OPERATOR:  Line unmuted.

22           THE COURT:  All right, everyone, are we all back?

23   Mr. Weisfelner, did you have an opportunity to reach your

24   client?

25           MR. WEISFELNER:  I did, indeed, Your Honor.  And

Page 196

1    thank you for the opportunity.

2                THE COURT:  Certainly.

3                MR. WEISFELNER:  Judge, in response to your

4    question, I will tell you that both my client and I took an

5    opportunity to consult with Mr. Pachulski.  I hope you don't

6    mind.

7                THE COURT:  Not at all.  Not at all.

8                MR. WEISFELNER:  Based on that conversation, we

9    have determined to withdraw our motion.

10               THE COURT:  All right, thank you.  Then we'll just

11   note -- I'm sorry, you're still talking.  My apologies.

12               MR. WEISFELNER:  I'm sorry, Your Honor.  I don't

13   mean to be verbose, but we did determine that withdrawal of

14   the motion would ultimately be in the best interests, not of

15   our own parochial concerns, but of the estate in general.

16               THE COURT:  I think that's right.  And I

17   appreciate the analysis.  Then if you have no objection,

18   what I would just simply do by docket entry is just note

19   that after hearing, the motion was withdrawn without

20   prejudice.

21               MR. WEISFELNER:  I would appreciate that, Judge.

22   Yes, thank you.

23               THE COURT:  All right.  Thank you.  Anything else

24   that we need to talk about today?

25               MR. HUSNICK:  Nothing further from the debtors,

```
                                                     Page 197

 1    Your Honor.  We'll see you on Tuesday (indiscernible).

 2              THE COURT:  All right.  Thank you.  Thank you,

 3    everyone.  Have a good weekend.  Mr. Cosenza, please show me

 4    that I don't have anything to worry about.

 5              MR. COSENZA:  We understand your concerns, Your

 6    Honor.  They will be addressed and we're going to be working

 7    diligently to get (indiscernible).  You have my word.

 8              THE COURT:  All right, terrific.  Thank you all.

 9    In that case, we'll be adjourned.  Everyone be safe.

10         (Proceedings adjourned at 4:16 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                        :
                                                             :        Chapter 11 Case No.
                                                             :
PARMALAT USA CORP., et al.,                                  :        04-11139 (RDD)
                                                             :
                Debtors.                                     :        (Jointly Administered)
                                                             :
-----------------------------------------------------------------x

### ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER AND SETTING THE DUTIES OF THE EXAMINER PURSUANT TO SECTIONS 1104(c)(2) AND 1106(b) OF THE BANKRUPTCY CODE

Upon the motion, dated May 6, 2004 (the "Motion"), of Friendship Dairies, Inc.

("Friendship") and Perry's Ice Cream Company, Inc. (together, the "Movants") for the

appointment of an examiner in the chapter 11 cases of Parmalat USA Corp. and Farmland

Dairies LLC (together with Milk Products of Alabama L.L.C., the "Debtors") and the Court

having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the

District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and the Court having reviewed (i) the Motion, (ii) the objection to the Motion filed by

the Debtors, (iii) the objection to the Motion filed by the official committee of unsecured

creditors (the "Creditors' Committee"), (iv) the objection and response to the Motion filed by the

United States Trustee (the "U.S. Trustee"), and (iii) the reply of the Movants; and having heard

the statements in support of and in opposition to the relief requested therein at a hearing before

the Court (the "Hearing"); and upon all of the proceedings had before the Court and for the

**A567**

reasons set forth at the Hearing the Court (a) having found that the Movants have not established

that the appointment of an examiner pursuant to section 1104(c)(1) of the Bankruptcy Code is in

the interests of creditors, any equity security holders and other interests of the estates and having

determined that such appointment under section 1104(c)(1) is not warranted, but (b) having

concluded that, as to Parmalat USA Corp., the appointment of an examiner is required by section

1104(c)(2) of the Bankruptcy Code; and after due deliberation and sufficient cause appearing

therefor, it is

      ORDERED that the U.S. Trustee shall appoint an examiner (the "Examiner") in

the case of Parmalat USA Corp. (04-11139), pursuant to 11 U.S.C. §  1104(c)(2), solely to

conduct the investigation set forth herein and to prepare and transmit a statement under 11

U.S.C. § 1106(b) (incorporating 11 U.S.C. § 1106(a)(4)) as described herein and in the Court's

ruling at the Hearing; and it is further

      ORDERED that the Examiner's duties, pursuant 11 U.S.C. §  1106(b), shall be to

meet with or interview the Debtors, the Creditors' Committee, and/or their advisors and

professionals and to determine, based on such meetings or interviews, whether the Debtors' and

the Creditors' Committee's claims strategy, including with respect to intercompany claims and

claims against third parties relating thereto, is being pursued in a disinterested manner; and it is

further

      ORDERED that the Examiner shall complete the investigation within two weeks

of the Court's approval of the Examiner's appointment by the U.S. Trustee as contemplated by

section 1104(d) of the Bankruptcy Code; and it is further

      ORDERED that the Examiner shall produce the statement  under 11 U.S.C. §

1106(b) contemplated hereby within one week of the completion of the investigation described

04-11139-rdd    Doc 383    Filed 06/04/04    Entered 06/04/04 11:51:03    Main Document
Pg 3 of 3

above, stating the results of the Examiner's investigation as described above and whether the

Examiner believes that the Debtors' and the Creditors' Committee's claims strategy with respect

to intercompany claims and claims against third parties related thereto is being pursued in a

disinterested manner; and it is further

ORDERED that the Examiner shall have a budget of $5,000 with which to

complete the investigation and prepare the statement, which amount shall be paid to the

Examiner by the Debtors' estates upon completion of the duties described herein, without the

need for further Court order; and it is further

ORDERED that it is not contemplated that the Examiner shall retain

professionals, but that if the Examiner chooses to do so the Examiner's budget shall not be

increased above $5,000.

Dated:  June 4, 2004
New York, New York

/s/ ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2
                                      .    Chapter 11
 3    IN RE:                          .
                                      .    Case No. 20-12522 (JTD)
 4    MALLINCKRODT PLC, et al.,       .
                                      .
 5                                    .    Courtroom No. 5
                                      .    824 North Market Street
 6                                    .    Wilmington, Delaware 19801
                                      .
 7                         Debtors.   .    Monday, November 22, 2021
 8    . . . . . . . . . . . . . . . . .    3:00 P.M.

 9                       TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12
      For the Debtors:          Michael Merchant, Esquire
13                              RICHARDS, LAYTON & FINGER LLP
                                920 North King Street
14                              Wilmington, Delaware 19801

15                              - and -

16                              Betsy Marks, Esquire
                                LATHAM & WATKINS LLP
17                              1271 Avenue of the Americas
                                New York, New York 10020
18

19
20    Audio Operator:          Jermaine Cooper

21    Transcription Company:   Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
25
```

**A570**

1   <u>APPEARANCES (Cont'd)</u>:

2   For Acthar Plaintiffs:    Donald Haviland, Esquire
                              HAVILAND HUGHES
3                             112 Haddontowne Court, Suite 202
                              Cherry Hill, New Jersey 08034
4
    For Attestor/Humana:      Benjamin McCallen, Esquire
5                             WILLKIE FARR & GALLAGHER LLP
                              787 Seventh Avenue
6                             New York, New York 10019

7
    For Sanofi:               Aaron Applebaum, Esquire
8                             DLA PIPER LLP (US)
                              1201 North Market Street, Suite 2100
9                             Wilmington, Delaware 19801

10
    For Express Scripts:      John Shaffer, Esquire
11                            QUINN EMANUEL URQUHART & SULLIVAN
                              865 S. Figueroa Street, 10th Floor
12                            Los Angeles, California 90017

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    MATTERS GOING FORWARD:

2    1. Status Conference re: Proposed Phase II Pretrial Order

3        **Argument/Discussion: 4-39**

4    2. Ad Hoc Acthar Group's Motion for an Order Directing the
     Appointment of an Examiner and to Designate Ballots [Docket
5    No. 5057 – filed October 29, 2021]

6        **Court's Ruling: 39**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1          That's 11 U.S.C. Section 1104(c).

2          While there is some debate among courts outside of

3     Delaware regarding whether Section 1104(c) mandates the

4     appointment of an examiner, in any case where the five-

5     million-dollar debt threshold is met, this Court has

6     repeatedly held that Section 1104(c)'s inclusion of the

7     phrase "as is appropriate" gives the Court discretion.  See

8     Spansion, 526 B.R. 114,128 (Bankr. D. Del. 2010); In Re

9     Visteon Corporation, 09-11786, (Bankr. D. Del. May 12, 2010),

10    hearing transcript at 170, lines 16 through 20; In re

11    Washington Mutual, Inc., 08-12229 (Bankr. D. Del. May 5,

12    2010), hearing transcript 97, 10 through 13.

13         I see no reason to depart from these rulings here.

14    As the moving party, the ad hoc group bears the burden to

15    demonstrate that an examiner is appropriate under the

16    circumstances of this case.  See In re Allied Nevada Gold,

17    15-10503 (Bankr. D. Del. September 11, 2015), hearing

18    transcript at 90 to 91.

19         It has not done so.  The ad hoc group's first

20    argument is that an examiner is needed to determine whether

21    the amendments made to the plan after solicitation were

22    significantly material in nature to require re-solicitation

23    of the plan.  The ad hoc group does not explain why the Court

24    cannot adequately address this issue, as it is a simple

25    question of law that the parties will be free to argue during

1  confirmation, and which I can resolve in connection with

2  confirmation.  As all the relevant facts on this issue are

3  already known, appointing an examiner to further investigate

4  this issue would be inappropriate.

5         The ad hoc group next used that an examiner is

6  needed to investigate the debtors and the UCC settlement with

7  the asbestos claims for $18 million, which they assert is

8  more than any other litigation creditor group and they argue

9  more than the asbestos claimants would receive if the general

10  unsecured trusts were allocated on a proportional basis.

11  They argue that since the settlement was announced, the

12  debtors and the UCC have been avoiding discovery into the

13  settlement and allocation of proceeds and that, quote:

14         "Only an independent examiner can force the

15  discovery that is needed to sort of through the morass of

16  potential conflicts of interest and issues surrounding the

17  UCC settlement."

18         I disagree.  The Court is given broad discretion

19  to handle discovery disputes and to fashion remedies for

20  violations of discovery rules and procedures.  To the extent

21  the ad hoc group believes the debtors or the UCC are not

22  complying with those rules, they are free to file a motion to

23  compel.

24         Further, the matter of whether a settlement with

25  the UCC or any allocation in connection with that settlement

1   is appropriate is a matter to be considered at confirmation.

2   The ad hoc group is free to raise it then in the form of a

3   confirmation objection.  Appointing an examiner to explore

4   this issue would, therefore, also be inappropriate.

5           Lastly, the ad hoc group argues that an examiner

6   is necessary to investigate the propriety of certain asbestos

7   claims and the ballots cast with respect to those claims.

8   This issue involves the conduct of counsel to one of the

9   members of the Unsecured Creditors Committee, attorney Thomas

10  Bevan, who is the subject of a recent opinion issued by

11  another member of this Court, Judge Silverstein, in the

12  Imerys bankruptcy case, Case Number 19-10289.

13          In that case, Judge Silverstein was presented with

14  a motion by Mr. Bevan's firm, Bevan & Associates, to change

15  its vote on the plan, pursuant to Bankruptcy Rule 3018.

16  Following a hearing on the motion, Judge Silverstein denied

17  Mr. Bevan's request to change his votes and held that the

18  master ballot he filed would, instead, be considered

19  withdrawn because, quote:

20          "The evidence raises significant questions as to

21  whether any of Bevan & Associates' clients have a claim

22  against any debtor."

23          She went on to state:

24          "What is crystal clear is that, one, Bevan &

25  Associates has a database of clients built up over the past

1  30 years; two, prior to voting, Bevan & Associates performed

2  zero diligence to discern which of its clients, if any, had

3  been exposed to talc, much less to debtors' talc; and, three,

4  Bevan & Associates submitted this master ballot, without

5  regard to whether any of its 15,713 clients had a talc

6  personal injury claim, as required to vote on the plan.  In

7  other words, Bevan & Associates simply printed out its list

8  of clients in an Excel spreadsheet format and slapped it

9  behind the master ballot."

10        Judge Silverstein then discussed the use of master

11  ballots, generally, which she observed has become commonplace

12  in mass-tort bankruptcies.  Expressly noting that she was not

13  commenting on whether master ballots should be commonplace,

14  she stated, quote:

15        "In order for master ballots to work, great trust

16  is placed in the Plaintiff's bar.  With respect to Bevan &

17  Associates, the evidence shows that such trust was not well-

18  placed.  It is true that direct talc personal injury claims

19  will be channeled to a trust for liquidation, but a lawyer

20  filing the master ballot still has the obligation to ensure

21  that he only votes on behalf of clients who have a claim

22  against the debtors."

23        That's In re Imerys Talc, Inc., 2021 Bankr. LEXIS

24  2852, *2728, (Bankr. D. Del. October 13, 2021).

25        The ad hoc group argues that discovery in this

1   case has revealed that Mr. Bevan undertook the same process
2   in submitting master ballots here as it did in Imerys.
3   Specifically, the ad hoc group cites to Mr. Bevan's
4   deposition, which he states that he submitted a master ballot
5   on behalf of his entire client group; the same, roughly,
6   15,000 claimants as in the Imerys case, without conducting
7   any inquiry into whether those clients, in fact, held claims
8   against the debtors.

9          The debtors argue that there is a significant
10  difference between the facts in Imerys and the facts in this
11  case, with the main one being that in Imerys, there was no
12  bar date for asbestos claims, and so there were no proofs of
13  claim filed.  Here, by contrast, every vote was connected
14  back to a timely filed proof of claim.

15         No objections to the asbestos proofs of claim were
16  filed prior to the voting deadline.  The debtors assert that
17  they did not have any obligation to inquire into the validity
18  of the claims, prior to the voting deadline.  They argue that
19  the claims are only being allowed at the present time for
20  voting purposes and that the validity of the claims and
21  whether claimants are entitled to payment are both still
22  undetermined.

23         I agree.  At this stage in the proceedings, the
24  only inquiry that was necessary for the debtors to conduct
25  was whether the votes cast were cast on behalf of people or

 1   entities that held claims.  As Judge Silverstein acknowledged

 2   in Imerys, when proofs of claim are filed and no objections

 3   have been made, holders of those claims are entitled to vote,

 4   Imerys, 2021 Lexis 2852, *29, Footnote 95, citing 11 U.S.C.

 5   Section 1126(a).

 6          The ad hoc group argues, however, that because

 7   many of their claims were held to be invalid, as

 8   unsubstantiated, that the same standard should apply to the

 9   asbestos claims, which they assert are also unsubstantiated.

10   While it is true that the validity or invalidity, as the case

11   may be, of some claims has been determined in this case,

12   there's no requirement that the debtors determine the

13   validity of all claims by the time the voting takes place.

14          There remains time for the validity of all the

15   asbestos claims to be determined.  The ad hoc group has since

16   filed objections to the Bevan claims; however, that objection

17   was well past the voting deadline.

18          Appointing an examiner here would be inappropriate

19   and the request could fairly be denied for that reason alone;

20   however, it is also worth noting that appointing an examiner

21   to investigate these matters would be improper for the

22   additional reason that Section 1104(c) very clearly provides

23   for the appointment of an examiner to conduct an

24   investigation of the debtor.

25          While the ad hoc group goes to great lengths to

1  attempt to connect the complaint of conduct back to the

2  debtors, what it is really concerned with is the conduct of

3  counsel to a member of a creditors' committee member.

4  Accordingly, appointing an examiner under 1104(c) to

5  investigate those concerns would not be appropriate.

6           For all of these reasons, the motion to appoint an

7  examiner is denied.

8           I turn now to the motion request for an order

9  designating and striking all ballots submitted by asbestos

10  claimants, pursuant to Section 1126(e) of the Code.  Section

11  1126(e) provides that the Court may, quote:

12           "May designate any entity whose acceptance or

13  rejection of a plan was not in good faith or was not

14  solicited or procured in good faith or in accordance with the

15  provisions of this title."

16           As Judge Silverstein stated in Imerys, quote:

17           "Designating a vote is a drastic entity and the

18  burden on the movant is a heavy one."

19           That's 2021 Bankr. LEXIS 2852, *37.

20           She went on to explain that, quote:

21           "Over the years, courts have developed several

22  badges of bad faith," that might just justify

23  disqualification, including, quote:

24           "Creditor votes designed to, one, assume control

25  of the debtor; two, put the debtor out of business or

1

1                         unitUNITED STATES BANKRUPTCY COURT
                               DISTRICT OF DELAWARE
2
                                          .  Chapter 11
3       IN RE:                            .
                                          .  Case No. 18-10814 (CSS)
4       EV ENERGY PARTNERS, *et al.*,     .
                                          .  Courtroom No. 6
5                                         .  824 North Market Street
                                          .  Wilmington, Delaware 19801
6                                         .
7                  Debtors.               .  May 16, 2018
        . . . . . . . . . . . . . . . . .    10:00 A.M.
8
                               TRANSCRIPT OF HEARING
9            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                     UNITED STATES BANKRUPTCY JUDGE
10
11      APPEARANCES:

12      For the Debtors:          Brad Weiland, Esquire
                                  Jeffrey Zeiger, Esquire
13                                William Arnault, Esquire
                                  Casey McGushin, Esquire
14                                Travis Bayer, Esquire
                                  KIRKLAND & ELLIS
15                                300 North LaSalle
                                  Chicago, Illinois 60654
16
                                  - and -
17
                                  Laura Davis Jones, Esquire
18                                PACHULSKI STANG ZIEHL & JONES
                                  919 North Market Street
19                                Wilmington, Delaware 19801
20
        Audio Operator:          Al Lugano
21
        Transcription Company:   Reliable
22                                1007 N. Orange Street
                                  Wilmington, Delaware 19801
23                                (302)654-8080
                                  Email:  gmatthews@reliable-co.com
24
25      Proceedings recorded by electronic sound recording,
        transcript produced by transcription service.

**A580**

2

```
1    APPEARANCES (Cont'd):

2

3    For Roger Kent:           Stuart Brown, Esquire
                               Derrick Farrell, Esquire
4                              DLA PIPER
                               1201 North Market Street
5                              Wilmington, Delaware 19801

6    For Ad Hoc Committee:     Philip Dublin, Esquire
                               AKIN GUMP
7                              One Bryant Park
                               Bank of America Tower
8                              New York, New York 10036

9    For EnerVest:            Alan Moskowitz, Esquire
                               GIBSON DUNN
10                             200 Park Avenue
                               New York, New York 10166
11
12   For U.S. Trustee:        Hannan McCollum, Esquire
                               OFFICE OF U.S. TRUSTEE
13                             844 King Street
                               Wilmington, Delaware 19801
14
     For JPMorgan Chase       Elisha Graff, Esquire
15                             SIMPSON THACHER
                               425 Lexington Avenue
16                             New York, New York 10017

17

18

19

20

21

22

23

24

25
```

3

1                                   INDEX

2                                                       PAGE

3
Motion of Certain Equity Holders for the Appointment of an Examiner
4   Pursuant to Section 1104(c) of the Bankruptcy Code and Bankruptcy
Rule 2007.1 Filed by RK Investments, Inc., Jerry R. Kent, Selma
5   Poznanovich [Filed 5/7/18] (Docket No. 160).

6   ARGUMENT:                                        132

7   RULING:                                          189

8   Adequacy of Disclosure Statement and Confirmation of Plan: Joint
Prepackaged Chapter 11 Plan of Reorganization for EV Energy
9   Partners, L.P. and Its Debtor Affiliates [Filed 4/2/18] (Docket No.
6).
10
11  ARGUMENT:                                        198

12  RULING:                                          212

13

14  DEBTORS' WITNESS(s)

15      MR. HARDEN

16      Direct examination by Mr. Farrell             5

17      Cross examination by Mr. Zeiger              75

18      Redirect examination by Mr. Farrell         114

19  DEBTORS' WITNESS(s)

20      NICHOLAS BOBROWSKI

21      Cross-examination by Mr. Brown              120

22  EXHIBITS:                                    I.D.      REC'D

23  Debtors' Exhibits 38,39,40,41                            112

24  Exhibits 42 and 43    Articles                  47

25

196

 1  disclosure statement isn't to generally inform the world of

 2  the facts of the case; it's to provide the investors with the

 3  information they need to know how to vote.  If you don't

 4  vote, a disclosure statement is really irrelevant.

 5          But even throwing that aside, I still think the

 6  disclosure statement contains more than enough information.

 7  It's already a telephone book, for those of us who remember

 8  what telephone books are, and, you know, there has to be a

 9  limit on what you have to put in a disclosure statement.  I'd

10  like to see shorter confirmation orders, shorter DIP orders,

11  and shorter disclosure statements, all of which would be to

12  the benefit of society as a whole.  So, I'm not -- I think

13  the disclosure statement here is more than adequate.

14          And, you know, there's really no reason to go back

15  into transactions that occurred in 2014 and 2015 that just

16  aren't relevant to the plan that's before the voters.  This

17  is a little -- kind of all over the place, but there's a lot

18  of cover.  There's a lot I didn't mention, but in all those

19  instances and in all those arguments, I reject the equity

20  holders' position and affirm the debtors'.

21          Real quick, on appointment of the examiner -- and

22  this goes to the "there's no there there" -- you don't -- I

23  don't believe, and I've said this in numerous cases and my

24  colleagues have said it, that it's just mandatory to appoint

25  an examiner, as long as someone asks for one.  I think there

1  has to be an actual examination that needs to be done, an

2  appropriate inquiry that needs to be pursued and I think the

3  Movant in a motion to appoint an examiner has the burden of

4  proof of establishing something, some reason that it would be

5  helpful to appoint an examiner and I just -- I don't see

6  anything here whatsoever to appoint an examiner.

7          Now, all this, of course, you know, it would

8  certainly be better if there was more value here for the

9  unsecured creditors, as well as equity.  We can't -- the

10 Court is powerless to create value out of thin air, and all I

11 can do in connection with determining value is weigh the

12 evidence as it's presented to me and do the best I can.  And

13 I may be wrong, and it may be a situation here where equity

14 is entitled to more, but based on the evidence I have, I am

15 sorry to say that I don't believe they are, and that they are

16 fortunate to be getting the 5 percent that they're getting.

17         And it's interesting even though -- talking about

18 fiduciary duties -- I mean, even though all the evidence

19 indicated to the Board that this -- that equity was out of

20 the money, this Board fought very, very hard to get some

21 return to its equity holders, perhaps even breaching their

22 fiduciary duties to their creditors in the process.  But I

23 think that that speaks volumes to the integrity of the Board

24 in this situation and is another reason that it's clear to me

25 that they have acted with robust corporate governance and

1

```
1                      UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
2
                                       .   Chapter 11
3    IN RE:                            .
                                       .   Case No. 20-10028 (LSS)
4    PADDOCK ENTERPRISES, LLC,         .
                                       .   Courtroom No. 2
5                                      .   824 North Market Street
                                       .   Wilmington, Delaware 19801
6                                      .
                                       .
7                    Debtor.          .   June 17, 2020
     . . . . . . . . . . . . . . . . . .   3:30 P.M.
8

9                    TRANSCRIPT OF TELEPHONIC RULING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                   UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12
     For the Debtor:          Michael Merchant, Esquire
13                            John Knight, Esquire
                              Brendan Schlauch, Esquire
14                            Sarah Silveira, Esquire
                              RICHARDS LAYTON FINGER, P.A.
15                            920 N. King Street
                              Wilmington, Delaware 19801
16


17   Audio Operator:          Ginger Mace

18
     Transcription Company:    Reliable
19                             1007 N. Orange Street
                               Wilmington, Delaware 19801
20                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
21
     Proceedings recorded by electronic sound recording;
22   transcript produced by transcription service.

23

24

25
```

2

```
 1   TELEPHONIC APPEARANCES (Continued):

 2   For the Debtors:          Jeffrey Bjork, Esquire
                               Amy Quartarolo, Esquire
 3                             Christina Craige, Esquire
                               Helena Tseregounis, Esquire
 4                             Lisa Lansio, Esquire
                               LATHAM & WATKINS
 5                             355 South Grand Avenue
                               Los Angeles, California 90071
 6
                               - and -
 7
                               Richard Levy, Esquire
 8                             330 North Wabash Avenue, Suite 2800
                               Chicago, Illinois 60611
 9
                               - and -
10
                               George Davis, Esquire
11                             885 Third Avenue
                               New York, New York 10022
12
     For the U.S. Trustee:     Richard Schepacarter, Esquire
13                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street
14                             Wilmington, Delaware 19801

15

16

17

18

19

20

21

22

23

24

25
```

**A586**

7

1   whether debtor can propose a confirmable plan.

2          The examiner motion is opposed by debtors, the

3   official committee of asbestos personal injury claimants, the

4   then proposed and now appointed future claims representative,

5   as well as O-I Glass.  The examiner motion is supported by

6   the United States on behalf of the Environmental Protection

7   Agency and Department of Interior, as well as various state

8   environmental agencies.

9          The United States Trustee first argues that an

10  appointment of an examiner is mandatory under Section 1104(c)

11  in that the debtors fixed, liquidated, unsecured debts exceed

12  $5 million dollars.  The United States Trustee argues that

13  based on debtor's filed schedules it is likely that these

14  liabilities will exceed that level.

15         As to this position, as I indicated at argument,

16  this court has consistently ruled that Section 1104(c) is not

17  mandatory.  I will not deviate from that holding even

18  assuming that the level of fixed liquidated unsecured debt

19  exceeds $5 million dollars.

20         The United States Trustee also argues that the

21  appointment of an examiner is in the best interest of

22  creditors.  The United States Trustee believes that having an

23  independent third-party conduct an investigation is the most

24  efficient way to approach the issues that need to be

25  explored, in the case and will provide the court and other

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 08-12229 (MFW)

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


WASHINGTON MUTUAL, INC., et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        824 North Market Street

        Wilmington, Delaware


        May 5, 2010

        10:30 AM


B E F O R E:

HON. MARY F. WALRATH

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  BRANDON MCCARTHY

2

1

2    HEARING re Debtors' Objection to Proof of Claim Filed by Mellon

3    Investor Services LLC

4

5    HEARING re Objection to Proof of Claim No. 201 Filed by Scott

6    **A. Burr**

7

8    HEARING re Debtors' Twenty-Fourth Omnibus (Substantive

9    Objection to Claims

10

11   HEARING re Debtors' Twenty-Fifth Omnibus (Non-Substantive)

12   Objection to Claims

13

14   HEARING re Debtors' (Non-Substantive) Objection to Claim Number

15   574 Filed by Frank Whitemaine

16

17   HEARING re Debtors' Thirty-First Omnibus (Non-Substantive)

18   Objection to Claims

19

20   HEARING re Supplemental Motion of Debtors Pursuant to Section

21   362 of the Bankruptcy Code for Order Modifying Automatic Stay

22   to Allow Advancement Under Insurance Policies

23

24   HEARING re Debtors' Objection to Proof of Claim Filed by

25   Egencia LLC

3

1

2    HEARING re Debtors' Twenty-Eighth Omnibus (Substantive)

3    Objection to Claims Filed by Claimants Gregory Bushansky, Dana

4    Marra, Marina Ware, Ontario Teachers' Pension Plan Board and

5    Brockton Contributory Retirement System (Claim Nos. 999, 1001

6    1002, 1003, 2759, 2761 and 2763) Pursuant to Section 510(b) of

7    the Bankruptcy Code

8

9    HEARING re Debtors' Thirtieth Omnibus (Substantive) Objection

10   to Claims Filed by Claimants Walden Management Co. Pension

11   Plan, Metzler Investment and South Ferry LP #2 (Claim Nos.

12   2808, 2809, 3087 and 3448) Pursuant to Section 510(b) of the

13   Bankruptcy Code

14

15   HEARING re Debtors' Twenty-First Omnibus (Substantive)

16   Objection to Claims

17

18   HEARING re Debtors' Twenty-Sixth Omnibus (Substantive)

19   Objection to Proofs of Claim of Jay Agnes (Claim No. 2588) and

20   R.S. Bassman (Claim No. 3666)

21

22   HEARING re Debtors' Twenty-Seventh Omnibus (Substantive)

23   Objection to Claims (Claim Nos. 2889, 2890, 2891, 2893, 2894,

24   2896, 2897, 2898 and 2900)

25

4

1

2    HEARING re Debtors' Objection to Proof of Claim Filed by

3    Michael Scott Blomquist (Claim No. 3220)

4

5    HEARING re Application of the Debtors Pursuant to Sections

6    327(a) and 328(a) of the Bankruptcy Rule 2014(a) and Local Rule

7    2014-1 for Order Authorizing the Retention of Blackstone

8    Advisory Partners L.P. as Financial Advisor Nunc Pro Tunc to

9    April 9, 2010

10

11   HEARING re Motion and Supporting Memorandum of the Official

12   Committee of Equity Security Holders for the Appointment of an

13   Examiner Pursuant to Section 1104(c) of the Bankruptcy Code

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

97

1    the other day.  And it could certainly lead to strategic

2    filings of motions for appointment of trustees just to defeat a

3    motion for appointment of an examiner.  So that is of no moment

4    to my ruling on this motion.

5            As I have recently ruled orally, so you can't really

6    rely on it, but I will follow myself.  I do believe that

7    1104(c)(2) gives the Court some discretion, even if the debt

8    level is reached, and the discretion is that the Court has the

9    discretion to determine what appropriate investigation of the

10   debtor should occur and that, if the Court determines that

11   there's no appropriate investigation that needs to be

12   conducted, the Court has the discretion to deny the appointment

13   of an examiner.

14           The Courts have looked at various factors in

15   determining whether an appropriate investigation is warranted.

16   They include whether that investigation, that same

17   investigation, has already been conducted by other parties.

18   They have looked at whether the appointment of an examiner will

19   increase costs and cause a delay with no corresponding benefit.

20   Of course I've looked at the timing of the motion.  I've looked

21   at whether the motion is a litigation tactic, which includes

22   the consideration of the timing, not just how soon it is in a

23   case but whether it is timed such as to evidence a litigation

24   tactic.

25           I think in this case it's a very close call.  I don't

98

1   find that this is a litigation tactic, although it's been

2   suggested that the shareholders are simply seeking to delay

3   things while they replace management so that they can have --

4   or, excuse me, the directors -- board of directors, so that

5   they can tank the settlement.  I'll accept their motion as

6   being -- as they state it:  an effort to have an investigation

7   conducted by an independent third party to determine whether or

8   not the plan proposed by the debtor, or this global settlement

9   referred to by the parties, is appropriate and whether,

10   instead, prosecution of those claims would result in a greater

11   recovery for the estate.

12          Notwithstanding that, reviewing the factors, I think

13   it is clear that the motion has to be denied at this point.

14   First, it is clear to me that this debtor has been investigated

15   to death.  And I'm sure that even the most experienced and

16   talented examiner that the United States Trustee could appoint

17   would not find any stone unturned.  The investigations have

18   been conducted not only by the debtor and the creditors'

19   committee, but by -- the equity committee itself has done some

20   investigation; the Office of Thrift Supervision; the FDIC; the

21   government task force, including the U.S. Attorney for the

22   Western District of Washington; the Department of Labor; the

23   Department of Justice; the FBI; the IRS; the SEC; the Attorney

24   General for the State of New York; the class action plaintiffs;

25   Congress; the U.S. Treasury; and the President's Financial

99

1   Fraud Task Force have all taken a look at Washington Mutual.

2   It is true that their investigations exceeded the scope of what

3   this Court need concern itself with.  They have talked about

4   systemic problems.  They have investigated possible criminal

5   actions by the parties.  In this case the Court is limited to,

6   as the equity committee suggests, the value of the estates and

7   how they will be distributed in this bankruptcy case.

8       I don't think it is fair to the creditors in this case

9   to be saddled with the cost of an investigation into systemic

10  problems, that would only benefit future parties but not

11  benefit the parties in this case.  In this case specifically,

12  the debtor and the creditors' committee have investigated the

13  specific assets owned by the debtor, or that the debtor claims

14  it owns.  The debtor has vigorously appeared in and prosecuted

15  its position in several adversaries in this case, in addition

16  to filing a claim in the FDIC receivership and prosecuting

17  claims it has in that forum.  All of that information should be

18  available to the equity committee.  And I don't want to hear

19  about obstacles being placed in their path to getting full and

20  open access to that information, whether it's documentary or

21  interviews with the debtors' management or others who have

22  conducted these investigations; and the same goes with the

23  creditors' committee, who's been actively involved in all of

24  this.

25      Again, the appointment of an examiner here really

100

1    would -- an examiner really would only have the task of

2    reviewing what others have already done.  I don't think there's

3    any original investigation left to be done.  So I think that's

4    just a waste of assets.

5         Secondly, I think the equity committee is fully able

6    to conduct the investigation that it seeks to have the examiner

7    conduct.  It has the benefit of Rule 2004, it has the benefit

8    of the discovery rules, because there are contested matters

9    presently and anticipated in which the equity committee could

10   fully avail itself of that discovery.  But, again, I'm strongly

11   urging the committee and the debtor to provide all the

12   information to the equity committee without testing the Court's

13   patience with discovery motions.

14        The -- again, the appointment of a third party to

15   conduct that investigation and to report to the Court its

16   conclusion is no substitute for the adversarial process extant

17   in bankruptcy court and the duty of the Court, after hearing

18   the views of the opposing parties, to make a decision as to

19   what assets the debtor owns, what the value of those assets is,

20   whether a settlement is reasonable, in resolving a conflicting

21   claim to those -- to ownership to those assets.

22        Finally, the timing of the motion.  I don't think that

23   this is a factor that I'll rely on in this case.  I think that

24   in other cases it's been evident that parties have been

25   litigating for many, many months, and only at the last minute

101

1   when a party thought it was going to lose did it file the

2   motion for a tactical reason.  In this case, the equity

3   committee is relatively new to this case, only since January,

4   and I don't think that the timing was meant -- is too late to

5   consider it, nor was it meant as a litigation strategy.

6          Let's see.  I don't know whether -- I'm not going to

7   accept the debtors' arguments or the committee's arguments

8   regarding delay here being a negative.  I'm not sure how

9   quickly the debtor honestly can proceed with its proposed plan

10  but, at any rate, I think there is sufficient time -- should be

11  sufficient time for the equity committee to conduct whatever

12  investigation it feels is relevant.  So I will deny the motion.

13         MR. ROSEN:  Your Honor, we have prepared a very short

14  order that says "Ordered that the motion is denied.  And it is

15  further ordered that this Court shall retain jurisdiction over

16  any and all matters arising from or related to the

17  implementation or interpretation of this order."  With that,

18  may I approach the bench?

19         THE COURT:  You may.  All right, I'll enter that

20  order.

21         MR. ROSEN:  Thank you.  That concludes this morning's

22  agenda.

23         THE COURT:  Well, before we conclude, where do we

24  stand on the 2019?  Did you send out a notice of a hearing on

25  that?

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-11786-CSS

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


VISTEON CORPORATION, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        824 North Market Street

        5th Floor

        Wilmington, Delaware


        May 12, 2010

        10:05 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

2

1

2    HEARING re Motion for Relief from Automatic Stay Filed by

3    Luther Gilford

4

5    HEARING re Seventh Omnibus Objection of Visteon Corporation and

6    Its Affiliated Debtors to Proofs of Claim (Duplicate Note

7    Claims, Duplicate Claims, and Cross-Debtor Duplicate Claims

8    (Substantive))

9

10   HEARING re Eighth Omnibus Objection of Visteon Corporation and

11   Its Affiliated Debtors to Proofs of Claim (Incorrect Debtor

12   Claims (Non-Substantive))

13

14   HEARING re Ninth Omnibus Objection of Visteon Corporation and

15   Its Affiliated Debtors to Proofs of Claim (Amended Claims and

16   Equity Claims (Non-Substantive))

17

18   HEARING re Tenth Omnibus Objection of Visteon Corporation and

19   Its Affiliated Debtors to Proofs of Claim (Claims to be

20   Adjusted (Substantive))

21

22   HEARING re Debtors' Objection to Proofs of Claim Filed by

23   Visteon UK Pension Trust Limited (as Trustee of the Visteon UK

24   Pension Plan) and the Board of the Pension Protection Fund

25

3

1

2    HEARING re Motion of the Debtors for Entry of an Interim Order

3    (i)Authorizing Use of Cash Collateral; (ii)Granting Adequate

4    Protection to Pre-Petition Secured Lenders; and (iii)Scheduling

5    Final Hearing

6

7    HEARING re Motion of Panasonic Electric Works Corporation of

8    America for an Order Compelling Debtors to Assume or Reject Its

9    Pre-Petition Contract

10

11   HEARING re Emergency Motion of the Official Committee of

12   Unsecured Creditors for Leave to Conduct Discovery Pursuant to

13   Fed. R. Bankr. P. 2004

14

15   HEARING re Motion for Order Authorizing the Official Committee

16   of Unsecured Creditors to File Emergency Motion of the Official

17   Committee of Unsecured Creditors for Leave to Conduct Discovery

18   Pursuant to Fed. R. Bankr. P. 2004 Under Seal

19

20   HEARING re Debtors' Third Motion to Extend Their Exclusive

21   Periods to File and Solicit Votes for Their Chapter 11 Plan

22

23   HEARING re Motion of the Official Committee of Unsecured

24   Creditors to Terminate Debtors' Exclusive Periods to File and

25   Solicit Votes for Their Chapter 11 Plan

4

1

2    HEARING re Motion of the Ad Hoc Equity Committee in Visteon

3    Corporation for Order Directing the Appointment of Examiner

4    Pursuant to Section 1104(c)(2) of the Bankruptcy Code

5

6    HEARING re Motion of Various Shareholders for an Order

7    Appointing an Official Committee of Equity Security Holders

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

170

1    THE COURT:  Thank you.  Excuse me.  All right, the

2    issue, of course, before the Court, is whether to appoint an

3    examiner, pursuant to the motion in front of the Court.  And

4    the statute which is applicable, of course, is 1104(c).  "If

5    the Court does not order the appointment of a trustee," which I

6    have not, "then at any time before the confirmation ... on

7    request of a party in interest ... and after notice and a

8    hearing, the court shall order the appointment of an examiner

9    to conduct such an investigation of the debtor as is

10   appropriate, including" and then it goes on, "if such

11   appointment is in the interests of creditors" equity holders,

12   et cetera, "or the debtor's fixed, liquidated, unsecured debts

13   ... exceed $5,000,000."  It's a troubling -- well, troubling,

14   it's a somewhat ambiguous statute notwithstanding the fact that

15   it says "shall", because it immediately limits the scope of

16   that "shall".  I don't think it's true, and I think it would be

17   an absurd result to find that in every case where the financial

18   criteria is met and a party-in-interest asks, the Court must

19   appoint an examiner.  There has to be an appropriate

20   investigation that needs to be done.

21       Now, it's -- until someone does an investigation, of

22   course, you don't know whether an investigation really needed

23   to be done or not.  But at some point there has to be a level

24   of smoke, if you will -- not a lot but more than none, more

25   than just a whiff of smoke -- but some sort of indication, some

171

1    sort of allegation or facts that make the Court think in a

2    whole that, hmm, somebody needs to look into this independently

3    and tell the Court what's going on.  It's easy in Lehman or

4    Revco to figure out that somebody's got to figure this out.

5    But not every case that has over five million dollars of

6    nontrade needs an examiner.

7              This case does not need an examiner.  We are in a

8    good old fashioned brawl, all right?  We all know it.  And the

9    prize is an automobile company -- excuse me, a parts -- well,

10   an automobile manufacturer of parts -- with a nice healthy

11   client.  Kind of a rarity, but it's nice to have.  And we're

12   going to fight.  There's going to be a fight.  Well, let's get

13   to it.  And I don't think there's any reason to keep tiptoeing

14   around it.  Equity thinks they're in the money.  They're going

15   to come to confirmation and they're going to try to prove it.

16   Mr. Willett's clients have an issue with what's on the table.

17   They're going to come in and litigate it.  The bondholders like

18   what's on the table or support it; they're going to come in and

19   litigate it.  There are no hidden motivations, here.  There are

20   hidden agendas, here.  I think this is just a good old

21   fashioned fight over a debtor that has some value, if it's

22   restructured.  It's a good company with a bad balance sheet.

23   That's what it looks like.  Maybe that's wrong.  Maybe it's a

24   good company with a good balance sheet.  But that's what

25   confirmation is going to tell us.

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 10-10187-MFW

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


HSH DELAWARE GP LLC, ET AL.,


        Debtors.


- - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            824 North Market Street

            Wilmington, Delaware


            April 23, 2010

            11:30 AM


B E F O R E:

HON. MARY F. WALRATH

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  BRANDON MCCARTHY

2

1

2   United States Trustee's (I)Statement With Respect to Motion for

3   an Order (A) Directing the Appointment of a Trustee Pursuant to

4   11 U.S.C. Sections 1104(a)(1)-(3); or in the Alternative, (B)

5   Terminating the Debtors' Exclusive Rights Pursuant to Section

6   1121(d) to Allow the Lenders to File and Solicit Acceptances of

7   a Chapter 11 Plan and (II) Independent Motion for an Order

8   Directing the Appointment of an Examiner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sharona Shapiro

31

1    independent motion for an examiner along with its response to

2    the trustee motion.  If my memory serves correctly, when we

3    filed the motion we weren't aware at that time that the trustee

4    motion had been continued to June.  So we intended that at the

5    April -- early April hearing, if that was the trustee motion

6    hearing, that if a trustee wasn't granted we would then seek,

7    you know, the appointment of an examiner at that hearing.  So

8    it's our position that an examiner can be heard -- a motion for

9    an examiner can be heard even while a trustee motion is

10   pending.  Thank you.

11           THE COURT:  Thank you.

12           Well, I agree with the U.S. Trustee on that last

13   point.  I think that I don't buy the argument that simply

14   because a trustee motion is pending the Court cannot or should

15   not appoint an examiner until after that motion is decided,

16   especially where the trustee motion is continued.  I think that

17   could lead to some gaming the system, if you will.

18           But I do agree that there is some discretion in

19   1104(c)(2) that the Court must exercise, not only in

20   determining whether and the amount of the unsecured non-trade

21   debt but also in determining whether, in fact, any

22   investigation is appropriate.

23           I think it is a futile act to appoint a trustee where

24   no proper investigation or appropriate investigation needs to

25   be done.  It's wasteful of assets of the estate and does not

32

1    serve the creditors and other constituents in the case.

2    And I agree that at this stage it appears that the appropriate

3    investigation that the Court would order an examiner to conduct

4    is already being conducted by the lenders in connection with

5    their pending trustee motion.

6            So at this point I don't see that there's any need for

7    an examiner.  However, I will continue this to the trustee

8    motion hearing and it may be appropriate at that time depending

9    on the outcome of that motion.  Okay.

10           MR. STEARN:  Thank you, Your Honor.  We'll settle on a

11   form of order and provide one.

12           THE COURT:  All right.  Then we'll stand adjourned.

13           MR. STEARN:  Thank you, Your Honor.

14           MR. DORSEY:  Thank you, Your Honor.

15       (Proceedings concluded at 12:07 p.m.)

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| MAGNA ENTERTAINMENT CORP., | . | Case No. 09-10720(MFW) |
| *et al.*, | . | |
| | . | April 20, 2010(10:37 a.m.) |
| Debtors. | . | (Wilmington) |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| REDROCK ADMINISTRATIVE | . | |
| SERVICES LLC, RACING AND | . | |
| GAMING SERVICES, LTD., AMWEST | . | |
| ENTERTAINMENT, LLC, BETTOR | . | |
| RACING, INC.,D/B/A ROYAL RIVER | . | |
| RACING, AND THE ELITE TURF | . | |
| CLUB, N.V., | . | |
| | . | |
| Plaintiffs, | . | |
| | . | |
| v. | . | Adv.Proc.No. 09-51155(MFW) |
| | . | |
| MAGNA ENTERTAINMENT CORP., | . | |
| PACIFIC RACING ASSOCIATION, | . | |
| INC., MEC LAND HOLDINGS | . | |
| (CALIFORNIA), INC.,GULFSTREAM | . | |
| PARK RACING ASSOC., INC., LOS | . | |
| ANGELES TURF CLUB, INC., AND | . | |
| THE SANTA ANITA COMPANIES, | . | |
| INC., | . | |
| Defendants. | . | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| MAGNA ENTERTAINMENT CORP., | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | Adv.Proc.No. 09-52212(MFW) |
| | . | |
| PA MEADOWS, LLC, PA MEZZCO, | . | |
| LLC, and CANNERY CASINO | . | |
| RESORTS, LLC, | . | |
| | . | |
| Defendants. | . | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**A607**

2

```
ALAMEDA COUNTY AGRICULTURAL    .
FAIR ASSOCIATION, et al.,      .
                              .
          Plaintiffs,         .
                              .
     v.                       .      Adv.Proc.No. 10-50193(MFW)
                              .
MAGNA ENTERTAINMENT CORP,     .
et al.,                       .
                              .
          Defendants.         .
```

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MARY F. WALRATH
              UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Brian S. Rosen, Esq. |
| | Weil, Gotshal & Manges LLP |
| | |
| For Certain Equity | Donna Harris, Esq. |
| Holders: | Pinckney, Harris & Weidinger |
| | |
| For the Creditors | Kenneth Eckstein, Esq. |
| Committee: | Josh Brody, Esq. |
| | Kramer, Levin |
| | |
| For the U.S. Trustee: | Mark Kenney, Esq. |
| | U.S. Trustee's Office |
| | |
| For PNC Bank: | Michael Gallerizzo, Esq. |
| | Gebhart & Smith |
| | |
| For Florida DPBR: | Jason Powell, Esq. |
| | Ferry, Joseph |
| | |
| For Santa Anita: | Derek Abbott, Esq. |
| | Morris, Nichols, Arsht & Tunnell |
| | |
| For Certain Creditors: | Gregg Galardi, Esq. |
| | Skadden, Arps |
| | |
| For MI Developments: | Lee Attanasio, Esq. |
| | John Hutchinson, Esq. |
| | Sidley, Austin |

3

| | |
|---|---|
| For Texas Racing<br>Commission: | Casey Roy, Esq.<br>Attorney General's Office |
| For the Mayor &<br>City Council: | David Sommer, Esq.<br>Gallagher, Evelius & Jones |
| For MID: | Michael Burke, Esq. |
| For State of Maryland: | Greg Cross, Esq. |
| For FC Gulfstream Park: | Carl N. Kunz, III, Esq.<br>Morris, James |
| For MRTEP: | Brian Esters, Esq.<br>Abato, Rubenstein & Abato |
| For the Grand Prairie<br>Sports Corp. | John Middleton, Esq.<br>Haynes & Boone, LLP |
| For Faracon Capital: | David A. Fidler, Esq.<br>Klee, Tuchen, Bogdanoff & Stern |
| For the Regents of<br>Univ. of California: | Eric Behrens, Esq.<br>     University of California |
| For the Los Angeles<br>County Tax Collector: | Barry S. Glaser, Esq.<br>Steckbauer, Weinhart, Jaffe |

| | |
|---|---|
| Audio Operator: | Brandon McCarthy |
| Transcriber: | Elaine M. Ryan<br>(302) 683-0221 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**A609**

Case 09-10720-MFW   Doc 2442   Filed 04/28/10   Page 4 of 173

4

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESS: | | | | |
| Gregory Rayburn | | 19 | 57 | 61 |
| | | 37 | | 62 |
| | | 40 | 64 | 64 |
| | | 45 | | |
| Timothy Harkness | | 84 | | |
| | | 92 | | |
| | | 93 | | |
| Rocco Liscio | | 104 | 125 | 132 |
| | | 110 | 129 | 137 |
| | | 114 | | |
| Evan Gershbein | | 140 | 142 | |

1   finance it through the Preakness, then I think we have a

2   different issue, which is a breach of fiduciary duty issue

3   that really calls for an Equity Committee at that point.

4        THE COURT: Well, let me make this ruling on the

5   motion for the appointment of an Equity Committee or in the

6   alternative for appointment of an Examiner.  I agree with the

7   Committee and the debtors that this is just too late in the

8   game for such a motion to be filed.  It should have been

9   filed more promptly.  Clearly, at the time the settlement was

10  announced, if the equity had a problem with that, they should

11  have acted more promptly.  With respect to the request for

12  discovery, I'm going to reserve on that.  I think we'll hear

13  testimony today, and I think the shareholders who have filed

14  an objection will have ample time to contest the debtors' and

15  Committee's submissions on valuation and other issues, but I

16  will not foreclose if we do not finish today the opportunity

17  for some discovery.  With respect to the Examiner, I will

18  make the same ruling I did previously.  I think that the

19  Committee has acted in whatever role the Examiner would have

20  been instructed to act, namely they have investigated the

21  serious allegations regarding the interested parties and the

22  secured lenders' position.  I am fully aware of the extensive

23  work done by the Committee in this regard, and that that was

24  ultimately settled.  I make no comment on the settlement

25  because that's what I'll hear at the confirmation hearing.

1    But I think at this late date to appoint an Examiner to do

2    the same thing would just be a waste of assets of the estate.

3    With respect to the request to appoint an examiner just to do

4    a valuation, again, I will hear the valuation testimony and

5    the Equity Committee's objection to that, I assume, they will

6    be cross-examining on that point, but at this point, I just

7    don't think the appointment of an Examiner is warranted,

8    although I do agree that the Bankruptcy Code Section, because

9    of the amount of non-trade unsecured debt, would suggest it's

10   mandatory, I think the Court does have discretion with

11   respect to what the role of an Examiner would be, and since

12   all of the roles that an Examiner would play in this case

13   have already been fulfilled, I find it's a futile act and

14   will not appoint an Examiner.

15        MS. HARRIS: Your Honor, simply with respect to the

16   issue of the actions of the equity holders from the point

17   that the settlement was announced, I do have a witness here

18   who can tell the Court exactly what was done and how things

19   proceeded before - in order to maybe enlighten the Court with

20   respect to that issue, if the Court is so inclined, before

21   making that ruling.

22        THE COURT: No, I think just based on the timing of

23   it, I think too long of a delay has occurred.  Okay?

24        MS. HARRIS: Thank you, Your Honor.

25        THE COURT: I do not foreclose any 503(b)(3) declaim

**A612**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                         .   Case No. 08-10960(KG)
                               .
IDLEAIRE TECHNOLOGIES          .
CORPORATION,                   .   824 North Market Street
                               .   Wilmington, DE  19801
                               .
                               .
          Debtor.             .    June 13, 2008
. . . . . . . . . . . . . .     .  4:03 p.m.


TRANSCRIPT OF EXAMINER MOTION
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Sullivan Hazeltine Allinson, LLC
                           By:  WILLIAM D. SULLIVAN, ESQ.
                           4 East 8th Street, Suite 400
                           Wilmington, DE  19801

                           Holland & Knight, LLP
                           By:  JOHN J. MONAGHAN, ESQ.
                           10 St. James Avenue
                           Boston, MA  02116


Audio Operator:            Leslie Murin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

```
APPEARANCES (Cont'd.):

For Majority Lenders/       Akin, Gump, Strauss, Hauer & Feld,
DIP Lender:                   L.L.P.
                            By:  SCOTT ALBERINO, ESQ.
                                 ABID QURESCHI, ESQ.
                            1333 New Hampshire Ave, NW
                            Washington, DC  20036

                            Young Conaway Stargatt & Taylor,
                             LLP
                            By:  ROBERT S. BRADY, ESQ.
                            The Brandywine Building
                            1000 West Street
                            17th Floor
                            Wilmington, DE  19801

For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  DAVID L. BUCHBINDER, ESQ.
                            J. Caleb Boggs Federal Building
                            844 King Street
                            Suite 2313
                            Lockbox 35
                            Wilmington, DE  19801

For the Committee:          Saul Ewing LLP
                            By:  MARK MINUTI, ESQ.
                                 JEREMY WILLIAM RYAN, ESQ.
                            222 Delaware Avenue
                            Suite 1200
                            Wilmington, DE  19801

TELEPHONIC APPEARANCES:

For Wells Fargo Bank:       Kelley Drye & Warren LLP
                            By:  JENNIFER CHRISTIAN, ESQ.
                            101 Park Avenue
                            New York, NY  10178

                            Ropes & Gray, LLP
                            By:  ANNELIESE H. PAK, ESQ.
                            1211 Avenue of the Americas
                            New York, NY  10036-8704
```

**J&J COURT TRANSCRIBERS, INC.**

**A614**

3

**INDEX**

| EXHIBIT | I.D. | EVD. |
|---------|------|------|
| UST-1 Form 8K | | 7 |

**J&J COURT TRANSCRIBERS, INC.**

44

 1          THE COURT:  Good afternoon.

 2          MS. CHRISTIAN:  Good afternoon.  We are counsel for

 3  Wells Fargo Bank National Association as Indenture Trustee and

 4  Collateral Agent for the debtors' 13 percent senior secured

 5  notes.

 6          THE COURT:  Yes.

 7          MS. CHRISTIAN:  Your Honor, we join in the Majority

 8  Secured Noteholder Group's objection, and respectfully request

 9  that the U.S. Trustee's motion for appointment of an examiner

10  be denied or, alternatively, that the motion be adjourned until

11  a sale process is complete.

12          THE COURT:  Thank you.

13          MS. CHRISTIAN:  Thank you.

14          THE COURT:  Thank you for that.  Well, I have read

15  all of the submissions, a lot of the underlying cases.  We have

16  a very and unusually, I think, complete record in this case at

17  this point.  I even went back and read legislative history, and

18  I am going to deny the motion for the appointment of the

19  examiner.

20          I do take note of the fact that on the first day of

21  this case Mr. Buchbinder stood here all alone virtually and

22  heroically, I think, argued the points that have made the way

23  now for a Creditors' Committee to step in and continue, I don't

24  want to say necessarily the fight, but certainly, the

25  investigation, and I think the one thing that's clear is it's

**J&J COURT TRANSCRIBERS, INC.**

**A616**

45

1   somewhat unclear whether or not from the cases Section
2   1104(c)(2) of the Code mandatorily requires the appointment of
3   an examiner whereas here the debts exceed $5 million.   There
4   are some persuasive decisions on both sides.

5           In fact, in one case that I read I thought that was
6   particularly well written, Judge Wedoff of the Northern
7   District of Illinois in the In re:  UAL case found that it was
8   mandatory.  But in this district the cases have almost
9   consistently held otherwise.  Judge Walsh in S.A.
10  Telecommunications found that the provision is not mandatory.
11  I don't think that it is mandatory based upon my reading of the
12  legislative history, and just as the parties have pointed out,
13  the language of the statute itself  and, particularly, the as
14  appropriate clause.

15          And I also noted that in another case we had a
16  visiting judge, Judge Newsome, it was the AC&S case in which
17  Judge Newsome, although he found that the appointment of an
18  examiner in these circumstances is mandatory, he told the
19  examiner that he wasn't going to do any work, and, in fact, I
20  think he used the expression not a penny for the examiner.

21          So I'm not about to really undertake a futile act or
22  appointment someone who is not going to be taking action,
23  because we have, I think, highly competent counsel, and now
24  I've learned a financial advisor -- highly competent financial
25  advisor representing the Creditors' Committee and doing the

46

1  very investigation that an examiner would be doing under these

2  circumstances, and I'm similarly persuaded by the fact that not

3  only is an examiner appropriate here, but it probably would be

4  inappropriate given the speed with which the case is

5  progressing and the work that's already been done by the

6  Committee, and the fact that negotiations are about to begin.

7  I just think the record is just full, replete with evidence

8  that the Committee's doing a very, very capable job.

9          In addition, I will also note that the Court

10 recently, at the request of the debtor, appointed counsel for

11 outside directors, and I think that may have some significance,

12 and perhaps the Court will hear from the outside directors as

13 to their views on the transactions.

14         And the bottom line is this.  We're going to have a

15 sale hearing.  It's going to be a strenuous sale hearing, I

16 suspect.  And to the extent the Committee and any other

17 interested parties have not been provided cooperation in their

18 investigation, to the extent there hasn't been a very

19 significant shopping of this, marketing of this company, all of

20 that is going to make it much more difficult for the Court to

21 approve a sale, and the Court's agenda, speaking of agendas, in

22 this case is that there be a complete record upon which the

23 Court is able to make a determination that the sale is fair.

24 That will be happening, and, obviously, the more cooperation

25 that there is with the Committee and the United States Trustee

47

1  and between the debtor and the bondholders, on the one hand,

2  and them on the other, I think the more likely it may be that

3  the Court is in a position upon reviewing all of the facts to

4  approve a sale.

5          So the expense of an examiner is unwarranted here,

6  and I will, therefore, deny the motion with great respect for

7  the United States Trustee's Office and its maintenance really

8  of the integrity of the bankruptcy system here, and -- but all

9  in all, I think the motion has to be denied under these

10 circumstances and will be.  And I will enter an order denying

11 the motion.  Mr. Minuti, anything further, sir?

12         MR. MINUTI:  Your Honor, if I could, just one

13 housekeeping matter.

14         THE COURT:  Yes.

15         MR. MINUTI:  Counsel for the noteholders had touched

16 on this, and I wanted to put it on the record and get Your

17 Honor's approval.  Your Honor, in light of Your Honor's denial,

18 we will be preparing a stipulation that increases the carve out

19 as --

20         THE COURT:  Yes.

21         MR. MINUTI:  -- as well as changes some of the dates

22 in the interim financing order subject to us having further

23 negotiations before the final.  But there were two dates, Your

24 Honor, that we were concerned of, and we wanted to put on the

25 record the continuance of those and ask Your Honor to so order

**J&J COURT TRANSCRIBERS, INC.**

**A619**

```
                 UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE


    IN RE:                      .    Chapter 11
                                .
    AMERICAN HOME MORTGAGE      .    Case No. 07-11047(CSS)
    HOLDINGS, INC., a Delaware  .    (Jointly Administered)
    corporation, et al.,        .
                                .    Oct. 31, 2007 (10:09 a.m.)
            Debtors.            .    (Wilmington)
```

```
                  TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
           UNITED STATES BANKRUPTCY COURT JUDGE
```

```
        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.
```

**A620**

Case 07-11047-CSS   Doc 1997   Filed 11/14/07   Page 2 of 91

2

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DEBTORS' EVIDENCE | | | | |
| WITNESS: | | | | |
| Steven Dickman | 28 | 39 40 | | |

1    budget.  Her view was that if the Code required the

2    appointment of an examiner, she would appoint one and have

3    the examiner ready to go if an issue arose later in the case

4    that required an examination, but because there was no

5    examination required at that time, she would merely put the

6    examiner in place to satisfy some reading of 1004©)(2) and

7    keep that examiner in place until or unless an issue arose in

8    the case that required some examination.  So, we've seen

9    through the treatises and case law and largely this is

10   unreported in how courts have dealt with this, courts

11   applying a practical approach to 1104©)(2) because again,

12   Your Honor, burdening this estate with an examiner where

13   there is no apparent need or no established need for an

14   examination would simply waste the creditors' money.  So with

15   that, we would ask that the Court deny the request.

16        THE COURT: All right.  Thank you, Mr. Brady.  You

17   read from the elements of Colliers that I have actually up

18   here on the bench and marked, and I think it's important -

19   Clearly, and I'm dealing here with the narrow issue of

20   1104©)(2) because I don't think the appointment of an

21   examiner would be in the best interest of the creditors or

22   the equity security holders or the interests of the estate.

23   So, I would deny, as I said earlier, I would deny the motion

24   for appointment of an examiner under ©)(1), and I'd like to

25   pick up before I sort of speak more on, I think, Mr. Brady's

**A622**

1   comment earlier in connection with the trustee motion and I

2   think it's equally applicable to the examiner motion, I

3   didn't see any real factual allegations contained in the

4   motion when it came to these issues.  I felt that the movants

5   basically parroted the language of the statute and sort of

6   said, Because I just said what the statute says, a trustee or

7   an examiner should be appointed, and obviously, you need to

8   do more than that.  The problem of course is that shall means

9   shall, and the courts require, when I see something like that

10  it obviously means the court's required to appoint an

11  examiner if the criteria are met.  I think it's important to

12  look at ©)(2) though as - not on its own, but as it relates

13  to the rest of the sentence.  So, the Court shall order the

14  appointment of an examiner to conduct such an investigation

15  of the debtor as is appropriate if the financial criteria are

16  met.  The problem isn't so much shall, it's that if and

17  whether if means, you know, if the financial criteria are met

18  you have to appoint an examiner.  Well, if you read it that

19  way, the first part of the sentence doesn't make any sense.

20  So I think you have to read it as a whole, and I think - I

21  have tons of respect for Judge Fitzgerald, but I think, you

22  know, appointing an examiner and then giving that examiner no

23  budget and no duties is tantamount to not appointing an

24  examiner, and having one ready to go, I mean, the process of

25  appointing an examiner is not particularly onerous, it

 1  doesn't take a ton of time.  So - and I'm sensitive to this
 2  issue and I know the Office of the United States Trustee is
 3  sensitive, and I understand their position in connection with
 4  shall meaning shall, and I think that's true, but I think in
 5  order for - I would draw a bit of a distinction between what
 6  Judge Walsh and Judge Balick have appeared to rule which is
 7  simply that it's a best interest test.  I don't think that's
 8  correct.  The best interest is in ©)(1).  It's not in ©)(2).
 9  I think the financial criteria are important, and obviously,
10  they're met in this case, but that's only one piece of the
11  puzzle, and the other piece of the puzzle is that there has
12  to be an investigation to perform that's appropriate.  I
13  think the cases cited in the <u>Colliers</u> treatise discuss that.
14  I think that's a more nuance approach than sort of saying it
15  is what it is, and if you cry "examiner" in a crowded case,
16  you get one.  In this case, reading the motion carefully, I
17  really didn't see a request for any investigation.  There was
18  a complaint about practices.  A 2004 request for information
19  about individual loan files that we've already discussed, but
20  no real articulation of what it was that the movants wanted
21  to be investigated by an examiner, and even if one were to
22  sort of assume, okay, they want someone to examine the
23  debtors' practices in connection with loan origination and
24  servicing that may be violations of state or federal law, I
25  don't think that at this time giving someone sort of carte

**A624**

1    blanche to look into that issue will be appropriate.  Again,

2    the Committee is extremely involved in this case.  There are

3    ongoing investigations, possibly by other governmental

4    entities.  There's obviously a lot of issues going on in

5    Congress right now in connection with these types of

6    practices that allegedly the debtor participated in, so I'm

7    not - I don't think in this case there would be anything to

8    be gained by appointing an examiner and giving that examiner

9    a budget and saying, I'd like you to investigate the debtors'

10   loan origination and servicing policies in connection with

11   whether it may have violated state or federal law.  I think

12   that's asking for a $20 million report, and I'm not sure what

13   it would accomplish.  So, with regard to the temporal

14   requirement, again, I'm not - I understand there are those

15   cases.  I think it would be more appropriate to deny the

16   motion without prejudice than to sort of say, Okay, I'm

17   granting the motion, but I'm not at this point going to

18   appoint an examiner.  Again, I think that's just tantamount

19   to denying the motion.  So, I'm going to do that.  I'm going

20   to deny the motion without prejudice to be brought again if

21   new facts arise or if the status of the case changes.  And

22   just an aside, I mean, I don't know what this case ultimately

23   ends up with, whether we end up in with a liquidating plan,

24   whether we convert to 7.  I mean, I know - I'm sure there are

25   discussions that I'm very happy to not be participating in

**A625**

1   that may be focused on that, but my instincts tell me that to

2   the extent there's some real issues out here, that they are

3   going to be investigated by somebody in the future, and if

4   turns out that that's not the case, I'm certainly open to

5   hearing someone ask me to appoint someone to do that on

6   behalf of the debtors' estate at the appropriate time.  All

7   right?  Are there any other issues?  I'm going to - So, I

8   think we've addressed the issues raised by - Oh, there was

9   the issue of the injunction.  I think that's very easily

10  dealt with.  You can't get an injunction by filing a motion.

11  I've said it many times before.  You have to file an

12  adversary proceeding under Rule 7001, and you need to meet

13  the criteria to get an injunction and you have to support it

14  by evidence, and without that, I'll deny that.  So I'm going

15  to deny - For the foregoing reasons, I'm going to deny all

16  three motions, and I'd ask the debtors to submit a form of

17  order, please, under certification of counsel.

18        MR. BRADY: Your Honor, we will prepare forms of

19  order for each motion.

20        THE COURT: I think that turns me to cash

21  collateral.  I don't have those papers.  I know they came

22  over yesterday in connection with the motion to shorten,

23  which I granted, but I didn't actually save them, so -

24        MR. WAITE: Your Honor, I can hand up - I have a

25  copy of the motion and a copy of the order; is that helpful

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of          )
                          )
SA TELECOMMUNICATIONS, INC.,  )
et al.,                   ) Case Nos. 97-2395
                          ) through 97-2401(PJW)
            Debtors.      )


                    U.S. Bankruptcy Court
                    Sixth Floor
                    824 Market Street
                    Wilmington, Delaware


                    Friday, March 27, 1998
                    1:00 p.m.


BEFORE: HONORABLE PETER J. WALSH
        United States Bankruptcy Judge


              WILCOX & FETZER
    1330 King Street - Wilmington Delaware   19801
              (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL



A627

1  these debtors, then how do you know if you need more

2  than one.   The answer is you don't.   You put an

3  examiner in there, you get the information you need,

4  you get an independent report, versus three different

5  stacks of discovery, that you can work off of.

6           And even if Your Honor concludes that

7  you can only appoint an examiner in the case of SA

8  Tel, if you for some reason, take their representation

9  that this debt only relates to SA Tel, well, then,

10  wouldn't it be efficient to, since the same issues

11  relate to all the other estates, since the same issues

12  are going to relate to the proposal of the plan, to

13  let the examiner examine all of the books and records,

14  finances of those related entities?

15           THE COURT:   Well, first of all, I'm

16  going to point out that this Court has for years

17  consistently viewed 1104(c)(2) as not being a

18  mandatory provision.   So we're only talking about

19  whether it's in the interests of the creditors and any

20  equity holders and the interests of the estate to

21  appoint an examiner.   I assume that nobody challenges

22  the proposition that there's no value for equity here,

23  so that interest is --

24           MR. ASTIN:   I would ask Your Honor to



1   consider the Revco case.  But if Your Honor knows the

2   court's position, I will acknowledge that there are

3   other cases out there that think "shall" doesn't mean

4   shall.  The U.S. Trustee believes it does and I think

5   Revco and the Morganstern case is right on point.

6          THE COURT:  My view doesn't turn on the

7   word "shall" and I've ruled a number of times to this

8   effect, Judge Balick has, and I think I'm not going to

9   change this Court's view of that section.

10         MR. ASTIN:  So if you look at the best

11   interests of the creditors I will acknowledge that

12   everyone here today is going to argue that their

13   interests are best served by the stipulation.  But, of

14   course -- the answer is of course.  Not everybody in

15   this room represents all of the interests in this

16   case.

17         The Committee I think will acknowledge

18   that you can't -- the Court shouldn't consider the

19   vote of the Committee to be representative of the

20   large body of creditors out there because it's

21   lopsided.  If it wasn't, then committee counsel long

22   ago and far away between November, when this case was

23   filed, and this hearing would have looked at the issue

24   of substantive consolidation.  The bottom line is,

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of                )
                                )
WEBCRAFT TECHNOLOGIES,          )  Case No. 93-1210
INC., et al.,                   )
                                )
            Debtor.             )


                           Bankruptcy Courtroom
                           Room two - Fourth Floor
                           U. S. Courthouse
                           844 King Street
                           Wilmington, Delaware


                           Thursday, November 4, 1993
                           11:55 a.m.


BEFORE: HONORABLE HELEN S. BALICK,
        United States Bankruptcy Judge


                    WILCOX & FETZER
        1330 King Street - Wilmington Delaware  19801
                     (302) 655-0477

─────── Wilcox & Fetzer ───────
Registered Professional Reporters

COPY

1   in his opening today, the management plan, you know,

2   everything else, he has been through inceptions with

3   Mr. Cochill, with Mr. Gardner, with Mr. Kane.  He's

4   asked him everything he's had to ask about that.

5   There is documents about them which he now has that

6   were disclosed in the disclosure statement.  So I am

7   forced to conclude, frankly, with all due respect,

8   that New York Life's sole purpose is not to have an

9   examination.  They know everything already.

10          Their sole purpose has to be to delay

11  this proceeding and to injure the company.  Having

12  contractually agreed to take a very deeply

13  subordinated position in this company, it is now

14  unhappy with the deal it has cut.  The subordination

15  provisions are such that New York Life has no

16  financial statement in Webcraft at this point.  I

17  think the point has been made that there would have

18  to be, you know, the issue was raised, you know,

19  claims against other creditors.  There would have to

20  be a recovery against another creditor of over 130,

21  150 million dollars before New York Life would see a

22  nickel out of that recovery.  That's more than the

23  value of the entire company.

24          On a growing concern basis, we had

*Wilcox & Fetzer*
*Registered Professional Reporters*

A631

1    the confirmation and to the process that the parties

2    in interest are pursuing in attempting to

3    restructure this company.

4             New York Life has told us already that

5    they are not seeking to do dwell the process.  I

6    think that it will become very clear that the

7    appointment of an examiner will have very distinct

8    and harmful effect and potentially derail the

9    process.  I think, Your Honor, that reduced to its

10   barest elements, New York Life is seeking to have

11   these estates and the creditors and the people who

12   have the real financial interest in these cases,

13   take the financial burden in conducting New York

14   Life's witch-hunt.  I think that that is clearly

15   inequitable and should not be counted in spite of

16   this count.  Thank you, Your Honor.

17            JUDGE BALICK:  Do you have a witness?

18            MR. SANTORO:  No, Your Honor.  We will

19   point out the disclosure statement is sufficient for

20   the request that we are making.  I would encourage

21   the Court to read the motion and specifically --

22            JUDGE BALICK:  I have read the motion.

23            Has New York Life rested their

24   motion?

*Wilcox & Fetzer*
*Registered Professional Reporters*

44

1    record.   I submit that nearly every statement he

2    just made is, in fact, not supported by the

3    disclosure statement.   Even the disclosure statement

4    indicates to the contrary.

5            JUDGE BALICK:   I have a motion to

6    dismiss New York Life Insurance Company and New York

7    Life Insurance Annuity Corporations motion for an

8    order directing the United States Trustee to appoint

9    an examiner in the Webcraft cases.   I understand New

10   York Life's response to that motion to rest on the

11   fact of the language of 1104(b)(2), which suggests

12   the mandatory appointment of an examiner, period.   I

13   do not read the statute in that sense.   I read the

14   statute as it begins following subsection (b).   And

15   there has been a reference to different parts of

16   subsection (b) and not its entirety.   But it is

17   obviously necessary to consider the appointment of

18   an examiner if appropriate.

19           The motion to dismiss is granted.   New

20   York Life has not presented any information or any

21   evidence which satisfies its burden.

22           Now, are you going to draft me an

23   order?

24           MS. JONES:   I will, Your Honor.

```
 1

 2                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 3

 4     IN RE:                        .        Chapter 11

 5     ACandS, Inc,                  .

 6           Debtor.                 .    Bankruptcy #02-12687 (RJN)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                                 Wilmington, DE
 8                             November 18, 2002
                                  10:05 a.m.
 9

10                            TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE RANDALL J. NEWSOME
11                    UNITED STATES BANKRUPTCY JUDGE

12     APPEARANCES:

13     For Debtor:                        Laura Davis Jones, Esq.
                                          Pachulski., Stang, Ziehl,
14                                        Young & Jones
                                          919 North Market Street
15                                        Wilmington, DE 19801

16                                        Alan J. Kornfeld, Esq.
                                          Pachulski, Stang, Ziehl,
17                                        Young & Jones
                                          919 North Market Street
18                                        Wilmington, DE 19801

19                                        Beth Levine, Esq.
                                          Pachulski, Stang, Ziehl,
20                                        Young & Jones
                                          919 North Market Street
21                                        Wilmington, DE 19801

22

23

24

25
```

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191



2

```
1                                    David Killalea, Esq.
                                     Gilbert, Heinz & Randolph
2                                    Ste  700
                                     1100 New York Ave., N.W.
3                                    Washington, DC 20005

4                                    Jerome Randolph, Esq.
                                     Gilbert Heinz & Randolph
5                                    200 E. Randolph Drive
                                     Chicago, IL 60601
6
      For Traveler's Casualty:       Barry R. Ostrager, Esq.
7     & Surety Company               Simpson, Thacher & Bartlett
                                     425 Lexington Ave.
8                                    New York, NY 10017

9                                    Mary Beth Forshaw, Esq.
                                     Simpson, Thacher & Bartlett
10                                   425 Lexington Ave.
                                     New York. NY 10017
11
                                     Bryce Friedman, Esq.
12                                   Simpson, Thacher & Bartlett
                                     425 Lexington Ave.
13                                   New York, NY 10017

14                                   Eric Schwartz, Esq.
                                     Morris, Nichols, Arsht
15                                   Tunnell
                                     1201 N. Market St.
16                                   Wilmington, DE 13899

17    For Asbestos Plaintiffs:       Nancy W. Davis, Esq.
                                     Ness, Motley, PA
18                                   28 Bridgeside Blvd.
                                     Mt. Pleasant, SC 29464
19
      For Asbestos Claimants:        Marla Eskin, Esq.
20    Committee                      Campbell & Levine, LLC
                                     1201 North Market St.-Ste. 1501
21                                   Wilmington, DE 19801

22                                   Philip E. Milch, Esq.
                                     Campbell & Levine, LLC
23                                   1700 Grant Building
                                     310 Grant Street
24                                   Pittsburgh, PA 15219

25
```

3

```
1    For IREX Corporation:          Kevin Gross, Esq.
                                    Rosenthal Monhait, Gross
2                                   & Goddess. PA
                                    919 Market Street-Ste. 1401
3                                   Wilmington, DE 19899

4                                   David Critchlow, Esq.
                                    Pillsbury, Winthrop, LLP
5                                   One Battery Park Plaza
                                    New York, NY 10004
6
                                    Richard L. Epling, Esq.
7                                   Pillsbury, Winthrop, LLP
                                    One Battery Park Plaza
8                                   New York, NY 10004

9    For U.S. Trustee:             Frank J. Perch, III, Esq.
                                    Office of U.S. Trustee
10                                  844 King Street-Ste. 2313
                                    Lock BOX 35
11                                  Wilmington, DE 19801

12   Audio Operator:               Sherry A. Johnson

13   Transcribing Firm:            Writer's Cramp, Inc.
                                    6 Norton Rd.
14                                  Monmouth Jct., NJ 08852
                                    732-329-0191
15
     Proceedings recorded by electronic sound recording, transcript
16   produced by transcription service.

17

18

19

20

21

22

23

24

25
```

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191

1  Indeed, the Committee represents all Unsecured Creditors in

2  this case.   The unsecured general trade debt is nominal, and

3  as the Court has noted no separate Committee has been

4  appointed.   To appoint an Examiner with the broad powers that

5  Traveler's seeks would be to reward Traveler's in a way that

6  neither the plain language of the Code or its intent require,

7  and allow Traveler's to use this statute to manipulate the

8  process to further its goal to delay if not defeat its own day

9  of reckoning.   Thank you.

10       MR. OSTRAGER:  Sixty seconds, Your Honor?

11       THE COURT: No.   We'll stand in recess for a few

12  minutes.

13       (Recess)

14       THE CLERK:   All rise.

15       THE COURT:   All right.   I'm prepared to rule on the

16  matter before me.   This Chapter 11 case is before the Court

17  pursuant to a Motion to Appoint an Examiner filed by

18  Traveler's casualty & Insurance company pursuant to Section

19  1104(C) of the Bankruptcy Code.   That statute states in

20  pertinent part as follows.   "If the Court does not order the

21  appointment of a Trustee under this Section, then at any time

22  before the confirmation of a plan, and on request of a Party-

23  In-Interest or the United States Trustee, and after notice and

24  a hearing, the Court shall order the appointment of an

25  Examiner to conduct such an investigation of the Debtor as is

appropriate, including an investigation of any allegations of
fraud, dishonesty, et cetera and so forth."

The facts before the Court are as follows.  A number of
transactions have been discussed by way of testimony here
today that raise red flags under the avoiding powers of the
Trustee, Sections 544 through 550.  Those transactions,
however, have been investigated first by forensic accountant
hired by the pre-petition Committee in this case to
investigate IREX and presumably the SPI spin, as well as the
2001 sale to Lancaster Acquisition of ACandS, or the ACandS
assets .  The transactions have been investigated quite
obviously by Traveler's in quite extensive detail.  They've
taken depositions.  They've taken depositions in the course of
this proceeding as well,  The Traveler's now asks that another
investigation take place, even though they have said that the
evidence is irrefutable that certain transactions that
occurred were either fraudulent transfers and/or preferences.
An Examiner investigating these transactions would almost
certainly need the assistance of an attorney, and probably the
assistance of an accountant if not a financial advisor and an
accountant.  In the meantime, the Creditors' Committee in this
case has taken the quite clear position that they intend to
investigate these transactions as well, thus making
potentially four different investigations on the very same
sets of transactions.  This would appear to the Court to be

1  utter and complete waste of money as well as time, and

2  completely contrary to the best interest, as far as I can

3  tell, of the Creditor community as a whole who do not, other

4  than  Traveler's, support this motion, as well as a waste of

5  the  Debtor's meager assets.

6       The statute, as the In Re: pevco DSE case at 898 F. 2nd.

7  498, 6th Circuit (1990) does require where there is more than

8  $5,000,000 of debt the appointment of an Examiner. To that

9  extent the motion is granted.  However, it is further ordered

10  that the Examiner appointed by the U.S. Trustee is not to

11  perform any task or take up any duty or in any way perform any

12  work without further order of the Court.  That order is to

13  ensure that the Committee is allowed to proceed with its

14  investigation, that the coverage action where the real stakes

15  in this case lie is permitted to proceed, and that those

16  matters be completed before putting yet another cop on the

17  beat in this case.  So if the U.S. Trustee can find someone to

18  accept the appointment under those circumstances, I will sign

19  an Order.  But only under those circumstances.  That does in

20  fact appoint an Examiner.  That's my disposition of this.

21  Anybody have any questions?

22         MR. PERCH:  Yes, Your Honor.

23         THE COURT:  Okay, Mr. Perch.

24       MR. PERCH:  Good afternoon, Your Honor.  Frank Perch

25  for the United States Trustee.  Your Honor, the U.S. Trustee

1   is required in the statute to appoint an Examiner if the Court
2   directs one to be appointed.  And we will, of course, consult
3   with all of the interested parties who wish to provide input
4   regarding the appointment of the Examiner, as the statute
5   requires.  I would like to inquire of the Court, because it
6   may be of assistance to the u.s. Trustee in this process,
7   whether with respect to the Court's ruling that the Examiner
8   is not permitted to perform any further duties until further
9   order of the Court, would the Court entertain a petition from
10  the Examiner who is appointed seeking leave to be authorized
11  to perform such tasks?  Or would the Court only hear from
12  other parties with respect to authorizing the Examiner to do
13  something?

14          THE COURT:  I would be most -- especially now, at
15  this point, I -- when I say they're not authorized to do
16  anything, I mean anything other than get appointed.  That's
17  all that this person is going to do.  It is as though they
18  were just like the old days of having a stand-by Chapter 11
19  Trustee under old XI.  This will be a stand-by Examiner who
20  Hill not begin to function until the Court orders him to.
21  There is not going to be one penny of fees that is spent by
22  this Examiner of any kind.  So does that answer your question?

23          MR. PERCH:  I understand the Court's position, Your
24  Honor.  Yes, thank you.

25          THE COURT:  And I don't anticipate that the Examiner

133

1  take an active role in this until such time as the passage of

2  time has occurred to allow an investigation by the Committee

3  to go forward, as well as Traveler's who frankly is

4  represented by this Creditors' Committee is free to pursue its

5  own investigation, as I think it's entitled to do under

6  applicable rules, and to cooperate with the Committee in their

7  investigation.  Until that has occurred, the Examiner may make

8  a motion to proceed, but it's not likely to be granted.

9          MR. PERCH:   Thank you, Your Honor.

10         THE COURT:   NOW, is there anything further to come

11  before the Court today?

12         MS. JONES:   No, Sir, there is not.

13         THE COURT:  All right.   Let's see if I've forgotten

14  any housekeeping items of my own.   I probably have but they're

15  probably not very important either way.   We'll stand adjourned

16  today.

17      (Court adjourned)

18

19                  CERTIFICATION
    I certify that the foregoing is a correct transcript from the
20  electronic sound recording of the proceedings in the above-
    entitled matter.

21

22  _____           11-26-02
    Signature of Transcriber          Date

23

24

25

1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                     .   Chapter 11
3      IN RE:                        .
                                     .   Case No. 20-12836 (JTD)
4      CRED INC., *et al.,*          .
                                     .   Courtroom No. 5
5                                    .   824 North Market Street
                                     .   Wilmington, Delaware 19801
6                                    .
                                     .
7                    Debtors.        .   December 18, 2020
       . . . . . . . . . . . . . . . .   9:30 A.M.
8
9             TRANSCRIPT OF TELEPHONIC SECOND DAY HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11     TELEPHONIC APPEARANCES:

12     For the Debtors:        Scott Cousins, Esquire
                               COUSINS LAW LLC
13                             Brandywine Plaza West
                               1521 Concord Pike, Suite 301
14                             Wilmington, Delaware 19803

15                             - and -

16                             James Grogan, Esquire
                               Mack Wilson, Esquire
17                             PAUL HASTINGS LLP
                               600 Travis Street, Fifty-Eight Floor
18                             Houston, Texas 77002

19
       Audio Operator:        Jason Spencer
20
       Transcription Company: Reliable
21                             1007 N. Orange Street
                               Wilmington, Delaware 19801
22                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
23
       Proceedings recorded by electronic sound recording, transcript
24     produced by transcription service.

25

**A642**

```
 1   TELEPHONIC APPEARANCES (Continued):

 2   For the Debtors:          G. Alexander Bongartz, Esquire
                               Derek Cash, Esquire
 3                             PAUL HASTINGS LLP
                               200 Park Avenue
 4                             New York, New York 10166

 5                             - and -

 6                             Austin Prouty, Esquire
 7                             PAUL HASTINGS LLP
                               1117 S. California Avenue
 8                             Palo Alto, California 94304

 9   For Jaime Shiller:        David Silver, Esquire
                               SILVER MILLER
10                             11780 W Sample Road
                               Coral Springs, Florida 33065
11
     For the U.S. Trustee:     Hannah McCollum, Esquire
12                             Joseph McMahon, Jr., Esquire
                               John Schanne, Esquire
13                             UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
14                             844 King Street, Suite 2207
                               Lock Box 35
15                             Wilmington, Delaware 19801
16
     For UpgradeYa:            Matthew Pierce, Esquire
17                             LANDIS, RATH & COBB LLP
                               919 Market Street, Suite 1800
18                             Wilmington, Delaware 19801

19   For Krzysztof Majdak,     Joseph Sarachek, Esquire
20   and Philippe Godineau:    THE SARACHEK LAW FIRM
                               101 Park Avenue, 27th Floor
21                             New York, New York 10178

22   For the Committee:        Joseph Evans, Esquire
                               Timothy Walsh, Esquire
23                             Darren Azman, Esquire
                               MCDERMOTT WILL & EMERY LLP
24                             340 Madison Avenue
                               New York, New York 10173
25
```

**A643**

1  TELEPHONIC APPEARANCES (Continued):

2  For Thomas Arehart:        Hollace Cohen, Esquire
                              Carl Neff, Esquire
3                             FISHERBROYLES LLP
                              445 Park Avenue, Ninth Floor
4                             New York, New York 10022

5
   For Maple Partners LLC:    Lucian Murley, Esquire
6                             SAUL EWING ARNSTEIN & LEHR LLP
                              1201 North Market Street, Suite 2300
7                             Wilmington, Delaware 19801

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            And four, the benefits derived by the appointment

2    of a trustee, balanced against the costs of that appointment.

3            See In Re Reserves Resorts Spa and Country Club,

4    LLC, Case Number 12-13316, nineteen -- a 2013 decision by

5    Judge Gross.

6            The evidence presented was that -- the evidence

7    presented before me in this case raises serious questions

8    about the conduct of the debtors' affairs pre-petition.

9    However, the debtor has removed the pre-petition management

10   of the company and replaced them with independent

11   professionals, including an independent member of the board

12   and the only board member, Mr. Lyons, having heard -- and

13   appointed Mr. Lyons as the only board member.

14           Having heard the testimony of Mr. Lyons and the

15   other professionals retained to run the debtors and market

16   the company for sale, I am convinced of their independence.

17   Although retained initially by prior management and equity

18   holders, no evidence was established to question that they

19   are, indeed, independent.  Moreover, the Official Committee

20   of Unsecured Creditors appointed in these cases have entered

21   into a plan support agreement setting out a valid proposal

22   for moving these cases forward.

23           Certain creditors and the U.S. Trustee, however,

24   still express reservations about allowing these independent

25   professionals to conduct the debtors' affairs, as they move

1    forward with a proposed plan.  I disagree with those

2    concerns.

3              However, I want to be perfectly clear that, if the

4    two equity security holders take any actions to either

5    replace Mr. Lyons as the independent director or try to

6    dilute his control of the board by appointing additional

7    members of the board without first seeking permission from

8    the Court, I will immediate appoint a Chapter 11 Trustee.

9    Therefore, for these reasons, I find that it would be

10   inappropriate at this time to appoint a Chapter 11 Trustee.

11             As for the appointment of an examiner, this is a

12   more difficult question.  I disagree with the UST's position

13   that the appointment of a -- of an examiner is mandatory.

14   The language of -- the language of 1104(c) provides the Court

15   with some discretion.  The Court -- it says that the Court

16   shall appoint an examiner to conduct such an investigation if

17   the -- of the debtor as is appropriate.  So the question

18   becomes:  Is it appropriate in this case?

19             The creditors' committee has taken the position

20   that they are conducting an investigation, although I will

21   note that they have just been appointed, and any

22   investigation must be in its very early stages of this case.

23   I'm also mindful of the fact that the -- some of the

24   creditors of the company are distrustful of the situation and

25   have concerns about the conduct of the previous management of

98

1   this company.

2           Therefore, I'm going to agree with Judge Glenn in

3   In Re Residential Capital, LLC, 474 B.R. 112, 119-120

4   (S.D.N.Y. 2012), in which he recognized that, quote:

5           "The only dispute as to whether the creditors'

6   committee should be permitted to conduct an investigation

7   without an examiner being appointment" --

8           The creditors' committee is ably represented in

9   these cases and no party questions the creditors' committee's

10  professionals' ability to competently and expeditiously

11  complete an investigation.  Nonetheless, Judge Glenn

12  determined in that case that appointment of an examiner was

13  appropriate, and I will do the same here.  I think

14  appointment of an examiner to conduct an investigation of the

15  pre-petition conduct of the debtors is appropriate.

16          And therefore, I will enter an order requiring

17  that that be done.  The parties should confer and submit an

18  appropriate form of order.

19          And in the form of order, I want to make clear, I

20  do not want any duplication of effort.  Since I'm appointing

21  an examiner to conduct an investigation, there's no need for

22  the creditors' committee to conduct a parallel investigation.

23  So I would not approve any fees associated with the

24  creditors' committee conducting that investigation.

25          Are there any questions?

1          (No verbal response)

2                  THE COURT:  All right.  Let's move on to the rest

3  of the agenda.  What's next up, Mr. Cousins?

4                  UNIDENTIFIED:  Your Honor --

5                  MR. COUSINS:  Good afternoon, Your Honor --

6                  THE COURT:  Go ahead, Mr. Cousins.

7                  UNIDENTIFIED:  Your Honor --

8                  THE COURT:  I hear "Your Honor."  Use the raise

9  your hand, so I can know who's talking.  I can't -- I've got

10  a screen full of faces here, I don't know who's talking.

11  Nobody.  Okay.

12                  Back to you, Mr. Cousins.  Go ahead.

13                  MR. COUSINS:  Thank you, Your Honor.  Good

14  afternoon.  Scott Cousins on behalf of the debtors.

15                  I do have one update I wanted to inform the Court

16  because I know we've taken up a lot of time.  We've conferred

17  with UpgradeYa about their motion, which is I think the

18  second-to-last item on the agenda.  They have agreed to

19  adjourn their motion, the debtor doesn't object.

20                  The next hearing we have is in connection with --

21  excuse me -- the adversary that we filed against James

22  Alexander and Alexander's motion to dismiss the case on

23  January 6th.  So, with the Court's permission, the debtors

24  would be comfortable, along with UpgradeYa, to move that

25  motion to January 6th.